## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-3155

BROOKE SLUSSER,
ALYSSA SUGAI,
ELLE PATTERSON,
MELISSA BATIE-SMOOSE,
ALEAH LIILII,
NICANORA CLARKE,
KAYLIE RAY,
MACEY BOGGS,
SIERRA GRIZZLE,
JORDAN SANDY,
KATELYN VAN KIRK, and
KIERSTEN VAN KIRK,

       Plaintiffs,

v.

THE MOUNTAIN WEST CONFERENCE,
GLORIA NEVAREZ, in her official capacity as the Commissioner of The Mountain West Conference,
BOARD OF TRUSTEES OF THE CALIFORNIA STATE UNIVERSITY,
LAURA ALEXANDER, in her individual capacity and in her official capacity as the Senior Associate Athletic Director for Student-Athlete Wellness and Leadership Development at San Jose State University,
TODD KRESS, in his individual capacity and official capacity as the head coach of the San Jose State University Women's Volleyball Team, and
MICHELLE MCDONALD SMITH, in her individual capacity and in her official capacity as the Senior Director of Media Relations at San Jose State University,

       Defendants.

---

## COMPLAINT FOR DAMAGES, DECLARATORY,
## AND INJUNCTIVE RELIEF

---

Plaintiffs Brooke Slusser, Alyssa Sugai, Elle Patterson, Melissa Batie-Smoose, Aleah ("Sia") Liilii, Nicanora Clarke, Kaylie Ray, Macey Boggs, Sierra Grizzle, Jordan Sandy, Katelyn Van Kirk and Kiersten Van Kirk (collectively the "Plaintiffs") by and through their counsel, for

their Complaint against Defendants The Mountain West Conference ("MWC"), Gloria Nevarez, Commissioner of the MWC, Board of Trustees of the University of the California State University ("CSU Board"), Laura Alexander, Todd Kress, Michelle McDonald Smith and Cynthia Teniente-Matson, President of San Jose State University ("SJSU") (collectively the "Defendants"), under the First and Fourteenth Amendments to the United States Constitution, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*., 28 U.S.C. § 1983, and the Declaratory Judgments Act, seeking damages, declaratory, injunctive, and other necessary and proper relief, <u>including emergency injunctive relief in advance of the MWC women's volleyball tournament to take place in Las Vegas, Nevada commencing on November 27, 2024</u>[1] state:

## I.    INTRODUCTION

1.    There is a robust national debate regarding the topic of transgender identifying males competing against girls and women in sport.

2.    A Gallup poll conducted in June 2023 indicated that 69% of Americans believe that men[2] should not play on women's sports teams.[3]

---

[1] In advance of this filing, Plaintiffs have communicated with legal counsel for the two Defendants against whom emergency relief will be sought (*i.e.*, MWC and the CSU Board) and are attempting to effectuate a resolution of matters related to the MWC conference tournament without the need to file a motion for emergency relief. In the event such relief is not available by agreement within a short time frame, a motion for emergency relief will be filed.

[2] "Sex" "Male" "Female" "Man" and "Woman" used in this Complaint refer solely to binary, biological sex and not a person's "gender identity." *See Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022) (Title IX defines "sex" "based on biology and reproductive function."); *Black's Law Dictionary* (5th ed. 1979) ("**Sex.** The sum of the peculiarities of structure and function that distinguish a male from a female organism[.]"); *see also Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 655 (2020) ("sex" in the Civil Rights Act of 1964 "refer[s] only to biological distinctions between male and female").

[3] *See* https://news.gallup.com/poll/507023/say-birth-gender-dictate-sports-participation.aspx ("A larger majority of Americans now (69%) than in 2021 (62%) say transgender athletes should only be allowed to compete on sports teams that conform with their birth gender. Likewise, fewer endorse transgender athletes being able to play on teams that match their current gender identity, 26%, down from 34%.").

3. The U.N. Special Rapporteur on Violence Against Women and Girls has recently reported that U.S. policies, such as those of the National Collegiate Athletic Association (NCAA) and the MWC that permit men to play on women's sports teams harm women, are inconsistent with the United States' international treaty obligations, and that collectively such rules have around the globe resulted in the loss of nearly 900 medals and podium placements by women.[4]

4. Despite vast public support for protecting women's opportunities and safety in sport by excluding men from women's teams, the NCAA, MWC, SJSU and other public colleges and universities have engaged in a purposeful and illegal assault on the rights of women athletes.

5. Recently, the MWC, SJSU, and the other Defendants have collectively manipulated MWC rules, diminished sport opportunities for women, spread inaccurate information, used their positions to chill and suppress speech with which they disagree, and punished dozens of female collegiate volleyball student-athletes for taking a public stand for their right to compete in a separate sports category, all in a concerted effort to stamp out debate over women's rights in sport.

6. Absent prompt court intervention the MWC's unlawful actions will adversely impact the rights of women student-athletes in the upcoming MWC women's volleyball championship tournament to be held in Las Vegas, Nevada on November 27-30, 2024, at which a bid to the NCAA women's volleyball national championship tournament will be awarded.

7. As Defendants' actions violate federal law, including the First and Fourteenth Amendments to the U.S. Constitution and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* and its implementing regulations ("Title IX"), Plaintiffs are entitled to preliminary and permanent injunctive relief. Plaintiffs are further entitled to permanent declaratory relief, damages, and other appropriate relief.

---

[4] *See* https://documents.un.org/doc/undoc/gen/n24/249/94/pdf/n2424994.pdf.

## II.     JURISDICTION

8.      This action arises under 42 U.S.C. §§ 1981 and 1983, the First and Fourteenth Amendments to the United States Constitution and Title IX.

9.      This Court therefore has jurisdiction over the federal claims by operation of 28 U.S.C. §§ 1331 and 1343.

10.      The Court also has supplemental jurisdiction over all state law claims. 28 U.S.C. § 1367.

11.      This Court has personal jurisdiction over persons and entities who reside and whose principal place of business is outside this district because each of these persons and entities has established minimum contacts with this district and Plaintiffs' claims arise out of or relate to the Defendants' forum-related activities. Minimum contacts have further been established through Defendants' purposeful participation in the MWC, a Colorado nonprofit corporation, and in MWC athletics programs, including, but not limited to, participating in women's volleyball matches, including those played in this district at Colorado State University and at the U.S. Air Force Academy during the 2022, 2023, and 2024 women's volleyball seasons, participating in other conduct in this district and carrying out the instructions, directions and policies of the MWC and participating in the governance of the MWC.

12.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the MWC's principal place of business is located in Colorado Springs, Colorado in this district, all Defendants are either institutional members of or participate in the MWC, and many of the acts described in this Complaint occurred in and originated from this district.

13.      This Court has authority to grant the requested injunctive relief under 28 U.S.C. § 1343; the requested declaratory relief under 28 U.S.C. §§ 2201 and 2202.

14.    This Court has authority to award costs, attorneys' fees and expert witness fees under 42 U.S.C. § 1988(b) and (c).

### III.    PARTIES

15.    Plaintiff **Brooke Slusser** is a student of San Jose State University and a member and team co-captain of the SJSU women's volleyball team, which competes in the MWC.

16.    Plaintiff **Alyssa Sugai** is a former student of San Jose State University and was a member of the SJSU women's volleyball team during 2022, which competed in the MWC.

17.    Plaintiff **Elle Patterson** is a former student of San Jose State University and was a member of the SJSU women's volleyball team during 2023, which competed in the MWC.

18.    Plaintiff **Sia Liilii** is a student of the University of Nevada, Reno and a member and team co-captain of the Nevada, Reno women's volleyball team, which plays in the MWC.

19.    Plaintiff **Nicanora Clarke** is a student of the University of Nevada, Reno and a member of the Nevada, Reno women's volleyball team, which plays in the MWC.

20.    Plaintiff **Kaylie Ray** is a student of Utah State University and a member and team co-captain of the Utah State University women's volleyball team, which plays in the MWC.

21.    Plaintiff **Macey Boggs** is a student of the University of Wyoming women's volleyball team, which plays in the MWC.

22.    Plaintiff **Sierra Grizzle** is a student of the University of Wyoming women's volleyball team, which plays in the MWC.

23.    Plaintiff **Jordan Sandy** is a student of the University of Wyoming women's volleyball team, which plays in the MWC.

24.    Plaintiff **Katelyn Van Kirk** is a student of Boise State University women's volleyball team, which plays in the MWC.

25.    Plaintiff **Kiersten Van Kirk** is a student of Boise State University women's volleyball team, which plays in the MWC.

26.    Plaintiff **Melissa Batie-Smoose** is the Associate Head Coach of the San Jose State University women's volleyball team, which plays in the MWC.

27.    Defendant **The Mountain West Conference** ("MWC") is a Colorado nonprofit corporation that has its headquarters and principal place of business in Colorado Springs, Colorado.

28.    Defendant **Gloria Nevarez** is the Commissioner of the MWC, employed by the MWC through her employment contract.[5]

29.    San Jose State University ("SJSU") is a public, federally funded, educational institution within the County of Santa Clara in the State of California that receives federal financial assistance. It is one of many campuses that are part of the California State University system ("CSU"), which is a public university system headquartered in Long Beach, California. CSU is federally funded and chartered by the State of California.[6]

30.    Defendant **Board of Trustees of the California State University** ("CSU Board") is a California corporation that governs the California State University, including SJSU. It is the only proper entity to be named in a civil suit brought against an institution within the California State University system.

31.    Defendant **Laura Alexander** is the Senior Associate Athletic Director for Student-Athlete Wellness and Leadership Development of SJSU. On information and belief, she is an employee of the California State University system.

---

[5] *Bylaws of the Mountain West Conference (MWC Bylaws)*, 4.02, *available at* https://storage.googleapis.com/themw-com/2024/09/9e6b0e71-conference-bylaws.pdf

[6] SJSU is not a named Defendant in this action as the CSU Board is being sued for the conduct attributable to SJSU.

32.     Defendant **Michelle McDonald Smith** is the Senior Director of Media Relations of SJSU. On information and belief, she is an employee of the California State University system.

33.     Defendant **Todd Kress** is the Head Coach of the SJSU Women's Volleyball Team ("SJSU Team"). On information and belief, he is an employee of the California State University system.

## IV.    GENERAL ALLEGATIONS

### A.    The Mountain West Conference

34.     The MWC is a NCAA Division I collegiate athletic conference formed in 1999.[7]

### 1.    Conference Members

35.     The members of the MWC for the 2024–25 academic year are the United States Air Force Academy, Boise State University, Colorado State University, Colorado College (women's soccer only), Fresno State University, University of Hawai'i (football only), University of Nevada, Reno, University of New Mexico, San Diego State University, San Jose State University, University of Nevada Las Vegas, Utah State University, Washington State University (women's swimming and baseball only), and Wyoming University.

36.     The members of the MWC for the 2024–25 academic year that participate in women's volleyball are the United States Air Force Academy, Boise State University, Colorado State University, Fresno State University, University of Nevada, Reno, University of New Mexico, San Diego State University, San Jose State University, University of Nevada Las Vegas, Utah State University, and Wyoming University.

---

[7] *See generally Mountain West Chronology*, *available at* https://themw.com/mountain-west-chronology/; *This is the Mountain West*, *available at* https://themw.com/this-is-the-mountain-west/.

37.     Each MWC member is a post-secondary educational institution that, on information and belief, is a direct and/or indirect recipient of federal funding.

38.     Each MWC member, except for the United States Air Force Academy and Colorado College, is a public university chartered by a State within the United States of America.

39.     The United States Air Force Academy is a United States service academy established by the United States Congress. 10 U.S.C.§ 9331. The organization of the Air Force Academy is prescribed by the Secretary of the Air Force. *Id.* The Board of Visitors of the U.S. Air Force Academy provides independent advice and recommendations on matters related to the Air Force Academy. 10 U.S.C. § 9455; 41 C.F.R. § 102-3.50(a).

40.     With the exception of two of its thirteen members, the MWC is composed of state-chartered and supported public universities that have delegated to the MWC the supervision over intercollegiate athletics.

41.     Through their state-chartered schools, the states of Idaho, Colorado, California, Hawai'i, Nevada, New Mexico, Utah, Washington, and Wyoming maintain an entwined, symbiotic relationship with the MWC in the realm of supervision of intercollegiate athletics, media rights and royalties related to the broadcasting of intercollegiate athletics, and the overall business and commerce that derives from the product of intercollegiate athletics.

### 2.     Exercise of Conference's Powers

42.     All corporate powers of the MWC are exercised by or under the authority of, and the business and affairs of the Conference are managed under the direction of, the Board of Directors.[8]

---

[8] MWC Bylaws 2.01. *See also* MWC Rule 1 (Conference Governance), 1.2.1, 1.2.2., *available at* 7abf843c-rule-1-conference-governance.pdf.

43.    The Board of Directors consists of a representative from each member institution and two non-voting, ex officio student-athlete representatives from the Mountain West Student-Athlete Advisory Committee. "The [school] representative appointed [to the MWC Board of Directors] must be the Chief Executive Officer (President, Superintendent, Chancellor or similar position) of the Member Institution."[9]

44.    Each voting member of the Board of Directors is an employee of the institution he or she represents.

45.    The administrative head of the MWC is the Commissioner, who reports to the Board of Directors. The Commissioner is the chief operating officer of the conference, has general charge of the business and affairs of the Conference and over its agents and employees, is responsible for the supervision of the operations of the Conference, serves as the principal enforcement officer of the MWC Handbook, and performs other duties consistent with the Bylaws and MWC Handbook.[10]

46.    "The Conference shall keep . . . minutes of the proceedings of the Board of Directors and of any other duly appointed and authorized body or committee when exercising any of the powers of the Board of Directors."[11]

47.    According to the MWC Handbook, "[t]he authority and responsibility of managing the business and affairs of the Mountain West shall rest with the Board of Directors and it shall decide all policy." MWC Rule 1.2.2.

48.    The Board of Directors also considers and resolves matters of significance to the Conference and its members brought to the Board by the Joint Council. MWC Rules 1.3, 1.3.5.

---

[9] MWC Bylaws 2.03.
[10] MWC Bylaws 4.01.
[11] MWC Bylaws 7.01.

49.     The primary function of the Joint Council is to address matters of significance to the Conference and its members and to make recommendations as to the resolution of those matters to the Board of Directors. MWC Rule 1.3.5.

50.     The Joint Council consists of three representatives from each member institution: a director of athletics, senior woman administrator, and faculty athletics representative; and three student-athlete representatives from the Mountain West Student-Athlete Advisory Committee who serve in a nonvoting, ex officio capacity. MWC Rule 1.3.1.

51.     The Joint Council conducts its business through four designated governance groups, as follows:

    a.      The Joint Council Executive Committee;

    b.      The Faculty Athletics Representatives ("FARs");

    c.      Directors of Athletics ("DOAs"); and

    d.      Senior Woman Administrators ("SWAs").

Ad hoc committees formed of members of the Joint Council are also designated to conduct the business of the Joint Council. MWC Rule 1.3.4.

52.     The FARs governance group consists of each MWC member institution's faculty athletics representative and one student-athlete representative from the Mountain West Student-Athlete Advisory Committee.

53.     The core tasks of the FARs include monitoring compliance with Conference and NCAA rules and "maintaining the Mountain West Handbook." MWC Rule 1.3.7.2.3.

54.     On information and belief, each FAR from each MWC member institution is an employee of that institution.

55.    The DOAs governance group consist of each MWC member institution's director of athletics and one student-athlete representative from the Mountain West Student-Athlete Advisory Committee.

56.    The core tasks of the DOAs governance group are in the areas of College Football Playoff and postseason football bowl games, television, revenue and championships and sports administration. MWC Rule 1.3.7.3.3.

57.    On information and belief, each DOA from each MWC member institution is an employee of that institution.

58.    The SWAs governance group consists of each MWC member institution's senior woman athletics department administrator and one student-athlete representative from the Mountain West Student-Athlete Advisory Committee.[12] The core tasks of the SWAs include, in relevant part, the following:

> The senior woman administrators shall review recommendations on regular season and championship management issues for all sports except football and men's and women's basketball. The senior woman administrators also shall review proposals to amend Conference and/or NCAA legislation relative to the administration of regular season and championship competition in all sports except football and men's and women's basketball.[13]

59.    On information and belief, each senior woman administrator of each MWC member institution is an employee of that institution.

60.    The DOAs Competition Committee is composed of six directors of athletics and "shall address competitive concerns of the Mountain West while focusing on maximizing postseason participation opportunities in all sports."[14]

---

[12] MWC Rule 1.3.7.4.1.
[13] MWC Rule 1.3.7.4.3.1.
[14] MWC Rule 1.3.7.3.5.2.

61.      The FAR, DOA, and the SWA governance groups each have shared responsibility for monitoring and reviewing "matters pertaining to issues related to the gender and minority equity efforts of the Conference and the Conference office"[15] and "problems and issues that affect the academic, athletics and campus life environments of all student-athletes."[16]

### 3.      Conference Handbook

62.      The MWC Board of Directors has promulgated, adopted, and approved a Handbook of rules, policies, and procedures to govern and control the day-to-day operations of the Conference.[17]

63.      According to the MWC Bylaws, "All Member institutions and future members of the Conference agree to abide by and fully comply with the rules and regulations of the National Collegiate Athletic Association ("NCAA") and the Mountain West Conference Handbook … ."[18]

64.      The Mountain West Conference Handbook "may be amended only by the affirmative vote of three-fourths (3/4) of the members of the Board of Directors."[19]

65.      The duty of "maintaining the Mountain West Handbook" is delegated to the FARs. MWC Rule 1.3.7.2.3.

66.      Adopted in April 2005 and revised from time-to-time thereafter, the current online version of the Handbook includes the MWC's Gender Equity Statement which says:

> The Mountain West affirms the value of gender equity in its intercollegiate athletics programs. Gender equity is the fair distribution of overall athletics opportunities, supported by

---

[15] MWC Rules 1.3.7.2.4.1, 1.3.7.3.4.1, 1.3.7.4.4.1.
[16] MWC Rules 1.3.7.2.4.3, 1.3.7.3.4.3, 1.3.7.4.4.3.
[17] MWC Bylaws 2.15.
[18] MWC Bylaws 1.01(c).
[19] MWC Bylaws 2.15. A true and accurate copy of the MWC Handbook currently on the MWC website is attached as **Appendix A**, *available at*: https://themw.com/2024-25-mountain-west-handbook/ (accessed Nov. 12, 2024).

equitable benefits and resources available to all men's and women's teams.[20]

**B.     MWC's Role in Controlling Aspects of College Sports for Its Members**

67.     The MWC controls the organization and delivery of significant aspects of college sports for its member institutions.

68.     For example, as noted above, the MWC compiles, implements and enforces a rulebook for its members' college sports competitions known as the MWC Handbook.

69.     The MWC Handbook sets forth detailed rules, policies and procedures which control and direct significant aspects of the collegiate sports programs of member institutions, including playing rules, scheduling rules (including which other schools that MWC members are permitted to play), and rules regarding roster size. The MWC Handbook also sets forth procedures for MWC recognition of athletes for conference awards, the conduct of conference championships, the determination of regular season champions, and the selection of conference representatives for NCAA national championships. *See*, *e.g*., MWC Regulation 1, Regulation 16 (Women's Volleyball).

70.     All member institutions of the MWC "agree to abide by and fully comply with the rules and regulations of the National Collegiate Athletic Association ("NCAA") and the Mountain West Conference Handbook[.]" MWC Bylaws 1.01(c).

71.     The Commissioner of the MWC is "the principal enforcement officer of the Handbook, with responsibility for and authority to provide rulings and interpretations of the Handbook and to conduct such investigations of Member Institutions as may be necessary." MWC Bylaws, Article IV, 4.01(c).

---

[20] *Mountain West Handbook*, p. 4, *available at* https://storage.googleapis.com/themw-com/2024/09/b7c86c16-composite-9-27-24.pdf.

72.    MWC members are required to follow all rules in the MWC Handbook and have therefore ceded college sports rulemaking authority to the MWC in all areas covered by the MWC Handbook.

73.    The MWC conducts conference championships in eight (8) men's sports and eleven (11) women's sports as follows:

| | |
|---|---|
| Baseball | |
| Men's Basketball | Women's Basketball |
| Men's Cross Country | Women's Cross Country |
| Football | |
| Men's Golf | Women's Golf |
| | Women's Gymnastics |
| | Women's Soccer |
| | Softball |
| | Women's Swimming & Diving |
| Men's Tennis | Women's Tennis |
| Men's Track & Field (Indoor) | Women's Track & Field (Indoor) |
| Men's Track & Field (Outdoor) | Women's Track & Field (Outdoor) |
| | Women's Volleyball |

74.    MWC members have ceded authority to the MWC to regulate and conduct conference championships in the foregoing sports.

75.    The MWC also plays an integral role in managing media rights to all Conference television, national radio and digital broadcasts, and related intellectual property by entering into various contractual agreements with linear and digital media networks. The policies and procedures for implementation of these agreements are coordinated by the MWC.[21]

76.    The MWC distributes revenues and monies, including revenues generated from its agreements with media networks to its member institutions. In many instances "[e]ach member institution shares equally in all of the MWC's net revenues.[22] However, the MWC Board of

---

[21] *See generally* MWC Handbook Rule 9 (Broadcast Policies).
[22] MWC Bylaws, Article I, 1.07(b).

Directors may determine that some revenues are distributed on a performance basis and/or other criteria established by the Board of Directors.[23] The directors of athletics of the various member institutions also negotiate revenue distribution formulas for review by the MWC Board of Directors.[24]

77.    In September 2024, the MWC entered into a Memorandum of Understanding with the United States Air Force Academy, University of Hawai'i, University of Nevada, Reno, University of New Mexico, San Jose State University, University of Nevada, Las Vegas, and University of Wyoming regarding maintenance of media rights, collecting withdrawal fees and exit fees from member institutions that plan to leave the MWC, and distribution of such fees to the remaining member institutions.[25]

## C.    Student-Athletes and The Ineligibility of Blaire Fleming

78.    The MWC has adopted the same definition of the term "student-athlete" as defined by NCAA Bylaw 12.02.14.

79.    The NCAA and the MWC define "student-athlete" as:

> . . . a student whose enrollment was solicited by a member of the athletics staff or other representative of athletics interests with a view toward the student's ultimate participation in the intercollegiate athletics program. Any other student becomes a student-athlete only when the student reports for an intercollegiate squad that is under the jurisdiction of the athletics department, as specified in [NCAA] Bylaw 20.2.4.7. A student is not deemed a student-athlete solely on the basis of prior high school athletics participation.

---

[23] *Id.*

[24] MWC Rule 1.3.7.3.3.3.

[25] *See generally* https://themw.com/news/2024/09/26/seven-mountain-west-conference-universities-solidify-membership-in-the-conference/. A true and accurate copy of the Memorandum of Agreement accessed from the KSNV news Las Vegas website is attached as **Appendix B**, *available at*: https://news3lv.com/resources/pdf/15fcfc8c-6ff4-4ef6-b5d4-3b0cf5436256-2024.09.26FullyExecutedCompositeMountainWestMOU.pdf (accessed Nov. 12, 2024).

NCAA Bylaw 12.02.14.

80.     Brooke Slusser, Alyssa Sugai, Elle Patterson, and Blaire Fleming are or were student-athletes on the SJSU Team and in the MWC during the time periods described below.

81.     Sia Liilii and Nicanora Clarke are student-athletes on the University of Nevada, Reno women's volleyball team and in the MWC as described below.

82.     Kaylie Ray is a student-athlete on the USU Team and in the MWC as described below.

83.     Macey Boggs, Sierra Grizzle and Jordan Sandy are student-athletes on the University of Wyoming women's volleyball team ("Wyoming Team") in the MWC as described below.

84.     Katelyn Van Kirk and Kiersten Van Kirk are student-athletes on the Boise State University women's volleyball team ("Boise Team") in the MWC as described below.

85.     Although SJSU refuses to publicly acknowledge that Blaire Fleming's sex is male and that Fleming is a transgender student-athlete competing in women's volleyball, there is no reasonable doubt that Fleming's sex is male.

