## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-03155-SKC-MDB

BROOKE SLUSSER, et al.,

      Plaintiffs,

v.

THE MOUNTAIN WEST CONFERENCE, et al.,

      Defendants.

---

## EMERGENCY MOTION FOR PRELIMINARY INJUNCTION

---

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................1

FACTS.............................................................................................................3

    A. The NCAA's Transgender Eligibility Policy (TEP) ......................................3

    B. The NCAA's TEP Ignores Science................................................................4

        1. The NCAA's TEP Ignores Male and Female Hormone Levels......4

        2. The NCAA's TEP Ignores Retained Male Advantage ..................4

        3. The NCAA's TEP Ignores Safety Risks in Contact Sports............5

    C. San Jose State University's (SJSU) Women's Volleyball Team Rosters a Male who Identifies as a Woman................................................................5

    D. Mountain West Conference (MWC) Women's Volleyball Teams Boycott Matches Against San Jose State University in Protest.........................7

    E. Mountain West Conference's Transgender Participation Policy (TPP) ......8

    F. Mountain West Conference Women's Volleyball Tournament ....................9

    G. Schools Silence Protests Because of the MWC TPP....................................9

        1. Suppression of Free Speech at Utah State University ..............10

        2. Suppression of Free Speech at University of Nevada, Reno......11

LEGAL STANDARD.......................................................................................12

ARGUMENT....................................................................................................12

I. Plaintiffs Are Likely to Succeed on the Merits ...............................12

    A. Plaintiffs Are Likely to Succeed on the Merts of Their Title IX Claims ..................................................................................................14

        1. Title IX Applies to SJSU and the MWC ....................................14

        2. Title IX Forbids Men from Competing Against Women in Women's Volleyball....................................................................17

            i. Title IX Protects Women, not Men Who Identify as Women ...................................................................................17

            ii. Title IX Requires Sex-Distinctions When Necessary to Ensure Equal Opportunity .............................................19

            iii. Deliberate Indifference to Unequal Opportunities within a Recipient's Control is Title IX Sex Discrimination..........21

        3. Fleming's Participation in MWC Women's Volleyball Competition is Sex Discrimination. ................................................................23

    B. Plaintiffs Are Likely to Succeed on Their Equal Protection Claims ....24

        1. The MWC is a State Actor........................................................24

C.  The MWC TPP Discriminates on the Basis of Sex and Does Not Survive Heightened Scrutiny ............................................................................. 27

D.  Plaintiffs Are Likely to Succeed on Their First Amendment Claims .. 30

1.  The First Amendment Protects the Right to Boycott ................ 30

2.  The First Amendment Prohibits Viewpoint Discrimination ..... 31

3.  The MWCViolated the First Amendment by Penalizing Boycott Activity and Blatantly Discriminating Against Plaintiffs' Viewpoint ........................................................................................ 32

i.  Facial Violation .................................................................. 32

ii.  As-Applied Violation ........................................................ 32

iii.  Viewpoint Discrimination................................................. 32

II.  Plaintiffs Will Suffer Irreparable Harm If the Injunction is Denied ............. 33

III.  The Threatened Injury Outweighs the Harm to the Opposing Party ........... 34

IV.  The Injunction Will Not Adversely Affect the Public Interest ....................... 35

CONCLUSION.............................................................................................................. 35

CERTIFICATE OF SERVICE............................................................................... ...37

CERTIFICATE OF CONFERRAL... .............................................................. 38

ARTIFICIAL INTELLIGENCE CERTIFICATION............................................. 40

The Mountain West Conference ("MWC") Women's Volleyball Tournament will begin on November 27, 2024. The top six teams in the MWC who are seeded based on interconference win-and-loss record will be the only competitors.

This season, however, the MWC has awarded wins and losses by enforcing its new Transgender Participation Policy ("MWC TPP"). The new policy was adopted to penalize MWC women's volleyball teams that refused to play their matches against the San Jose State University women's volleyball team ("SJSU Team") because the SJSU Team rostered a male[1] who identifies as transgender and claims a female gender identity. The MWC policy awarded each team a loss for each boycott of a scheduled match against the SJSU Team.

SJSU's decision to roster a male athlete violated Title IX's mandate of equal opportunity for women in collegiate athletics. The MWC's TPP by protecting SJSU's Title IX violations and adopting the NCAA Transgender Policies ("NCAA TEP"), also violates Title IX. The MWC TPP is also a blatant act of viewpoint discrimination in violation of the First Amendment as it penalizes the expressive activity of boycotts and accompanying speech.

The Moving Plaintiffs[2] move the Court to enter a Preliminary Injunction against the MWC, Gloria Nevarez in her official capacity, and Todd Kress in his official capacity, and to order these Defendants to

---

[1] All references to "sex" "man' woman' "male" and "female" in this brief are references to a person's immutable "biological sex" and not a person's "gender identity." *See Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 655 (2020) ("sex" "refer[s] only to biological distinctions between male and female").

[2] The Moving Plaintiffs (hereafter "Plaintiffs") are Brooke Slusser (San Jose State University) who seeks only an order rendering Fleming ineligible; Kaylie Ray (Utah

1.  Rescind the portion of the MWC TPP that creates forfeits and wins and losses for a cancelled or non-played conference game where a member of the non-canceling team is a "transgender student-athlete";

2.  Rescind the wins granted to the SJSU Team and the losses assigned via the MWC TPP to the teams which did not play the SJSU Team;

3.  Order that for the purpose of calculating winning percentage to determine the six teams eligible to compete in the MWC 2024 women's volleyball tournament the six wins previously assigned to SJSU by operation of the MWC TPP and the six losses previously assigned by operation of the MWC TPP to teams which canceled women's volleyball games with SJSU cannot be relied upon to calculate the final MWC women's volleyball standings and team winning percentages (meaning that SJSU will have fewer wins and fewer games played and that the four teams that canceled games with SJSU will have fewer losses and fewer games played), and

4.  Enjoin SJSU from continuing to roster student-athlete Blaire Fleming because Fleming has been continuously ineligible to play women's volleyball pursuant to Title IX as Fleming's sex is male

---

State University); Macey Boggs, Sierra Grizzle and Jordan Sandy (University of Wyoming); Katelyn and Kiersten Van Kirk (Boise State University).

and is therefore ineligible to play in, and should not be permitted by the MWC to play in, the MWC women's volleyball tournament.

This Motion has been made with notice to the parties impacted by the requested relief and after telephonic meet and confers between counsel did not result in an agreement regarding the relief requested. Plaintiffs request a hearing on November 21, 2024 at 8:00 AM MST, pursuant to the Court's Order. (ECF No. 9).

## FACTS

### A.    The NCAA's Transgender Eligibility Policies (TEP)

Eleven National Collegiate Athletics Association ("NCAA") Division I universities compete in women's volleyball in the MWC. (*See* Movant's Appendix ("App.") 316). The Bylaws of the MWC specify that, "[a]ll Member Institutions … *agree to abide by and fully comply with the rules and regulations of the [NCAA]* and the [MWC] Handbook[.]" (App. 117 (MWC Bylaws 1.01(c) (emphasis added)). This provision, along with a few others, effectively incorporates the NCAA Transgender Eligibility Policies ("NCAA TEP") into the MWC rules applicable to each member institution. (*See* App. 145–295).