86.     MWC Commissioner Nevarez has publicly confirmed that Blaire Fleming is male and identifies as transgender. Commissioner Nevarez stated on October 18, 2024 "The student-athlete (in question) [*i.e.*, Fleming] meets the [transgender student-athlete] eligibility standard, so if a team does not play them, it's a forfeit, meaning they take a loss."[26]

87.     As the above statement from Commissioner Nevarez reflects, the MWC has repeatedly taken public actions imposing penalties against MWC women's volleyball teams on the

---

[26] AP News, *Mountain West commissioner says she's heartbroken over turmoil surrounding San Jose State volleyball*, October 18, 2024, *available at:* https://apnews.com/article/san-jose-state-volleyball-b8f2b101b9825ee839ce17bd5cb1a1a2.

ground that Fleming is a "transgender student-athlete" within the meaning of the MWC's own rules. *See* MWC Handbook Appendix J (Transgender Participation Policy).

88.    Although as a trans-identifying male Fleming may satisfy the transgender eligibilities policies of the NCAA, because SJSU is a recipient of federal funding and subject to Title IX, Fleming is eligible to compete on a sex-separated women's volleyball team in the MWC only if the NCAA transgender eligibility policies are valid under (i.e., do not conflict with the requirements of) Title IX.

89.    According to the MWC Handbook, "[o]nly eligible (pursuant to applicable NCAA, Conference, and institutional rules) student-athletes designated as a part of an institution's competition roster (home and visiting team) shall be permitted to compete in Conference competition." MWC Regulation 1.14.2.1 (Eligibility).

90.    Because, as a recipient of federal funding SJSU is subject to, and required by law to comply with, Title IX, Title IX is an institutional rule applicable to SJSU and to which SJSU has agreed by accepting federal funds.

91.    Because Blaire Fleming is male, for the reasons explained below, pursuant to Title IX Fleming has always been ineligible to participate or compete on the SJSU sex-separated *women's* volleyball team in MWC competition.

92.    Moreover, according to the MWC Handbook, "[o]nly eligible (pursuant to applicable NCAA, Conference, and institutional rules) student-athletes shall be permitted to travel to a Conference Championship." MWC Regulation 1.14.4.1 (Eligibility).

93.    Therefore, because Blaire Fleming is male, pursuant to Title IX Fleming is ineligible to travel to the MWC Conference Championship in Women's Volleyball.

94.    Thus, Fleming is ineligible to be transported by SJSU to the MWC Conference Championship in Women's Volleyball to occur November 27-30, 2024 in Las Vegas, Nevada and is ineligible to compete in the MWC Women's Volleyball Conference Championship.

95.    It is the duty of SJSU to enforce the eligibility rules applicable to Blaire Fleming. MWC Rule 5.1.

96.    However, to the detriment of the Plaintiffs, SJSU has not complied with the requirements of Title IX and has instead continued to permit Blaire Fleming to compete on SJSU's sex-separated women's volleyball even though Fleming is male and therefore ineligible under Title IX to do so.

97.    Moreover, the MWC has repeatedly allowed Fleming to compete in MWC competition even though the MWC is aware that Fleming is male and therefore ineligible to compete in sex-separated women's sport pursuant to Title IX.

98.    Without injunctive relief it is clear SJSU and MWC will continue to allow Fleming to compete on the SJSU women's volleyball in MWC competition in violation of Title IX.

99.    Therefore, as explained below, Plaintiffs are entitled to a preliminary injunction and declaratory judgment and permanent injunction that pursuant to Title IX Blaire Fleming is an ineligible student-athlete.

100.    Because the MWC Handbook provides that "only eligible . . . student-athletes shall be permitted to travel to a Conference Championship," Plaintiffs are entitled to a preliminary and permanent injunction enjoining SJSU from both transporting Fleming to the Conference Championship and permitting Fleming to compete on the SJSU team in the MWC Conference Championship and enjoining the MWC from permitting Blaire Fleming to compete in the MWC women's volleyball championship.

**D.    The MWC Has Adopted the NCAA Transgender Eligibility Policies (TEP)**

101.    As noted above, the Bylaws of the MWC specify that, "[a]ll Member Institutions and all future members of the Conference *agree to abide by and fully comply with the rules and regulations of the National Collegiate Athletic Association ("NCAA") and the Mountain West Conference Handbook[.]"*[27]

102.    Thus, MWC Bylaw 1.01(c) as well as MWC Handbook Regulation 1.1.1 and MWC Regulation 16.1 effectively incorporate the NCAA Transgender Eligibility Policies (NCAA TEP) into the MWC rules applicable to each member institution.[28]

103.    MWC Regulation 1.1.1 provides:

> All regular-season competition and Conference championships shall be conducted under NCAA rules, regulations, and format except when specifically modified by Joint Council action. Any additional rules or regulations made by the Joint Council shall be more stringent than those of the NCAA.

104.    MWC Regulation 16.1 provides:

> Women's volleyball Conference competition shall be conducted in accordance with the rules of the NCAA, the Mountain West Handbook and the Mountain West Women's Volleyball Game Management Handbook.

105.    MWC has chosen to implement the NCAA TEP.

106.    SJSU has chosen to implement the NCAA TEP.

107.    Because SJSU is subject to Title IX, SJSU cannot lawfully implement any MWC or NCAA rule which violates Title IX or which causes SJSU to violate Title IX.

---

[27] Bylaws of the Mountain West Conference, 1.01(c) (emphasis added).
[28] A true and accurate copy of the current NCAA TEP is attached as **Appendix C** and made a part thereof.

108.    Because the MWC is subject to Title IX, the MWC cannot lawfully implement any MWC or NCAA rule which violates Title IX or which causes the MWC or any member of the MWC to violate Title IX.

109.    As explained below, because the NCAA TEP purports to allow men to participate in college sports on sex-separated women's teams the NCAA TEP cannot be lawfully adopted, implemented or relied upon by an entity subject to Title IX.

110.    Plaintiffs are therefore entitled to declaratory and injunctive relief declaring the NCAA TEP violates Title IX and enjoining SJSU and the MWC from applying the NCAA TEP or making male athletes eligible to compete on sex-separated women's teams through reliance upon the NCAA TEP.

**E.    The NCAA TEP As Adopted and Implemented by the MWC Deprives Women of Equal Opportunities in Violation of Title IX**

**1.    Retained Male-Advantage in Men Who Identify as Transgender**

111.    "Retained Male Advantage" refers to the retention of sport performance enhancing advantages of being biologically male that persist after testosterone suppression and other "gender affirming hormone treatment" ("GAHT").

112.    The reason for sex-separated sport (*i.e.*, for creating separate men's and women's teams or a separate women's category) and the reason the Title IX regulations endorse sex-separated sports teams is to give women a meaningful opportunity to compete that they would be otherwise denied were they required to compete against men.

113.    Biological differences between men and women prevent meaningful competition between men and women and deprive women of any realistic equality of opportunity absent sex-separation of women's teams in the sports of Women's Basketball, Women's Cross Country,

Women's Golf, Women's Gymnastics, Women's Soccer, Women's Swimming & Diving, Women's Tennis, Women's Track & Field and Women's Volleyball conducted by the MWC.

114.    Developmental biologist Dr. Emma N. Hilton and sport physiologist Dr. Tommy R. Lundberg report that "the performance gap between males and females . . . often amounts to 10 – 50% depending on sport." Hilton, E.N., Lundberg, T.R., "Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage," *Sports Medicine* (2021) 51:199-214, p. 199.

115.    Hilton and Lundberg note that the sport performance gap between men and women is not limited to certain sports but applies generally to most skills necessary for success in sport. *Id*. Here is a chart that illustrates male sport performance advantages across a wide group of discrete sport skills:



**Fig. 1** The male performance advantage over females across various selected sporting disciplines. The female level is set to 100%. In sport events with multiple disciplines, the male value has been averaged across disciplines, and the error bars represent the range of the advantage. The metrics were compiled from publicly available sports federation databases and/or tournament/competition records. *MTB* mountain bike

Reproduced from: Hilton, E.N., Lundberg, T., "Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage," *Sports Medicine*, (2021) 51:199-214, p. 202, Fig. 1.

116.    The source of male athletic performance advantages over women (sometimes described as the "Male-Female Sport Performance Gap") is attributed by many scientists to genetic differences between males and females and the effects higher levels of testosterone have on the male body throughout male development.

117.    The developmental and physiological effects brought about by genetic differences between males and females and higher levels of circulating testosterone in males begin well before puberty.

118.    In the womb and in the 6-9 month "mini puberty" phase immediately post birth, natal males experience endogenous synthesis and secretion of higher levels of testosterone than natal females, triggering differentiation in male body structure beginning even before birth.

119.    The result "is a clear sex difference in both muscle mass and strength even adjusting for sex differences in height and weight. On average women have 50% to 60% of men's upper arm muscle cross-sectional area and 65% to 75% of men's thigh muscle cross-sectional area, and women have 50% to 60% of men's upper limb strength and 60% to 80% of men's leg strength. Young men have on average a skeletal muscle mass of >12 kg greater than age-matched women at any given body weight."[29] The impact of these differences is "an obvious performance enhancing effect, in particular in sports that depend on strength and (explosive) power, such as track and field events."[30]

120.    Also, "levels of circulating hemoglobin are androgen-dependent and consequently higher in men than in women by 12%[.]"[31] Increased levels of hemoglobin are due to the fact that, "[t]estosterone increases secretion of and sensitivity to erythropoietin, the main trophic hormone

---

[29] Handelsman, D.J., Hirschberg, A.L., Bermon, S., "Circulating Testosterone as the Hormonal Basis of Sex Differences in Athletic Performance," *Endocr. Rev.* 2018 Oct; 39(5): 803-829.
[30] *Id.*
[31] *Id.*

for erythrocyte production and thereby hemoglobin synthesis[.]"[32] These effects from testosterone and erythropoietin "[i]ncreas[e] the amount of hemoglobin in the blood [with] the biological effect of increasing oxygen transport from lungs to tissues, where the increased availability of oxygen enhances aerobic energy expenditure. This is exploited to its greatest effect in endurance sports. . . . It may be estimated that as a result the average maximal oxygen transfer will be ~10% greater in men than in women, which has a direct impact on their respective athletic capacities."[33]

121.    Further, due to the impacts of testosterone, and perhaps other factors, on male development, "on average men are 7% to 8% taller with longer, denser, and stronger bones, whereas women have shorter humerus and femur cross-sectional areas being 65% to 75% and 85%, respectively, those of men."[34] The athletic advantages conferred by men's larger and stronger bones includes, "greater leverage for muscular limb power exerted in jumping, throwing, or other explosive power activities" and greater male protection from stress fractures.[35]

122.    Additionally, there is a sex difference in pulmonary function which "may be largely explained by the androgen-sensitive difference in height, which is a strong predictor of lung capacity and function."[36]

123.    There are many ways to illustrate the Male-Female Sport Performance Gap and demonstrate that men competing on women's teams is incompatible with equal opportunities for women.

124.    A point of comparison that helps put the Male-Female Sport Performance Gap in perspective is to understand that *every* women's world record in *every* track and field event is

---

[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *Id.*

bested *every* year by dozens, and in many cases hundreds, of high school age males. *See* Coleman, D.L., Joyner, M.J., Lopiano, D., "Re-Affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule," *Duke Journal of Genera Law & Policy*, Vol. 27:69-134, p. 89.

125.    As demonstrated in the chart, in a single year tens of thousands of males outperformed the best female 400m runners in the world.

126.    Here is a table which shows that high school boys ages 14-15 have eclipsed many women's world records by large margins:

**Table 3** Selected junior male records in comparison with adult elite female records

| Event | Schoolboy male record | Elite female (adult) record |
|---|---|---|
| 100 m | 10.20 (age 15) | 10.49 |
| 800 m | 1:51.23 (age 14) | 1:53.28 |
| 1500 m | 3:48.37 (age 14) | 3:50.07 |
| Long jump | 7.85 m (age 15) | 7.52 m |
| Discus throw | 77.68 m (age 15) | 76.80 m |

*M* meters

Time format: minutes:seconds.hundredths of a second

Reproduced from: Hilton, E.N., Lundberg, T., "Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage," Sports Medicine, (2021) 51:199-214, p. 204, Table 3.

127.    These examples reflect that the plain language of Title IX which speaks in terms of binary, biological sex (*i.e.*, male and female) is supported by science.

128.    Peer reviewed scientific research papers also confirm testosterone suppression does not bridge the Male-Female Sport Performance Gap.

129.    In one peer reviewed article researchers studied the effects of a year of hormone suppression on males and found that while males on hormone suppression experienced some reduction in muscle mass, they "generally maintained their strength levels."[37]

130.    In another report, researchers Hilton and Lundberg concluded "that under testosterone suppression regimes typically used in clinical settings, and which comfortably exceed the requirements of sports federations for inclusion of transgender women in female sports categories by reducing testosterone levels to well below the upper tolerated limit, *evidence for loss of the male performance advantage*, established by testosterone at puberty and translating in elite athletes to a 10–50% performance advantage, *is lacking*."[38]

131.    Hilton and Lundberg continued:

> Rather, the data show that strength, lean body mass, muscle size and bone density are only trivially affected. The reductions observed in muscle mass, size, and strength are very small compared to the baseline differences between males and females in these variables, and thus, there are major performance and safety implications in sports where these attributes are competitively significant. These data significantly undermine the delivery of fairness and safety presumed by the criteria set out in transgender inclusion policies, particularly given the stated prioritization of fairness as an overriding objective (for the IOC). If those policies are intended to preserve fairness, inclusion and the safety of biologically female athletes, sporting organizations may need to reassess their policies regarding inclusion of transgender women.

*Id*.

---

[37] Wiik, Anna, et al., "Muscle Strength, Size, and Composition Following 12 Months of Gender-affirming Treatment in Transgender Individuals," *J Clin Endocrinol Metab*, March 2020, 105(3):e805–e813, available at: https://academic.oup.com/jcem.

[38] Hilton, E.N., Lundberg, T., "Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage," *Sports Medicine*, (2021) 51:199-214, p. 211.

132.    Peer reviewed scientific studies confirm testosterone suppression does relatively little to mitigate the strength, speed, size, power and other athletically relevant differences between men and women (*i.e.*, the Male-Female Sport Performance Gap).

133.    A review published in April 2023 reported there have been a total of 19 published peer reviewed research reports on the effects of testosterone suppression (as part of gender affirming hormone treatment or "GAHT") on performance.[39]

134.    "Collectively, the existing research indicates that while GAHT affects biology, the changes it creates are minimal compared to the initial biological differences between typical males and typical females, which means that both biological attributes and performance differences are retained even after years of GAHT." *Id*.

135.    "In spite of testosterone suppression in transwomen reducing circulating hemoglobin concentration to the levels of reference women, all of these reviews came to the conclusion that even after 3 years of testosterone suppression there are still lasting male athletic advantages in transwomen." *Id*.

**2.    The NCAA TEP Are Discriminatory on Their Face**

136.    Increasing testosterone levels enhances athletic performance by increasing lean muscle mass and hemoglobin production and enhancing recovery from exertion, among other things.

137.    The NCAA's Transgender Eligibility Policies for men who wish to compete on women's teams simply require one year of testosterone suppression and measurements at three points during the season confirming suppression of testosterone below the applicable sport

---

[39] "Should Transwomen be allowed to Compete in Women's Sports?" Brown, Gregory A., Ph.D. and Lundberg, Tommy, Ph.D., available at: https://www.sportpolicycenter.com/news/2023/4/17/should-transwomen-be-allowed-to-compete-in-womens-sports.

threshold: 1. Prior to any competition during the regular season; 2. Prior to the first competition in an NCAA championship event; and 3. Prior to any competition in the non-championship segment.[40]

138.    For Women's Volleyball, the approved testosterone threshold is < 10 nmol/L (<288.18 ng/dL).[41]

139.    While testosterone suppression is the backbone of the NCAA TEP and a basis upon which the NCAA authorizes men to compete in women's sports after only a year of testosterone suppression, peer reviewed scientific research discussed above confirms the NCAA's reliance upon testosterone suppression is not supported by reliable scientific data.

140.    Men produce far more testosterone than women and there is a significant gap between the upper end of the testosterone range for women and the lower end of the testosterone range for men.

141.    A 2018 metanalysis established that in healthy individuals there is "a clear bimodal distribution of testosterone levels, with the lower end of the male range being four- to five-fold higher than the upper end of the female range (males 8.8-30.9 nmol/L, females 0.4-2.0 nmol/L)." Clark RV, Wald JA, Swerdloff RS, *et al.*, *Large divergence in testosterone concentrations between men and women: Frame of reference for elite athletes in sex-specific competition in sports, a narrative review. Clin. Endocrinol* (Oxf). 2019; 90:15–22. https://doi.org/10.1111/cen.13840.

---

[40]    Transgender Student-Athlete Participation Policy (Updated May 2024), *available at* https://www.ncaa.org/sports/2022/1/27/transgender-participation-policy.aspx.
[41]    NCAA Transgender Student-Athlete Participation Policy – Sport-Specific Testosterone Thresholds and Championship Eligibility Deadlines, Fall Sports (Updated May 2024), *available at* https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/SSI_TransgenderSADeadlinesAndThresholds Fall.pdf.

142.    The <10 nmol/L testosterone threshold used by the NCAA for granting eligibility to men to compete against women in Women's Volleyball is five times higher than the upper end of the female testosterone range, twenty-five times higher than the testosterone level of females at the lower end of the female range, and *includes testosterone levels that are within the normal male range* of 8.8 nmol/L to 30.9 nmol/L.

143.    Importantly, the female range of 0.4 nmol/L to 2.0 nmol/L *includes elite female athletes*.

144.    This means that even after "suppression," men are allowed to compete in Women's Volleyball with testosterone levels far higher than any female volleyball athlete could ever achieve without doping.

145.    Moreover, under current NCAA rules, some men (those falling within the lower end of the normal male testosterone range (*i.e.*, between 8.8 to 10.0 nmol/L or so) could compete in NCAA women's sports without substantially reducing their testosterone level at all.

146.    Plaintiffs do not concede that rules that permit a man to compete in women's scholastic sports through engaging in any level of testosterone suppression can pass muster under Title IX.

147.    But, even were it to be found that relying upon male testosterone suppression to permit men to access women's sports and sports teams could preserve equal opportunities for women in sports, the NCAA's current eligibility rules, as adopted by the MWC, would still fail to treat men and women equally because the policies *provide a testosterone advantage to men that women cannot replicate without doping*.

148.    Because the NCAA TEP specifically authorize males to compete in sex-separated women's sports with testosterone levels massively higher than those which women can naturally

produce the NCAA TEP violate Title IX and are facially discriminatory under the Equal Protection Clause of the Fourteenth Amendment.

149.    Therefore, Plaintiffs are entitled to a declaratory judgment that it is unlawful for SJSU and the MWC to rely upon or implement the NCAA TEP as an eligibility rule for women's teams in sex-separated sport.

150.    Plaintiffs are also entitled to an injunction enjoining SJSU and the MWC from implementing or relying upon the NCAA TEP as an eligibility rule in sex-separated women's sport and enjoining SJSU and the MWC from relying upon the NCAA TEP to make Blaire Fleming or any other male eligible for sex-separated women's sport.

**F.    Title IX Applies to SJSU and to Women's Sports Governed by the MWC and NCAA TEP**

151.    Section 901(a) of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

152.    Thus, Title IX specifies that equal educational opportunities are to be allocated, measured and equalized "on the basis of sex."

153.    The statute is understood to require the allocation of equal opportunities *based on biological sex alone without regard to or consideration of gender identity*.

**1.    Title IX Protects Equal Opportunity for Women in Sport**

154.    Title IX protects equal opportunity for women's athletics programs and opportunities.

155.    As the Title IX regulations enacted soon after the law was passed recognize, due to inherent biological differences women must be affirmatively protected with sex-separated sports

teams, competitions, championships, and locker rooms to achieve equality and equal opportunity for women.

156.     Pursuant to 34 CFR § 106.33 "separate toilet, locker room, and shower facilities . . . provided for students of one sex shall be comparable to such facilities provided for students of the other sex."

157.     MWC provides athletic programs separated by sex.

158.     SJSU provides athletic programs separated by sex.

159.     The MWC Women's Volleyball program is an athletic program separated by sex.

160.     The SJSU women's volleyball program is an athletic program separated by sex.

161.     Title IX's implementing regulations and guidance require that, if an entity subject to Title IX provides athletic programs or opportunities separated by sex, then it must do so in a manner that "provide[s] equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c).

162.     One aspect of assessing "equal athletic opportunity for members of both sexes" is ascertaining, **"[w]hether the** selection of sports and **levels of competition effectively accommodate the** interests and **abilities of both sexes**." 34 C.F.R. § 106.41(c)(1) (emphasis added).

163.     On the effective accommodation prong, the "governing principle" is that "the athletic interests and abilities of male and female students must be equally **effectively accommodated**." 44 Fed. Reg. 71,413, 71,414 (1979) (the "Policy Interpretation") (emphasis added).

164.     More specifically, the covered entity (in this case the MWC and each member institution that receives federal financial assistance) must accommodate the physical abilities of

girls and women "to the extent necessary to provide equal opportunity in . . . levels of competition," and competitive opportunities "which equally reflect their abilities." *Id*. at 71,417-418.

165.    As another aspect of equal athletic opportunity, implementing regulations and guidance state that male and female athletes "should receive equivalent treatment, benefits and opportunities." Policy Interpretation, 44 Fed. Reg. 71,414 (emphasis added).

166.    Factors two through ten of 34 C.F.R. § 106.41(c) are used to evaluate "equal" teams. The "equal treatment" to which girls and women are entitled includes equal "opportunities to engage in . . . post-season competition," *id*. at 71,416, equal opportunities for public recognition, 34 C.F.R. § 106.41(c), and the right to be free of any policies which are "discriminatory in . . . effect" or that have the effect of denying "equality of athletic opportunity." *Id*. at 71,417.

167.    Accordingly, Title IX and its implementing regulations currently in effect prohibit men from competing against women in women's sports competitions covered by Title IX where a man may rely upon inherent aspects of their maleness, including physical and athletic advantages, to take women's places, titles and public recognition, which Title IX requires to be protected for women and made equally available to them.

168.    There are only about 240 colleges in the U.S. with men's volleyball programs.

169.    One reason that some schools offer women's volleyball but not men's volleyball is that Title IX requires schools to offer equal sports opportunities for male and female students.

170.    Thus, to offset larger roster sizes in male sports such as football, many schools offer women's only programs in a variety of sports.[42]

---

[42] *See*, *e.g*., "Volleyball Was for Girls. Now It's Booming with Boys," Wall Street Journal, June 11, 2024, by Rachel Bachman, *available at*: https://www.wsj.com/sports/volleyball-high-school-boom-9ac83e22. ("The federal Title IX law requires schools and universities to offer equal opportunities for male and female students, including in sports, which has made some wary of adding boys or men's teams even when there is demand for them. Some schools stay in balance by adding another sport, like girls wrestling.").

171.    Therefore, in the MWC, and at some MWC member schools, including SJSU, women's volleyball exists specifically to provide athletic opportunities for biological women because they cannot effectively compete for roster spots in other men's sports in which the MWC schools field men's teams, such as: Baseball, Men's Basketball, Men's Cross Country, Football, Men's Golf, Men's Tennis, Men's Track & Field (Indoor), Men's Track & Field (Outdoor).

172.    There are currently no known women student-athletes competing on a men's team at MWC member institutions in the sports of Baseball, Men's Basketball, Men's Cross Country, Football, Men's Golf, Men's Tennis, Men's Track & Field (Indoor), Men's Track & Field (Outdoor).

173.    The most significant reason that women overwhelmingly are unable to effectively compete for roster spots, scholarships, and recognition on men's teams in these sports is biological: male competitive advantage derived from vast physiological differences between men and women.

**2.    Title IX Protects Women's Safety**

174.    Some medical professionals evaluate the relative risk of acute injury in sports by categorizing sports as contact, limited-contact, or non-contact sports.

175.    In "contact sports" (hereafter, "Contact Sports") athletes routinely make contact with each other or with inanimate objects, making the potential for serious injury through collisions with other athletes a known risk.

176.    Contact Sports regulated by the NCAA include: basketball, beach volleyball, diving, fencing, ice hockey, lacrosse, soccer, volleyball, water polo, and wrestling.