The NCAA's TEP for men who wish to compete on women's teams require one year of testosterone suppression and measurements at three points during the season showing suppression of testosterone below the applicable sport threshold: 1. Prior to any competition during the regular season; 2. Prior to the first competition in an NCAA championship event; and 3. Prior to any competition in the non-championship segment. (App. 145). For Women's Volleyball, the approved testosterone threshold is < 10 nmol/L (<288.18 ng/dL). (App. 160).

**B.    The NCAA's TEP Ignores Science**

While testosterone suppression is the backbone of the NCAA's Transgender Eligibility Policies and a basis upon which the NCAA authorizes men to compete in women's sports after only a year of testosterone suppression, peer reviewed scientific research confirms the NCAA's reliance upon testosterone suppression is not supported by reliable scientific data. (App. 366–67 (Declaration of Dr. Tommy Lundberg ("Lundberg Decl.") ¶¶ 6.12, 8.4)).

**1.    The NCAA's TEP Ignores Natural Male and Female Hormone Levels**

Men produce far more testosterone than women, and there is a significant gap between the upper end of the testosterone range for women and the lower end of the testosterone range for men. The lower end of the male range is four- to five-fold higher than the upper end of the female range (males 7.7–29.4 nmol/L, females 0.1–1.7 nmol/L). (App. 362 (Lundberg Decl. ¶ 4.2)). In other words, the <10 nmol/L testosterone threshold used by the NCAA for granting eligibility to men to compete against women in Women's Volleyball is far higher than any female volleyball athlete could ever achieve without doping. (App. 497 (Declaration of Dr. Chad Thomas Carlson ("Carlson Decl.") ¶ 126)).

**2.    The NCAA's TEP Ignores Retained Male Advantage (RMA)**

Even if testosterone suppression resulted in men competing at the same testosterone levels as women, it would not eliminate "Retained Male Advantage" (RMA). RMA refers to the retention of sport performance enhancing advantages of being biologically male that persist after testosterone suppression and other "gender

4

affirming hormone treatment" ("GAHT"). (*See* App. 364–366 (Lundberg Decl. ¶¶ 6.1–
6.11) (referring to the "retention of athletic advantage despite testosterone suppres-
sion")). These advantages arise from the physiological differences between males and
females and the effects higher levels of testosterone have on the male body through-
out male development. (*Id.*) The factors that produce RMA begin well before puberty.
(*Id.*) Peer reviewed scientific studies concluded that even after GAHT, men generally
retained their strength levels. (*Id.*; App. 475 (Carlson Decl. ¶¶ 27–28)).

### 3.    The NCAA's TEP Ignores Safety Risks in Contact Sports

Women's volleyball is considered a contact sport. RMA increases injury risks
for women who compete against men in volleyball. (App. 497–500 (Carlson Decl. ¶¶
125–143)). Concussions are just one type of serious athletic injury for which women
are at higher risk than men. Concussions raise serious long term health implications
and can have lifelong debilitating effects.  The size, strength and speed of trans iden-
tifying male opponents in Contact or Limited Contact Sports materially increases the
injury risk of female student-athletes in those sports. (App. 498-99 (Carlson Decl.
¶¶ 134, 142) ("[a] volleyball … struck by a male and travelling an average 35%
faster than one struck by a female, will deliver 82% more energy to a head upon
impact")).

### San Jose State University's Women's Volleyball Team Rosters a Male who Identifies as a Woman

SJSU is one of the eleven universities that competes in women's volleyball in
the MWC. (App. 316). For the 2024 women's volleyball season, the SJSU Team has
rostered and played in every game outside hitter Blaire Fleming, a male who identi-
fies as transgender and claims a female gender identity. (App. 425–426 (Declaration

of Melissa Batie-Smoose ("Batie-Smoose Decl.") ¶¶ 33–44); App. 455 (Declaration of Brooke Slusser ("Slusser Decl.") ¶¶ 9–10)).

Fleming has leaping ability and hitting power that far exceeds any female player in the conference. (App. 423 (Batie-Smoose Decl. ¶¶26-28); App. 455 (Slusser-Decl. ¶ 12); App. 436–37 (Declaration of Kaylie Ray ("Ray Decl.") ¶¶ 17–18, 23)). Where Fleming stands out is spiking the volleyball and blocking on the front row. Fleming's spikes significantly increase the risk of teammates and opponents being concussed as it is difficult for the players to react to Fleming's attacks and to even get their hands up in time to deflect a ball away from their face. (App. 455–56 (Slusser Decl. ¶¶ 14–18)); App. 425 (Batie-Smoose Decl. ¶ 38–39)).

Fleming has a demonstrable impact on the success of SJSU's Team. As of November 8, 2024, Fleming was one of the highest ranked players in the MWC in average kills per set (fourth in the conference) and average points per set (third in the conference). (App. 320–21 (Ex. 11)). At one point in the season, Fleming was also one of the highest ranked players in the MWC in average service aces per set (ninth in the conference). (App. 339–40 (Ex. 12)). Per the NCAA's TEP, Fleming may participate in women's volleyball with a testosterone level of <10 nmol/L, which is five times higher than testosterone levels that any woman can produce naturally without doping. (App. at 497 (Carlson Decl. ¶ 126).

Fleming has hit multiple women in the face with spikes because those players are unable to react to the speed of Fleming's spikes in time. (App. 458–59 (Slusser Decl. ¶¶ 31, 34); App. 425–26 (Batie-Smoose Decl. ¶¶ 40–41)). SJSU female athletes

6

have been hit in the head and about their body by volleyballs hit by Fleming causing greater bruising, pain, and discomfort than what they experienced from similar hits by female volleyball players. (App. 456 (Slusser Decl. ¶ 19); (App. 424 (Batie-Smoose Decl. ¶ 30)). Others have experienced similar injuries. (App. 436–37 (Ray Decl. ¶ 18)).

**D.   Mountain West Conference Women's Volleyball Teams Boycott Matches Against San Jose State University in Protest**

During the 2024 season, it became public knowledge that Fleming is male. Due to this public knowledge, the SJSU Team has received public criticism for having an unfair advantage over other volleyball women's teams they have faced this season.

On September 14, 2024, Southern Utah University (a non-MWC member team) withdrew from a scheduled match against SJSU in the Santa Clara tournament in which Santa Clara, Southern Utah University and MWC members SJSU and Fresno State University were playing. (App. 296 (Ex. 4); App. 303 (Ex. 5); App. 438 (Ray Decl. ¶ 26)). The reason Southern Utah University withdrew from the game against SJSU was widely reported to be concern over playing against Fleming. (App. 438 (Ray Decl. ¶ 26); App. 313 (Ex. 8)). During the rest of the 2024 season, four MWC teams followed Southern Utah University in boycotting matches against the SJSU team due to concern over playing against Fleming. These teams boycotted, or plan to, as follows:

| Date of Boycott | Team |
| --- | --- |
| Sept. 28, 2024 | Boise State University |
| Oct. 5, 2024 | Wyoming University |
| Oct. 24, 2024 | Utah State University |
| Oct. 26, 2024 | University of Nevada, Reno |
| November 14, 2024 | Wyoming University |
| November 21, 2024 | Boise State University |

App. 462 (Van Kirk Decl. ¶ 5); App. 450 (Liilii Decl. ¶ 5); App. 429–30 (Boggs Decl. ¶ 5); App. 441 (Ray Decl. ¶ 53–55); App. 312–13 (Ex. 8)). MWC awarded a loss to each of the foregoing teams for each of the matches they boycotted and a win to SJSU. (App. 314–317 (Exs. 9 & 10); App. 519 (Ex. 13)).