177.    It is known that Retained Male Advantage increases injury risks for women who compete against men in Contact Sports.

178.    Therefore, another way that allowing men to compete on women's teams denies women equal opportunities is that in women's Contact Sports, allowing men to compete against

women – given male advantages in size, strength, power, weight and speed – increases safety risks for women.

179.    Concussions raise serious long term health implications and can have lifelong debilitating effects.

180.    "[Y]oung athletes may suffer significant long-term cognitive, memory, and fine motor impairment secondary to sports related, mild, traumatic brain injuries." Brown, K.A., Patel, D.R., "Participation in sports in relation to adolescent growth and development," *Transl Pediatr* 2017;6(3):150-159, p. 156, *available at* https://tp.amegroups.com/article/view/14626/14780.

181.    "[D]amage to the brain from collisions has been shown to cause greater instance of mental illness such as depression and psychosis. Through . . . even one substantial head injury, the connections between brain neurons can be profoundly disrupted." "What Parents Should Know About Youth Athletics and Mental Health," Skyland Trail.org, *available at* https://www.skylandtrail.org/what-parents-should-know-about-youth-athletics-and-mental-health/ (Skyland Trail is a non-profit mental health treatment organization based in Atlanta.).

182.    "Studies from US collegiate sports have shown that female athletes are 1.9 times more likely to develop a sports-related concussion than are their male contemporaries in comparable sports." Sanderson, K. Why Sports Concussions Are Worse for Women, *Nature* (Aug. 3, 2021), https://www.nature.com/articles/d41586-021-02089-2.

183.    The size, strength and speed of trans identifying male opponents in Contact or Limited Contact Sports materially increases the injury risk of female student-athletes in those sports.

184.    Concussions are just one type of serious athletic injury for which women are at higher risk than men.

185.    The NCAA's TEP deprive women of equal opportunities by imposing an even higher risk of concussions and other injuries upon them.

186.    Specifically in the sport of women's volleyball, and specifically in the case of Blaire Fleming, allowing men to compete against women increases the risk of injury for women by increasing the risk of concussions and other injuries arising from being struck by a ball at high velocity.

**G.    Women's Volleyball in the MWC**

187.    The MWC has promulgated regulations for each of its sanctioned sports. MWC Sport Regulation 16 governs Women's Volleyball.[43]

188.    Women's volleyball conference competition in the MWC shall be conducted in accordance with the rules of the NCAA, the Mountain West Handbook and the Mountain West Women's Volleyball Game Management Handbook.[44]

189.    The regular-season champion shall be the institution with the highest regular-season winning percentage in Conference competition.[45]

190.    A six-team single elimination Conference tournament shall be conducted to determine the automatic representative to the NCAA Division I Women's Volleyball Championship.[46]

191.    The Conference tournament champion shall be the automatic representative to the NCAA Division I Women's Volleyball Championship.[47]

---

[43] MWC Regulation 16, Women's Volleyball, *available at* b65bf76b-regulation-16-womens-volleyball.pdf.
[44] MWC Regulation 16.1.
[45] MWC Regulation 16.3.
[46] MWC Regulation 16.4.
[47] MWC Regulation 16.5.

192.    Other Conference teams may accept invitations to participate in postseason tournaments only when conducted or approved by the NCAA.[48] Tournament Seeding shall be based on regular season winning percentage in Conference competition.[49]

**H.    In Violation of Title IX the MWC Authorizes the SJSU Women's Volleyball Team to Roster and Play a Trans-identifying Male**

193.    Prior to the 2022 season the then coach of the SJSU Team Trent Kersten recruited an outside hitter from Coastal Carolina University, a NCAA Division I program in Conway, South Carolina, named Blaire Fleming, who had entered the transfer portal after playing the 2021 season at Coastal Carolina.

194.    Fleming is a male who identifies as transgender and who claims a women's gender identity.

195.    Fleming was given a full scholarship to play for the SJSU Team.

196.    On information and belief, SJSU advised the MWC that Blaire Fleming was a trans-identifying male and would be participating in women's volleyball on the SJSU Team.

197.    Without agreement of the MWC, a trans-identifying male would not be eligible to compete in MWC interconference volleyball games or the MWC women's volleyball tournament.

198.    The MWC has discretion to implement or not implement the NCAA TEP.

199.    The MWC has chosen to implement and adopt the NCAA TEP as an eligibility rule for student-athletes competing on intercollegiate athletics teams in MWC competition.

200.    Blaire Fleming has been permitted to compete in MWC competition on the SJSU women's volleyball team only because the MWC and SJSU purport to adhere to the NCAA TEP.

---

[48] *Id.*
[49] MWC Regulation 16.7.

I.     **Harms to Former San Jose State University Student-Athlete Alyssa Sugai Arising from Fleming's Participation on the 2022 SJSU Women's Volleyball Team**

201.    Adding Fleming to the SJSU Team immediately had a significant adverse impact upon SJSU Team student-athlete Alyssa Sugai.

202.    Sugai transferred to SJSU as a walk-on in 2021 and played on the SJSU Team in the Spring of 2021 for her Sophomore season of eligibility (because of COVID-19 scheduling) and the Fall of 2021 for her Junior year of eligibility. She also played Beach volleyball in the Spring of 2022.

203.    During the Spring of 2022, Sugai considered transferring to another school so she could play women's volleyball as a scholarship athlete. Her coaches, including Trent Kersten knew that it was a financial hardship and sacrifice for her to pay full tuition with student loans as a walk-on at SJSU. Sugai discussed this financial sacrifice with Trent Kersten in the Spring of 2022.

204.    Ultimately, Sugai decided to bet on herself, that all the work she had put in during the previous two years would pay off and that she would have a fair opportunity to fairly compete for a scholarship position during the 2022 season.

205.    As a senior, Sugai also anticipated receiving a significant amount of playing time or at least having the opportunity to fairly compete for a significant amount of playing time on the SJSU Team.

206.    Sugai made a financial sacrifice to play for the SJSU Team without a scholarship, taking out additional student loans to cover her expenses for the 2022 season at SJSU.

207.    During the summer of 2022, prior to the start of the 2022 season, Fleming was introduced to the SJSU Team as a transfer, along with the other transfers and incoming freshman.

208.    In July 2022, Sugai and Fleming attended open gym practices and team meetings in July 2022. Coaches, including Kersten, were present at the team meetings. Formal coach-led practices began in August 2022.

209.    No member of the SJSU coaching staff or athletic department, including Trent Kersten, informed Sugai that Fleming was a trans-identifying male at the initial team meetings in July 2022 or at any time while she was on the SJSU Team roster. Instead, Fleming was introduced to the team the same way that the other female transfers and incoming freshman were introduced.

210.    Sugai and Fleming played the same position, right-side hitter. They competed during practices for the starting right-side hitter position throughout the 2022 season.

211.    Fleming consistently outperformed Sugai despite Sugai's best efforts. Sugai put in extra hours in the gym and before practices, but Fleming continued to outperform Sugai.

212.    In early September 2022, Kersten decided to make Fleming the starting right-side hitter because, in Kersten's words, Fleming was more "physical" than Sugai. Sugai reported that Kersten "needed Blaire to be more physical that I was," that is jump higher, hit the ball harder, and be more physical at the net.

213.    The reason that Fleming outperformed Sugai was not effort but was Retained Male Advantage which Sugai could not match because Sugai is a woman.

214.    Kersten never explained to Sugai that the reason Fleming was more "physical" was that Fleming was a trans-identifying male. Sugai was left to assume that Fleming was simply a better female athlete than she was and that there was nothing Sugai could do about it.

215.    Sugai did not receive the playing time she anticipated when she decided to remain at SJSU because Fleming received the playing time instead.

216.    Sugai also did not receive a scholarship offer from SJSU for her final year of eligibility and Fleming received a scholarship instead.

217.    Sugai would have received an athletic scholarship for her final year of collegiate eligibility in 2023 if she had been the starting right-side hitter on the SJSU team in 2022.

218.    Sugai and Fleming shared the same women's locker room for practices and games.

219.    Although Fleming never fully disrobed in front of Sugai, Sugai was in the locker room while other athletes, including Sugai, changed clothes, fully disrobing in front of Fleming.

220.    Sugai was deprived of the opportunity to make an informed choice of whether to disrobe in front of Fleming, a trans-identifying male because no SJSU coach or staff member informed Sugai of Fleming's true sex.

221.    Losing significant playing time to Fleming caused Sugai to consider transferring to another institution for her fifth year of eligibility.

222.    Sugai considered entering the transfer portal after the 2022 season but soon realized she was unlikely to receive a scholarship offer from another school due to the fact that she had not had sufficient playing time during the 2022 season because she played behind Fleming.

223.    As a result of her frustration and feelings of inadequacy because she was not able to make the starting line-up through effort and sacrifice and because her diminished playing time behind Fleming prevented her from receiving offers through the transfer portal, Sugai faced depression during and after the transfer portal period and ultimately determined that she had no realistic choice other than to give up playing collegiate volleyball after the 2022 season.

224.    Losing to Fleming caused Sugai to doubt her ability to play volleyball at a high level, even though she had rigorously trained and competed since childhood. It also caused her to doubt her self-worth and caused her to feel "defeated."

225.    After Sugai ended her collegiate volleyball career, she learned that Fleming was a trans-identifying male in the early spring of 2023 when she heard a rumor about Fleming's sex that was circulating on campus.

226.    After Sugai discovered Fleming's true sex in the early spring of 2023, everything "clicked" and it "made sense why I could never compare" to Fleming.

227.    Sugai "was really angry" because nobody connected to the SJSU Team told her about Fleming's true sex and Sugai continues to suffer from depression, regret, emotional stress and sadness because so much of her feelings of self-worth and her dreams for her future had centered on volleyball.

228.    These experiences have caused Sugai to feel that a very important opportunity to complete her collegiate volleyball career was stolen from her.

229.    Had SJSU ever advised her in July 2022 or August 2022 that she would be competing for a position against a biological male athlete for the 2022 season, Sugai would have transferred to another school or waited another year instead of spending a year of eligibility in an unfair competition with a trans-identifying male and taking out additional student loans to do so.

230.    Had SJSU ever advised her in July or August 2022 that she would be competing for a position against a biological male athlete for the 2022 season, Sugai believes she would have suffered less self-doubt and feelings of inadequacy about her volleyball playing ability that contributed to her decision to retire and not come back for her final year of eligibility and that she would have come back for a final year of eligibility.

231.    Due to NCAA rules which require a student-athlete to use their four years of eligibility within a five-year period, the failure of SJSU and Kersten to disclose Fleming's true sex now prevents her from attempting to reclaim her lost final year of collegiate eligibility.

232.    Sugai's right to exercise informed consent while disrobing in front of Fleming was also violated by SJSU, Kersten, and the MWC through actions, policies and practices that caused her to lose her right to bodily privacy without consent.

233.    Sugai is entitled to recover damages from the CSU Board and the MWC for implementing rules which authorized a trans-identifying man to compete against her in sex-separated women's volleyball and disregarded her right to exercise informed consent while disrobing in the locker room.

**J.    Coaches Todd Kress and Melissa Batie-Smoose Join the San Jose State University Women's Volleyball Team and Recruit Elle Patterson to Play at SJSU**

234.    Following the 2022 Season, Trent Kristen left the SJSU Team and Todd Kress, the former Head Coach at Fairfield University, was named the Head Coach of the SJSU Team. Melissa Batie-Smoose, the former Associate Head Coach at Fairfield University, was named the Associate Head Coach of the SJSU Team.

235.    During the time that Melissa Batie-Smoose was being recruited to coach at SJSU she was not told that SJSU had a student-athlete on the women's volleyball team whose sex was male.

236.    When Coach Batie-Smoose arrived at SJSU she was put in charge of taking over the beach volleyball team and hiring a Head Coach for that team.

237.    One of the players that Kress and Batie-Smoose had recruited to play at Fairfield University was Elle Patterson who was to be an incoming freshman during the 2023 season.

238.    Elle Patterson was recruited to play as an outside hitter and she was offered a full scholarship to attend Fairfield University and play for the women's volleyball team.

239.    After Kress and Batie-Smoose made the decision to leave Fairfield University and coach at SJSU they asked Patterson to come to SJSU to play volleyball and offered her a full scholarship to join the SJSU Team as an outside hitter.

240.    Kress and Batie-Smoose told Patterson that if she came to SJSU she could play for the SJSU Team.

241.    Elle was a top-rated beach volleyball player coming out of high school.

242.    In reliance upon Kress's promises that she would receive a full athletic scholarship from SJSU and be able to play beach volleyball at SJSU, Elle accepted the promises by transferring to SJSU.

243.    However, after Elle arrived on the SJSU campus Todd Kress told her that he did not want any indoor volleyball players to play beach volleyball.

244.    In contrast, Fleming was given preferential treatment and allowed to play beach volleyball when Fleming requested to do so even though Fleming had never played beach volleyball before.

245.    Fleming told others Fleming just wanted to be outside and get sun and not train for the indoor game.

246.    When Kress asked Batie-Smoose how Fleming was doing playing beach volleyball, Batie-Smoose's response was, "Wow! She went up to block a ball and she jumps like a Dude and hangs like a Dude! Crazy!" This was before Batie-Smoose found out that Fleming is male.

K.    **The Recruitment of Brooke Slusser and the 2023 San Jose State University Women's Volleyball Season and 2023-2024 Academic Year**

247.    Brooke Slusser is a volleyball athlete who transferred from the University of Alabama to SJSU in the Fall of 2023, where she received a scholarship for playing on the SJSU Team.

41

248.    Upon transferring to SJSU in the Fall of 2023 Slusser began sharing a residence with four members of the SJSU Team.

249.    One of the teammates with whom Brooke Slusser shared a residence at SJSU in 2023 was Blaire Fleming.

250.    At no point during Slusser's recruitment from the University of Alabama or during the 2023 volleyball season (i.e., approximately August – November) did Kress or any SJSU representative or Fleming advise Slusser that Fleming is a male, even when it was known to SJSU that Slusser was considering rooming with Fleming.

251.    Slusser was frequently assigned by Kress and/or the SJSU athletic department to room with Fleming on road trips to competitions even though Fleming is male and without Slusser being informed that Fleming is male.

252.    Due to her personal convictions and religious beliefs, Slusser would not have roomed with Fleming or changed clothes in front of Fleming if Slusser had known Fleming was male.

253.    Slusser's right to protect her bodily privacy was violated by SJSU, Kress, and the MWC through actions, policies and practices that caused her to lose her right to bodily privacy without consent and against her will.

254.    Brooke Slusser was not aware for months after her arrival at SJSU that Fleming is male.

255.    However, towards the end of the 2023 volleyball season Slusser learned that Fleming is male when Slusser overheard a conversation between two students, who are not members of the SJSU Team, in which a statement was made that Fleming is a "guy."

256.    Upon overhearing the remark, Slusser inquired of the fellow students and was told that Fleming is a "dude."

257.    Slusser was surprised to learn Fleming is male, although this was consistent with Slusser's observation that Fleming played volleyball with jumping ability and power that surpassed that of any girl on the team.

258.    As Fleming had not informed Slusser that Fleming was male or transgender, and as the SJSU Team coaches had not told the team that Fleming was male, Slusser was initially unsure about how to proceed with this new information.

259.    Slusser ended up not discussing what she had learned about Fleming's true sex for the rest of the 2023–24 school year while she thought about how to respond.

260.    Slusser did learn however that the reason she had been assigned to room with Fleming so often during road trips in the 2023 season was that Kress and other SJSU women's volleyball officials asked Fleming who Fleming wanted to room with, and Fleming chose Slusser.

261.    At the times she was assigned to room with Fleming during the 2023 season, Slusser had no idea that Fleming was being given the choice of which girl he wanted to room with on team road trips.

262.    When Elle Patterson reported to campus in August 2023 Todd Kress told Patterson that she would not receive a scholarship during the 2023 season but promised she would receive a full scholarship for subsequent seasons.

263.    Therefore, Patterson decided to remain at SJSU and pay full out-of-state tuition and room and board during the 2023-24 academic year.

264.    Elle received significant playing time during the 2023 season.

265.    During the 2023 season Fleming was reported to have sustained a hand injury and missed a significant part of the season.

266.    Once Fleming was permitted to play in games, the SJSU coaching staff frequently substituted Elle for Fleming on the back row as Elle was a superior passer and digger to Fleming.

267.    Where Fleming stood out was spiking the volleyball and blocking on the front row due to Fleming's leaping ability and hitting power which far exceeded that of any player in the conference.

268.    After the 2023 season Todd Kress changed his mind about giving Elle a scholarship and told her that while he would like her to stay on the SJSU Team, she would not receive a scholarship during the 2024 season.

269.    Although missing more of the 2023 season than Elle Patterson, Fleming retained the full scholarship Fleming has had throughout the time that Fleming played on the SJSU Team.

270.    Because Fleming and Patterson played the same position, had Fleming not been on the team Patterson would have received a full scholarship to play on the SJSU Team during both the 2023 and 2024 seasons.

271.    Ultimately, Patterson informed Associate Head Coach Batie-Smoose and Head Coach Todd Kress that she was financially unable to pay for full out-of-state tuition, room and board at SJSU again in 2024 and therefore would be unable to return to the SJSU Team without a scholarship.

272.    Nevertheless, Todd Kress remained firm in his position that Patterson would not receive a scholarship to play on the SJSU Team in 2024, and that Fleming would receive a full scholarship to play on the SJSU Team.

273.    Patterson was injured by Kress's breached promises which induced her to enroll at SJSU and incur significant expense and disruption without providing her the athletic scholarships or opportunity to play beach volleyball that she was promised.

274.    Patterson was injured by the implementation of policies by SJSU and the MWC that permitted a man to take playing time and a scholarship from her and compete against her in sex-separated women's sport.

275.    In April 2024 an online news article was published stating that Fleming was male, but Slusser was not immediately aware of the publication of this news article.

276.    When Slusser got back to her apartment near the end of the day that the article about Fleming was published, Fleming and another student asked if Slusser would go with them to get ice cream because there was something Fleming wanted to say.

277.    At that time, Fleming told Slusser that he was born male and identifies as a "transgender woman."

278.    Slusser asked why Fleming had not shared this information with her before, particularly as they had been living together. Fleming responded that there never seemed to be a good time to bring it up, and that he had been afraid that Slusser might not be his friend if Slusser knew the truth. Fleming also said that if Slusser was uncomfortable with it that Fleming would leave the volleyball team.

279.    Slusser responded that while she did not want Fleming to be bullied, Slusser was uncomfortable with Fleming continuing on the SJSU Team as she questioned whether it was safe or fair for the other women on the team and for opposing teams for Fleming to compete on the women's team.

**L.     San Jose State University Staff and Coaches Forbid and Inhibit their Players from Exercising First Amendment Rights**

280.    In April 2024 SJSU officials convened a meeting with the women's volleyball players and coaches to address a recent news article about Fleming being male.

281.    During this meeting, SJSU officials, including Head Coach Kress and Senior Director of Media Relations Michelle McDonald Smith, told the SJSU Team members that:

a.    they should not speak about Fleming's sex or gender identity with anyone outside the team;

b.    if the women spoke publicly about Fleming being male things would go badly for the team members;

c.    any information about Fleming's sex was Fleming's information alone – it was "this was Blaire's story to tell" and "Blaire's story alone," – the women on the team could not share it;

d.    the female players could not share what they thought about playing with a male, and that they could not speak with others outside the team about any safety or privacy concerns that related to Fleming being male and playing on the SJSU team;

e.    criticism of Fleming or his participation on the SJSU Team would indicate bigotry and harm their reputation and could subject them to discipline or loss of their scholarship and could be considered a violation of school policies or state law.

282.    The foregoing items were repeated to SJSU Team members by SJSU staff over the coming months.

283.    The repeated instructions by SJSU administrators not to speak about Blaire Fleming were intended to cause, and did cause, SJSU Team members to fear that they could lose their scholarships or be removed from the team if they spoke outside of a team meeting about Fleming's sex or being transgender or if they expressed any public disagreement outside a team meeting concerning having Fleming on the team.

284.    The SJSU Team members were told by SJSU administrators that such comments would indicate that they are "transphobic" and could be considered a violation of Title IX, school policies, or state law.

285.    These statements about the SJSU Team members being perceived as "transphobic" were made to attempt to intimidate the girls into silence.

286.    In the summer of 2024, Slusser and her SJSU teammate and fellow co-captain Brooke Bryant played on the MWC team in the World Challenge along with other women volleyball players.

287.    After Slusser and Bryant came back from playing on the Mountain West team in the World Challenge they spoke with SJSU Head Coach Todd Kress and Associate Head Coach Melissa Batie-Smoose about their concerns about Fleming playing on the SJSU Team for the upcoming season.

288.    Slusser communicated that Fleming's participation on the team was not fair to the girls and put them at physical risk.

289.    She also reported that other teams within the conference would not play SJSU due to Fleming being on the team and told the SJSU coaches that girls from other teams had told them they wanted to protest against a man playing women's volleyball.

47

290.    Todd Kress became angry at Slusser for bringing these concerns forward and told her any protest about Fleming would not go anywhere.

291.    After the conversation with Slusser and Bryant, Kress reported the conversation with Slusser and Bryant to Laura Alexander.

292.    It is reasonable to infer that at some point the comments of Slusser and Bryant that MWC women's volleyball teams were discussing protesting Fleming's participation and boycotting MWC women's volleyball games may have been reported by SJSU to MWC officials.

**M.    Beginning of the MWC 2024 Women's Volleyball Season**

293.    During practices in August 2024 immediately before the 2024 season Slusser and Batie-Smoose saw that Fleming was hitting the ball with more force than in 2023 and far harder than any woman they had ever played or coached with or against.

294.    Where Fleming stood out was spiking the volleyball and blocking on the front row due to Fleming's leaping ability and hitting power, which far exceeded that of any player in the conference and was the most explosive of any player that SJSU's Associate Head Coach has observed in collegiate women's volleyball.

295.    Per the NCAA's TEP, Fleming may participate in women's volleyball with a testosterone level of <10 nmol/L, which is five times higher than testosterone levels that any woman can produce naturally without doping.

296.    Fleming's spikes were estimated to be traveling upwards of 80 miles per hour, which is faster than a woman hits a volleyball.

297.    Fleming's spikes significantly increased the risk of teammates and opponents being concussed as Fleming hit the ball so hard that if the ball was not blocked at the net by a defender, it was difficult for the players to react to Fleming's spike and to even get their hands up in time to deflect a ball away from their face.

298.    Many of the girls on the SJSU Team spoke about their fears of being hit by balls spiked by Fleming, and concerns about potential concussions from being hit by a Fleming spike were regularly discussed among the women on the team.

299.    Brooke Slusser and Melissa Batie-Smoose observed that the girls on the SJSU Team were doing everything they could in practices to dodge Fleming's spikes but still could not fully protect themselves.

300.    Throughout the 2024 pre-season and during their regular in-season practices Slusser and SJSU teammates have been afraid of getting concussed from getting hit in the head by a volleyball struck by Fleming.

301.    No steps have been taken by SJSU, Kress or the MWC to protect female players from injury form Fleming's hits in practices or in games.

302.    Slusser and others have been hit in the head and about their body by volleyballs hit by Fleming causing greater bruising, pain, and discomfort than what they experienced from similar hits by female volleyball players.

303.    Other players have experienced similar injuries.

304.    Due to public knowledge that Fleming is male, the SJSU Team has received public criticism for having an unfair advantage over other volleyball women's teams they have faced this season.

305.    As a team captain Slusser personally spoke to Coach Kress about the risk of injury to team members from Fleming's hitting.

306.    Kress responded that having played for a Power 5 school Slusser must have played against male practice players and tried to suggest that Fleming's participation in practices was no different than SJSU using male practice players.

307.    Slusser responded to her coach, "You can't lie to me. At Alabama each of the practice players was warned by the coach that if they hit harder than 70% against the girls they would not ever come back to practice. No college women's team lets their male practice players hit like Blaire is hitting in our practices."

308.    Slusser told Kress that Fleming's participation in practices, and the fact that the coaches were not asking Fleming to pull back on use of his physical power, was putting everyone on the team at risk of serious injury. Slusser again Kress to take steps to protect the women players on the team. However, Kress brushed Slusser off and would not talk further about it.