**E.    Mountain West Conference's Transgender Participation Policy (TPP)**

The MWC's decision to penalize each team that boycotted their matches against SJSU was based on the new MWC TPP that was intentionally crafted to punish the boycotts. In relevant part, the MWC TPP penalized with a forfeited loss any team that refused to play the SJSU Team in 2024:

> If a MW member institution's team refuses to compete in an intraconference contest against a fellow MW member institution's team which includes an eligible transgender student-athlete(s), the team refusing to participate shall be deemed to have forfeited the contest. The forfeiting team will be charged with a loss and the opposing team credited with a win – for the purposes of Conference records, standings, tie-breaking formulas and MW championships participation.

(App. 114 (MWC Appendix J)).

The irregularities surrounding how and when the TPP was posted point to the reasonable conclusion that the TPP was drafted to target and suppress the expressive conduct it penalized on the very day it was first posted. No other motive makes sense. The policy was uploaded to the MWC website on September 27, 2024, the same day Boise State announced they would boycott. (App. 511 (Declaration of Dennis Baskin ("Baskin Decl.") ¶¶ 1–5)). This policy was not part of the MWC Handbook when that Handbook was previously uploaded on September 13, 2024. (App. 507).

The MWC TPP is the only MWC rule that imposes a penalty for a team not playing a match or game due to concerns about athlete safety. The MWC Handbook anticipates cancelled games for "interrupted contests" and "inclement weather." (App. 43–46 (MWC Reg. 1.7 & 1.8)). Interrupted contests can be applied "when circumstances exist such that commencement or continuation of play *would pose a threat to the safety of the constituent groups* involved with the contest." (App. 44 (MWC Reg. 1.7.2 (emphasis added)). Interrupted contests that cannot be rescheduled are simply "considered a cancelled game." (App. 45 (MWC Reg. 1.7.4.4)). The Handbook does not include any provisions for declaring a forfeit or for assigning a win or a loss in the event of a contest which is not played, cancelled or suspended prior to, or even after, its start due to concerns regarding student-athlete safety. (*See* App. 4–133).

**F.    Mountain West Conference Women's Volleyball Tournament**

The MWC Women's Volleyball Tournament will begin on November 27, 2024. The teams that will compete are the top six teams in the MWC who are seeded based on interconference winning percentage. (App. 95 (MWC Reg. 16.3)). The six-team single elimination Conference tournament determines the MWC's automatic representative to the NCAA Division I Women's Volleyball Championship. (App. 95 (MWC Reg. 16.4)). Tournament Seeding shall be based on regular season winning percentage in Conference competition. (App. 95 (MWC Reg. 16.7)).

**G.    Schools Silence Protests Because of the MWC TPP**

Because of the MWC TPP's threat of forfeiture (which implicates and jeopardizes Conference records, standings, tie-breaking formulas and MW championships participation), the coaches and athletic department staff of MWC member

institutions have reacted, just as the MWC intended, by threatening and discouraging women's volleyball student athletes from (a) exercising their First Amendment rights to protest and speak out against Fleming's participation in MWC women's volleyball and (b) boycotting matches against the SJSU Team.

These threats and discouragements from MWC coaches and athletic departments are caused by the MWC TPP and have been encouraged by the MWC, including through the actions and comments of Commissioner Nevarez and through the actions of the Athletic Directors and Presidents of MWC public member institutions who sit on MWC Committees and control the policies and actions of the MWC.

### 1.    Suppression of Free Speech at Utah State University

Following Utah State University's October 24, 2024 boycott of its match against SJSU, Kaylie Ray and some of her teammates wore "BOYcott" shirts to a Friday practice. (App. 443 (Ray Decl. ¶ 66)).  Friday practices on the USU Team are known as "Fun Friday" and the women are allowed to wear whatever they want to practice. (*Id.*) The Head Coach of the USU Team rebuked Ray and her teammates who wore the "BOYcott" shirts. (App. 445 (Ray Decl. ¶¶ 71, 73–76)). The USU Coach told Ray this was a "hot button issue" and that the USU players should avoid making any more public statements about this issue. (App. 445 (Ray Decl. ¶ 75)).

Ray also reports that the team has been pressed to sign a statement that they will not protest in the MWC championship tournament and that she has been told that the MWC has been communicating to coaches and athletic departments that they need to get their players in line and end the protests. (App. 434 (Ray Decl. ¶ 2); ECF No. 1 at 76 (Complaint ("Compl.") ¶ 465)). These communications from USU

10

personnel have led Ray and her teammates to be concerned that they will be pre-vented from playing in the conference championship if they do not say exactly what the MWC is requiring them to say. (Compl. ¶ 466).

### 2. Suppression of Free Speech at University of Nevada, Reno

The University of Nevada, Reno (Nevada, Reno) women's volleyball team (the "Nevada, Reno Team") also experienced significant pressure from the MWC TPP and MWC representatives at their University not to protest the participation of Fleming in their scheduled October 25, 2024, match with the SJSU Team.

On or about October 3, 2024, without consulting the members of the Nevada, Reno Team, and motivated by the MWC TPP the administration at Nevada, Reno issued a public announcement stating that the Nevada, Reno Team would play the SJSU Team in their women's volleyball match scheduled for October 26, 2024. (App. 450 (Liilii Decl. ¶ 2); Compl. ¶ 469). But 16 of the 17 team members of the Nevada, Reno Team members did not want to play the SJSU Team because they wanted to protest that a male athlete was taking the place of a women. (Compl. ¶ 474–475). They also did not want to play the match because of their safety concerns with playing against Fleming, whom they recognized had a combination of power, explosiveness, and leaping ability that no other player in the conference had. (*Id.* ¶¶ 476–78).

On Monday, October 6, Athletic Director Rempe, who is a member of the MWC Joint Council and of the Directors of Athletics Governance Group of the MWC, met with the Nevada, Reno Team, telling them they "should get educated;" "think about it, because it will affect your season;" and "loss of one game could take you out of the conference tournament," relying specifically upon the recently posted MWC TPP to

11

try to discourage the Nevada, Reno players from engaging in a protest against the SJSU Team. (*Id.* ¶¶ 471–72, 479–88.)

Ultimately, on October 17, 2024, the Nevada, Reno Team members sent out a public announcement stating that they would not play the game against the SJSU team. (*Id.* ¶ 496.) But the school's announcement did not in fact support the women volleyball players' decision to stand up for their rights, but instead simply said that Nevada, Reno would not penalize the team members for protesting. (*Id.* ¶ 498.)

## LEGAL STANDARD

To obtain a preliminary injunction, the movant must show: (1) a likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest. *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016); *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007). The right to such relief must be "clear and unequivocal." *Petrella v. Brownback*, 787 F.3d 1242, 1256 (10th Cir. 2015) (cleaned up).

## ARGUMENT

### I. Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs are likely to succeed on the merits of their claim that Fleming is ineligible to play women's volleyball in the MWC and that the MWC TPP is unconstitutional. Fleming's participation in MWC women's volleyball violates Title IX's equal opportunity guarantee that women will have an equal opportunity to compete on a level playing field. Fleming's participation has destroyed equal opportunity in the

MWC because Fleming is permitted to participate with more testosterone than any woman has absent doping, retains the size, power, explosive jumping ability, and agility that comes with Retained Male Advantage, and poses an inherent safety risk to women playing volleyball. (App. at 496–500 ("Carlson Decl.") ¶¶ 125–143)). Additionally, pursuant to Title IX every university in the MWC has equal numbers of spots on sex-separated women's teams to spots on men's teams, and when a male plays on a women's team it upsets the equal opportunity balance required by Title IX. Under Title IX, Fleming is ineligible and has been ineligible at all times.