309.    In a game against the University of Delaware, which took place on September 7, 2024, in a tournament hosted by the University of Iowa, a SJSU freshman set Fleming for a spike, and Fleming smashed the ball into the face of a woman on the University of Delaware team's back line, knocking the opposing player to the ground.

310.    The Fleming spike into the face of the University of Delaware libero drew thousands of views and reposts on the social media site X.

311.    Several days after the event, the SJSU freshman who had set the ball for Fleming came to Slusser in tears due to feelings of guilt that her set to Fleming had led to the Delaware player being hit in the head. The SJSU freshman wondered aloud whether she had done the right thing to set the ball for Fleming and whether she was responsible for any injury the University of Delaware player suffered.

**N.    Adoption and Publication of the 2024 MWC Handbook**

312.    On September 13, 2024, the MWC published its 2024-25 MWC Handbook online.

313.    On information and belief, the 2024-25 MWC Handbook published by the MWC on September 13, 2024, contained no MWC transgender participation policy and no policy requiring a forfeit by a conference member that pulled out of a women's volleyball game due to

concern over the safety of its players or due to an unwillingness of its women players to compete against a team with a male player.

314.    However, on September 27, 2024, after the MWC women's volleyball competitions had begun the MWC Commissioner's staff made under-the-radar, non-publicized changes to the MWC Handbook that added (or altered) a MWC transgender participation policy.

315.    Due to the secretive nature of these changes to the MWC Handbook it is not possible for the public to access version of the MWC Handbook actually in place when the 2024 MWC women's volleyball competition season began.

O.    **Southern Utah University Withdraws from Women's Volleyball Game Against SJSU**

316.    On September 14, 2024, Southern Utah University (a non-MWC member team) withdrew from a scheduled match against SJSU in the Santa Clara tournament in which Santa Clara, Southern Utah University and MWC members SJSU and Fresno State University were playing.

317.    The reason Southern Utah University withdrew from the game against SJSU was widely reported to be concern over playing against Fleming.

318.    The decision by the women's volleyball team of Southern Utah University not to play against Fleming, coming so soon after Fleming had driven a ball into the face of the libero from the University of Delaware, catapulted the MWC women's volleyball season into a national news story.[50]

319.    Within a week of the Southern Utah University decision not to play SJSU, administrators in the Boise State University athletic department were considering safety and

---

[50] *See*, *e.g*., "Southern Utah Refuses to Play San Jose State Volleyball, Which Has Transgender Player," *Outkick*, Sept. 14, 2024, *available at*: https://www.outkick.com/sports/exclusive-southern-utah-san-jose-state-volleyball-transgender.

competitive fairness concerns raised by its women's volleyball team about playing against
Fleming.[51]

**P.    Brooke Slusser Files Title IX Claims in Federal Court**

320.    On September 23, 2024, Brooke Slusser filed a motion with the U.S. District Court
for the Northern District of Georgia, asking to be added as a Plaintiff in a lawsuit against the
NCAA asserting that the NCAA's TEP violate Title IX and recounting her experience with Blaire
Fleming at SJSU. *Gaines, et al. v. NCAA, et al.*, No. 1:24-cv-01109-MHC, ECF. No. 88 (N.D. Ga.
Sept. 23, 2024).

321.    Before Slusser filed her Title IX charges in federal court the SJSU Team was
undefeated and already a national news story for starting a trans-identifying male player.

322.    Up to that time, some members of the public had been harshly critical of the girls
on the SJSU Team who were perceived to be intentionally benefitting from the powerful attacks
of Fleming which other women's teams could not hope to match.

323.    Yet, the online critics of Slusser and her teammates did not know that the girls on
the SJSU team were fighting their own behind-the-scenes battle for women's rights, asking school
administrators to intervene and remove Fleming from the team and being vigorously opposed by
the SJSU administration.

324.    After repeated rebuffs of the SJSU administration to the approaches of Slusser and
her teammates Slusser asked the U.S. District Court in Georgia to allow her to assert claims against
the NCAA and challenge the lawfulness of the NCAA TEP.

---

[51] *See*, *e.g*., "In depth: Boise State administrators made volleyball call, amid outside lobbying,"
Idaho Education News, October 18, 2024, *available at*: https://www.idahoednews.org/top-news/in-depth-boise-state-administrators-made-volleyball-call-amid-outside-lobbying/.

325.   While Slusser did not sue the MWC or SJSU in the Georgia lawsuit, Slusser's federal filing greatly increased the pressure on MWC Commissioner Nevarez who sensed a looming national controversy over the rights of women.

326.   Commissioner Nevarez was also feeling pressure from a lawsuit against the MWC filed the very next day, on September 24, 2024, by the PAC-12 Conference, suing the MWC over massive poaching penalties the MWC sought to impose over the impending move of Boise State University and three other MWC members to the PAC-12 to occur beginning with the 2026-2027 season. *The PAC-12 Conference v. The Mountain West Conference*, Case No. 4:24-cv-06685-SVK (filed Sept. 24, 2024, N.D. Cal.).

327.   Also on September 24, 2024, the first day of MWC women's volleyball competition in Mountain West Conference play, the Independent Council on Women's Sports (ICONS), a nonprofit corporation committed to ensuring the next generation of women and girls have the opportunity to be champions, sent each Mountain West Conference University President a letter demanding that each President "act immediately and decisively to protect and support your women volleyball players and their rights to equal athletic opportunities and fair and safe competition which are guaranteed by Title IX and the Equal Protection Clause of the Fourteenth Amendment.[52]

328.   The ICONS letter pointed out that the school "and the MWC are state actors subject to constitutional equal protection."

329.   The ICONS letter concluded by stating, "[w]e expect you to act immediately to comply with the law and your duty to protect your women athletes, this includes immediately finding Blaire Fleming (and any other males) ineligible to compete in MWC women's

___
[52] A true and accurate copy of the ICONS letter and transmittal email to Dr. Marlene Tromp the President of Boise State University is attached as **Appendix D**.

competitions, withdrawing from any competition in which any male competes, and public rejection of the NCAA TEP."

330.    As explained below, following the ICONS letter asking MWC universities to withdraw from women's volleyball matches involving Blaire Fleming, Commissioner Nevarez moved quickly to double down on the MWC's denial of women's rights by adding a new MWC policy to suppress any dissent from women's volleyball players and teams protesting the MWC's transgender eligibility rules.

**Q.    SJSU Retaliates Against Slusser for Raising Title IX Claims and Seeks to Suppress the Speech of Slusser and Others**

331.    In the meantime, pressure from Slusser's claims against the NCAA also shone a light on what was happening at SJSU and soon brought a response from the SJSU administration.

332.    Shortly after September 23, 2024, Laura Alexander told Slusser that she wanted to clarify Alexander's prior statements to Slusser that Slusser should not speak about issues related to Fleming outside the SJSU Team, Alexander said, that she "just wanted to give a reminder that speaking disrespectfully against the school or the NCAA would be against your letter of intent and could affect your scholarship."

333.    Alexander then said, "I know this because I am on an NCAA committee."

334.    Slusser perceived these comments to be a direct threat to her not to speak up any further.

335.    Since she filed her Title IX claims against the NCAA Slusser has been repeatedly retaliated against by SJSU, including by Laura Alexander and Coach Kress.

336.    The retaliation against Slusser has created a hostile environment against Slusser based upon her sex and in retaliation for her bringing a Title IX complaint in which she discussed SJSU's violation of Title IX by rostering and playing a male athlete in reliance on the NCAA TEP.

337.    Kress's recent actions against Slusser include but are not limited to the following conduct.

   a.    Coach Kress has stopped speaking to Slusser and stopped coaching her and has sought to denigrate her in communications with other SJSU teammates.

   b.    Kress has communicated with a private lawyer as part of his effort to get Slusser removed from the SJSU Team.

   c.    Kress has told others that he has filed Title IX complaints against Slusser based not on comments Slusser has made in practice but on communications Slusser has made to journalists and in public forums concerning her beliefs.

   d.    As explained further below, Kress has also failed to fulfill his duties to protect Slusser against potential physical threats.

338.    As explained below, Kress has also sought to use his position as the SJSU Head Coach to attempt to silence speech by other female athletes within the MWC.

**R.    Boise State University Withdraws from Women's Volleyball Game Against SJSU**

339.    On September 27, 2024, Boise State University issued a statement saying that its women's volleyball team would not play SJSU in the women's volleyball match scheduled for September 28, 2024.

340.    Behind the scenes the Boise State University women's volleyball players and administrators had been pushing for the Boise State University Team not to play the SJSU Team due to concerns over competitive fairness and athlete safety.

341.    The Boise State announcement read:

   Boise State volleyball will not play its scheduled match at San José State on Saturday, Sept. 28. Per Mountain West Conference policy, the Conference will record the match as a forfeit and a loss for Boise State. The Broncos will next compete on Oct. 3 against Air Force.

342.    Immediately, Idaho Governor Brad Little praised Boise State, saying, "[w]e need to ensure player safety for all our female athletes and continue the fight for fairness in women's sports."

**S.    The Very Day of Boise State's Announcement the MWC Covertly Posted (or Amended) a Hastily Drafted New MWC Policy Designed to Suppress Speech and Penalize Female Student-Athletes For Protesting a Man Competing on a Woman's Team**

343.    The Boise State announcement referred to an alleged "Mountain West Conference policy" regarding forfeits.

344.    However, on the morning of September 27, 2024, the 2024-25 MWC Handbook apparently contained no MWC transgender participation policy and no policy requiring a forfeit by a conference member that pulled out of a women's volleyball game due to concern over the safety of its players or due to an unwillingness of its women players to compete against a team with a male player.

345.    Review of the "News" section on the MWC website does not reflect a public announcement of a MWC Board of Directors vote to adopt an amendment to the MWC Handbook in September of 2024.[53]

346.    Yet, on September 27, 2024, the very day that Boise State University announced its women's volleyball team would not play its September 28, 2024, match against SJSU, without fanfare, and indeed without any apparent public announcement or acknowledgement, a new Mountain West Conference "Transgender Participation Policy" (MWC TPP) appeared as "Appendix J" in the online version of the 2024-25 MWC Handbook.

347.    On information and belief, there was, in fact, not a fully ratified MWC TPP in the MWC Handbook when MWC officials, including Commissioner Nevarez, became aware that

---

[53] MWC News, *available at*: https://themw.com/news/.

Boise State was considering protesting and possibly boycotting the Boise State-SJSU women's volleyball game.

348.    Rather, on information and belief, the burgeoning controversy, which Commissioner Nevarez apparently believed could lead women's volleyball players and teams to exercise their constitutional rights to protest and boycott, caused the Commissioner and her staff to hastily draft and post on the MWC website a policy designed to penalize First Amendment protests supporting the rights of women's volleyball players in the MWC.

349.    This new MWC policy was clearly intended to chill and suppress the free speech rights of women athletes in the MWC.

350.    The circumstances surrounding the hasty adoption and under-the-radar online posting of the MWC TPP raise an inference that the TPP was adopted specifically to penalize the viewpoint of, and chill the speech of, women's volleyball players who sought to stand up for their rights and protest Fleming's participation on the SJSU Team.

351.    Metadata from the MWC website reveals the MWC TPP was drafted by the Office of the MWC Commissioner, inserted in the online version of the MWC Handbook, and posted on the MWC website by Commissioner Nevarez's second-in-command, MWC Deputy Commissioner Bret Gilliland, or someone assisting him, on September 27, 2024.

352.    Metadata from the pdf version of the MWC TPP uploaded to the MWC website on September 27, 2024, reveals that the MWC TPP itself was modified and saved at 11:57 a.m. on September 27, 2024, by Deputy Commissioner Gilliland.

353.    Deputy Commissioner Gilliland is Commissioner Nevarez's chief of staff and a 37-year-veteran of the NCAA headquarters staff.

354.    The irregular manner in which the MWC TPP was posted and the timing of the post, on the same day the MWC TPP was utilized to penalize the Boise State University women's volleyball team members for speaking out, lead to the unescapable conclusion that the MWC TPP was specifically drafted and posted to target and suppress the very expressive conduct that it was used to penalize on the very day it was posted.

355.    The adoption, posting, and use of the MWC TPP to suppress expressive conduct violates the First Amendment.

356.    The TPP, as it now appears in Appendix J of the MWC Handbook, states as follows:

The focus of the Conference policy will be on-site competition considerations.

Conference game management procedures and the existing provisions of MW Rule 4 – Sportsmanship will also be applicable if necessary.

The decision as to whether a transgender athlete(s) will be permitted to participate in intercollegiate athletics for a particular MW member shall be a matter of that individual institution's discretion in the context of its interaction with the individual, the application of state law, etc. A MW member may not, however, preclude student-athletes from other MW member institutions from participation in accordance with the policy outlined herein.

The institution shall be responsible for identifying transgender student-athletes in its program. Just as is the case for all other areas of eligibility, the institution shall be responsible for certifying the student-athlete's eligibility for competition per the applicable NCAA transgender participation standards and procedures and competing with only those individuals who are eligible. Failure to do so could result in consequences related to NCAA championships participation.

In the interest of inclusion, a transgender student-athlete may be a member of a team and participate in practice activities without certification of eligibility. To compete, however, the student-athlete must complete the NCAA process and meet the applicable eligibility threshold.

For intraconference competition, a transgender athlete who has been deemed eligible by the NCAA and has been included on a MW member institution's team shall be permitted to participate in all Conference competitions.

If a MW member institution's team refuses to compete in an intraconference contest against a fellow MW member institution's team which includes an eligible transgender student-athlete(s), the team refusing to participate shall be deemed to have forfeited the contest. The forfeiting team will be charged with a loss and the opposing team credited with a win – for the purposes of Conference records, standings, tie-breaking formulas and MW championships participation.

The status of any such contest with regard to NCAA records, statistics and postseason eligibility shall be determined by the NCAA standards in effect.

The application of the policy is straightforward for team sports competition. For individual sports which involve both individual results and a team score component, an institution (or its individual student-athletes) may choose to withdraw from a particular event(s) without triggering the team forfeit provision. Should the entire team choose not to compete, it would forfeit its position in the event/final standings.

For interconference competition, the applicable NCAA playing rules for the sport shall apply should a nonconference opponent refuse to compete.

Any questions regarding the status or eligibility of a transgender student-athlete shall be directed to the certifying institution, not the Conference nor the NCAA. Given the privacy considerations involved, the certifying institution is not obligated to proactively notify the Conference nor other institutions (Conference or non-conference) regarding the status of a transgender student-athlete. An opposing institution wishing to confirm the status of a student athlete may inquire and it shall be the discretion of the certifying institution whether or not to provide pertinent information. The certifying institution may simply respond that it has ensured all of its student-athletes are eligible prior to competition. The NCAA will not entertain inquiries or challenges regarding the eligibility of transgender student-athletes.[54]

---

[54] MCW Handbook, Appendix J, Mountain West Transgender Participation Policy, *available at*: 3a9b0b52-appendix-j-mountain-west-transgender-participation-policy.pdf.

### 1.    Adoption of the MWC TPP Constituted State Action

357.    MWC Rule 8 sets forth the MWC Handbook amendment process which requires that a "proposed amendment to the rules of the Handbook shall be submitted in writing to the faculty athletics representatives' designated governance group." MWC Rule 8.1.

358.    "All proposals" to amend Handbook rules must first be referred "to the faculty athletics representatives' designated governance group to develop appropriate language." MWC Rule 8.1.

359.    Thereafter, a "proposed amendment to a provision of the Articles, Bylaws or Handbook may be amended at any annual or called meeting [of the MWC Board of Directors]." MWC Rule 8.1.1.

360.    On information and belief, the annual meeting of the MWC Board of Directors did not take place in September of 2024.

361.    Article 2.06 of the MWC Bylaws provides that the regular annual meeting of the MWC Board of Directors is to take place in May or June of each year.

362.    No public announcement of a "called meeting" of the MWC Board of Directors to adopt the MWC TPP appears to have been issued in September 2024.

363.    "Special meetings of the Board of Directors may be called by or at the request of the Chairperson of the Board or fifty percent (50%) or more of the members of the Board of Directors then in office." MWC Bylaws, Article 2.07.

364.    "Notice of each meeting of the Board of Directors stating the place, date and time of the meeting shall be delivered . . . to all directors at least seven (7) days before the date of the meeting." MWC Bylaws, Article 2.08.

365.    At a minimum, approval of an amendment to the Handbook "requires a 75 percent vote of Conference member institutions in good standing." MWC Rule 8.1.1; *accord* MWC

Bylaws, Article 2.15 (specifying "[t]he Handbook may be amended only by the affirmative vote of three-fourths (3/4) of the members of the Board of Directors").

366.    However, "[a]ny action which is required to be or may be taken at a meeting of the Board of Directors or any committee thereof may be taken without a meeting if Consents in writing, setting forth the action so taken are signed by all of the directors or committee members entitled to vote with respect to the subject matter thereof.  Such consents (which may be signed in counterparts) shall have the same force and effects as a unanimous vote of the directors or committee members." MWC Bylaws, Article 2.08.

367.    Thus, to adopt the MWC TPP without a meeting (as must have happened if the MWC TPP was lawfully posted by Commissioner Nevarez's staff) required a written consent from every Chief Executive Officer (President, Superintendent, Chancellor or similar position) of every College and University in the MWC.

368.    To adopt the MWC TPP after following the required notice procedures <u>through a meeting</u> of the MWC Board Directors would have required the affirmative vote of at least eleven of the fourteen Directors of which either all or all but one are state institutions.[55]

369.    However, given the time frames involved, if the MWC TPP was legally adopted in accordance with MWC Handbook and Bylaws requirements then *it must have been approved in writing through "Consents" signed by every MWC college and university President*. *See* MWC Bylaws, Article 2.08.

370.    Adoption of the MWC TPP plainly constituted state action as the MWC TPP was adopted by state actors (i.e., University Presidents acting in their official capacities) and the MWC

---

[55] All member institutions in the MWC are state actors with the sole exception of Colorado College.

TPP must therefore pass muster under the First and Fourteenth Amendments to the U.S. Constitution.

371.    It does not.

**2.    The MWC TPP Targets for Penalty the Viewpoint that a Man Should Not Participate on a Women's Team in College Sport**

372.    Timing makes clear that adoption of the MWC TPP was motivated by participation of Fleming on the SJSU Team and public knowledge that MWC women's volleyball teams were considering sitting out of matches against SJSU because Fleming is a trans-identifying male.

373.    No other reasonable explanation can be given for the mid-season, last minute, posting of the MWC TPP just as the Boise State University was announcing its women's volleyball team would not be playing its match against the SJSU Team.

374.    Review of the existing MWC policies, which do not set forth a clear policy or practice of imposing losses upon teams which choose not to play for safety reasons, also supports the conclusion the MWC TPP was specifically adopted to chill protests and other expressive conduct, including boycotts, on a women's rights issue.

375.    Prior to adoption of the TPP all MWC rules regarding a team not participating in a scheduled MWC competition were set forth in the General Regulations (Regulation 1) or the sport-specific regulations (Regulations 2-16) in the MWC Handbook.

**3.    MWC General Regulations Do Not Penalize A Team For Not Continuing to Compete When There Exists a Threat to Student-Athlete Safety**

376.    MWC Handbook Regulation 1 contains two rules related to the failure to contest or complete a scheduled conference game:

a.    Interrupted Contest Procedures (MWC Regulation 1.7);

b.    Inclement Weather (MWC Regulation 1.8);

377.    Interrupted Contest Procedures can be applied in "emergencies . . . which make a contest's start or completion impossible or inadvisable." MWC Regulation 1.7.

378.    Interrupted Contest Procedures can also be applied "when circumstances exist such that commencement or continuation of play would pose a threat to the safety of the constituent groups involved with the contest." MWC Regulation 1.7.2.

379.    "The authority to cancel, postpone or terminate a contest is vested only in the Commissioner or their designee. Authority to suspend a contest is vested in the head official." MWC Regulation 1.7.3.

380.    According to the MWC Interrupted Contest Procedures, "[i]f a contest is suspended prior to the start for any reason and cannot resume under the applicable guidelines, the participating institutions, in consultation with the Commissioner or their designee, shall attempt to declare the contest postponed and reschedule the contest at a later date. If the Commissioner determines the game cannot be rescheduled, <u>it will be considered a cancelled game</u>." MWC Regulation 1.7.4.4 (emphasis added).

381.    The Interrupted Contest Procedures do not include any provisions for declaring a forfeit or for assigning a win or a loss in the event of a contest which is not played, cancelled or suspended prior to, or even after, its start due to concerns regarding student-athlete safety.

382.    The recently added MWC TPP is therefore *the only MWC rule that imposes a penalty for a team not playing a match or game due to concerns about athlete safety*.

383.    In every context other than when the opposing team has a "transgender athlete" there is no authority to impose a forfeit or assign a win or loss when a concern over student-athlete safety causes a contest not to be played or completed.

384.    Similarly, the MWC Inclement Weather procedures do not provide for declaring a forfeit or for assigning a win or a loss in the event of a contest which is not played, cancelled or suspended prior to or after its start due to concern for player safety arising from inclement weather.

**4.    The MWC TPP is Nothing Like Other MWC Rules Involving Forfeits**

385.    MWC General Regulation 1.12 states that, "[a]t no time is either the home or visiting coach vested with the authority to stop or discontinue play. A coach unilaterally taking his/her team from the playing area or refusing to play may be subject to Conference sanctions and possible forfeiture of the contest." MWC Regulation 1.12.

386.    Additionally, MWC Regulations pertaining to Men's and Women's Basketball, and Football provide that a visiting team which does not arrive at the location of the contest at the moment the scheduled start time is reached is subject to forfeiture of the contest upon the approval of the Conference office. MWC Regulation 3.8.a (Men's Basketball), MWC 4.8.a (Women's Basketball), MWC 6.4.a (Football).

387.    The foregoing were the only MWC rules addressing forfeits before promulgation of the MWC TPP and they require specific evaluation by the Conference office of the reasons a contest was not played, including consideration of any extenuating circumstances such as safety concerns.

388.    Thus, prior to the adoption of the MWC TPP, the only circumstances in which the MWC Handbook permitted a forfeit to be assessed was (a) if a coach unilaterally took their team off the field in the middle of a contest or (b) if a visiting team failed to show up on time to a Football game or a Men's or Women's Basketball game, and in both circumstances a forfeit is not automatic but is imposed only after evaluation of all relevant circumstances by the Conference office.

389.    The MWC TPP therefore is the only conference forfeiture policy which makes forfeiture automatic and does not involve the Conference office in the balancing of equities or in the consideration of safety concerns.

390.    That the MWC TPP was adopted solely to punish dissent from full-on endorsement of transgender ideology and without any room to even consider the safety of female athletes could not be clearer.

### 5.    Targeted Nature of the Last-Minute MWC TPP

391.    Furthermore, the MWC TPP is not a broad forfeit policy regarding team protests on general matters of public concern, but instead is clearly targeted only at protests that express the specific viewpoint that men should not participate in women's college sports.

392.    The MWC TPP specifically penalizes schools and student-athletes (a) attempting to protect female student-athletes from unfair or unsafe competition against a male, or (b) protesting participation by a man on a women's team.

393.    The MWC TPP singles out "intraconference contest[s] against a fellow MW member institution's team which includes an eligible transgender student-athlete(s)" and does not mention any other kind of contest.

394.    Therefore, the MWC TPP is, on its face, a mandatory forfeiture policy that penalizes student athletes for exercising their First Amendment rights to protest men participating in women's sports and their Fourteenth Amendment right not to be subject to sex discrimination through having their safety threatened and risks of injury increased by having to face a man competing in women's volleyball.

395.    The MWC TPP was purposefully added to the MWC Handbook, and approved by Commissioner Nevarez and posted on the MWC website at her direction, to create a threat of forfeiture (which impacts Conference records, standings, tie-breaking formulas and MWC

championships participation) to deter female student-athletes and teams from exercising their First Amendment rights to protest and boycott male participation on women's sports teams to which they objected.

396.    The MWC TPP penalizes member institution athletic teams who protest the inclusion of men in women's sports by "charging [the protesting team] with a loss … for the purposes of Conference records, standings, tie-breaking formulas and MW championships participation."