The MWC TPP violates the Equal Protection Clause because it enforces sex discrimination on its face. The penalties exacted by the MWC TPP apply only when the opposing team has a student-athlete of a sex opposite the sex specified for the sport eligibility category in question (*i.e.*, the opposing team has a trans-identifying male on a women's team or a trans-identifying female on a man's team). Such a classification is subject to heightened scrutiny. The MWC TPP cannot survive that scrutiny because whatever interest the MWC and SJSU may have, it is not substantially related to fair competition and safety.

The MWC TPP also violates the First Amendment because it penalizes expressive activity in the form of a boycott and accompanying speech in support of the boycott. This is true on the face of the TPP and as applied to the Plaintiffs. No other policy for cancelled games imposes a penalty in the MWC Handbook except this one. The policy was also drafted with the specific intent to quash the Plaintiffs' boycotts and to punish them for it. This is unconstitutional viewpoint discrimination.

A.    **Plaintiffs Are Likely to Succeed on the Merts of Their Title IX Claims**

1.    **Title IX Applies to SJSU and the MWC**

Title IX applies to "any education program or activity" that "receives federal financial assistance." 20 U.S.C. § 1681. Title IX's "inclusive terminology" "encompass[es] *all* forms of federal aid to education, direct or indirect." *Grove City Coll. v. Bell*, 465 U.S. 555, 564 (1984) (internal citations and quotation marks omitted) (emphasis in original). Recognizing the "need to accord Title IX a sweep as broad as its language," the Court is "reluctant to read into [Title IX] a limitation not apparent on its face." *Id. Accord Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 460 (1999).

SJSU is subject to Title IX because it is a public university that receives federal funding. *Steshenko v. Gayrard*, 70 F. Supp. 3d 979, 990 (N.D. Cal. 2014) ("The Board does not deny the [San Jose State] University's receipt of federal funds.").

The MWC is also subject to Title IX because it exercises "controlling authority" over its federally funded member institutions in the realm of collegiate athletics. The Fourth, Sixth, and Eleventh Circuits have held that Title IX applies to athletic associations that exercise "controlling authority" over federal funding recipients. *Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282, 1294 (11th Cir. 2007).[3]

The Eleventh Circuit in *Williams* adopted the "controlling authority" test because "allow[ing] funding recipients to cede control over their programs to indirect

---

[3] See also *B.P.J. by Jackson v. W. Virginia State Bd. Of Educ.*, 98 F.4th 542, 554 (4th Cir. 2024); *Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 272 (6th Cir. 1994); *Barrs v. S. Conf.*, 734 F. Supp. 2d 1229, 1230 (N.D. Ala. 2010) (applying *Williams*); *A. B. by C.B. v. Hawaii State Dep't of Educ.*, 386 F. Supp. 3d 1352, 1357–58 (D. Haw. 2019) (applying *Williams* and *Horner*).

funding recipients but . . . not hold[ing] indirect funding recipients liable for Title IX violations" would leave a large loophole in Title IX coverage. *Id*. The Eleventh Circuit said that it relied upon the Western District of Michigan's analysis in *Communities for Equity v. Michigan High Sch. Athletic Ass'n*, 80 F. Supp. 2d 729, 733–35 (W.D. Mich. 2000), which, in turn, relied heavily on the Supreme Court's decision in *Cannon* holding that Title IX "was enacted for the benefit of . . . those discriminated against on the basis of sex" as opposed to simply being a "ban on discriminatory conduct by recipients of federal funds" or "a prohibition against the disbursement of public funds to educational institutions engaged in discriminatory practices." *Id*. (citing *Cannon*, 441 U.S. at 691–92). *Communities for Equity* noted the following in support of its finding that the schools had ceded controlling authority:

- The association required member schools to "adopt the Regulations and Interpretations" of the association that covered all aspects of athletic programs "as their own and agree to be primarily responsible for their enforcement." *Id*. at 737.

- The association had a "de facto monopoly over interscholastic sports" as all high schools in Michigan were members. *Id*.

- A school's decision to "disregard [association] rules, or leave the [association]" would subject the school to "sanctions (including possible expulsion), jeopardize its ability to compete in statewide tournaments, find it difficult to schedule opponents, and in general providing interscholastic athletic programs … ." *Id*.

Other District Courts applying the "controlling authority" test to athletic associations have relied on similar factors. *Barrs v. S. Conf.*, 734 F. Supp. 2d 1229, 1235 (N.D. Ala. 2010) ("… Defendant 'governs, regulates, operates, and controls' the intercollegiate athletics of its member schools and those schools "delegate and assign the authority to do so" to Defendant"); *A.B. by C.B.*, 386 F. Supp. 3d at 1357–58 (same).

Here, the federally funded MWC member entities – twelve of thirteen members, and all eleven members who participate in women's volleyball – ceded "controlling authority" to the MWC by

- Ceding authority over the rulemaking and enforcement components of collegiate athletics to the MWC. (App. 42 (MWC Reg. 1.1.1), 95 (MWC Reg. 16.1), 117 (MWC Bylaw 1.01(c)), 124 (MWC Bylaw 4.01(c)).

- Ceding authority over the end-of-season conference tournaments to the MWC. (App. 95 (MWC Reg. 16.4); *see also, e.g.*, App. 60 (MWC Reg. 4.4).

- Paying association fees to the MWC. While this factor is not dispositive, it is relevant when considered alongside the other factors present here. (App. 117 (MWC Bylaws 1.02)).

- Accepting the MWC's limit on the number of non-conference games that women's volleyball teams may schedule. (App. 96 (MWC Reg. 16.9); *see also, e.g.*, App. 61 (MWC Reg. 4.9.2)).

- Accepting the MWC's exclusive right to negotiate media rights contracts with broadcast networks and to distribute revenues from these contracts to the member institutions. (App. 40–41 (MWC Rule 9); App. 134–36 (Ex. 2)).

- Agreeing to pay millions of dollars to the MWC if they ever leave the MWC to join a rival conference.[4] (App. 118 (MWC Bylaws 1.04(b)); App. 134–36 (Ex. 2)).

Based on these facts, Title IX applies to the MWC.

---

[4] These "exit fees" were the subject of the MWC recently adopted Memorandum of Agreement, in which the MWC anticipated collecting $100 million from Colorado State University, Boise State University, California State University, Frenso, San Diego State University, and Utah State University collectively. (App. 134–36 (App. 2)). The significant financial leverage that the MWC has over its member institutions underscores that the member schools have ceded controlling authority to the MWC conference over their collegiate athletics programs when they join and cannot easily leave the MWC if they disagree with MWC policies.

### 2.     Title IX Forbids Men from Competing Against Women in Women's Volleyball

### i.     Title IX Protects Women, not Men Who Identify as Women

"Title IX prohibits sex discrimination by recipients of federal education funding." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). Title IX equalizes opportunities for women by extending its protections based on "sex." 20 U.S.C. § 1681(a). It forbids treating women worse than men.