397.    Except in the very limited circumstances described above, no other MWC Handbook policy, rule, or regulation mandates that teams suffer forfeiture because they choose, for whatever reason, whether based on safety concerns or otherwise, not to participate in an interconference contest *and no other forfeit rule is applied automatically*.

398.    Moreover, no other MWC Handbook policy imposes a penalty for conduct taken if the other team "includes an eligible transgender student athlete."

**6.    The "Don't Ask, Don't Tell" Clause in the MWC TPP Is Also Intended to Chill Speech and Prevent Petitions for Redress of Grievances**

399.    Another anti-speech provision in the MWC TPP is the "don't ask, don't tell" aspect of the policy set forth in the last paragraph of the MWC TPP.

400.    That paragraph states:

> Any questions regarding the status or eligibility of a transgender student-athlete shall be directed to the certifying institution, not the Conference nor the NCAA. Given the privacy considerations involved, the certifying institution is not obligated to proactively notify the Conference nor other institutions (Conference or non-conference) regarding the status of a transgender student-athlete. An opposing institution wishing to confirm the status of a student-athlete may inquire and it shall be the discretion of the certifying institution whether or not to provide pertinent information. The certifying institution may simply respond that it has ensured all of its student-athletes are eligible prior to competition. The NCAA

will not entertain inquiries or challenges regarding the eligibility of transgender student-athletes.

401.    This clause has the effect of foreclosing any avenue of bringing concerns forward about the eligibility of a transgender student-athlete and it further demonstrates that Commissioner Nevarez and the MWC posted and promulgated the MWC TPP specifically to chill dissent.

402.    It mandates that an institution shall "not" direct questions regarding the status or eligibility of a transgender student-athlete to "the Conference nor the NCAA."

403.    Due to this aspect of the MWC TPP, it has now become a rule violation for a team or school to even ask the MWC or NCAA to investigate the eligibility of a transgender student-athlete or to report concerns about the eligibility of the athlete.

404.    There is no rational basis for a rule that prevents a school from reporting eligibility concerns regarding a student-athlete.

405.    In effect, this aspect of the rule is an anti-whistleblower provision—*it is designed to discourage individuals from reporting potential rule violations*.

406.    The approach underlying this rule is inconsistent with other rules of the MWC which provide that those with information about potential rule violations in other contexts are encouraged to report the potential violations to the conference and/or the NCAA.

407.    For example, the MWC Sportsmanship Policy (MWC Rule 4) provides that, "[a]llegations of misconduct generally shall be reported to the Commissioner (or designee) within 24 hours of the incident." MWC Rule 4.3.

408.    Thus, the "don't ask don't tell" aspect of the MWC TPP is inconsistent with free speech and with a state actor's duty to permit petitions for the redress of grievances, further underscoring that the purpose of this peculiarly adopted rule was to punish dissent and chill speech.

409.    Finally, the "don't ask, don't tell" aspect of the MWC TPP highlights the absurdity of the exercise in which SJSU and the MWC have engaged this season and provides further evidence of the targeted nature of the MWC TPP.

410.    Early paragraphs in the MWC TPP purport to punish refusals to play as "forfeits" and impose a "loss" for a refusal to play solely if the opposing team has a "transgender student-athlete."

411.    Yet, the "don't ask, don't tell" aspect of the same policy denies MWC members and student-athletes the necessary transparency  to confirm whether a student-athlete on the opposing team is, in fact, a "transgender student-athlete."

412.    Indeed, SJSU has oddly but steadfastly refused to publicly acknowledge that Fleming is a transgender student-athlete while selectively providing this information in a self-serving manner, as discussed below.

413.    And the "don't ask, don't tell" policy tells SJSU it does not have to answer anyone's question about whether Fleming is a "transgender student-athlete."

414.    At the same time that SJSU has been keeping up its charade of silence and claiming to the media it is unable to acknowledge that Fleming is a "transgender student-athlete," the MWC Commissioner has been publicly acknowledging that *Fleming is a transgender student-athlete* by awarding wins to SJSU, which, of course, SJSU is willingly accepting, all on the grounds that (as required for the win and loss to be assessed under the MWC TPP) Fleming is a "transgender student-athlete."

415.    Such contortions by SJSU and the MWC arise from their effort to suppress speech, public debate, and scrutiny and silence those seeking transparency about biological facts and an

honest discussion about the real harms to women that arise from allowing a male "transgender student-athlete" to compete on a women's team.

416.     Clearly, the MWC TPP was not meant to work in a practical and logical fashion.

417.     Instead, it was designed specifically and solely to conceal facts and punish women's volleyball student-athletes who would dare to protest against having to play against a man competing on a women's team.

## T.     In Addition to Violating the First Amendment the MWC TPP Transgresses the Equal Protection Clause

418.     In addition to being a targeted effort to suppress expressive conduct in violation of the First Amendment, the MWC TPP violates the Equal Protection Clause of the Fourteenth Amendment.

419.     The penalties exacted by the MWC TPP apply only when the opposing team has a "transgender student-athlete" on their roster.

420.     In other words, the penalties exacted by the MWC TPP apply only when the opposing team has a student-athlete of a sex opposite the sex specified for the sport eligibility category in question (*i.e.*, the opposing team has a trans-identifying male on a women's team or a trans-identifying female on a man's team).

421.     Under the Equal Protection Clause a classification based on sex is subject to heightened scrutiny and can be lawful only if the classification serves an important interest and is substantially related to the achievement of that interest.

422.     The MWC TPP fails heightened scrutiny because it does not serve an important interest.

423.    The MWC can show no important interest in requiring women to play against a male volleyball player when the women's school or the women themselves have legitimate safety concerns about playing against the male.

424.    To require that safety concerns of female athletes be disregarded is inconsistent with how the MWC handles many other situations in which a contest is not played, which is to simply regard the game as a cancellation rather than to automatically assign a loss to one team and win to the other.

425.    Thus, because the MWC has not advanced a rationale for the MWC TPP that can overcome heightened scrutiny, it fails under the Equal Protection Clause.

**U.    The MWC is Encouraging Its Members, Coaches and Athletic Directors to Suppress Free Speech and Protest**

426.    Because of the MWC TPP's threat of forfeiture (which implicates and jeopardizes Conference records, standings, tie-breaking formulas and MW championships participation), the coaches and athletic department staff of MWC member institutions have reacted, just as the MWC intended, by threatening and discouraging women's volleyball student athletes from (a) exercising their First Amendment rights to protest and speak out against Fleming's participation in MWC women's volleyball and (b) boycotting matches against the SJSU Team.

427.    Players report that their coaches say "we support you" but that because the coaches are "employees of the school" the coaches are not able to express their views publicly and could lose their positions at their schools if they publicly agreed with the team members' protest.

428.    There is a plain undercurrent within the MWC motivated at least in part by the MWC TPP that school employees who support women's volleyball protests will be punished.

429.    The threats and discouragements of student-athletes exercising their First Amendment rights from MWC coaches and athletic departments directly result from the MWC

TPP and have been encouraged by the MWC and the MWC TPP, including through the actions and comments of Commissioner Nevarez and through the actions of the Athletic Directors and Presidents of MWC public member institutions who sit on MWC Committees and control the policies and actions of the MWC.

1.    **USU Team Members Have Been Harmed by MWC Policies and Discouraged from Exercising Their First Amendment Rights**

430.    The experiences of Kaylie Ray and her teammates at Utah State University ("USU") are typical of what many MWC volleyball student-athletes have experienced during the 2024–25 volleyball season.

431.    Ray is currently a member of the USU women's volleyball team ("USU Team") which plays in the MWC. She received a full scholarship to play for the USU women's volleyball team as an outside hitter. She is a redshirt junior and a team co-captain.

432.    When Ray was recruited to play women's college volleyball she never expected to have to play against males who have significant physiological advantages in collegiate competition.

433.    Ray knows from experience and thousands of hours watching video of the world's best volleyball players that men have unmatchable physical advantages over women in volleyball. She knows that she could not play NCAA Division I men's volleyball because she cannot match the power and speed in the men's game.

434.    Relatively early in the 2024 season and before conference competition began, the members of the USU team heard that Southern Utah University had backed out of a game with SJSU because Fleming was male.

435.    As a result, Ray and many of her teammates began to talk amongst themselves about how unfair and unsafe they thought it was that they were expected to play against a biological male.

436.    Ray and her teammates watched videos of some of Fleming's attacks and kills, which demonstrate Fleming's unmatched power, explosiveness and leaping ability in comparison to women.

437.    One of Ray's former teammates was forced to medically retire due to concussions from playing volleyball, and Ray and her teammates realized that all it would take for them to have to retire and perhaps be permanently injured would be for a single Fleming attack to hit them in the head. They recognized that if that happened, it could be their last game.

438.    Ray reports that as she and her teammates thought about what was happening in the MWC and around the country to opportunities for women in sport, they began to realize that they would need to fight for their rights.

439.    Ray and the women on the USU Team began to understand that things would not change for the better if they sat back and expected others to defend their rights.

440.    Next, the USU women heard that Boise State University had canceled their match against SJSU and that the Idaho Governor had come out in support of the Boise State women's volleyball players.

441.    After Boise State announced their cancellation the USU head women's volleyball coach came into a film meeting and stated flatly and emphatically, "I don't know how you guys feel about this, but we will be playing against San Jose State; Blaire is not that talented."

442.    Ray says, "[t]his statement by our coach really rubbed our team the wrong way. We were shocked that we had no say in the decision, nor were we asked if we thought competing against SJSU was fair or safe."

443.    Ray recalled, "[w]hen the University of Wyoming stood up and also cancelled their match against SJSU, we were further inspired as a team to do something."

444.    Several USU Team members communicated to their coach that they thought it was wrong for Fleming to play and that they did not think USU should play against SJSU. However, the Coach was resistant to any protest.

445.    Eventually, the team had a players-only Zoom meeting with the USU President and Athletic Director.

446.    The USU President explained that she would like the USU Team to participate in an anonymous survey about how each player felt about playing in the SJSU match.

447.    The players were instructed simply to, "tell us your thoughts and feelings regarding the SJSU match."

448.    The USU women learned shortly after their survey responses were received that they would not have to play the match against SJSU.

449.    Ray says, "My teammates and I are glad we are standing up for our rights as women, however, we are making significant sacrifices to do so. Title IX is supposed to guarantee us equal opportunities as women, but it is not being interpreted that way by the NCAA, the MWC or by SJSU. They all have adopted rules that allow a man to steal our places and opportunities and threaten our safety. We were required by the MWC to take a loss for 'forfeiting' against SJSU, even though it was SJSU's insistence on rostering a male to play women's volleyball that caused us not to play the game. In other words, the MWC and its unjust rules say we are in the wrong for

standing up for women's rights and against discrimination. As a senior playing in my last volleyball season at Utah State, that is one less game in my career, one game taken away from me because the NCAA, MWC, and SJSU do not have policies that comply with Title IX. That is a bitter pill for me and a majority of my teammates to swallow."

450.    Ray also observed that the USU statement that the USU Team forfeited to SJSU was posted on the USU website, and Ray understands that SJSU reached out and asked USU to take down the statement from the USU website. Ray, says, "It was insulting to the USU women's volleyball team that the USU statement about the game was initially taken down by USU and then eventually put back up. It appears there may be some who want to quickly erase the memory of any woman standing up for her rights."

451.    Ray and her teammates experienced additional efforts to prevent them from speaking out about women's rights.

452.    Friday practices on the USU Team are known as "Fun Friday" and the women are allowed to wear whatever they want to practice.

453.    After standing up for their rights not to play a male player, four of the USU players decided they would wear t-shirts with the inscription "BOYcott" on them to practice.

454.    Ray said, "it was a bonding thing and a statement of solidarity with all the women in the conference who are standing up against men taking women's places in sport. We thought it would encourage our teammates and we wanted to demonstrate the pride we have in our entire team being willing to stand up for women's rights."

455.    Before practice, four of the student-athletes, including Ray, took a picture on the volleyball court wearing their "BOYcott" t-shirts.

456.    Later, the picture was posted on social media and it began to get widespread attention. Here is a true and accurate copy of the picture that was posted:



457.    On the following Monday the USU Team traveled to Reno, Nevada for their next Mountain West Conference game.

458.    In her hotel room after arriving in Reno, Ray was informed by her head coach that her coach had received a message from the head women's volleyball coach at SJSU stating that it was distasteful for Ray and her teammates to try to make a statement by having their pictures taken in "BOYcott" t-shirts.

459.    Later in the film room, the USU head coach, in front of the entire team, spoke sharply to Kaylie and another teammate who was also in the photo.

460.    The USU Coach accused Ray of usurping the voice of the team and being "selfish" for having the picture posted.

461.    The USU Coach told Ray this was a "hot button issue" and that the USU players should avoid making any more public statements about this issue.

462.    After that, the USU Team got on the team bus to drive to practice and one of Ray's teammates in the picture came to Ray crying after the uncomfortable and embarrassing dress-down received from their coach. Ray consoled her teammate with the thought that, "we did a hard thing, and we did a good thing."

463.    That this pushback on Ray's protected First Amendment activity took place at a university that allowed its women athletes to express their opinion about playing the SJSU Team and then canceled the team's game against USU illustrates the fraught and hostile environment for free expression on the men in women's sports issue the MWC TPP has created and was intended to create.

464.    Ray reports that she has "tried to stay positive as I reflect on the fact that even as we were trying to sacrifice for other women in the conference and for future generations of women, many around us were only concerned about the discomfort our stand was causing them and how it made them appear to others. They did not appear to care about standing up for us; they simply acted inconvenienced and put off by our decision to speak up for women."

465.    Ray reports that the team has subsequently been pressed to agree on a statement that they will not protest in the MWC championship tournament and that she has been told that the MWC has been communicating to coaches and athletic departments, informing them they need to get their players in line and end the protests.

466.    These communications from USU campus personnel have led Ray and her teammates to be concerned that they will be prevented from playing in the conference championship if they do not say exactly what the MWC is requiring them to say.

2.    **Nevada, Reno Team Members Have Been Harmed by the MWC TPP and Discouraged from Exercising Their First Amendment Rights as a Result of Concerted Activity Resulting from the MWC TPP**

467.    The University of Nevada, Reno (Nevada, Reno) women's volleyball team (the "Nevada, Reno Team") has also experienced significant pressure resulting from the MWC TPP and from MWC representatives at their University to not protest the participation of Fleming in the scheduled October 25, 2024, match between the Nevada, Reno Team and the SJSU Team.

468.    Sia Liili and Nicanora Clarke are members of the Nevada, Reno Team.

469.    On or about October 3, 2024, without consulting the members of the Nevada, Reno Team, and motivated by the MWC's adoption of the NCAA TEP and the existence of the MWC TPP the administration at Nevada, Reno issued a public announcement stating that the Nevada, Reno Team would play the SJSU Team in their women's volleyball match scheduled for October 26, 2024.[56]

470.    This public announcement was made on the day the Nevada, Reno Team was playing their cross-state rivals at the University of Nevada Las Vegas (UNLV).

471.    After the UNLV game the Nevada, Reno coach told team members they would have a team meeting with Nevada, Reno Athletic Director Stephanie Rempe on the following Monday, October 6.

472.    AD Rempe is a member of the MWC Joint Council and of the Directors of Athletics Governance Group of the MWC.

473.    As a member of the Directors of Athletics Governance Group of the MWC, AD Rempe has shared responsibility in the governance of the MWC to monitor and review issues related to the gender equity efforts of the Conference and the Conference office, including the

---

[56] *See* https://www.outkick.com/sports/university-nevada-volleyball-san-jose-state-blaire-fleming.

review of access and inclusiveness of women at all levels of the athletics programs of member institutions and to advocate processes and proposals to foster equity in the athletics programs of the Conference.

474.    Before their meeting with AD Rempe the women's volleyball team members met and 16 out of 17 team members voted not to play in the SJSU game.

475.    The 16 team members who did not want to play the SJSU Team felt this way in part because they wanted to protest that a male athlete was taking the place of a women.

476.    They also did not want to play the match because they had safety concerns as they had seen that Fleming was able to spike the ball over blockers, with those kills over the block sometimes hitting the floor within the ten foot line.

477.    This was an astounding display of leaping ability by Fleming of which they knew no other player on a women's team in the MWC was capable.

478.    The team members recognized that no other player in the conference had Fleming's combination of power and explosiveness, and that they would be facing increased safety risks by playing Fleming.

479.    At the meeting with AD Rempe the Nevada, Reno team members said they did not believe it was fair to be asked to play a man and that women had fought for a long time to be able to play college sports and it was not right that a man could sweep all that progress away.

480.    Throughout the meeting AD Rempe read comments off a paper she was holding, and she responded, "there are two sides to every story."

481.    Relying upon the MWC TPP, AD Rempe also said she wanted the team members to "think about it, because it will affect your season."

482.    AD Rempe told the team members that "we don't want you to miss the opportunity to play."

483.    While AD Rempe acknowledged she was "not fully educated" on the issue of transgender student-athlete athletic ability, she told the Nevada, Reno Team members "you should get educated" on what Blaire Fleming could and could not do.

484.    AD Rempe said that she had received information about Blaire Fleming from the Athletic Director at SJSU whom she had contacted.

485.    AD Rempe said that, "I can guarantee you that Fleming's testosterone levels are being tested every week."

486.    AD Rempe said that "transwomen are at a disadvantage compared to ciswomen" because they are "taking testosterone blockers and estrogen."

487.    And AD Rempe said, "transwomen are at a disadvantage because estrogen makes them tired."

488.    Sia Liilii responded to AD Rempe, "If this is all true why don't we see women transitioning to men and dominating [the men] like Lia Thomas [in the women's category] did and competing in [men's] Division 1 sports like Blaire [is competing in women's Division 1 sports]," to which AD Rempe responded, "I don't know."

489.    The Nevada, Reno student-athletes told AD Rempe that they had developed a public statement confirming that they had decided they would not play against SJSU and wanted to issue the public statement on their own behalf.

490.    AD Rempe responded that she wanted the Nevada, Reno women to hold off releasing any statement and to think about what she had said to them.

491.    After the meeting with AD Rempe the Nevada, Reno student-athletes had numerous conversations with each other about what they should do.

492.    Although the Nevada, Reno athletes laughed among themselves after the meeting that "we have estrogen too" and "maybe that's what makes us tired," the overall feeling that the team members had coming out of the meeting was discouragement because they believed their concerns about their safety and competitive fairness were not being taken seriously by their University and the MWC.

493.    Although AD Rempe had told the Nevada, Reno student-athletes that they "should get educated," and one volleyball player requested written information, no volleyball players were provided written information by the school administration.

494.    Further discussions among the team members led them to recognize that, while many student-athletes still did not want to play, some were not anxious to challenge their school's athletic director.

495.    Ultimately, 13 of the 17 team members decided to sign a letter to Athletic Director Rempe and other members of the Nevada, Reno school administration reaffirming their decision not to play. A true and accurate copy of this letter is attached as **Appendix E** to this Complaint.

496.    On October 17, 2024, the Nevada, Reno Team members sent out a public announcement saying that they would not play their scheduled MWC game against the SJSU team, stating:

> We, the University of Nevada Reno women's volleyball team, forfeit against San Jose State University and stand united in solidarity with the volleyball teams of Southern Utah University, Boise State University, the University of Wyoming, and Utah State University.

> We demand that our right to safety and fair competition on the court be upheld. We refuse to participate in any match that advances injustice against female athletes.[57]

497.    After the team members' announcement went out, AD Rempe asked for another meeting with the Nevada, Reno Team at which she said that Nevada, Reno would be coming out with a statement in support of the women's volleyball team.

498.    However, when the Nevada, Reno statement came out the women on the Nevada, Reno team recognized that the University's statement did not in fact support the student-athletes statement or decision to stand up for their rights, but instead simply said that Nevada, Reno would not penalize the Nevada, Reno women's volleyball team members for protesting.

499.    The statement from the Nevada, Reno Administration read as follows:

> On Oct. 13, 2024, the majority of members of the University of Nevada, Reno women's volleyball team sent a statement to the University advising the institution that they were forfeiting its scheduled match with San Jose State University on Oct. 26, 2024. The players' decision and statement were made independently, and without consultation with the University or the athletic department.

> The players' decision also does not represent the position of the University. The University and its athletic programs are governed by the Nevada Constitution and Nevada law, which strictly protect equality of rights under the law, and that equality of rights shall not be denied or abridged by this state or any of its subdivisions on account of race, color, creed, sex, sexual orientation, gender identity or expression, age, disability, ancestry or national origin.

> The University is also governed by federal law as well as the rules and regulations of the NCAA and the Mountain West Conference, which include providing competition in an inclusive and supportive environment. The University intends to move forward with the match as scheduled, and the players may choose not to participate in the match on the day of the contest. No players will be subject to

---

[57]    *See*    https://www.outkick.com/sports/university-nevada-volleyball-forfeit-san-jose-state-transgender-blaire-fleming.

any team disciplinary action for their decision not to participate in
the match.[58]

500.    On October 17, 2024, Nevada, Reno President Brian Sandoval issued a further

statement stating in part:

> The University acknowledges that a student athlete's refusal to
> participate in the match with San José State University can be
> interpreted as free expression that is protected by the First
> Amendment of the United States Constitution. Conversely, we also
> acknowledge that a student athlete's choice to play in the same
> match may also be intended as free expression protected by the First
> Amendment. Consequently, a forfeiture declared by the University
> prior to the match for reasons involving gender identity or
> expression could violate the rights of our student athletes whether
> they choose to compete or not.[59]

501.    On October 22, 2024, the University of Nevada, Reno and SJSU released a joint

statement moving the site of their scheduled October 26, 2024, women's volleyball game from

Reno to the SJSU gymnasium.[60]

502.    On October 24, 2024, the Nevada, Reno women's volleyball team played its

scheduled match at Fresno State University. After the Fresno State game there were two buses

waiting for the Nevada, Reno women. One bus would take the women directly home to Reno. The

women were told that the other bus would travel to SJSU for the game with SJSU. The Nevada,

Reno women were told they had to choose on which bus to sit.

503.    A single student-athlete chose the bus bound for SJSU. However, after the choices

had been made the student-athlete on the bus to San Jose was told to disembark as that bus would

not be making the trip to San Jose.

---

[58] *See* https://www.outkick.com/sports/breaking-university-nevada-says-forfeit-against-sjsu-does-
not-represent-position-school.
[59]    *See*    https://nevadasportsnet.com/newsletter-daily/unr-president-brian-sandoval-releases-new-
statement-on-nevada-sjsu-volleyball-match.
[60]    *See*    https://nevadasportsnet.com/news/reporters/nevadas-controversial-volleyball-match-
against-san-jose-state-has-moved-locations.

504.    Only after that exercise did Nevada, Reno officials announce that the Nevada, Reno women's volleyball team would not play the SJSU Team.

505.    The Nevada, Reno women's volleyball players intending to exercise their First Amendment rights, as the President of their University made clear, did not play in the game against SJSU.

506.    However, the Nevada, Reno student-athletes were punished by the MWC for engaging in First Amendment activity and protesting as the team was assigned a "loss" for the SJSU game which they boycotted, just as three other student-athletes on three other teams in the MWC have been punished via the MWC TPP.

## V.    Reported Attempt by Blaire Fleming, in Collusion with a CSU-FC Player, to Physically Injure Slusser

507.    Brooke Slusser's motion to join the Title IX lawsuit and assert her concerns arising from Fleming's participation on the SJSU Team was filed on the evening of September 23, 2024, less than a full day before the SJSU Teams' September 24 game against Fresno State University.

508.    Following Boise State University's refusal to play the SJSU Team on September 28, 2024, the SJSU Teams' next game was scheduled for October 3, 2024, at Colorado State University located in Fort Collins, Colorado (CSU-FC).

509.    On October 2, 2024, the SJSU Team traveled to Fort Collins, Colorado for the CSU-FC game.

510.    That night a teammate of Brooke Slusser received a social media direct message at 8:24 p.m. stating, "please distance yourself from brooke. tomorrow at the game, it will not be good for her."[61]

---

[61] A true and accurate copy of this direct message is attached as **Appendix F**.

511.    This message was upsetting and deeply concerning to most of the girls on the SJSU Team, and it resulted in extra police presence at the CSU-FC game.