Under Title IX, "sex" does not mean gender identity, and "woman" does not "transgender women" or men who identify as women. "[T]he unambiguous plain language of the statutory provisions and the legislative history [of Title IX] make clear that the term 'sex' means the traditional concept of biological sex in which there are only two sexes, male and female." *Kansas v. United States Dep't of Educ.*, No. 24-4041-JWB, 2024 WL 3273285, at *8 (D. Kan. July 2, 2024); *accord Oklahoma v. Cardona*, No. CIV-24-00461-JD, 2024 WL 3609109, at *5 (W.D. Okla. July 31, 2024). *See also Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 655 (2020) ("'Sex' means the physiological or 'biological distinctions between male and female.'").

The Supreme Court's decision in *Bostock*, which held that discrimination because of gender identity is discrimination "because of sex," is not to the contrary. As the District of Kansas has recognized, *Bostock* interpreted Title VII, not Title IX. This is critical for two reasons. First, "Title IX includes several carve outs to the prohibition on sex discrimination that are not present in Title VII." *Kansas*, 2024 WL 3273285, at *9 (citing 20 U.S.C. § 1681(a)(1)–(9)). Second, "Title IX is about schools, and 'the school is not the workplace.'" *Id.* (citing *Adams by & through Kasper v. Sch.*

*Bd. of St. Johns Cnty.*, 57 F.4th 791, 808 (11th Cir. 2022) and *Davis v. Monroe Cnty.
Bd. of Educ.*, 526 U.S. 629, 651 (1999)).

The recently promulgated regulations of the United States Department of Education's ("DoE") redefining the Title IX definition of "sex discrimination" to include gender identity discrimination do not impact this case either. *See* 89 Fed. Reg. at 33474–76 (to be codified at 34 C.F.R. § 106.10). First, the DoE's new rule states it did not change the athletics regulations of Title IX. If there was any doubt, the DOE explicitly made this point in recent litigation. *Kansas*, 2024 WL 3273285, at *11 (noting that the DOE argues "that the athletics regulation is not impacted by the new rule."). Second, even if the DoE's new rule did apply to athletics, the rule exceeds the DoE's statutory authority. The "DoE's reinterpretation of Title IX to place gender identity on equal footing with (or in some instances arguably stronger footing than) biological sex would subvert Congress' goals of protecting biological women in education." *Id.; accord Cardona*, 2024 WL 3609109, at *4–6. In fact, all nine Justices of the Supreme Court recently agreed when denying a recent application by the Justice Department to stay a lower court ruling enjoining the new Title IX regulations that "newly redefine[d] sex discrimination to include discrimination on the basis of sexual orientation and gender identity." *Dep't of Educ. v. Louisiana*, 144 S. Ct. 2507, 2509–10 (Aug. 16, 2024). Third, the DoE's new rule cannot stand under the major questions doctrine because it decides a major question that Congress did not clearly authorize it to decide. *Kansas*, 2024 WL 3273285, at *12; *Cardona*, 2024 WL 3609109, at *7.

### ii. Title IX Requires Sex-Distinctions When Necessary to Ensure Equal Opportunity

Title IX protects female students "from being 'excluded from participation in' or 'denied the benefits of' any 'education program or activity.'" *Davis*, 526 U.S. at 650 (quoting 20 U.S.C. § 1681(a)). "Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004). *Accord Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 & n.36 (1979); *Cohen v. Brown Univ.*, 101 F.3d 155, 164–65 (1st Cir. 1996) (detailing same historical goal).

Thus, Title IX not only *permits* sex-based distinctions, but *requires* them where necessary to ensure equal opportunity. As Justice Ginsburg said, the "[p]hysical differences" between the sexes are "enduring." *United States v. Virginia* (*VMI*), 518 U.S. 515, 533 (1996). *See also* 117 Cong. Rec. 30,407 (1971) (statement of Sen. Bayh) (noting Title IX would not require co-ed sports teams or locker rooms); 118 Cong. Rec. 5807 (1972) (statement of Sen. Bayh) (Title IX respects privacy in athletic facilities).

Sex distinctions are allowed; otherwise, Title IX cannot achieve its goal to stop denials of "benefits" in educational programs "on the basis of sex." 20 U.S.C. § 1681(a). *Cf. Fischer*, 144 S. Ct. at 2185 (looking to the "distinct purpose of each provision" to discern meaning based on their "evident purpose") (cleaned up).

Title IX not only allows some sex distinctions, it sometimes requires them. *Soule v. Connecticut Ass'n of Sch.*, No. 3:20-CV-00201(RNC), 2024 WL 4680533, at *11 (D. Conn. Nov. 5, 2024) (holding "failure to provide [women athletes] with sex-separated competition" stated a Title IX claim). "Students are not only protected from

discrimination, but also specifically shielded from being 'excluded from participation in' or 'denied the benefits of' any 'education program or activity.'" *Davis*, 526 U.S. at 650 (quoting 20 U.S.C. § 1681(a)). That may any act "that unintentionally results in exclusion," *Knox Cnty. v. M.Q.*, 62 F.4th 978, 1002 (6th Cir. 2023), or precludes "meaningful access" to a desired benefit, *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

For women to have "equal opportunity" in athletic competition, "relevant differences cannot be ignored." *Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 657 (6th Cir. 1981). "[A]n institution may violate Title IX simply by failing to accommodate effectively the interests and abilities of student athletes of both sexes." *Roberts v. Colorado State Bd. of Agric.*, 998 F.2d 824, 828 (10th Cir. 1993).

Schools must "fully and effectively accommodate the interests and abilities of its women athletes." *Roberts*, 998 F.2d at 831. Equal opportunity in theory doesn't count. "[T]he mere opportunity for girls to try out" for a team is not enough if they don't stand a realistic chance of making the roster because of competition from men. *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3d Cir. 1993). And the mere chance to participate on a team is not enough if women cannot realistically win scholarships or "enjoy the thrill of victory" in sports where males can dominate based on their sex-linked advantages. *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 773 (9th Cir. 1999).

Title IX's promise of equal opportunity means little if institutions covered by it ignore biological reality to permit a man to take a woman's place. In sport, the

enduring physical differences between men and women trend in a single direction. In each NCAA sport with the possible exceptions of equestrian and shooting, males enjoy significant athletic performance advantages rooted in male biology. Therefore, where collegiate sports are sex-separated due to enduring physical differences (i.e., male advantages in size, strength, power and performance) that separation must be maintained. Men cannot take women's places.

The law agrees with the facts alleged here. Due to the "average physiological differences" between the sexes, "males would displace females to a substantial extent if they were allowed to compete" for the same teams. *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982). Most "females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement" without sex-specific teams. *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977), *abrogated on other grounds*. Those male advantages are prominent in college volleyball and specifically when considering this case. (App. 497–500 (Carlson Decl. ¶¶ 125–143); App. 423 (Batie-Smoose Decl. ¶¶26-28); App. 455 (Slusser Decl. ¶ 12); App. 436–37 (Ray Decl. ¶¶ 17–18, 23)).

### iii. Deliberate Indifference to Unequal Opportunities within a Recipient's Control is Title IX Sex Discrimination

Sex discrimination includes a federal funding recipient's deliberate indifference towards any conduct that deprives women of equal educational opportunity. *E.g.*, *Jackson*, 544 U.S. at 182 ("deliberate indifference constituted intentional discrimination on the basis of sex"); *Gebser v. Lago Vista Ind. School Dist.*, 524 U.S. 274, 290–291 (1998) (deliberate indifference to sexual harassment); *Farmer v. Kansas*

*State Univ.*, 918 F.3d 1094, 1104 (10th Cir. 2019) (same); *Davis*, 526 U.S. at 642 (deliberate indifference to hostile educational environment).

Deliberate indifference occurs when the environment the funding recipient controls "so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 650–51.