512.    SJSU Associate Head Coach Melissa Batie-Smoose learned of the threatening message when Slusser and her roommate both came to Batie-Smoose at the team hotel the evening before the game. The student-athletes were both distraught about the message and had been unable to locate Coach Kress to report the message.

513.    Batie-Smoose was able to connect with Kress, and they contacted an off-duty police officer who was traveling with the SJSU Team. The off-duty officer then reached out to CSU-FC campus security.

514.    During these discussions, and given the threat was directed at Slusser who had recently raised Title IX claims involving Blaire Fleming, the question was raised, "where is Blaire?"

515.    Batie-Smoose and Kress learned that in violation of team rules Fleming had snuck out of the team hotel.

516.    Kress started texting Fleming to come back to the hotel, and when Batie-Smoose asked why Fleming was out of the team hotel, contrary to explicit instructions not to leave it, Kress said, "I'll handle this."

517.    Batie-Smoose does not believe that Fleming was ever disciplined for this violation of SJSU Team rules, and she reports that Todd Kress had told her that he specifically gives Fleming preferential treatment because Fleming is transgender.

518.    At this time, Batie-Smoose and Kress were not aware that any other student-athlete had left the team hotel with Fleming.

519.    The tension level surrounding the SJSU Team going into the CSU-FC game was increased by CSU-FC designating the game as the "Inclusive Excellence Volleyball Game," which turned the volleyball game into a forum for social protesting.

520.    From Batie-Smoose's vantage point the game proceeded in a concerning fashion.

521.    Fleming had by far the worst game of the season, but it was not just that Fleming was not playing well, Fleming was repeatedly out of position throughout the game.

522.    Fleming frequently did not come to the net and was regularly out of position to block the opposite hitter on the CSU-FC Team.

523.    Batie-Smoose reports that it seemed that Fleming's head was totally out of the game, but even more oddly on several occasions Batie-Smoose saw Fleming wink at CSU-FC's outside hitter Malaya Jones, who wears CSU-FC uniform no. 1, on occasions when Fleming did not go to the net to block as Fleming was supposed to do.

524.    During the first and third sets Batie-Smoose was positioned right next to Fleming and calling the SJSU Team's blocking.

525.    Batie-Smoose repeatedly sought to communicate with Fleming, but Fleming simply ignored Batie-Smoose and would not acknowledge the Associate Head Coach's attempts to communicate.

526.    It was clear to Batie-Smoose that Fleming was intentionally not blocking and was ignoring Batie-Smoose and the SJSU Team's gameplan.

527.    Batie-Smoose brought all these things to the attention of Coach Kress during the game and told him that Batie-Smoose believed that Fleming was trying to intentionally throw the game to CSU-FC.

528.    After the first set, Todd said to Batie-Smoose, "You take the team, I'll talk to Blaire."

529.    However, nothing changed in Fleming's performance, refusal to block, and refusal to execute the gameplan, throughout the match.

530.    Nevertheless, Todd Kress kept Fleming in the game and refused to discuss Fleming's play further with Batie-Smoose.

531.    Fleming had the most errors of anyone on the court and was doing strange things like gently tapping the ball to the opposite hitter on the CSU-FC Team, Malaya Jones, who promptly spiked the ball towards the SJSU setter, Brooke Slusser.

532.    On at least one such occasion after Fleming passed the ball to Jones, Jones blew a kiss towards Fleming.

533.    SJSU lost all three sets, the team's first loss of the season.

534.    After the game, Todd Kress allowed Fleming and SJSU student-athlete Randilyn Reeves to stay behind in Fort Collins and not travel back to SJSU with the team.

535.    This was highly unusual, and when Batie-Smoose asked why Fleming and Reeves were not traveling back with the team, Kress said that Fleming had asked to stay behind in Colorado.

536.    After the game Kress told all the players on the team that upon return to campus each player would be required to have fifteen (15) minute one-on-one meetings with him.

537.    Batie-Smoose was concerned that these post travel meetings might violate NCAA rules and tried to discourage them given that the entire team was exhausted from travel, but Kress was adamant that the meetings were going to be held.

538.    All SJSU Team student-athletes except Fleming and Reeves, who were still in Colorado, were required to attend the meetings.

539.    After the SJSU Team got back to campus student-athlete Chandler Manusky told teammates, including team co-captains Brooke Bryant and Alyssa Bjork, that Manusky, Fleming, and Reeves, had snuck out of the team hotel after hours the night before the CSU-FC game (i.e., October 2) to meet with Malaya Jones and that they had all gone to the residence of Jones.

540.    Manusky said that at Jones' residence Fleming had shared with Jones the scouting for the CSU-FC game and they had discussed Fleming "throw[ing] the game" and how they would set up Jones to "blow up" Slusser and "blast" her in the face during the game.

541.    Manusky also said that Fleming stated, "I'm going to leave center court open," which would allow Malaya Jones to have a wide-open shot to try to "blow up Slusser," *i.e.*, to try to hit Brooke Slusser in the face with the ball.

542.    Manusky was emotional and told her teammates that she felt badly about the incident and about being involved in a discussion about throwing the game but that she did not want to tell the coaches about what she knew.

543.    However, SJSU players insisted that the matter needed to be brought forward to the coaches.

544.    As a result, Manusky came forward to Batie-Smoose and Coach Kress.

545.    Manusky then explained Fleming revealing scouting to the CSU-FC player, Fleming's intent to "throw the game," and the effort to "blow up Slusser."

546.    Manusky was crying, asking the coaches not to tell Fleming that Manusky had revealed the meeting to them.

547.    At the time that Manusky admitted that she and Reeves had accompanied Fleming to meet with Malaya Jones neither Batie-Smoose nor Todd Kress (to Batie-Smoose's knowledge) were aware that either Manusky or Reeves had accompanied Fleming in sneaking out of the team hotel.

548.    After Manusky left, Todd Kress told Batie-Smoose he did not believe Manusky and thought she had made up the entire story so she would not get in trouble for leaving the team hotel.

549.    However, this explanation made no sense to Batie-Smoose.

550.    First, Manusky's explanation was consistent with everything Batie-Smoose witnessed in the CSU-FC game, including Fleming's conduct in the game.

551.    Second, neither Kress nor Batie-Smoose knew Manusky had left the team hotel and accompanied Fleming until Manusky told them that.

552.    Third, Manusky had not voluntarily come forward but had only come forward because her teammates had told her she had to come forward after she had explained to them the plan to throw the match and attempt to physically injure Brooke Slusser.

553.    Also, the threatening direct message predicting something bad was going to happen to Brooke Slusser during the CSU-FC game was transmitted around the time that Manusky said the meeting with the CSU-FC player occurred and this raised questions about whether Fleming could be connected to that electronic threat.

554.    Thus, in the opinion of SJSU Associate Head Coach Melissa Batie-Smoose, the report by Manusky was serious and there was sufficient corroboration and plausibility to it that there should have been an effort by SJSU to immediately get this information to law enforcement and to conduct a robust investigation, but Batie-Smoose does not believe this occurred.

555.    Instead, Batie-Smoose believes that SJSU had in its possession evidence of an effort to physically retaliate against Brooke Slusser for pursuing a Title IX complaint and evidence about throwing a college volleyball match in violation of the MWC's sportsmanship and ethical conduct policy, yet for nearly four weeks it does not appear that SJSU investigated whether this occurred, nor immediately report this information to the MWC as SJSU was required to do.

556.    When Batie-Smoose asked Kress later if he had brought forward the allegations of Manusky he said, "it's out of my hands" and that he had reported Manusky's allegations to Laura Alexander and that Alexander had "reported to Title IX."

557.    However, nearly four weeks after the allegations and concerns of Batie-Smoose and Manusky were brought forward to Coach Kress and after Coach Kress had claimed to Batie-Smoose that a Title IX investigation had commenced, Batie-Smoose had not been contacted as part of any investigation about the effort to injure Brooke Slusser or about the effort to throw the game to CSU-FC until November 12, 2024, the day before this lawsuit was filed.

558.    On November 12, 2024, Batie-Smoose was contacted by SJSU to interview with counsel for the MWC and SJSU. Batie-Smoose was contacted to schedule this interview only after SJSU and the MWC received written notice of potential legal action against SJSU and the MWC by women's volleyball athletes.

559.    Additionally, Brooke Slusser was never contacted or interviewed in any investigation by SJSU, the MWC or the NCAA until the day before this lawsuit was filed, when she was contacted by SJSU to interview with counsel for SJSU and the MWC. Like Batie-Smoose, Slusser was contacted only after SJSU and the MWC received written notice of potential legal action against SJSU and the MWC by women's volleyball athletes.

560.    On information and belief, Kress and Alexander did not promptly and properly initiate an investigation or report to the MWC regarding Fleming's alleged efforts to injure Brooke Slusser in retaliation for Slusser bringing forward Title IX concerns.

561.    The failure by SJSU, Kress and Alexander to properly bring forward corroborated allegations of potential ethical misconduct, including collusion, throwing a game, and trying to physically harm Slusser raises an inference that SJSU, Kress, and Alexander sought to punish and retaliate against Slusser for filing Title IX claims referencing the SJSU Team and/or that they did not wish the allegations against Fleming to be investigated and/or that they did not want Slusser to be protected against violence.

**T.    Retaliation by Kress, Alexander, and SJSU Against Slusser and Batie-Smoose**

562.    Batie-Smoose has at all times met the reasonable job-related requirements and responsibilities of her job.

563.    Coach Batie-Smoose is beloved by SJSU Team members who value her coaching and her friendship and emotional support and caring approach.

564.    Many SJSU Team members view Coach Batie-Smoose as the only SJSU coach in their corner.

565.    After Brooke Slusser filed her Title IX allegations in federal court Batie-Smoose observed that Kress became increasingly hostile towards Slusser, Batie-Smoose, and other girls on the SJSU Team whom Kress perceived to be supporting Brooke Slusser or to be concerned about Fleming's participation on the SJSU Team.

566.    Throughout the two seasons she has been at SJSU, Batie-Smoose has observed Kress regularly give preferential treatment to Fleming over other players such as by not enforcing team rules and discipline towards Fleming.

567.    Batie-Smoose questioned Kress's preferential treatment toward Fleming and told him it was unfair to the women on the team.

568.    Kress responded that because of Kress's alignment with LGBTQ+ individuals that Kress identifies with Fleming and considers Fleming to be facing similar challenges to those Kress believes he has faced.

569.    Batie-Smoose responded "what about the team?" and that women as a class had long been discriminated against and were entitled to protection, to which Kress's response was to focus solely on the difficulty of Fleming's situation.

570.    Batie-Smoose has tried to protect Brooke Slusser and other women on the SJSU Team who have brought concerns forward about their Title IX rights being violated and who have protested Fleming playing for SJSU.

571.    As a result, Batie-Smoose has been harshly treated by Coach Kress and Laura Alexander and Kress has persistently sought throughout the season to limit Batie-Smoose's role on the team and to turn SJSU Team members against her.

572.    Kress has sought to characterize the positions of women student-athletes at SJSU who do believe Fleming is disqualified by sex from being on the women's volleyball team as "hateful" and referred to them in disparaging and vile terms.

573.    Kress has sought to turn SJSU Team members against Slusser and Batie-Smoose and has sought to turn Batie-Smoose against Slusser and to intimidate Batie-Smoose to prevent Batie-Smoose from supporting Slusser.

574.    For instance, on Sunday, October 27, 2024, Batie-Smoose received an email from Todd Kress, attached hereto as **Appendix G**, in which Kress forwarded an email from another person who appeared to be an attorney.

575.    The email forwarded by Kress stated:

> A person has a constitutional right as an individual to join or file a lawsuit challenging another person's right to play a sport. That player does not have a right as a team member to lie on public media about danger posed by the teammate in order to attempt to ban the teammate from playing or to cause the team as a whole to in effect forfeit its remaining games knowing other schools will act like blockheads. Slusser's statements are on video and cannot effectively be denied. The results cannot be denied. The school and you as coach along with the AD I presume have the discretion to decide that Slusser is knowingly harming her teammate and the volleyball team and should lose her playing position, co-captain position and her scholarship. She does not have a C right to play, or to be falsely positioned as a leader. Do you think another athlete could knowingly falsely accuse a teammate of using performance enhancing drugs in order to cause the teammate to be banned from playing and yet assert a C right to stay on the team, much less to play and be a captain and be repeatedly called a leader of the team?
>
> It is apparent that Slusser's mother and her daughter feel hatred toward trans people. The school should stop facilitating the public display of that hatred.

576.    Batie-Smoose believes that Kress sent the email to her to try to prevent her from resisting his efforts to retaliate against Slusser and that it is indicative of Kress's intent to discriminate against Slusser.

577.    Kress, Alexander, and Smith have created an intolerant and hostile team and work environment for Batie-Smoose, Slusser, and others who have tried to express their views on women's sports and/or who spoke up on the need to protect women on the SJSU Team.

578.    SJSU has at all relevant times been aware of this hostile environment, been deliberately indifferent to it, and permitted it to continue.

579.    SJSU has facilitated this hostile environment by not protecting the Title IX rights of SJSU Team members and coaches, and by engaging in discriminatory acts and retaliation.

580.    This hostile environment has taken a severe emotional toll upon Slusser, and Batie-Smoose and other women connected to the SJSU Team who have not conformed to the ideological orthodoxy mandated by SJSU, Kress, Alexander, and Smith and reinforced by the MWC TPP.

581.    Therefore, on Tuesday, October 29, 2024, SJSU Associate Head Coach Melissa Batie-Smoose filed a detailed sworn written declaration and Title IX complaint and request for investigation with SJSU, the MWC (through Commissioner and Deputy Commissioner Gilliland) and the NCAA (via NCAA General Counsel Scott Bearby) regarding her concerns about discrimination against women.

582.    In response to Batie-Smoose filing her written declaration alleging Title IX violations and misconduct under MWC and NCAA rules, on October 31, 2024, the SJSU Title IX coordinator reached out to Coach Batie-Smoose via email.

583.    This email from the SJSU Title IX coordinator and the failure of the Title IX coordinator to reach out sooner to Batie-Smoose suggests that no Title IX investigation may have been initiated by Todd Kress or Laura Alexander. The SJSU Title IX coordinator stated in part: "I appreciate the time you took to document the tremendous difficulties you and some of the players have experienced with the volleyball team. Would you be open to meeting with me so I can better understand your observations and experiences, and to discuss potential next steps? … For your awareness, I plan to send individual emails to the players you identified in your complaint who have been experiencing potential discrimination. I am also going to offer them meetings. My hope is that they get back to me." This email from the SJSU Title IX Coordinator is attached as **Appendix H**.

584.    This email from SJSU's Title IX coordinator suggests that if Kress and Alexander had requested a Title IX investigation, as Kress claimed, that the Title IX coordinator would have reached out to Batie-Smoose and the relevant SJSU team members much sooner.

585.    Not until November 12, 2024, and only after only after SJSU and the MWC received written notice of potential legal action against SJSU and the MWC by women's volleyball athletes did SJSU request an interview with Batie-Smoose.

**W.    SJSU Ramps Up Its Retaliation Against Batie-Smoose and Tries to Prevent Her from Speaking Out**

586.    On November 2, 2024, approximately 90 minutes before the SJSU Team was scheduled to play the New Mexico University women's volleyball team, an SJSU official blocked Batie-Smoose's entrance to the SJSU Spartan Gym to join the SJSU Team for warm-ups.

587.    The SJSU representative informed Batie-Smoose that she was suspended indefinitely, effective immediately.

588.    She was forced to hand over her school ID and her keys and was not even allowed to gather her belongings from her office.

589.    Batie-Smoose was told to leave campus immediately and instructed not to return to campus until further notice.

590.    She was told if she wanted her personal belongings that were still in her office, she would have to make arrangements later to retrieve them.

591.    The SJSU official handed Batie-Smoose a letter signed by Joanne Wright, SJSU Senior Associate Vice President, University Personnel at SJSU and copied to Jeff Konya, Director of Athletics, Julie Paisant, Senior Director, Employee Relations, Mary Quintanar, Senior Associate Athletics Director for Human Resources, and Julianne Miyashiro, Director, Academic Employee Relations.

592.    The letter from SJSU Senior Associate Vice President Wright which contained purposefully misleading and false allegations against Batie-Smoose and advised her that she was being immediately placed on administrative leave was not copied to the SJSU Title IX office.

593.    Batie-Smoose was instructed not to speak with the media regarding matters in which SJSU is involved or with any of the players on the SJSU Team and was threatened with discipline if she did not comply.

594.    SJSU's actions against Batie-Smoose, including SJSU's precipitous action of suspending her minutes before a televised game, SJSU's failure to investigate the facts before acting, and statements made by SJSU and Kress to the media were purposefully intended to malign Batie-Smoose's reputation and destroy her coaching career.

595.    The suspension of Batie-Smoose and the erroneous allegations set forth in SJSU Senior Associate Vice President Wright's letter were in retaliation for Batie-Smoose attempting to protect Slusser from retaliation and in retaliation for Batie-Smoose filing her own Title IX Complaint and Request for Investigation and for Batie-Smoose exercising her First Amendment right to speak out regarding matters of public concern regarding the SJSU women's volleyball team and the mistreatment of student-athletes on that team and efforts by a SJSU student-athlete to throw a college volleyball game and attempt to injure a SJSU volleyball student-athlete and efforts by SJSU employees, including Kress, Alexander, and others to cover-up the effort to throw a game and injure a SJSU student-athlete.

## X.    Kress Recently Confirmed Key Details of Batie-Smoose's Report About the CSU-FC Volleyball Game and of SJSU's Failure to Promptly Bring Forward Allegations of Unethical Behavior to the MWC

596.    MWC Rule 4 requires that each member institution "ensure that all individuals associated with its athletics program conduct themselves in an appropriate fashion" and "exhibit ethical behavior at all . . . Conference competition[s]." MWC Rule 4.1.

597.    Allegations of misconduct are to "be reported to the Commissioner (or designee) within 24 hours of the incident." MWC Rule 4.3.

598.    According to an ESPN article dated November 2, 2024, "Kress confirmed the meeting between the SJSU player and the CSU player happened on the night of October 2[.]"[62]

599.    Also, according to the ESPN article, "[f]ollowing practice on Oct. 7, Kress said another SJSU player who was present for the off-campus conversation reported to him that she heard her teammate and the CSU player talking about how they would align themselves to open up areas of the court for freer swings."

600.    Further, according to the ESPN article, Kress reported that, "[t]he unnamed player told Kress she thought it was a joke but reported it anyway."

601.    Next, the ESPN article states that, "Kress said he called CSU head volleyball coach Emily Kohan the same day he received the allegations and that they reviewed film of the game."

602.    ESPN quotes Kress as saying, "Both [student-athletes] [i.e., the SJSU player Fleming and the CSU-FC player Jones] said that they were shocked that anybody thought anything of it, because it was totally a joke."

603.    Thus, Kress has reportedly claimed to an ESPN reporter that Fleming and Jones, as well as the reporting athlete, Chandler Manusky, all said that a pre-game conversation about throwing the game, trying to hurt Brooke Slusser during the game, and Fleming standing back to allow Jones to get free shots at Slusser, was all a "joke."

604.    The contention by Kress that this conversation was thought by all participants in it to have been a "joke" is contradicted by the accounts of multiple individuals who say that Manusky

---

[62] "San Jose State volleyball coach denies collusion accusation," *ESPN*, Nov. 2, 2024, *available at*: https://www.espn.com/college-sports/story/_/id/42157485/san-jose-state-coach-denies-player-colluded-opponent.

was distraught and upset when she reported the incident first to teammates and then to the SJSU coaches.

605.     Further, the fact that according to Kress, both Fleming and Jones confirmed to their respective coaches that the statements about harming Slusser were made as a "joke" is significant because it confirms that all three witnesses to the statements concede that the topics of harming Slusser and throwing the game were discussed between Fleming and Jones.

606.     This is, of course, a significant detail that should have been passed on to the MWC because it corroborates Manusky's statement that Fleming and Jones spoke about harming Slusser, as according to Kress neither Fleming nor Jones disputed the discussion about harming Slusser occurred, they merely dispute whether they actually intended to hurt her.

607.     Further, Kress's admissions to the ESPN reporter reflect that, rather than promptly reporting an "[a]llegation of misconduct" to the MWC Commissioner as specified in MWC Rule 4.3, Kress has acknowledged that he first conducted his own investigation and then reported the incident *only to the SJSU Title IX officer*. The ESPN report did not say Kress reported the incident to the MWC.

608.     Kress also reportedly told the ESPN reporter, "[h]e does not know if an investigation was opened" by the SJSU Title IX office.

609.     Kress's recent statements to the ESPN reporter are consistent with the conclusion reached by Batie-Smoose from reading the SJSU Title IX coordinator's email, that SJSU never opened a Title IX investigation before she submitted her own declaration and request for investigation to SJSU, the MWC, and the NCAA on October 29, 2024.

**Y.      Protests by MWC Teams and Continuing MWC Efforts to Chill and Suppress Protests**

610.    As of the date of the date of filing this lawsuit, four MWC women's volleyball teams (Boise State University, the University of Nevada, Reno, Utah State University and the University of Wyoming) have chosen not to play the SJSU Team in six (6) MWC games in protest of Fleming's participation on the SJSU Team and to protect their student athletes.

611.    On September 28, 2024, the Boise State University women's volleyball team ("Boise State Team") did not to play the SJSU Team in protest of Fleming's participation on the SJSU Team.[63]

612.    The MWC applied the new MWC TPP, deeming the Boise State Team's protest as a "forfeit" and awarding a loss to Boise State and a win to the SJSU Team.

613.    Following the Boise State Team's protest communicated on September 27, on October 5, 2024, the Wyoming University Women's volleyball team ("Wyoming Team") chose not to play the SJSU Team in protest of Fleming's participation on the SJSU Team.

614.    The MWC applied the new MWC TPP, deeming the Wyoming Team's protest as a "forfeit" and awarding a loss to the Wyoming Team and a win to the SJSU Team.

615.    Commissioner Nevarez confirmed the applicability of the MWC's Transgender Policy to the decisions of [universities] to protest the eligibility of Fleming on the SJSU women's volleyball team. She stated on October 18, 2024 "The student-athlete (in question) [*i.e.*, Fleming] meets the eligibility standard, so if a team does not play them, it's a forfeit, meaning they take a loss."[64]

---

[63] San Jose State University Women's Volleyball 2024-2025 Schedule, available at Women's Volleyball 2024 - SJSU Athletics - Official Athletics Website - San Jose State Spartans.

[64] AP News, *Mountain West commissioner says she's heartbroken over turmoil surrounding San Jose State volleyball*, October 18, 2024, *available at* https://apnews.com/article/san-jose-state-volleyball-b8f2b101b9825ee839ce17bd5cb1a1a2.

616.    Notwithstanding Commissioner Nevarez's comments, on October 23, 2024, the USU Women's Volleyball Team ("USU Team") chose not to play the SJSU Team in protest of Fleming's participation on the SJSU Team.

617.    The MWC applied the new MWC TPP, deeming the USU Team's protest as a "forfeit" and awarding a loss to the USU Team and a win to the SJSU Team.

618.    On October 25, 2024, the University of Nevada, Reno women's volleyball team ("Nevada, Reno Team") chose not to play the SJSU Team in protest of Fleming's participation on the SJSU Team.

619.    The MWC applied the new MWC TPP, deeming the Nevada, Reno Team's protest as a "forfeit" and awarding a loss to the Nevada, Reno Team and a win to the SJSU Team.

620.    On November 1, 2024, the Boise State University's women's volleyball team announced that they would choose not to play their second match against the SJSU Team, scheduled for November 21, 2024, in protest of Fleming's ongoing participation on the SJSU Team.

621.    On information and belief, the MWC intends to apply the new MWC TPP, deeming the Boise State Team's protest as a "forfeit" and awarding a loss to the Boise State Team and a win to the SJSU Team.

622.    Through the MWC TPP and other means MWC representatives have sought to impose pressure on member institutions, the athletic departments of member institutions and upon the women's volleyball coaching staffs and the student-athletes to commit not to engage in any protest or boycott during the MWC conference tournament.