Title IX sex discrimination takes many forms, not just the "severe, pervasive, and objectively offensive" student-on-student sexual harassment the U.S. Supreme Court addressed in *Davis*. The Supreme Court has "consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination." *Jackson*, 544 U.S. at 183; *accord N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 521 (1982) ("if we are to give Title IX the scope that its origins dictate, we must accord it a sweep as broad as its language." (cleaned up)). A plaintiff need only establish that her environment "effectively denied [her] equal access to an institution's resources and opportunities," and the school was deliberately indifferent to that fact. *Davis*, 526 U.S. at 650–51; *Alexander v. Choate*, 469 U.S. 287, 301 (1985) (acts that bar "meaningful access" to a desired benefit).

A recipient's duty not to be deliberately indifferent to sex discrimination is heightened where "the recipient retains substantial control" over the environment where the discrimination occurs. *Davis*, 526 U.S. at 646. In facilities which the school controls, its power "is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." *Id*. (cleaned up).

### 3. Fleming's Participation in MWC Women's Volleyball Competition is Sex Discrimination.

Title IX sex discrimination may, therefore, simply refer to any act which diminish(es) a female's use or enjoyment of a particular resource, school location, or opportunity to which females are entitled access, such as a locker room or an athletic field. Where the recipient was aware of the circumstances, which Plaintiffs have alleged here, a recipient's refusal to act to prevent loss of women's opportunities arising from a man's intrusion "fly[s] in the face of Title IX's core principles" and will subject the recipient to claims for monetary damages. *Id.* at 651.

Fleming's participation on the SJSU Team in MWC competition is sex discrimination because it deprives women of the equal opportunity to compete with women in sex-separated sport and only women have comparable testosterone levels and comparable jumping ability, strength, power, and agility. Men are not comparable to women physically. Competing against a man has exposed Plaintiffs and some 200 or more MWC women to greater risk of injury than what they otherwise would experience if Fleming were not participating. Viewed through the gender-identity-blind lens of Title IX's sex-based mandate, allowing Fleming to compete in women's volleyball is no different than permitting any male volleyball player to participate.

The MWC and SJSU also demonstrated deliberate indifference toward the Plaintiffs and the other women of the MWC by turning a blind eye to their concerns for safety and the deprivation of equal opportunity. The situation in the MWC this year is anything but ordinary. Beyond physical harm, every match against SJSU has become fraught with emotional turmoil as every match becomes a political and

ideological statement by the MWC, SJSU, and the teams that still choose to play SJSU. There is no evidence that any male collegiate sporting event takes place under such circumstances. In a word, the environment that the MWC and SJSU control "so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 650–51.

However, applying Title IX's sex-based equal opportunity mandate need not be fraught. Title IX was never intended to be, and interpretation of it should not be, a gender identity rights litmus test. Instead, adherence to Title IX's plain wording simply requires school administrators and courts to make equal opportunity decisions on the basis of sex alone. Gender identity simply does not come into play because Title IX does not dispense rights or protections upon the basis of gender identity (or any other category or basis not encompassed in the statute's text.)

## B.    Plaintiffs Are Likely to Succeed on Their Equal Protection Claims

### 1.    The Mountain West Conference is a State Actor

A threshold issue is whether the MWC, a non-profit private entity, is a state actor with respect to the alleged conduct in this case. Whether a private entity is a state actor under § 1983 is "necessarily [a] fact-bound inquiry" that "var[ies] with the circumstances." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 939 (1982) (reversing grant of dismissal); *accord Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974) ("true nature of the State's involvement may not be immediately obvious, and detailed inquiry may be required.").

24

Athletic conferences and associations – like MWC – are state actors when they are pervasively entwined in a symbiotic relationship with public schools. In *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001), the Supreme Court held that an athletic association was a state actor because it found "pervasive entwinement of public institutions and public officials in [the association's] composition and workings, and there is no substantial reason to claim unfairness." *Id*. *See also Lugar*, 457 U.S. at 937 (finding joint action when "[private entity] has acted together with or has obtained significant aid from state officials).

The Court in *Brentwood* found pervasive entwinement because the Association was comprised of "members" who are "public schools," scholastic athletics "play an integral part in the public education of" the state institutions, and the member schools "adopt and enforce the rules that make the system work." *Brentwood Acad.*, 531 U.S. at 299. That many of the Association's members were private schools did not preclude finding pervasive entwinement. *Id.*

The Tenth Circuit has described the Brentwood "entwinement" or "symbiotic relationship" analysis to require "asking whether and to what extent the state's relationship with the private actor goes beyond the 'mere private [purchase] of contract services'" and considering whether "private and public actors have sufficiently commingled their responsibilities." *Wittner v. Banner Health*, 720 F.3d 770, 778 (10th Cir. 2013) (citing *Gallagher v. "Neil Young Freedom Concert,"* 49 F.3d 1442 (10th Cir.1995)). Another Tenth Circuit panel described the symbiosis as the state entity "'so far insinuated itself into a position of interdependence' with a private party that

'it must be recognized as a joint participant in the challenged activity.'" *Johnson v. Rodrigues*, 293 F.3d 1196, 1204 (10th Cir. 2002) (quoting *Gallagher*, 49 F.3d at 1451)).

The Tenth Circuit applied this analysis in *Christian Heritage Acad. v. Oklahoma Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1026 (10th Cir. 2007), to find that "Oklahoma's state-organized school activities association, which regulates inter-scholastic activities." OSSAAA "determine[d] athletic divisions, set[] eligibility rules, and h[eld] state play-offs and championships." *Id.* Moreover, 98 percent of its members were public schools. *Id.* at 1030. The Tenth Circuit held that OSSAA was a state actor under *Brentwood*:

> OSSAA's conduct constitutes state action because of the pers[v]asive entwinement of public institutions and public officials in its composition and workings. OSSAA members are 98 percent public schools, which is a larger percentage than that in *Brentwood Academy*. All fourteen of OSSAA's current directors are public school employees, and Oklahoma has authorized OSSAA to determine athletic eligibility and hold play-off games.

*Id.* at 1030–31 (cleaned up).[5]

Here, MWC is a state actor for all the same reasons that its member institutions who receive federal funds have ceded "controlling authority" to the MWC conference for purposes of collegiate athletics. *See supra* at Section I.A.1.

---

[5] The plain application of *Brentwood* has become so commonplace for athletic associations that some no longer dispute that they are state actors in constitutional litigation. *Szymakowski v. Utah High Sch. Activities Ass'n, Inc.*, No. 2:24-CV-00751-RJS, 2024 WL 4519187, at *6 (D. Utah Oct. 17, 2024) ("The parties do not dispute that the UHSAA is a state actor for purposes of the Fourteenth Amendment and 42 U.S.C. § 1983."); *see also Entwistle v. S. Dakota High Sch. Activities Ass'n*, No. CV 06-4030-KES, 2006 WL 8453556, at *2 (D.S.D. Mar. 24, 2006) (same).

The facts in this case are on all fours with *Brentwood* and *Christian Heritage Academy*. Eleven of the MWC's thirteen member institutions are state schools, and another is a government run military college. (App. 132). Moreover, the leadership and operations structure of the MWC is the epitome of "comingled" responsibilities between MWC employees and state university officials. *Wittner*, 720 F.3d at 778. The Board of Directors and multiple sub-committees that direct the operations of the MWC are principally constituted by officials of the member institutions. (App. 42–51 (MWC Reg. 1)). These facts perfectly replicate the *Brentwood* factors for establishing pervasive entwinement.