623.    The MWC has communicated that even if a school has otherwise qualified to compete in the MWC women's volleyball tournament the MWC will require that the school give

up their right to protest and/or boycott the participation of the SJSU Team in the MWC women's volleyball tournament, and said that any women's volleyball team which fails to relinquish the right to protest and/or engage in a boycott against the SJSU Team will not be permitted to compete in the MWC women's volleyball tournament.

624.    There is no MWC rule that purports to authorize the MWC to pressure student-athletes to give up their rights to protest or otherwise engage in expressive activity to compete in the MWC women's volleyball tournament if the student-athletes' team has qualified for that tournament based on finishing in the top six teams for the conference tournament.

**Z.    Preliminary Injunctive Relief Is Needed to Prevent Irreparable Harm to Some Plaintiffs**

625.    The 2024 MWC women's volleyball championship tournament will take place on November 27-30, 2024.

626.    As a result of the unlawful MWC TPP SJSU has been awarded wins and the Boise State, Utah State, Wyoming and Nevada, Reno teams have been given losses for games that without the MWC TPP would have been considered no contests, as to which no loss or win should have been assigned.

627.    Here is a chart which lists the current MWC standings and reflects the team records without the impact of the MWC TPP:

| Current Rank | Team | Record w/ TPP | Record w/out TPP | Rank w/out TPP (win %) |
|---|---|---|---|---|
| 1 | CSU-FC | 12-2 | 12-2 | 1 (.857) |
| 2 | SJSU | 11-5 | 5-5 | 6 (.500) |
| 3 | S.D. State | 9-5 | 9-5 | 3 (.642) |
| 3 | Fresno State | 9-5 | 9-5 | 3 (.642) |
| 3 | Utah State | 9-5 | 9-4 | 2 (.692) |
| 6 | Boise State | 8-7 | 8-5 | 5 (.615) |

| Current Rank | Team | Record w/ TPP | Record w/out TPP | Rank w/out TPP (win %) |
|---|---|---|---|---|
| 7 | Wyoming | 6-9 | 6-7 | 7 (.461) |
| 8 | UNLV | 5-9 | 5-9 | 8 (.357) |
| 9 | New Mexico | 4-10 | 4-10 | 10 (.286) |
| 9 | Nevada, Reno | 4-10 | 4-9 | 9 (.307) |
| 11 | Air Force | 2-12 | 2-12 | 11 (.143) |

628. As the chart indicates, simply by removing the effect of the MWC TPP SJSU would become the sixth-place team, just .039 ahead of the seventh-place Wyoming team with two games remaining to be played by SJSU and three games remaining to be played by Wyoming.

629. At present the Plaintiffs from the Utah State (4 games remaining), Boise State (3 games remaining) and Wyoming (3 games remaining) teams could all potentially be adversely impacted by the MWC TPP provision which assigned these teams losses for not playing against SJSU.

630. Additionally, as explained above, SJSU played Fleming, an ineligible player, in every game in which it competed this year, meaning that SJSU should not have any wins and should not be considered eligible for the MWC tournament.

631. Alternatively, even if injunctive relief were not entered removing all wins from SJSU's record, because Fleming is ineligible Fleming should not be permitted to compete in the MWC tournament and an injunction keeping Fleming out of the tournament would benefit the SJSU Plaintiffs and the other teams in the conference tournament, including potentially Plaintiffs from Utah State University, Boise State University and the University of Wyoming.

632. Prompt preliminary and permanent injunctive and declaratory relief from the Court and against the MWC and SJSU is needed to:

a. Enjoin the MWC from using the unlawful MWC TPP to impose losses on teams which chose not to play against SJSU, as the improper imposition of those losses could otherwise alter the makeup of the top six teams which are eligible to compete in the MWC tournament,

b. Enjoin SJSU from bringing ineligible student-athlete Blaire Fleming to the MWC tournament,

c. Enjoin SJSU and the MWC from allowing SJSU to compete with Fleming in the MWC tournament,

d. Declare Blaire Fleming has been an ineligible student-athlete and ineligible to compete in all women's volleyball games in which Fleming has competed for SJSU,

e. Enjoin SJSU from competing in the MWC tournament despite using an ineligible player throughout the season,

f. Enjoin the MWC from enforcing the MWC TPP and from continuing to attempt to chill the First Amendment Rights of the Plaintiffs and others similarly situated.

## V.     CLAIMS FOR RELIEF

### COUNT I – Title IX Deprivation of Equal Opportunities and Fourteenth Amendment Equal Protection and Bodily Privacy
*Against the MWC and the CSU Board*

633.    The foregoing allegations in paragraphs 1 to 632 above are hereby incorporated by reference into Count I for relief as if fully set forth.

634.    This Count sets forth claims by Plaintiffs Slusser, Sugai, Patterson, Ray, Clarke, Liilii, Sandy and the Van Kirks against the MWC and the CSU Board.

635.    As explained above, the NCAA TEP which the MWC and SJSU apply without change is facially discriminatory because it allows men to compete on women's volleyball teams with testosterone levels more than five times higher than the highest recorded female testosterone levels.

636.    Further, the MWC TPP is invalid on its face and violates Title IX because it severely limits the MWC and any of its members from being able to verify whether men are competing on women's teams and even whether any such male student-athlete is complying with NCAA rules.

637.    The MWC TPP is a "don't ask, don't tell" rule that severely limits verification of whether men are competing against women or even whether the grossly insufficient standards established by the NCAA are being met.

638.    Because Fleming is a trans-identifying male, and for the reasons discussed above, SJSU's addition of Fleming to its women's volleyball team, and the MWC's authorization of SJSU to do so, deprives women on the SJSU Team of equal competitive opportunities, playing time, recognition, and scholarships by giving competitive opportunities, playing time, recognition and a scholarship to Fleming.

639.    Likewise, Fleming's participation on the SJSU Team deprives women on other MWC teams of competitive opportunities and recognition because Fleming has insuperable performance advantages which stem directly from Fleming's biological maleness and which allow for greater jumping explosiveness and ball hitting power than any woman volleyball player could realistically match.

640.    Fleming's participation on the SJSU Team puts women on Fleming's team (particularly during practices) and women on competing teams (particularly during games) at

increased risk of injury due to Fleming's power and explosiveness, which creates increased risk of injury for women on the receiving end of Fleming's hits.

641.    Indeed, the rules of the NCAA and the MWC specifically recognize the significant physical advantage that male volleyball players have over female volleyball players.

642.    Because male players can jump higher, tend to be taller, and tend to hit the ball harder than women, the net in the women's game is more than 7 inches lower than in the men's game.

643.    As of November 12, 2024, during the 2024 season the SJSU Team has lost only five (5) matches, the second fewest losses in the MWC.

644.    SJSU's success during the 2024 season is a direct result of Fleming's membership on the team and the effect of the TPP.

645.    Fleming has a demonstrable and statistically verified impact on the success of SJSU's Team.

646.    As of November 8, 2024, Fleming was one of the highest ranked players in the MWC in average kills per set (fourth in the conference) and average points per set (third in the conference).[65] At one point in the season, Fleming was also one of the highest ranked players in the MWC in average service aces per set (ninth in the conference).[66]

647.    SJSU's success has impacted the winning percentages of the Women's volleyball teams of the MWC, which, according to MWC Regulation 16, will decide who the regular-season conference champion is and determine the seeding for the annual conference tournament.

---

[65] 2024-25 Mountain West Women's Volleyball Conference Leaders in Conference Games, as of Nov. 8, 2024, *available at https://storage.googleapis.com/themw-com/2024/11/696f0c11-mw-vb-stats-nov.-7.pdf*.

[66] 2024-25 Mountain West Women's Volleyball Conference Leaders in Conference Games, as of Oct. 30, 2024, *available at* https://storage.googleapis.com/themw-com/2024/10/18ab9595-2024-mw-vb-stats-oct.-29.pdf.

648.    Like the results of the regular-season, if Fleming is allowed to continue to compete on the SJSU Team, the conference tournament will also be skewed in violation of Title IX.

649.    Plaintiffs have been injured by the foregoing violations of Title IX and the Fourteenth Amendment and are entitled to actual, compensatory, consequential, nominal and punitive damages and to declaratory and injunctive relief.

650.    Wherefore, Plaintiffs request the Court grant them the relief requested in their prayer for relief below.

## COUNT II – Title IX Deprivation of Equal Opportunities Pursuant to 42 U.S.C. § 1983

### Against the MWC, Commissioner Nevarez, and the CSU Board

651.    The foregoing allegations in paragraphs 1 to 650 above are hereby incorporated by reference into Count II for relief as if fully set forth.

652.    This Count sets forth claims by Plaintiffs Slusser, Sugai, Patterson, Ray, Clarke, Liilii, Sandy and the Van Kirks against the MWC, Commissioner Nevarez, and the CSU Board.

653.    Title IX is further applicable to the MWC and the CSU Board, and applicable to Commissioner Nevarez pursuant to 42 U.S.C. § 1983 to the extent that these defendants were acting under color of law in connection with adopting and enforcing the MWC TPP and applying the NCAA TEP.

654.    42 U.S.C. § 1983 states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ….

655.    The MWC, Commissioner Nevarez, and the CSU Board may be held accountable under 42 U.S.C. § 1983 for actions which violate Title IX where they collaborate or participate in a Title IX violation for which a state actor may also be held responsible.

656.    At all times relevant to the Complaint, the MWC and Commissioner Nevarez acted under color of state law by engaging in the alleged conduct under Count II.

657.    Plaintiffs have been injured by the foregoing violations of Title IX and are entitled to damages and to declaratory and injunctive relief.

658.    Wherefore, Plaintiffs request the Court grant them the relief requested in their prayer for relief below.

## COUNT III – Title IX Retaliation

### *Against the CSU Board*

659.    The foregoing allegations in paragraphs 1 to 632 above are hereby incorporated by reference into Count III for relief as if fully set forth.

660.    This Count sets forth claims by Plaintiffs Slusser and Batie-Smoose against the CSU Board.

661.    As described above, SJSU, Kress, and Alexander have retaliated against Slusser and Batie-Smoose in violation of Title IX.

662.    Slusser and Batie-Smoose have been injured by the foregoing violations of Title IX and the Fourteenth Amendment and are entitled to damages and to declaratory and injunctive relief.

663.    Wherefore, Plaintiffs request the Court grant them the relief requested in their prayer for relief below.

**COUNT IV – Equal Protection Clause Violation to 42 U.S.C. § 1983**
**(Facial, As-Applied, Purposeful Discrimination Challenge)**

*The MWC TPP Violates the Equal Protection Clause*

*Against the MWC and Commissioner Nevarez*

664.    The foregoing allegations in paragraphs 1 to 632 above are hereby incorporated by reference into Count IV for relief as if fully set forth.

665.    This Count sets forth claims by Plaintiffs Slusser, Ray, Clarke, Liilii, Boggs, Grizzle, Sandy and the Van Kirks against the MWC and Commissioner Nevarez.

666.    The Equal Protection Clause of the Fourteenth Amendment prohibits discrimination on the basis of sex.

667.    42 U.S.C. § 1983 states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ….

668.    The penalties exacted by the MWC TPP apply only when the opposing team has a "transgender student-athlete" on their roster.

669.    In other words, the penalties exacted by the MWC TPP apply only when the opposing team has a student-athlete of a sex opposite the sex specified for the sport eligibility category in question (*i.e.*, the opposing team has a trans-identifying male on a women's team or a trans-identifying female on a man's team).

670.    Under the Equal Protection Clause a classification based on sex is subject to heightened scrutiny and can be lawful only if the classification serves an important interest and is

substantially related to the achievement of that interest. *Fowler v. Stitt*, 104 F.4th 770, 794 (10th Cir. 2024).

671.    The MWC TPP fails heightened scrutiny because it does not serve an important interest.

672.    The MWC can show no important interest in requiring women to play against a male volleyball player when the women's school or the women themselves have legitimate safety concerns about playing against the male.

673.    To require that safety concerns of female athletes be disregarded is inconsistent with how the MWC handles many other situations in which a contest is not played, which is to simply regard the game as a cancellation rather than to automatically assign a loss to one team and win to the other.

674.    Thus, because the MWC has not advanced a rationale for the MWC TPP that can overcome heightened scrutiny, it fails under the Equal Protection Clause on its face, as applied, and is the result of purposeful discrimination by the MWC.

675.    At all times relevant to the Complaint, the MWC and Commissioner Nevarez acted under color of state law by engaging in the alleged conduct under Count IV.

676.    Ray, Liilii, Clarke, Slusser, Boggs, Grizzle, Sandy, and the Van Kirks have been injured by the foregoing violations of the Equal Protection Clause and are entitled to damages and injunctive and declaratory relief for the conduct alleged under Count IV.

677.    Wherefore, Plaintiffs request the Court grant them the relief requested in their prayer for relief below.

## COUNT V – Fourteenth Amendment Bodily Privacy Violations
## Pursuant to 42 U.S.C. § 1983

### *Against the MWC, Commissioner Nevarez, CSU Board, Laura Alexander in her official and individual capacity, and Todd Kress in his official and individual capacity*

678.    The foregoing allegations in paragraphs 1 to 632 and 666 to 667, above are hereby incorporated by reference into Count V for relief as if fully set forth.

679.    This Count sets forth claims by Plaintiff Slusser against the MWC, Commissioner Nevarez, the CSU Board, Laura Alexander, and Todd Kress and by Plaintiff Sugai against the MWC, Commissioner Nevarez, and CSU Board.

680.    There is a sex-based constitutional right to bodily privacy because most people have a special sense of privacy in their body and involuntary exposure of it in the presence of people of the other sex may be especially demeaning and humiliating.

681.    By adopting and/or enforcing the NCAA TEP and the MWC, Commissioner Nevarez, the CSU Board, Laura Alexander, and Todd Kress had a purposeful policy that discriminated against women by allowing men who identified as transgender to access women's locker rooms and live with female student-athletes without telling those female student-athletes that they would be sharing a locker room with or living with a male, to the detriment and humiliation of women.

682.    The MWC, Commissioner Nevarez, the CSU Board, Laura Alexander, and Todd Kress intentionally authorized and enabled a male student athlete who identifies as transgender, Blaire Fleming, to access women's locker rooms and room with female student-athletes to the detriment and humiliation of women.

683.    The MWC, Commissioner Nevarez, the CSU Board, Laura Alexander, and Todd Kress had actual knowledge of these discriminatory actions, practices, and/or policies that violated the bodily privacy rights of Slusser and/or Sugai.

684.     The MWC, Commissioner Nevarez, the CSU Board, Laura Alexander, and Todd Kress acted with deliberate indifference to and with reckless disregard for the bodily privacy rights of Slusser and/or Sugai.

685.     At all times relevant to the Complaint, the MWC, Commissioner Nevarez, the CSU Board, Laura Alexander, and Todd Kress acted under color of state law by engaging in the alleged conduct under Count V.

686.     Slusser and Sugai have been injured by the foregoing violations of the Equal Protection Clause and are entitled to damages and injunctive and declaratory relief for the conduct alleged under Count V.

687.     Wherefore, Plaintiffs request the Court grant them the relief requested in their prayer for relief below.

## COUNT VI – First Amendment Violation Pursuant to 42 U.S.C. § 1983 (Facial Challenge)

### *The MWC TPP Punishes Boycotts*

### *Against the MWC and Commissioner Nevarez*

688.     The foregoing allegations in paragraphs 1 to 632 above are hereby incorporated by reference into Count VI for relief as if fully set forth.

689.     This Count sets forth claims by Plaintiffs Slusser, Ray, Clarke, Liilii, Boggs, Grizzle, Sandy and the Van Kirks against the MWC and Commissioner Nevarez.

690.     The First Amendment to the United States Constitution provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

691.    The First Amendment applies to state action and action take under color of state law pursuant to the Fourteenth Amendment to the United States Constitution.

692.    42 U.S.C. § 1983 states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ….

693.    The issue of transgender participation in women's collegiate athletics is a political, ideological, and philosophical issue that is a matter of public concern and national debate.

694.    MWC student-athletes engage in speech and expressive activity protected by the First Amendment by boycotting intraconference contests against a fellow MWC member institution's team that includes a transgender student athlete, which is a matter of public concern and debate.

695.    MWC student athletes' participation in this expressive activity is protected under the First Amendment.

696.    Pursuant to the MWC TPP, MWC student-athletes, including Ray, Liilii, Clarke, Boggs, Grizzle, Sandy and the Van Kirks are penalized for expressive activity protected by the First Amendment by being "charged with a loss … for the purposes of [MWC] records, standings, tie-breaking formulas and MW championships participation."

697.    The MWC TPP violates the First Amendment on its face because it imposes penalties on MWC student-athletes, imposes a political, ideological, and philosophical litmus test and seeks to deter speech and expressive activity related to MWC student-athletes' political, ideological, and philosophical beliefs and associations.

698.     At all times relevant to the Complaint, the MWC and Commissioner Nevarez acted under color of state law by engaging in the alleged conduct under Count VI.

699.     Ray, Liilii, Clarke, Slusser, Boggs, Grizzle, Sandy, and the Van Kirks have been injured by the foregoing violations of the First Amendment and are entitled to damages and injunctive and declaratory relief for the conduct alleged under Count VI.

700.     Wherefore, Plaintiffs request the Court grant them the relief requested in their prayer for relief below.

### COUNT VII – First Amendment Violation Pursuant to 42 U.S.C. § 1983 (As-Applied Challenge)

*The MWC and Commissioner Nevarez Violated First Amendment Rights by Applying the MWC TPP to the Boycotting Student Athletes*

*Against the MWC and Commissioner Nevarez*

701.     The foregoing allegations in paragraphs 1 to 632, and 690 to 693 are hereby incorporated by reference into Count VII for relief as if fully set forth.

702.     This Count sets forth claims by Plaintiffs Slusser, Ray, Clarke, Liilii, Boggs, Grizzle, Sandy and the Van Kirks against the MWC and Commissioner Nevarez.

703.     Plaintiffs Kaylie Ray, Sia Liilii, Nicanora Clarke, Macey Boggs, Sierra Grizzle, Brooke Slusser, Jordan Sandy, Katelyn Van Kirk, and Kiersten Van Kirk engaged in speech and expressive activity protected by the First Amendment by boycotting women's volleyball matches against the SJSU Team, a fellow MWC member institution, because the SJSU Team rostered a transgender student athlete for those matches, which is a matter of public concern and debate.

704.     Plaintiffs Kaylie Ray, Sia Liilii, Nicanora Clarke, Macey Boggs, Sierra Grizzle, Brooke Slusser, Jordan Sandy, Ketelyn Van Kirk, Kiersten Van Kirk and other similarly situated individuals engaged in speech and expressive activity by making public comment, wearing

clothing, and otherwise speaking in support of the boycott of women's sporting events that include teams who that roster transgender student-athletes.

705.    Ray's, Clarke's, Liilii's, Bogg's, Grizzle's, Slusser's, Sandy's and the Van Kirks participation in this boycott and exercise of speech related to and in support of this boycott are protected under the First Amendment.

706.    Pursuant to the MWC TPP, the MWC and Commissioner Nevarez penalized Ray, Liilii, Clarke, Boggs, Grizzle, Sandy, and the Van Kirks for expressive activity protected by the First Amendment by "charg [ing]" the teams of Ray, Clarke, Liilii, Boggs, Grizzle, Sandy and the Van Kirks "with a loss … for the purposes of [MWC] records, standings, tie-breaking formulas and MW championships participation" when they joined their teams in boycotting women's volleyball matches against San Jose State University women's volleyball team, a fellow MWC member institution, because the SJSU Team rostered a transgender student-athlete for those matches.

707.    The MWC and Commissioner Nevarez violated the First Amendment as applied to Plaintiffs Kaylie Ray, Sia Liilii, Nicanora Clarke, Macey Boggs, Sierra Grizzle, Brooke Slusser, Jordan Sandy, Katelyn Van Kirk, and Kiersten Van Kirk by encouraging, incentivizing, and inducing MWC women's volleyball student-athletes coaches and staff, like Ray's head coach and Liilii's and Clarke's Athletic Director to disparage, intimidate, misinform and/or bully women for exercising their rights to free speech and expressive activity to support of the boycott of schools that roster transgender student athletes in women's sports.

708.    The MWC and Commissioner Nevarez did this through drafting, promulgating and enforcing the MWC TPP against MWC teams and players who boycotted matches against the SJSU Team. This encouragement, incentivizing, and inducement imposes a political, ideological,

and philosophical litmus test and seeks to deter speech and expressive activity related to Ray's, Clarke's, Liilii's, Boggs's, Grizzle's, and Slusser's, Sandy's and the Van Kirks' political, ideological, and philosophical beliefs and associations.

709.    At all times relevant to the Complaint, the MWC and Commissioner Nevarez acted under color of state law by engaging in the alleged conduct under Count VII.

710.    Ray, Clarke, Liilii, Boggs, Grizzle, Slusser, Sandy, and the Van Kirks have been injured by the foregoing violations of the First Amendment and are entitled to damages and injunctive and declaratory relief for the conduct alleged under Count VII.

711.    Wherefore, Plaintiffs request the Court grant them the relief requested in their prayer for relief below.

## COUNT VIII – First and Fourteenth Amendment Violation
### (Viewpoint Discrimination)

*The MWC and Commissioner Nevarez Violated First Amendment*
*Rights of Female Athletes by Adopting and Enforcing the*
*MWC TPP to Punish Free Speech and Protest*

### *Against the MWC and Commissioner Nevarez*

712.    The foregoing allegations in paragraphs 1 to 632, and 690 to 693 above are hereby incorporated by reference into Count VIII for relief as if fully set forth.

713.    This Count sets forth claims by Plaintiffs Slusser, Ray, Clarke, Liilii, Sandy, and the Van Kirks against the MWC and Commissioner Nevarez.

714.    The MWC TPP violates the First Amendment, both on its face and as applied by the MWC and Commissioner Nevarez, to Plaintiff Slusser, Plaintiff Ray, Plaintiff Liilii, Plaintiff Clarke, Plaintiff Boggs, Plaintiff Grizzle, Plaintiff Sandy, and Plaintiffs Van Kirks because it discriminates against protected expression based on the expression's content and viewpoint.

715.    The MWC TPP penalizes teams and players who boycott intraconference contests and engage in related expressive activity against a fellow MWC member institution's team that includes a transgender student athlete without penalizing other teams and players who do not compete against fellow MWC member institutions for other reasons that are not related to a transgender student athlete's participation in an intraconference contest.

716.    The MWC TPP limits inquiry into whether a school with a transgender student-athlete is complying with the relevant eligibility rules or whether any MWC member institution has a transgender student-athlete on a team in women's sports without limiting inquiry into a MWC member institution's compliance with eligibility requirements that do not relate to transgender status.

717.    At all times relevant to the Complaint, the MWC and Commissioner Nevarez acted under color of state law by engaging in the alleged conduct under Count VI.

718.    Ray, Liilii, Clarke, Boggs, Grizzle, Slusser, Sandy and the Van Kirks have been injured by the foregoing violations of the First Amendment and are entitled to damages and injunctive and declaratory relief for the conduct alleged under Count VIII.

719.    Wherefore, Plaintiffs request the Court grant them the relief requested in their prayer for relief below.

## COUNT IX – First and Fourteenth Amendment Violation
### (Viewpoint Discrimination)

*The San Jose State University and Laura Alexander,*
*Michelle McDonald Smith and Todd Kress,*
*in their <u>official capacities</u>, Violated First Amendment Rights*
*of Female Athletes by Forbidding Free Speech and Protest*

### *Against the CSU Board, Alexander, McDonald Smith, and Kress*

720.    The foregoing allegations in paragraphs 1 to 632, and 690 to 693 above are hereby incorporated by reference into Count IX for relief as if fully set forth.

721.    This Count sets forth claims by Plaintiffs Slusser and Batie-Smoose against the CSU Board.

722.    MWC student athletes and coaches, including Slusser and Batie-Smoose engaged in speech and expressive activity protected by the First Amendment by speaking publicly about, protesting, and criticizing matters related to Blaire Fleming's participation and activity on the SJSU Team, which is a matter of public concern and national debate.

723.    MWC student athletes and coaches' participation in this speech and public expression is protected under the First Amendment.