It is also legally irrelevant that MWC members include one private university and one military university. As the Supreme Court said in *Brentwood*, 531 U.S. at 300, an athletic association does not lose authority delegated by state entities merely because private entities (or a federal entity) associates with it too. This applies with equal force to the MWC.

### C. The MWC TPP Discriminates on the Basis of Sex and Does Not Survive Heightened Scrutiny

The penalties exacted by the MWC TPP apply only when the opposing team has a "transgender student-athlete" on their roster. The MWC TPP penalty occurs only when the opposing team has a student-athlete of a sex opposite the sex specified for the sport eligibility category in question (*i.e.*, the opposing team has a trans-identifying male on a women's team or a trans-identifying female on a man's team).[6]

---

[6] Timing and context make clear that MWC administrators were not motivated to make their mid-season move to add the MWC TPP for any reason other than lowering the boom on women standing up for women's rights.

Under the Equal Protection Clause a classification based on sex is subject to heightened scrutiny in the Tenth Circuit. *Fowler v. Stitt*, 104 F.4th 770, 794 (10th Cir. 2024). A sex-based classification is lawful only if the classification serves an important interest and is substantially related to the achievement of that interest. *Id.*

The MWC TPP fails heightened scrutiny because it does not serve an important interest. The MWC cannot show an important interest in requiring women to play against a male volleyball player when the women's school or the women themselves have legitimate science-based safety concerns about playing against the male and when science also clearly demonstrates that men have an unfair competitive advantage against women due to Retained Male Advantage and given the indisputable fact that under the NCAA TEP men are able to compete with testosterone levels that are five times higher than what a women can naturally produce without doping. To require that these safety and fairness concerns be disregarded is inconsistent with how the MWC handles many other situations in which a contest is not played, which is to simply regard the game as a cancellation rather than to automatically assign a loss to one team and a win to the other. (App. 44–45 (MWC Reg. 1.7 )).

Plaintiffs recognize that Defendants may seek to invoke Fleming's own equal protection rights. However, the Tenth Circuit has not recognized transgender status as a quasi-suspect class but conducts all of its analysis under a single heading of sex discrimination. *Fowler v. Stitt*, 104 F.4th 770, 794 (10th Cir. 2024) ("We decline to decide whether transgender status is a quasi-suspect class because the Policy discriminates based on sex, so intermediate scrutiny applies regardless.")

Even were the Court to interpret *Fowler* to equate discrimination on the basis of transgender status with discrimination on the basis of sex, no Court in this Circuit has addressed how to scrutinize a policy, like the MWC TPP, that purports to protect student athletes from discrimination on the basis of transgender status while it simultaneously perpetuates discrimination on the basis of biological sex.

Should the Court engage in intermediate judicial scrutiny it must weigh all of the competing interests to determine what is substantially related to important government interests. *Cf. Soule v. Connecticut Ass'n of Sch.*, No. 3:20-CV-00201(RNC), 2024 WL 4680533, at *14–15 (D. Conn. Nov. 5, 2024) (balancing interests of fair competition for females with interests of transgender student-athletes when the two are in "direct conflict"). On this point, the Tenth Circuit is clear: "physical differences between men and women … exist and … may be relevant to whether state action passes judicial scrutiny." *Fowler,* 104 F.4th at 790, 793 (10th Cir. 2024) (citing *VMI*, 518 U.S. at 533). Thus, however the Court characterizes Fleming's status vis-à-vis the Plaintiffs, all parties and the Court must grapple with the reality of physical differences between the sexes.

Whatever interests Defendants might articulate – and it is the Defendants' burden to assert them – they are not significant enough to override the fundamental purpose of the MWC or collegiate sports generally, which is *fair and safe competition*. Fair and safe competition is the reason the MWC and SJSU's athletic department exist. Allowing a male athlete who has an unfair advantage and creates an unsafe

environment to compete in women's volleyball has no rational, much less substantial, relation to any legitimate or important government interest.

### D.    Plaintiffs Are Likely to Succeed on Their First Amendment Claims

As explained above, the MWC is a state actor. As such, it violated the First Amendment by intentionally crafting a policy to penalize expressive activity in the form of a boycott of women's volleyball competition against SJSU and accompanying speech in support of the boycott.

#### 1.    The First Amendment Protects the Right to Boycott

The First Amendment protects the right to participate in a boycott. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907 (1982); *Koontz v. Watson*, 283 F. Supp. 3d 1007, 1021 (D. Kan. 2018). In *Claiborne Hardware*, the Court held that a boycott of white merchants in Claiborne County, Mississippi, was protected First Amendment speech. The boycott's "acknowledged purpose was to secure compliance by both civic and business leaders with a lengthy list of demands for equality and racial justice."

The Court applied a two-step analysis. First, after surveying the history of boycotts in America, the Court held that the boycott was First Amendment activity "inseparable" from the rights of "speech, assembly, and petition." *Id.* at 907, 911–12 (quoting *Thomas v. Collins*, 323 U.S. 516, 530 (1945)). The Court recalled that "the practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process," *id.* (quoting *Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 294 (1981)), and

explained, in detail, how the boycott was also accompanied by other forms of protected speech, such as "speeches and nonviolent picketing." *Id.*; *see also id.* at 909–12.

Second, the Court considered the state actor's interest in regulating the boycotters. The Court recognized state power to "regulate economic activity," but held that state actors do not have a "right to prohibit peaceful political activity such as that found in the boycott in this case." *Id.* at 913. The Court said

> expression on public issues has always rested on the highest rung of the hierarchy of First Amendment values. Speech concerning public affairs is more than self-expression; it is the essence of self-government. There is a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.

*Id.* at 913 (cleaned up). *See also Koontz v. Watson*, 283 F. Supp. 3d 1007, 1022 (D. Kan. 2018) (holding Kansas law forbidding government contracts with participants in a boycott against Israel violated the First Amendment because the boycotters "'banded together' to express, collectively, their dissatisfaction with … the injustice and violence they perceive, as experienced by both Palestinians and Israeli citizens" and "amplify[ied] their voices to influence change, as did the boycotters in *Claiborne*").

### 2. The First Amendment Prohibits Viewpoint Discrimination

The First Amendment also prohibits state actors from engaging in viewpoint discrimination. "Viewpoint discrimination is a subset—and a particularly 'egregious form'—of content discrimination." *Pahls v. Thomas*, 718 F.3d 1210, 1229 (10th Cir. 2013) (quoting *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819, 829 (1995). It occurs "'[w]hen the government targets not subject matter, but particular views taken by speakers on a subject.'" *Id.* "'The government must

abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.'" *Id.* Viewpoint discrimination is "presumptively invalid." *Id.*

### 3. The Mountain West Conference Violated the First Amendment by Penalizing Boycott Activity and Blatantly Discriminating Against Plaintiffs' Viewpoint

#### i. Facial Violation

The MWC TPP violates the First Amendment on its face. It is the only policy in the MWC Handbook that imposes a penalty for not playing a match due to concerns about athlete safety. MWC Regulation 1.7.2. The MWC TPP imposes this unique penalty while taking the content of speech into account, namely, boycotts of a competition where one of the teams has rostered a transgender athlete. The penalty does not apply to any other boycott or refusal to play another team for any other reason.

#### ii. As-Applied Violation

Even were it not a facial violation of the First Amendment, the TPP was applied to penalize boycotts about a particular ideological and political viewpoint, namely the belief that women should not compete against men because it is fundamentally unsafe and unfair.