724.    The San Jose State University, Laura Alexander, Michelle McDonald Smith and Todd Kress violated the First Amendment by prohibiting and discouraging Slusser and Batie-Smoose and other similarly situated individuals from speaking publicly, protesting, or criticizing the matters related to Blaire Fleming's participation and activity on the SJSU Team while encouraging and/or not prohibiting and discouraging speech and expressive activity that disagreed with the viewpoint of Slusser and Batie-Smoose and other similarly situated individuals.

725.    The San Jose State University, Laura Alexander, Michelle McDonald Smith and Todd Kress violated the First Amendment by bullying, intimidating, and threatening Slusser and other similarly situated individuals from speaking publicly, protesting, or criticizing the SJSU

Team by stating that her scholarship was at risk if she engaged in speech and expressive activity related to Blaire Fleming's participation and activity on the SJSU Team while encouraging and/or not prohibiting and discouraging speech and expressive activity that disagreed with Slusser's viewpoint.

726.    Laura Alexander, Michelle McDonald Smith and Todd Kress violated the First Amendment by bullying, intimidating, and threatening Batie-Smoose from exercising speech and expressive activity related to Blaire Fleming's participation and activity on the SJSU Team by prohibiting Batie-Smoose from speaking and engaging in expressive activity and ultimately suspending her role on the SJSU Team while not making similar statements, threats or suspensions for speech and expressive activity that disagreed with the content of Batie-Smoose's viewpoint.

727.    At all times relevant to the Complaint, San Jose State University, Laura Alexander, Michelle McDonald Smith and Todd Kress acted under color of state law by engaging in the alleged conduct under Count IX.

728.    Slusser and Batie-Smoose have been injured by the foregoing violations of the First Amendment and are entitled to damages and injunctive and declaratory relief for the conduct alleged under Count IX.

729.    Wherefore, Plaintiffs request the Court grant them the relief requested in their prayer for relief below.

## COUNT X – First and Fourteenth Amendment Violation
### (Viewpoint Discrimination)

***Laura Alexander, Michelle McDonald Smith and Todd Kress,
in their <u>individual capacities</u>, Violated First Amendment Rights
of Female Athletes by Forbidding Free Speech and Protest***

### *<u>Against Alexander, Smith and Kress</u>*

730.    The foregoing allegations in paragraphs 1 to 632, and 690 to 693 above are hereby incorporated by reference into Count X for relief as if fully set forth.

731.    This Count sets forth claims by Plaintiffs Slusser and Batie-Smoose against Alexander, Smith and Kress.

732.    MWC student athletes and coaches, including Plaintiff Slusser and Batie-Smoose, engaged in speech and expressive activity protected by the First Amendment by speaking publicly about, protesting, and criticizing matters related to Blaire Fleming's participation and activity on the SJSU Team, which is a matter of public concern and national debate.

733.    MWC student athletes' and coaches' participation, including Plaintiff Slusser's and Batie-Smoose's participation, in this speech and public expression is protected under the First Amendment.

734.    Laura Alexander, Michelle McDonald Smith and Todd Kress violated the First Amendment by prohibiting and discouraging Slusser and Batie-Smoose and other similarly situated individuals from exercising speech and expressive activity related to Blaire Fleming's participation and activity on the SJSU Team while encouraging and not prohibiting and discouraging speech and expressive activity that disagreed with the content of Slusser's viewpoint.

735.    Laura Alexander, Michelle McDonald Smith and Todd Kress violated the First Amendment by bullying, intimidating, and threatening Slusser and other similarly situated individuals from exercising speech and expressive activity related to Blaire Fleming's participation

and activity on the SJSU Team by stating, threatening, or otherwise implying that her scholarship was at risk if she engaged in such speech and expressive activity and not making similar statements, threats or implications for speech and expressive activity that disagreed with the content of Slusser's viewpoint.

736.    Laura Alexander, Michelle McDonald Smith and Todd Kress violated the First Amendment by bullying, intimidating, and threatening Batie-Smoose from exercising speech and expressive activity related to Blaire Fleming's participation and activity on the SJSU Team by prohibiting Batie-Smoose from speaking and engaging in expressive activity and ultimately seeking the suspension of her role on the SJSU Team while not making similar statements, threats or suspensions for speech and expressive activity that disagreed with the content of Batie-Smoose's viewpoint.

737.    At all times relevant to the Complaint, San Jose State University, Laura Alexander, Michelle McDonald Smith and Todd Kress acted under color of state law by engaging in the alleged conduct under Count X.

738.    Slusser and Batie-Smoose have been injured by the foregoing violations of the First Amendment and are entitled to damages and injunctive and declaratory relief for the conduct alleged under Count X.

739.    Wherefore, Plaintiffs request the Court grant them the relief requested in their prayer for relief below.

## COUNT XI – Fraud

***San Jose State University (through its Coaches Todd Kress and Trent Kersten) Defrauded
Brooke Slusser, Elle Patterson and Alyssa Sugai by Encouraging and/or Recruiting Them to
Play for the Women's Volleyball Team While Knowingly or Recklessly Omitting that They
Would Live with, Room with, Share a Locker Room with, Play Alongside, and/or Compete
with a Man***

### *Against the CSU Board and Todd Kress*

740.    The foregoing allegations in paragraphs 1 through 632 above are hereby
incorporated by reference into the Count XI for relief as if fully set forth.

741.    This Count sets forth claims by Plaintiffs Slusser, Patterson and Sugai against the
CSU Board and by Plaintiffs Slusser and Patterson against Kress.

742.    San Jose State University and the SJSU athletic department, including Alexander,
and Head Coaches Kersten and/or Kress, have known since at least 2022 that Fleming is male and
knowingly withheld this information from freshman SJSU volleyball players and volleyball
players who transferred from other schools during their recruitment process, including Alyssa
Sugai, Brooke Slusser and Elle Patterson.

743.    San Jose State University Head Coaches Kersten and/or Kress have known since at
least 2022 that Fleming is male and knowingly or recklessly withheld this information from (a)
freshman SJSU volleyball players and volleyball players who transferred from other schools
during their recruitment process, including Brooke Slusser and Elle Patterson, and (b) SJSU
volleyball players who decided to remain at SJSU rather than transfer elsewhere, including Alyssa
Sugai. Recruiting women and accepting walk-on players to play for a women's volleyball team
implies (and creates a justifiable expectation that) all student-athletes on the team are women by
sex.

744.    Players recruited by SJSU coaches and athletic department relied upon the omission
of fact about Fleming's male sex when they decided to play for SJSU. Players who decided to play

as walk-on athletes relied upon the omission of fact about Fleming's male sex when they decided to stay to play for SJSU.

745.    Slusser was recruited by SJSU coaches during 2023. At no point during Slusser's recruitment from the University of Alabama or during the 2023 volleyball season (*i.e.*, approximately August – November) did any SJSU coach or staff member, including Defendant Kress and Defendant Alexander, advise Brooke that Fleming is a male, even though it was known to SJSU coaches.

746.    At no point during Slusser's recruitment from the University of Alabama or during the 2023 volleyball season (*i.e.*, approximately August – November) did any SJSU coach or staff member, including Defendant Kress and Defendant Alexander, advise Slusser would room with a male, even though it was known to SJSU coaches.

747.    Upon arrival at SJSU in 2023, Slusser began sharing a residence with four members of the SJSU Team.

748.    Slusser did learn however that the reason she had been assigned to room with Fleming so often during road trips in the 2023 season was that SJSU officials asked Fleming who he wanted to room with, and he chose Slusser.

749.    At the times she was assigned to room with Fleming during the 2023 season, Slusser had no idea that Fleming was being given the choice of which girl he wanted to room with on team road trips.

750.    Only two of the nine (9) new recruits on the team for the 2024 season were affirmatively told that Fleming is male and participating on the women's team as a result of the NCAA Transgender Eligibility Policies, even though this was now a well-known fact to the athletic department and virtually everyone at SJSU, and Kress only confirmed to two of the incoming

student-athletes that Fleming's sex was males because these student-athletes and their families had learned of Fleming's sex from other sources and asked Kress to speak about the topic.

751.    Slusser became aware that upon learning that one of their teammates was a trans-identifying male, several of the new recruits became upset, as it was too late for them to transfer.

752.    Todd Kress made representations to Slusser and Patterson while recruiting them to play for the SJSU Team and promising them scholarships. None of these representations informed Slusser or Patterson that a biological male who identified as a transgender woman was on the SJSU Team and that Slusser would be rooming with and playing alongside this biological male.

753.    Todd Kress had a duty to disclose that a biological male who identified as a transgender woman was on the SJSU team and that Slusser and Patterson would be rooming with and playing alongside this biological male during his recruitment of Slusser and Patterson.

754.    Todd Kress knowingly made these false representations and omissions and/or had reckless disregard for the truth of these representations or omissions with the intent to induce Brooke Slusser to transfer to SJSU to play for the SJSU Team.

755.    Slusser and Patterson justifiably relied upon Todd Kress's representations and omission of any mention of the fact that a biological male who identified as a transgender woman was on the SJSU Team and that Slusser and Patterson would be rooming with, sharing a locker room with, playing alongside, and competing with this biological male when they decided to transfer to San Jose State University to play on the SJSU Team.

756.    Slusser and Patterson were not aware that a biological male who identified as a transgender woman was on the SJSU Team until several months after they already transferred and were not aware that Todd Kress's representations had omitted that fact before they had already transferred.

757.    Trent Kersten knew that Sugai was enduring financial hardship to play for SJSU as a walk-on, knew that she was considering transferring to another school to obtain a scholarship, and knew that she ultimately decided to use her 2022 season of eligibility to play for the SJSU Team and compete for a scholarship. None of Kersten's communications with Sugai informed Sugai that a biological male who identified as a transgender woman was on the SJSU Team and that Sugai would be playing alongside, sharing a locker room with, and competing with this biological male.

758.    Kresten had a duty to disclose that a biological male who identified as a transgender woman was on the SJSU Team and that Sugai would be playing alongside, sharing a locker room with, and competing with this biological male.

759.    Kersten knowingly made these false representations and omissions and/or had reckless disregard for the truth of these representations or omissions with the intent to induce Sugai to play for the SJSU Team.

760.    Sugai justifiably relied upon Kersten's representations and omission of any mention of the fact that a biological male who identified as a transgender woman was on the SJSU Team and that Sugai would be playing alongside, sharing a locker room with, and competing with this biological male when she decided to take out additional student loans to attend SJSU, decided to spend a year of playing eligibility to play on the SJSU Team, and decided to give up her final year of eligibility as a student-athlete.

761.    Sugai was not aware that a biological male who identified as a transgender woman was on the SJSU Team until several months after she already decided to spend a year of eligibility and additional student loans at SJSU and had already given up her final year of eligibility and was not aware that Kersten's representations had omitted that fact before she made these decisions.

762.    Trent Kersten and Todd Kress acted within the scope of their employment and professions as NCAA Division I women's volleyball coaches when they committed the actions and omissions that are alleged in Count XI.

763.    As a result of Sugai's justifiable reliance on Trent Kersten's knowing representations and omissions as alleged in Count XI, and as a result of Slusser's and Patterson's justifiable reliance on Todd Kress's knowing representations and omissions as alleged in Count XI, Sugai, Slusser and Patterson have suffered damages.

764.    Wherefore, Plaintiffs request the Court grant them the relief requested in their prayer for relief below.

## COUNT XII – Negligent Misrepresentation

***San Jose State University (through its Coaches Todd Kress and Trent Kersten) Mislead Brooke Slusser, Elle Patterson and Alyssa Sugai by Encouraging and/or Recruiting Them to Play for the Women's Volleyball Team While Knowingly, Recklessly, or Negligently Omitting that They Would Room with, Share a Locker Room with, Play Alongside, and/or Compete with a Man***

### *Against the CSU Board and Todd Kress*

765.    The foregoing allegations in paragraphs 1 through 632 above are hereby incorporated by reference into Count XII for relief as if fully set forth.

766.    This Count sets forth claims by Plaintiffs Slusser, Patterson and Sugai against the CSU Board and by Plaintiffs Slusser and Patterson against Kress.

767.    San Jose State University Head Coaches Kersten and/or Kress have known since at least 2022 that Fleming is male and knowingly, recklessly, or negligently withheld this information from (a) freshman SJSU volleyball players and volleyball players who transferred from other schools during their recruitment process, including Brooke Slusser and Elle Patterson, and (b) SJSU volleyball players who decided to remain at SJSU rather than transfer elsewhere, including Alyssa Sugai. Recruiting women and accepting walk-on players to play for a women's volleyball

team implies (and creates a justifiable expectation that) all student-athletes on the team are women by sex.

768.    None of these representations informed Sugai, Slusser and Patterson that a biological male who identified as a transgender woman was on the SJSU team and that Sugai, Slusser and Patterson would be rooming with, sharing a locker room with, playing alongside, and/or competing with this biological male.

769.    SJSU and Kersten had a duty to disclose that a biological male who identified as transgender was on the SJSU Team and that Sugai would be sharing a locker room with and competing against this biological male.

770.    SJSU and Kress had a duty to disclose that a biological male who identified as transgender was on the SJSU Team and that Slusser would be rooming with and playing alongside this biological male, and that Patterson would be playing alongside and competing with this biological male.

771.    Sugai justifiably relied upon Trent Kersten's representations and omissions, and Slusser and Patterson justifiably relied upon Todd Kress's representations and omissions when they decided to either transfer to SJSU or remain at SJSU to play on the SJSU Team.

772.    Slusser and Patterson were not aware and did not become aware that a biological male who identified as a transgender woman was on the SJSU Team until several months after they already transferred and were not aware that Kress's representations had omitted that fact before they had already transferred.

773.    Sugai was not aware that a biological male who identified as a transgender woman was on the SJSU Team until several months after she already decided to spend a year of eligibility

and additional student loans at SJSU and had already given up her final year of eligibility and was not aware that Kersten's representations had omitted that fact before she made these decisions.

774.   Todd Kress, Trent Kersten and other SJSU representatives acted within the scope of their employment and profession as an NCAA Division I women's volleyball coach or member of the SJSU athletic department staff when they committed the actions and omissions that are alleged in Count XII.

775.   As a result of Slusser's, Patterson's and Sugai's justifiable reliance on these representations and omissions as alleged in Count XII, Slusser, Patterson and Sugai have suffered damages.

776.   Wherefore, Plaintiffs request the Court grant them the relief requested in their prayer for relief below.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief.

1.     A declaration that the MWC TPP and the NCAA TEP as applied by the MWC violates Title IX.

2.     A declaration that the San Jose State University, acting through its Board of Trustees of the California State University, Laura Alexander, Michelle McDonald Smith and Todd Kress, violated Title IX by retaliating against Brooke Slusser and Melissa Batie-Smoose.

3.     A declaration that the MWC TPP violates the Equal Protection Clause of the United States Constitution on its face.

4.     A declaration that the MWC TPP violates Equal Protection Clause of the United States Constitution as-applied to the MWC women's volleyball teams and players.

5.    A declaration that the MWC TPP purposefully discriminates based on sex in violation of the Equal Protection Clause of the United States Constitution.

6.    A declaration that the MWC TPP violates the First Amendment to the United States Constitution on its face.

7.    A declaration that the MWC TPP violates the First Amendment to the United States Constitution as-applied to the MWC women's volleyball teams and players.

8.    A declaration that the MWC committed viewpoint discrimination, in violation of the First Amendment to the United States Constitution, by adopting the MWC TPP, applying it to MWC women's volleyball teams, and thereby incentivizing MWC coaches, like the coaches and staff of the San Jose State University women's volleyball team and the Utah State University women's volleyball team, to discourage and prohibit their women's volleyball players, like Brooke Slusser, Brook Bryant, Kaylie Ray, and Sia Liilii, Jordan Sandy, Katelyn Van Kirk and Kiersten Van Kirk from exercising their First Amendment right of free speech, protest, and boycott.

9.    A declaration that San Jose State University, acting through its Board of Trustees of the California State University, Laura Alexander, Michelle McDonald Smith and Todd Kress violated the First Amendment by prohibiting the San Jose State University women's volleyball players, including Plaintiff Brooke Slusser and Brooke Bryant, and by prohibiting the San Jose State University women's volleyball coaches, including Melissa Batie-Smoose, from exercising their First Amendment right of free speech, protest, and/or boycott.

10.     A declaration that any male student-athlete is ineligible to compete in women's volleyball in the MWC and on the San Jose State University women's volleyball team.

11.     A permanent prohibitory injunction forbidding the MWC and Commissioner Nevarez and their agents and employees from enforcing, or attempting to enforce, the MWC TPP and/or the NCAA TEP.

12.     A permanent prohibitory injunction forbidding the San Jose State University, acting through its Board of Trustees of the California State University, Laura Alexander, Michelle McDonald Smith and Todd Kress from preventing any San Jose State University women's volleyball player, including Plaintiff Brooke Slusser and Brooke Bryant, and any San Jose State University women's volleyball coach, including Melissa Batie-Smoose, from speaking, in any form.

13.     Actual, compensatory, consequential, nominal, exemplary and punitive damages pursuant to 42 U.S.C. §1983, the United States Constitution, and Title IX from the Defendants.

14.     An award of attorneys' fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988 and Title IX.

15.     Actual, compensatory, consequential, and exemplary and punitive damages arising from the fraud and negligent misrepresentation of SJSU and Todd Kress.

16.     Such other relief as the Court deems just and proper.

DATED: November 13, 2024.

/s/ William Bock III
William Bock III, CO Atty. No. 45633
Justin R. Olson, IN No. 31450-49
Kroger Gardis & Regas, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Tel: (317) 692-9000
Fax: (317) 264-6832
E-mail:     wbock@kgrlaw.com
E-mail:     jolson@kgrlaw.com

ATTORNEYS FOR PLAINTIFFS

**Jury Demand**

Plaintiffs hereby demand trial by Jury on all claims so triable.

/s/ William Bock III
William Bock III, CO Atty. No. 45633
Justin R. Olson, IN No. 31450-49

**Table of Contents**

I.  INTRODUCTION ................................................................................................. 2

II.  JURISDICTION ................................................................................................ 4

III.  PARTIES ........................................................................................................ 5

IV.  GENERAL ALLEGATIONS ............................................................................ 7

   A.  The Mountain West Conference ................................................................ 7

      1.  Conference Members .............................................................................. 7

      2.  Exercise of Conference's Powers ........................................................... 8

      3.  Conference Handbook ........................................................................... 12

   B.  MWC's Role in Controlling Aspects of College Sports for Its Members ................... 13

   C.  Student-Athletes and The Ineligibility of Blaire Fleming ........................... 15

   D.  The MWC Has Adopted the NCAA Transgender Eligibility Policies (TEP) ............. 19

   E.  The NCAA TEP As Adopted and Implemented by the MWC Deprives Women of Equal Opportunities in Violation of Title IX .................................................. 20

      1.  Retained Male-Advantage in Men Who Identify as Transgender ............... 20

      2.  The NCAA TEP Are Discriminatory on Their Face ................................... 26

   F.  Title IX Applies to SJSU and Women's Sports Governed by the MWC and NCAA TEP ........................................................................................ 29

      1.  Title IX Protects Equal Opportunity for Women in Sport ........................... 29

      2.  Title IX Protects Women's Safety .......................................................... 32

   G.  Women's Volleyball in the MWC ............................................................. 34

   H.  In Violation of Title IX the MWC Authorizes the SJSU Women's Volleyball Team to Roster and Play a Trans-identifying Male ............................................... 35

   I.  Harms to Former San Jose State University Student-Athlete Alyssa Sugai Arising from Fleming's Participation on the 2022 SJSU Women's Volleyball Team ............... 36

   J.  Coaches Todd Kress and Melissa Batie-Smoose Join the San Jose State University Women's Volleyball Team and Recruit Elle Patterson to Play at SJSU .................... 40

   K.  The Recruitment of Brooke Slusser and the 2023 San Jose State University Women's Volleyball Season and 2023-2024 Academic Year .................................. 41

   L.  San Jose State University Staff and Coaches Forbid and Inhibit their Players from Exercising First Amendment Rights ....................................................... 46

   M.  Beginning of the MWC 2024 Women's Volleyball Season .......................... 48

   N.  Adoption and Publication of the 2024 MWC Handbook ............................. 50

   O.  Southern Utah University Withdraws from Women's Volleyball Game Against SJSU .......................................................................................... 51

   P.  Brooke Slusser Files Title IX Claims in Federal Court ............................... 52

Q.      SJSU Retaliates Against Slusser for Raising Title IX Claims and Seeks to Suppress the Speech of Slusser and Others ............................................................................. 54

R.      Boise State University Withdraws from Women's Volleyball Game Against SJSU ... 55

S.      The Very Day of Boise State's Announcement the MWC Covertly Posted (or Amended) a Hastily Drafted New MWC Policy Designed to Suppress Speech and Penalize Female Student-Athletes For Protesting a Man Competing on a Woman's Team .................. 56

    1.      Adoption of the MWC TPP Constituted State Action .................................... 60

    2.      The MWC TPP Targets for Penalty the Viewpoint that a Man  Should Not Participate on a Women's Team in College Sport ...................................................................... 62

    3.      MWC General Regulations Do Not Penalize A Team For Not Continuing  to Compete When There Exists a Threat to Student-Athlete Safety ........................................ 62

    4.      The MWC TPP is Nothing Like Other MWC Rules Involving Forfeits ..................... 64

    5.      Targeted Nature of the Last-Minute MWC TPP ........................................... 65

    6.      The "Don't Ask, Don't Tell" Clause in the MWC TPP Is Also Intended  to Chill Speech and Prevent Petitions for Redress of Grievances ....................................... 66

T.      In Addition to Violating the First Amendment the MWC TPP Transgresses the Equal Protection Clause ...................................................................................... 69

U.      The MWC is Encouraging Its Members, Coaches and Athletic Directors to Suppress Free Speech and Protest ................................................................................... 70

    1.      USU Team Members Have Been Harmed by MWC Policies and Discouraged from Exercising Their First Amendment Rights ............................................................... 71

    2.      Nevada, Reno Team Members Have Been Harmed by the MWC TPP and Discouraged from Exercising Their First Amendment Rights as a Result of Concerted Activity Resulting from the MWC TPP ................................................................................ 77

V.      Reported Attempt by Blaire Fleming, in Collusion with a CSU-FC Player, to Physically Injure Slusser ................................................................................. 83

W.      SJSU Ramps Up Its Retaliation Against Batie-Smoose and Tries to Prevent Her from Speaking Out .................................................................................................. 94

X.      Kress Recently Confirmed Key Details of Batie-Smoose's Report About the CSU-FC Volleyball Game and of SJSU's Failure to Promptly Bring Forward Allegations of Unethical Behavior to the MWC .................................................................................... 95

Y.      Protests by MWC Teams and Continuing MWC Efforts to Chill and Suppress Protests ............................................................................................................... 98

Z.      Preliminary Injunctive Relief Is Needed to Prevent Irreparable Harm to Some Plaintiffs ............................................................................................................... 100

V.      CLAIMS FOR RELIEF .................................................................................. 102

    COUNT I – Title IX Deprivation of Equal Opportunities and Fourteenth Amendment Equal Protection and Bodily Privacy .................................................................. 102

COUNT II – Title IX Deprivation of Equal Opportunities Pursuant to 42 U.S.C. § 1983 ................................................................................................................................ 105

COUNT III – Title IX Retaliation .................................................................................. 106

COUNT IV – Equal Protection Clause Violation to 42 U.S.C. § 1983 ........................... 107

COUNT V – Fourteenth Amendment Bodily Privacy Violations .................................... 109

COUNT VI – First Amendment Violation Pursuant to 42 U.S.C. § 1983 (Facial Challenge) ....................................................................................................................... 110

COUNT VII – First Amendment Violation Pursuant to 42 U.S.C. § 1983 (As-Applied Challenge) ....................................................................................................................... 112

COUNT VIII – First and Fourteenth Amendment Violation (Viewpoint Discrimination) ....................................................................................................................................... 114

COUNT IX – First and Fourteenth Amendment Violation (Viewpoint Discrimination) 116

COUNT X – First and Fourteenth Amendment Violation (Viewpoint Discrimination) . 118

COUNT XI – Fraud ......................................................................................................... 120

COUNT XII – Negligent Misrepresentation .................................................................... 124

VI.    PRAYER FOR RELIEF ................................................................................................. 126