#### iii. Viewpoint Discrimination

The evidence also requires the Court go one step further and find the MWC intentionally quashed expressive activity because of the viewpoint expressed. The MWC TPP was adopted in September 2023 in response to public dissent about Fleming's participation in the MWC intraconference competition and teams who were

protesting Fleming's participation by refusing to play SJSU. It was the result of a willful act by Commissioner Nevarez and the MWC to suppress free speech.

The MWC's message was so clear that it caused school coaches and athletic directors to brow beat their players into submission, threatening them with the implications of taking losses that might jeopardize their opportunity to compete in the MWC tournament. This did not come about by happenstance. It was purposeful viewpoint discrimination.

## II.    Plaintiffs Will Suffer Irreparable Harm If the Injunction is Denied

"[A] plaintiff satisfies the irreparable harm requirement by demonstrating 'a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'" *RoDa Drilling Co. v. Siegal,* 552 F.3d 1203, 1210 (10th Cir. 2009) (*quoting Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003)). "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Schrier v. Univ. Of Co.,* 427 F.3d 1253, 1267 (10th Cir. 2005). The injury must be imminent, and there must be a clear and present need for equitable relief to prevent irreparable harm. *Id.* The Tenth Circuit has held that "any deprivation of any constitutional right" is irreparable harm. *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 806 (10th Cir. 2019).

Plaintiffs' Title IX claims, and their evidence in support, satisfies the "certain, great, actual and not theoretical standard" of irreparable harm. If the Court does not enjoin enforcement of the MWC TPP, women's volleyball student-athletes will play against an ineligible male athlete in the upcoming MWC tournament, and teams who

should be playing or have a better seed (*e.g.*, Boise State, Utah State, and Wyoming) will not be participating, and teams that should not be participating (SJSU) will be.

Plaintiffs' First Amendment and Equal Protection claims satisfy the constitutional injury standard of irreparable harm. The MWC TPP is a blatant exercise of viewpoint discrimination that chills free speech and protest. The MWC TPP also facially discriminates on the basis of sex against female athletes and in favor of males on the issue of ongoing eligibility for MWC matches and by favoring teams with a male athlete and penalizing teams with only female athletes.

## III.    The Threatened Injury Outweighs the Harm to the Opposing Party

The balance of harms factor requires balancing the irreparable harm to Plaintiffs "against the harm that the preliminary injunction causes." *City of Fort Collins, Colorado*, 916 F.3d at 806. "When a constitutional right hangs in the balance, though, 'even a temporary loss' usually trumps any harm to the defendant." *City of Fort Collins*, 916 F.3d at 806. Here Plaintiffs' Title IX rights, constitutional rights, and their safety from injury hang in the balance. No Defendant has any similar rights at stake here. Again, Plaintiffs recognize that Defendants may assert Fleming's equal protection rights. However, as explained above, any competing rights cannot withstand intermediate scrutiny that takes physical differences between the sexes into account.

Moreover, it is possible for transgender athletes to fairly compete in the sex category that matches their biological sex without harm and without controversy. Universities within the National Association of Intercollegiate Athletics (NAIA) have crafted a transgender eligibility policy that does just that. Dr. Brent Ellis explains, the NAIA freely admits transgender athletes to participate in the sex category that

34

matches their biological sex. (App. 385–387 (Declaration of Dr. Brent Ellis ("Ellis Decl.") ¶¶ 17–21)). The NAIA policy was unanimously adopted after two years of careful study and debate. (App. 385 (Ellis Decl. ¶ 17)). Dr. Ellis reports that there have not been any issues with its implementation (App. 387 (Ellis Decl. ¶ 22)), further confirming that the balance of harms weighs in Plaintiffs favor and against upholding the MWC's unlawful and unfair TPP.

**IV.    The Injunction Will Not Adversely Affect the Public Interest**

As to the fourth factor, the Tenth Circuit has said "it's always in the public interest to prevent the violation of a party's constitutional rights." *City of Fort Collins*, 916 F.3d 792, 807 (10th Cir. 2019). Because Plaintiff's constitutional rights outweigh the harms to Defendants, the requested injunction favors Plaintiffs.

## CONCLUSION

For the foregoing reasons, Plaintiffs are entitled a preliminary injunction.

DATED: November 15, 2024.          Respectfully Submitted,

*/s/ William Bock III*

William Bock III, CO Atty. No. 45633
Justin R. Olson, IN Atty. No. 31450-49
Kroger Gardis & Regas, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Tel: (317) 692-9000
Fax: (317) 264-6832
E-mail:    wbock@kgrlaw.com
E-mail:    jolson@kgrlaw.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I certify that on November 15, 2024, a true and correct copy of the foregoing was filed electronically. Notice of this filing will be served by operation of the Court's electronic filing system on the following parties who have appeared in this case.

Bryan Heckenlively
Helen E. White
Munger Tolles & Olson, LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
bryan.heckenlively@mto.com
helen.white@mto.com

*Counsel for Board of Trustees of the California University System, Laura Alexander, and Todd Kress*

I also certify that I caused to a true and correct copy of the foregoing to be sent by electronic mail to the following parties who have not yet appeared in this case:

Wesley R. Powell
Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019-6099
wpowell@willkie.com

*Counsel for The Mountain West Conference*

*/s/ William Bock III*
William Bock III, CO Atty. No. 45633

37

## <u>CERTIFICATION OF CONFERRAL</u>

Pursuant to the District of Colorado's Local Rule 7.1(a), the undersigned certifies that Plaintiffs have made good-faith effort to confer with Defendants regarding this motion.

On November 11, 2024, I left a voicemail with MWC Deputy Commissioner Gililland in which I communicated the relief requested in this Motion. On November 12, 2024, I and counsel for the MWC had a teleconference where I again communicated the relief requested in this Motion and responded to questions from counsel. Counsel for the MWC communicated the requested relief to the MWC Board of Directors who considered the requested relief. I followed-up this conversation with an email summarizing the relief requested in this Motion in written form. On November 13, 2024, Plaintiffs filed their Complaint. I sent courtesy copies of the Complaint to counsel for the MWC, reiterating Plaintiffs willingness to resolve the issues of the relief requested without filing the Motion. On November 14, 2024, I again spoke with counsel for the MWC by phone, and during this call, counsel stated that the MWC would not agree to the relief requested in this Motion.

On November 11, 2024, I left a voicemail with SJSU Chief of Staff Shawn Walen in which I communicated the relief requested in this Motion. On November 12, 2024, I was contacted by email by counsel for SJSU. I responded to this email with an email summarizing the relief requested in this Motion in written form. On November 13, 2024, Plaintiffs filed their Complaint. I sent courtesy copies of the Complaint to counsel for SJSU, reiterating Plaintiffs willingness to resolve the issues of the relief

requested without filing the Motion. On November 14, 2024, I spoke with retained counsel for SJSU by phone, and we discussed again the relief requested in this Motion. During this phone conversation, counsel for SJSU stated that SJSU would not agree to the relief requested in this Motion.

The written communications memorializing the parties good faith efforts to confer in advance of this Motion included in the appendix in this matter. (App. 520–552).

/s/ William Bock III

William Bock III, CO Atty. No. 45633

## <u>ARTIFICIAL INTELLIGENCE CERTIFICATION</u>

I certify that no portion of this filing was drafted by artificial intelligence.

*/s/ William Bock III*
William Bock III, CO Atty. No. 45633