IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-03155-SKC-MDB

BROOKE SLUSSER, *et al.*,
Plaintiffs,

v.

THE MOUNTAIN WEST CONFERENCE, *et al.*,
Defendants.

---

**DEFENDANTS THE MOUNTAIN WEST CONFERENCE AND GLORIA
NEVAREZ'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
EMERGENCY MOTION FOR PRELIMINARY INJUNCTION**

---

Defendants The Mountain West Conference (the "MWC") and Gloria Nevarez
(collectively, "Defendants" or "MWC") respectfully submit this Memorandum of Law
in Opposition to Plaintiffs' Emergency Motion for a Preliminary Injunction.

# TABLE OF CONTENTS

NATURE OF THE CASE ..................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................ 3

   I.   The Parties. ............................................................................................................. 3

   II.   The MWC adopted, implemented, and communicated its Transgender
Participation Policy to member institutions in August 2022. ...................................... 6

   III.   The 2024-25 volleyball season and forfeits beginning in September 2024. ..... 8

LEGAL STANDARD .......................................................................................................... 14

ARGUMENT ....................................................................................................................... 16

   I.   Plaintiffs are not Entitled to Injunctive Relief for a Manufactured Emergency.
16

   II.   Plaintiffs' Claims Against the MWC and Commissioner Nevarez Are
Unlikely to Succeed on the Merits. ............................................................................. 21

      A.   The MWC is Not a State Actor Subject to Section 1983 Liability. ...............22

      B.   Commissioner Nevarez Is Not a State Actor Subject to Section 1983
Liability .......................................................................................................................26

   III.   Plaintiffs Are Not Likely to Succeed on Title IX Claims Against the
Defendants. .................................................................................................................27

      A.   Plaintiffs Fail to Allege That the MWC Received Federal Financial
Assistance .....................................................................................................................27

      B.   The Moving Plaintiffs' Title IX "Control Theory" Has Been Rejected. ........29

      C.   Title IX Claims Cannot Be Brought Against Individual Defendants. ........31

      D.   USU's Title IX Claims Are Unlikely to Succeed for the Same Reasons. ....32

   IV.   The Remaining Preliminary Injunction Factors Weigh Against the Moving
Plaintiffs' Requested Relief. ..................................................................................... 33

CONCLUSION ................................................................................................................... 34

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*A.B. by C.B. v. Hawaii State Dep't of Educ.*,
   386 F. Supp. 3d 1352 (D. Haw. 2019) ........................................................29

*A.K. by & through Moyer v. Cherry Creek Sch. Dist. No. 5*,
   No. 20-cv-00392-PAB-NRN, 2020 WL 2197920 (D. Colo. May 6,
   2020) ................................................................................................ 17, 20

*Am. Ass'n of People with Disabilities v. Herrera*,
   580 F. Supp. 2d 1195 (D.N.M. 2008) ...............................................17, 20

*Archer v. Griswold*,
   638 F. Supp. 3d 1246 (D. Colo. 2022) ........................... 14, 15, 16, 32, 34

*Att'y Gen. of Oklahoma v. Tyson Foods, Inc.*,
   565 F.3d 769 (10th Cir. 2009) .................................................................. 14

*B.P.J. by Jackson v. W. Virginia State Bd. Of Educ.*,
   98 F.4th 542 (4th Cir. 2024) .................................................................... 29

*Barrs v. S. Conf.*,
   734 F. Supp. 2d 1229 (N.D. Ala. 2010) ..................................................30

*Barrs v. S. Conf.*,
   No. 2:10-CV-01227-AKK, 2010 WL 11613799 (N.D. Ala. May 13,
   2010) .................................................................................................29, 30

*Behagen v. Amateur Basketball Ass'n of U.S.*,
   884 F.2d 524 (10th Cir. 1989)............................................................24, 25

*Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*,
   531 U.S. 288 (2001) (*Brentwood I*).............................................. 23, 24, 25

*Byrd v. Ind. Sch. Dist. No. 8 of Tulsa Cnty.*,
   No. 23-CV-00404-CDL, 2024 WL 4350800 (N.D. Okla. Sept. 30,
   2024) ........................................................................................................31

*Christian Heritage Acad. v. Oklahoma Secondary Sch. Activities Ass'n*,
   483 F.3d 1025 (10th Cir. 2007) ...............................................................24

*United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*,
883 F.2d 886 (10th Cir. 1989) ...................................................................................14

*National Collegiate Athletic Ass'n v. Tarkanian*,
488 U.S. 179 (1988) ...............................................................................................22, 23

*Communities for Equity v. Michigan High Sch. Athletic Ass'n*,
80 F. Supp. 2d 729 (W.D. Mich. 2000) ...................................................................29

*Day v. The Career Bldg. Acad.*,
No. 18-CV-00837-RM-KMT, 2021 WL 4260797 (D. Colo. Sept. 20, 2021) ..................................................................................................................................31

*Denver Homeless Out Loud v. Denver*,
32 F.4th 1259 (10th Cir. 2022) ..........................................................................14, 33

*Dimas v. Pecos Indep. Sch. Dist. Bd. of Educ.*,
No. 23-2064, 2024 WL 1881076 (10th Cir. Apr. 30, 2024).....................................31

*Doe v. Univ. of Denver*,
No. 16-CV-00152-PAB-KMT, 2018 WL 1304530 (D. Colo. Mar. 13, 2018), *aff'd on other grounds*, 952 F.3d 1182 (10th Cir. 2020) ............................25

*Edmonds-Radford v. Sw. Airlines Co.*,
No. 16-CV-02860-LTB-STV, 2020 WL 13897201 (D. Colo. Mar. 6, 2020), *aff'd*, 13 F.4th 1107 (10th Cir. 2021), *opinion withdrawn and superseded on reh'g*, 17 F.4th 975 (10th Cir. 2021), and *aff'd*, 17 F.4th 975 (10th Cir. 2021) ..........................................................................................29

*Florence v. Peterson*,
No. CIVA 06CV00178 REBPA, 2007 WL 1793899 (D. Colo. June 19, 2007), *aff'd*, 268 F. App'x 737 (10th Cir. 2008)........................................................25

*Found. Learning LLC v. Acad., Arts & Action Charter Acad.*,
No. 17-cv-03182-RM-KLM, 2018 WL 3382933 (D. Colo. May 18, 2018) .................................................................................................................17, 21

*GTE Corp. v. Williams*,
731 F.2d 676 (10th Cir. 1984) .....................................................................16, 17, 18

*Heideman v. S. Salt Lake City*,
348 F.3d 1182 (10th Cir. 2003) ................................................................................20

*Horner v. Kentucky High Sch. Athletic Ass'n*,
   43 F.3d 265 (6th Cir. 1994) ..................................................................................29

*Houston v. Mile High Adventist Acad.*,
   846 F. Supp. 1449 (D. Colo. 1994) ........................................................................27

*Intelligent Off. Sys., LLC v. Virtualink Canada, LTD.*,
   No. 15-CV-02724-CMA-MEH, 2016 WL 687348 (D. Colo. Feb. 18,
   2016) ......................................................................................................................15

*Justice v. Nat'l Collegiate Athletic Ass'n*,
   577 F. Supp. 356 (D. Ariz. 1983) ..........................................................................34

*Kirchner v. Marshall*,
   No. 20-CV-00114-MEH, 2021 WL 243448 (D. Colo. Jan. 25, 2021) ......................22

*Lorillard Tobacco Co. v. Engida*,
   213 F. App'x 654 (10th Cir. 2007) ........................................................................15

*Lundgrin v. Claytor*,
   619 F.2d 61 (10th Cir. 1980) ................................................................................ 15

*Muhammad v. Vectrus Sys. Corp.*,
   No. 123CV02186SKCMDB, 2024 WL 1073216 (D. Colo. Mar. 12,
   2024) ......................................................................................................................26

*NCAA v. Smith*,
   525 U.S. 459 (1999) (*Smith* I)..............................................................................28

*Neal v. Colorado State Univ.-Pueblo*,
   No. 16-CV-873-RM-CBS, 2017 WL 633045 (D. Colo. Feb. 16, 2017),
   *report and recommendation adopted*, No. 16-CV-00873-RM-CBS,
   2017 WL 11696393 (D. Colo. Sept. 11, 2017)....................................................31, 32

*Powers v. Fed. Bureau of Prisons*,
   699 F. App'x 795 (10th Cir. 2017) ........................................................................15

*Schwab v. Kansas Dep't of Child. & Fams.*,
   851 F. App'x 110 (10th Cir. 2021) (unpublished) ..................................................22

*Sgaggio v. Weiser*,
   No. 21-CV-00830-PAB-KMT, 2022 WL 252325 (D. Colo. Jan. 27,
   2022), *report and recommendation adopted,* No. 21-CV-00830-PAB-
   NYW, 2022 WL 425240 (D. Colo. Feb. 8, 2022) ................................................26, 27

*Sharp v. Kean University*,
    153 F. Supp. 3d 669 (D.N.J. 2015) ...................................................................... 28, 31

*Smith v. NCAA*,
    266 F.3d 152 (3d Cir. 2001) (*Smith* II) ............................................................. 30, 31

*Spikes v. Car Toys, Inc.*,
    No. 21-CV-00681-PAB-KAS, 2024 WL 4135234 (D. Colo. Sept. 10,
    2024) ..................................................................................................................... 26

*Williams v. Bd. of Regents of Univ. Sys. of Georgia*,
    477 F.3d 1282 (11th Cir. 2007) .......................................................................... 29

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................................ 15

**Statutes**

20 U.S.C.A. § 1681 ........................................................................................................ 27

42 U.S.C. § 1983 ................................................................................................. 22, 23, 26

Okla. Stat. Ann. tit. 70, § 8-103.2 .............................................................................. 24

**Other Authorities**

Josephine Potuto, *NCAA As State Actor: Much Ado About Nothing*,
    Marquette Sports L. Rev. 23:1 1, 4 n.16 (2012) ....................................................... 24

**NATURE OF THE CASE**

The MWC is a Colorado nonprofit corporation committed to excellence in intercollegiate athletics. The MWC's primary goal is to support its member institutions by cultivating opportunities for student athletes to compete at the highest level while fostering academic achievement and sportsmanship. While each MWC member institution determines which collegiate athletic programs to offer, funds those programs, and determines which student-athletes are eligible to participate, the MWC facilitates intraconference competition among its members, which funds the MWC's operations via dues in amounts determined by the MWC's Board of Directors (the "Board"), comprised of one representative of each member institution. Effective administration, which is expected of the MWC, requires rules. Importantly, the MWC does not have a rule requiring any member institution to include or exclude transgender athletes from their men's or women's athletic teams. That decision is left to each member institution. However, in the interest of administering a functional league, the MWC does have a rule for how to count wins and losses in the event that one member institution refuses to play against another when the opposing team includes a transgender player. It is this MWC transgender athlete participation policy (the "TPP") that Plaintiffs challenge in the present action.

The MWC adopted the TPP in August 2022, following approval by the MWC Board and ratification by the Athletic Directors ("AD") of each MWC member, and that policy has been known to the member institutions and their athletic departments

for over two years.  Moreover, and crucially important for purpose of Plaintiffs' so-called "emergency motion for preliminary injunction," all Plaintiffs were aware no later than September 27, 2024—*almost two months ago*—that the MWC's TTP would result in a forfeit, to be recorded as a loss in the conference standings, if an MWC volleyball team refused to participate in a scheduled match against a team which included a transgender athlete.

Despite the undisputed fact that they have been aware since at least September 2024 of the MWC's application of its transgender participation policy, Plaintiffs waited until November 15, 2024 to file for relief—more than two years after the policy's adoption by representatives of Plaintiffs' institutions and almost two months after they concede they became aware of the policy.  A subset of the Plaintiffs (*infra* Section I, the "Moving Plaintiffs"), less than two weeks before the beginning of the MWC Championship tournament—now attempt to seek "emergency" relief and force this Court to decide important legal on a highly expedited time table.  This crunched timeframe is entirely of the Moving Plaintiffs' own making.  Preliminary injunctions are an extraordinary remedy only granted in true emergencies.  The Moving Plaintiffs should not be granted such an extraordinary remedy based on the fabricated sense of urgency created by their decision to hold onto their grievances until the eve of this year's conference tournament.

The Moving Plaintiffs should not be rewarded for manufacturing an emergency, nor should they receive a pass on filing claims with no legal basis.

2

Neither the MWC nor Defendant Nevarez constitute state actors for the purposes of Plaintiffs' First and Fourteenth Amendment claims. Nor are the MWC and Nevarez subject to Title IX. As described more fully below, even without the Moving Plaintiffs' undue delay in bringing their claims and seeking relief, the many other legal and factual deficiencies in the Moving Plaintiffs' Motion require the Court's denial of their motion for a preliminary injunction, which is not a tool for speeding up the legal process at plaintiffs' convenience, but is an extraordinary remedy available only when there is truly a need for immediate action.

## FACTUAL BACKGROUND

### I.    The Parties.

Plaintiffs consist of nine current women's collegiate volleyball players, an Associate Head Coach of the San Jose State University ("SJSU") women's volleyball team, and two former SJSU women's volleyball team members. (Complaint ("Compl.") at 5-6, ECF No. 1.) The Moving Plaintiffs—Brooke Slusser, Kaylie Ray, Macey Boggs, Sierra Grizzle, Jordan Sandy, Katelyn Van Kirk, and Kiersten Van Kirk—bring the instant Motion seeking an Emergency Preliminary Injunction against the MWC and Gloria Nevarez in her official capacity, and Defendant Todd Kress in his official capacity. (Emergency Motion for Preliminary Injunction ("Mot.") at 4–5, ECF No. 14.)[1]

---

[1] Plaintiff-Intervenor Utah State University ("USU") joins the instant motion only with respect to the Title IX claims.

Slusser is a senior co-captain on the SJSU women's volleyball team. (Appendix in Support of Emergency Motion for Preliminary Injunction ("App.") ¶¶ 6, 8, ECF No. 14-1.) On September 23, 2024, almost eight weeks before Slusser and the Plaintiffs initiated this matter, Slusser joined the Title IX lawsuit, *Gaines et al. v. National Collegiate Athletic Association et al.*, Docket No. 1:24-cv-01109 (N.D. Ga. Mar 14, 2024), pending in United States District Court for the Northern District of Georgia. (App. at Ex. 12.) In the *Gaines* matter, Slusser is represented by the same counsel that represents her in this litigation and brings virtually identical Title IX claims against the NCAA related to the same facts underlying the present litigation. *See* Corrected Second Amended Complaint, *Gaines et al. v. National Collegiate Athletic Association et al.*, Docket No. 1:24-cv-01109 (N.D. Ga. Mar 14, 2024), ECF No. 94 (asserting claims for violations of Title IX and Equal Protection; asserting the same argument that the NCAA transgender eligibility policy deprives women of equal opportunities in violation of Title IX (¶¶ 30-37); providing nearly word-for-word identical allegations relating to the "Male-Female Sport Performance Gap" and the NCAA "testosterone suppression policy" (¶¶ 272-286, 293-301, 305, 307, 308-10, 312-13)). Plaintiffs Ray (Utah State University); Boggs, Grizzle, and Sandy (University of Wyoming); and Katelyn and Kiersten Van Kirk (Boise State University) are all current women's volleyball players for teams that compete in the MWC. (Mot. at 1–2.)

Defendant, the MWC, is a nonprofit corporation headquartered in Colorado Springs, Colorado.  (Compl. ¶ 27.)  The MWC is a private membership organization, whose members are academic universities located in California, Colorado, Hawaii, Idaho, New Mexico, Nevada, Utah, Washington, and Wyoming.  (*See* Declaration of Bret Gilliland in Support of Defendants' Opposition to Emergency Motion for Preliminary Injunction ("Gilliland Decl.") Ex. 3, 1.)  Each member university shares equally in all of the MWC's net revenues.  (Gilliland Decl. Ex. 2, § 1.07.)

The MWC does not receive "Public Support" from a governmental unit or any other source of federal funds.[2]  (*See* Gilliland Decl. Ex. 1.)  The MWC generates revenue primarily through television broadcast deals, conference and NCAA tournaments, and dues paid by its members.  (*Id.* at Part VIII.)  The MWC pays its employees from revenues generated by the conference; no MWC employee is paid directly by any member institution.  (*See* Gilliland Decl. ¶ 6.)  Given the fungibility of money, the MWC does not and cannot identify the specific sources of the dues the MWC receives from any member institution.

The MWC is governed by its Board of Directors.  (*See* Gilliland Decl. Ex. 3, Rule 1.1.)  The Board of Directors consists of representatives of the member institutions

---

[2] Demonstrating that it does not receive "Public Support," the MWC did not indicate on its Form 990 Schedule A that it is (1) "an organization operated for the benefit of a college or university owned or operated by a governmental unit described in section 170(b)(1)(A)(iv)"; (2) "an organization that normally receives a substantial part of its support from a governmental unit or from the general public described in section 170(b)(1)(A)(iv)"; or (3) "a community trust described in section 170(b)(1)(A)(iv)." (Gilliland Decl. Ex. 1.)

and two ex officio student-athlete representatives who carry out customary board duties, as described in the MWC Handbook and the MWC Bylaws. (*See generally Id.* at Rule 1.2; Gilliland Decl. Ex. 2) Each member institution has the primary responsibility for the conduct of its respective intercollegiate athletics program; the institutions are required to follow and enforce the MWC's rules and regulations governing intraconference contests. (Gilliland Decl. Ex. 3, Rule 5.) The MWC does not govern intraconference play.

The Conference Commissioner is the chief administrative officer of the MWC and reports directly to the Board. (*Id.* at Rule 1.4.) Defendant Gloria Nevarez is the Commissioner of the MWC. (Compl. ¶ 28.) The MWC compensates Nevarez through its generated revenue. (*See* Gilliland Decl. Ex. 1.)

Jane Doe(s) ("Doe") is one or more transgender student-athletes who currently competes in the MWC. Due to Conference policy and Doe's privacy rights, the MWC will use "Doe" instead of any given name or names in this submission.

## II.    The MWC adopted, implemented, and communicated its Transgender Participation Policy to member institutions in August 2022.

The MWC does not have any policy regarding whether a member institution may permit a transgender athlete to participate in its intercollegiate athletic program. (*See* Gilliland Decl. ¶ 21.) The decision is "a matter of that individual institution's discretion in the context of its interaction with the individual, the application of state law, etc." (Gilliland Decl. Ex. 3, Appendix J.)

On August 23, 2022, the MWC Board convened for a virtual meeting.  (Gilliland Decl. ¶ 12, Ex. 4.)[3]  During that meeting, the Board adopted a MWC Transgender Participation Policy as an interim policy contingent upon AD support.  The Board also discussed how the TPP would be communicated to member institutions.  (*Id.* at ¶ 12.)

During a virtual meeting of the MWC Directors of Athletics, held on August 25, 2022, the ADs ratified the interim transgender participation policy, which established the TPP as an official permanent policy for the MWC.  (Gilliland Decl. Ex. 5.)  That same day, the MWC confirmed to the Board that the TPP is "effective immediately."  (Gilliland Decl. Ex. 6.)  The MWC additionally instructed staff members to add the TPP to "the various handbooks" and provide a link "by tomorrow (Friday, August 2[6]) at noon for women's soccer and women's volleyball, and as soon as possible for all other sports."  (Gilliland Decl. Ex. 7.)

On August 26, 2022, in accordance with the prior directive, MWC staff distributed "a link to the updated MW Volleyball Game Management Handbook, which contained the Mountain West Transgender Participation Policy for 2022-23."

---

[3] The minutes of meetings of the Board of Directors and Athletic Directors of the Mountain West Conference frequently contain sensitive information that the organization views as highly confidential.  Here, two exhibits to Bret Gilliland's declaration contain details of contractual negotiations, discussions of sport scheduling, and other sensitive information unrelated to any issue presented in the Moving Plaintiffs' Motion.  Public release of these documents could provide a competitive advantage to other conferences and could negatively impact the MWC.  For this reason, the MWC attaches redacted versions of the two exhibits with this submission.

(Gilliland Decl. Ex. 9.)    The TPP was included going forward in the Game Management Handbook for each conference sport, including women's volleyball, in 2022, 2023, and 2024.  (Gilliland Decl. Exs. 10, 11, 12.)  The TPP was distributed as an "internal" policy.  (Gilliland Decl. ¶ 15.)

Prior to Plaintiffs' initiation of the present litigation, no person or entity ever objected to any provision of the TPP, including the forfeit provisions.  (*Id.* at ¶ 23) Further, no member institution, AD, or any other person has ever requested an interpretation of the TPP provision as *required* by the Rule 6.1 of the MWC Handbook if there is any doubt as to the "applicability of a rule to an actual or hypothetical situation."[4]  (*Id.* at ¶ 22; *Id.* Ex. 3, Rule 6.1) (emphasis added).

### III.    The 2024-25 volleyball season and forfeits beginning in September 2024.

In late September 2024, in response to certain public inquiries concerning the TPP, the MWC incorporated the TPP into the Mountain West Handbook, 2024-25, as Appendix J.    (Gilliland Decl. ¶ 20.)    On September 26, 2024, the Boise State

---

[4] Rule 6.1 states that

> Interpretations of any rule or provision of the Mountain West Handbook or the NCAA Manual may be requested by any member institution's chief executive officer, director of athletics, senior woman administrator, faculty athletics representative, compliance administrator or the Conference Commissioner. Interpretations shall include a determination of applicability of a rule to an actual or hypothetical situation.  *All authorized institutional representatives must seek interpretations in all cases for which they are in doubt.*

(Gilliland Decl. Ex. 3, Rule 6.1) (emphasis added).

University AD contacted the MWC and confirmed that the Boise State women's volleyball team would not play its volleyball match against SJSU, scheduled for September 28, 2024, and would be issuing a press release the next day. (*Id.* at ¶ 24.) On September 27, 2024, Boise State University released the following statement: "Boise State volleyball will not play its scheduled match at San José State on Saturday, Sept. 28. Per Mountain West Conference policy, the Conference will record the match as a forfeit and a loss for Boise State. The Broncos will next compete on Oct. 3 against Air Force."[5] Between September 28, 2024 and the filing of this litigation on November 13, 2024, no representative of Boise State or any other person tendered a request to the MWC that it treat the September 28, 2024 match as a "no contest" or otherwise modify the treatment of the game for purposes of conference standing, or otherwise. (Gilliland Decl. ¶ 25.).

Following the MWC's publishing the TPP, the MWC did not receive a single request to change, interpret, clarify, or appeal the applicability of TPP, until the instant litigation.[6] (*Id.* at ¶¶ 22, 23.)

On October 1, 2024, representatives of the University of Wyoming confirmed to the MWC that the Wyoming women's volleyball team would not play its match

---

[5] Boise State Athletics, *Statement From Boise State Athletics Regarding Volleyball*, BRONCOSSPORTS.COM (Sept. 27, 2024, 2:32 PM), https://broncossports.com/news/2024/9/27/womens-volleyball-statement-from-boise-state-athletics-regarding-volleyball.

[6] On November 12, 2024, Plaintiffs' counsel made the first, and only, request the MWC has received that the MWC rescind the TPP provision that "creates forfeits and

against SJSU scheduled for Saturday, October 5, 2024. (*Id.* at ¶ 26.) The University of Wyoming subsequently released a public statement: "After a lengthy discussion, the University of Wyoming will not play its scheduled conference match against San José State University in the UniWyo Sports Complex on Saturday, Oct. 5. Per MWC policy, the Conference will record the match as a forfeit and a loss for Wyoming. The Cowgirls will host Fresno State on Thursday, Oct. 3 at 6:30 p.m. in the UniWyo Sports Complex."[7] Between October 1, 2024 and the filing of this litigation on November 13, 2024, no representative of the University of Wyoming or any other person tendered a request to the MWC that it treat the October 1, 2024 match as a "no contest" or otherwise modify the treatment of the game for purposes of conference standing, or otherwise. (Gilliland Decl. ¶ 27.)

On October 2, 2024, in advance of its October 23, 2024 volleyball match against SJSU, Utah State University contacted the MWC and confirmed that its women's volleyball team would not play against SJSU. (*Id.* at 28.) That same day, Utah State University published the following statement: "Utah State University will not participate in its scheduled October 23, 2024, volleyball match at San José State University. The University will abide by Mountain West Conference policy regarding

_____

wins and losses for a cancelled or non-played conference game where a member of the non-canceling team is a 'transgender student-athlete.'" (App. Exs. 14, 15.)

[7] Nick Seeman, *Statement From Wyoming Cowgirl Volleyball*, ONE WYOMING COLLECTIVE (Oct. 1, 2024, 2:59 PM), https://gowyo.com/news/2024/10/1/womens-volleyball-statement-from-wyoming-cowgirl-volleyball.aspx.

how this match is recorded."[8] Between October 2, 2024 and the filing of this litigation

on November 13, 2024, no representative of Utah State University or any other

person tendered a request to the MWC that it treat the October 23, 2024 match as a

"no contest" or otherwise modify the treatment of the game for purposes of conference

standing, or otherwise.  (Gilliland Decl. ¶ 29.)

The University of Nevada, Reno was scheduled to host SJSU for a volleyball

match on October 26, 2024.  On October 14, 2024, the University of Nevada, Reno

informed the MWC:

> This afternoon, the University of Nevada, Reno will
> release the following statement to the media regarding the
> University's women's volleyball match on Oct. 26 versus
> San Jose State University:
>
> On Oct. 13, 2024, the majority of members of the
> University of Nevada, Reno women's volleyball team sent
> a statement to the University advising the institution that
> they were forfeiting its scheduled match with San Jose
> State University on Oct. 26, 2024. The players' decision and
> statement were made independently, and without
> consultation with the University or the athletic
> department.  The players' decision also does not represent
> the position of the University.
>
> The University and its athletic programs are
> governed by the Nevada Constitution and Nevada law,
> which strictly protect equality of rights under the law, and
> that equality of rights shall not be denied or abridged by
> this state or any of its subdivisions on account of race, color,
> creed, sex, sexual orientation, gender identity or
> expression, age, disability, ancestry or national origin.  The

---

[8] Utah State University, *University Announces Volleyball Schedule Update*, Utah
State TODAY (Oct. 2, 2024), https://www.usu.edu/today/story/university-
announces-volleyball-schedule-update.

> University is also governed by federal law as well as the rules and regulations of the NCAA and the Mountain West Conference, which include providing competition in an inclusive and supportive environment.
>
> The University intends to move forward with the match as scheduled, and the players may choose not to participate in the match on the day of the contest. No players will be subject to any team disciplinary action for their decision not to participate in the match.
> Thank you,
> Scott Walquist

(Gilliland Decl. ¶ 30.)

On October 21, 2024, in response to the University of Nevada, Reno's statement, the MWC and both institutions agreed that the match would be hosted by SJSU. (*Id.* at ¶ 31.) On October 24, 2024, the University of Nevada, Reno released a statement that it would not play against SJSU: "Due to not having enough players to compete, the University of Nevada women's volleyball team will not play its scheduled Mountain West Conference match at San José State on Saturday, Oct. 26. Per Mountain West Conference policy, the match will be recorded as a conference loss for Nevada."[9] Between October 24, 2024 and the filing of this litigation on November 13, 2024, no representative of the University of Nevada, Reno or any other person tendered a request to the MWC that it treat the October 26, 2024 match as a "no

---

[9] Nevada Athletics, *Statement from Nevada Athletics Regarding Volleyball*, NEVADA WOLFPACK (Oct. 24, 2024), https://nevadawolfpack.com/news/2024/10/24/womens-volleyball-statement-from-nevada-athletics-regarding-volleyball.aspx.

contest" or otherwise modify the treatment of the game for purposes of conference standing, or otherwise. (Gilliland Decl. ¶ 32.)

On November 1, 2024, Boise State confirmed to the MWC that the Boise State women's volleyball team would forfeit its scheduled November 21, 2024 match against SJSU. (*Id.* at ¶ 33.) Between November 1, 2024 and the filing of this litigation on November 13, 2024, no representative of Boise State or any other person tendered a request to the MWC that it treat the November 21, 2024 match as a "no contest" or otherwise modify the treatment of the game for purposes of conference standing, or otherwise. (*Id.*) On November 8, 2024, the University of Wyoming similarly confirmed to the MWC that its women's volleyball team would forfeit its November 14, 2024 match against SJSU.[10] (Gilliland Decl. at ¶ 34.) Between November 8, 2024 and the filing of this litigation on November 13, 2024, no representative of the University of Wyoming or any other person tendered a request to the MWC that it treat the November 14, 2024 match as a "no contest" or otherwise modify the treatment of the game for purposes of conference standing, or otherwise.

---

[10] Nick Seeman, *Statement From Wyoming Athletics on Cowgirl Volleyball*, ONE WYOMING COLLECTIVE (Nov. 8, 2024, 10:58 AM), https://gowyo.com/news/2024/11/8/womens-volleyball-statement-from-wyoming-athletics-on-cowgirl-volleyball.aspx; Boise State Athletics, *Statement From Boise State Athletics Regarding Volleyball*, BRONCOSSPORTS.COM (Nov. 1, 2024, 5:00 PM), https://broncosports.com/news/2024/11/1/womens-volleyball-statement-from-boise-state-athletics-regarding-volleyball.

(*Id.*)  The MWC volleyball championship tournament is scheduled to begin November 27, 2024 in Las Vegas, Nevada.  (*Id.* at ¶ 35.)

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.,* 883 F.2d 886, 888–89 (10th Cir. 1989).  "Because it constitutes drastic relief to be provided with caution, a preliminary injunction should be granted only in cases where the necessity for it is clearly established."  *Id.* (reversing grant of preliminary injunction where movant failed to establish that it was entitled to injunctive relief).

A party seeking a preliminary injunction bears the burden of demonstrating: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest.  *Denver Homeless Out Loud v. Denver,* 32 F.4th 1259, 1277-78 (10th Cir. 2022) (vacating and remanding district court's grant of preliminary injunction in favor of plaintiff).

Where, as here, the movants seek "disfavored" injunctive relief that alters the status quo or requires affirmative action, they must "make a heightened showing of the above four factors."  *Att'y Gen. of Oklahoma v. Tyson Foods, Inc.,* 565 F.3d 769, 776 (10th Cir. 2009); *Archer v. Griswold,* 638 F. Supp. 3d 1246, 1255 (D. Colo. 2022) (explaining the characteristics of disfavored injunctions and finding plaintiffs failed

to meet "heightened burden" applied to them). Requests for such relief "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Archer*, 638 F. Supp. 3d at 1255 (citations omitted).

Thus, as to the first element, the Moving Plaintiffs must make a "strong showing" that they have "a substantial" probability of success and will ultimately be entitled to the relief sought. *Powers v. Fed. Bureau of Prisons*, 699 F. App'x 795, 798 (10th Cir. 2017) (citation omitted); *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980) (affirming denial of plaintiff's motion for preliminary injunction). As to the second element, irreparable harm requires movants to show that the injury is "both certain and great," absent an injunction, not "merely serious or substantial." *Lorillard Tobacco Co. v. Engida*, 213 F. App'x 654, 656 (10th Cir. 2007) (affirming denial of plaintiff's motion for preliminary injunction and dissolution of existing TRO). The third element, where Moving Plaintiffs seek disfavored relief, similarly a requires a stronger showing "that threatened injury to the movant outweighs the injury to the other party under the preliminary injunction." *Intelligent Off. Sys., LLC v. Virtualink Canada, LTD.*, No. 15-CV-02724-CMA-MEH, 2016 WL 687348, at *7 (D. Colo. Feb. 18, 2016). Even if the movant demonstrates substantial likelihood of success on the merits, the fourth—but no less important—element commands that the injunction, if issued, would not be adverse to the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24-26 (2008).

## <u>ARGUMENT</u>

I.    **Plaintiffs are not Entitled to Injunctive Relief for a Manufactured
      Emergency.**

The Court should deny the Moving Plaintiffs' motion as a threshold matter for
filing a request for emergency relief only eleven days before the MWC Championship
tournament begins, despite being aware of the MWC TPP and the consequence of
forfeiting matches on participation in the MWC conference tournament since
September 2024 at the latest.   The Moving Plaintiffs' delay in seeking relief
undermines any claim that they now require or are entitled to the type of exceptional,
urgent, and emergent relief that preliminary injunctions are intended to provide.
(ECF No. 1-D; *supra* § II; Compl. ¶ 625; App. Ex. 3.)

"A preliminary injunction is an extraordinary remedy" warranted only when
"there is an *urgent need for speedy action* to protect [a] plaintiff's rights." *Archer,* 638
F. Supp. 3d at 1255 (citation omitted); *GTE Corp. v. Williams,* 731 F.2d 676, 679 (10th
Cir. 1984) (emphasis added).   For that reason, a moving party's delay is an "important
consideration in the assessment of irreparable harm for purposes of a preliminary
injunction," because "[b]y sleeping on its rights a plaintiff demonstrates the lack of
need" for emergency relief.  *GTE Corp.,* 731 F.2d at 679 (reversing and remanding
grant of preliminary injunction in favor of plaintiff where plaintiff delayed bringing
suit, indicating it "felt no sense of urgency").

Here, the Moving Plaintiffs plainly have "slept" on their rights, demonstrating
that they are not in "urgent need [of] speedy action." *Id.*  Indeed, Tenth Circuit courts

have consistently denied delayed requests for preliminary injunctions when faced with the type of inaction demonstrated by the Plaintiffs here. *E.g.*, *Am. Ass'n of People with Disabilities v. Herrera*, 580 F. Supp. 2d 1195, 1246 (D.N.M. 2008) (denying injunction and finding that the plaintiffs' two-week delay from filing lawsuit to seeking preliminary injunction "considerably undercut [ ] their allegation of irreparable harm"); *GTE Corp.,* 731 F.2d at 679 (denying injunction and holding three month delay in seeking injunctive relief was "[in]consistent with plaintiffs' allegations that they [were] facing imminent harm"); *Found. Learning LLC v. Acad., Arts & Action Charter Acad.*, No. 17-cv-03182-RM-KLM, 2018 WL 3382933, at *3 (D. Colo. May 18, 2018) (denying injunction on basis that waiting three months to file motion for emergency injunctive relief without explanation "strongly undermine[d] plaintiff's suggestion that the moment of maximum harm is now at hand"); *A.K. by & through Moyer v. Cherry Creek Sch. Dist. No. 5*, No. 20-cv-00392-PAB-NRN, 2020 WL 2197920, at *3 n.1 (D. Colo. May 6, 2020) (denying injunctive relief and holding "that the delay in seeking injunctive relief cuts against plaintiff's assertions of imminent irreparable harm"). The Moving Plaintiffs similarly delayed in bringing the present action, a fact warranting denial of their current request for immediate relief.

Nonetheless, the Moving Plaintiffs allege that injunctive relief is required to "[e]njoin the MWC from using the unlawful MWC TPP to impose losses on teams which chose not to play SJSU, as the improper imposition of those losses could otherwise alter the makeup of the top six teams which are eligible to compete in the

MWC" women's volleyball tournament. (Compl. ¶632(a).) However, the Moving Plaintiffs were made aware of the MWC's TPP policy resulting in forfeits no later than September 27, 2024—two months before the MWC women's volleyball tournament. (Compl. ¶¶ 339; Gilliland Decl. ¶ 24) And beginning in September 2024, and continuing into October 2024, multiple MWC member institutions began refusing to play SJSU's volleyball team and incurring losses as a result, putting Plaintiffs on indisputable notice of the TPP and its allegedly "new" forfeiture policy. (Gilliland Decl. ¶¶ 23-34; *see supra* § III.)

This undisputed evidence, including the Moving Plaintiffs' complaint allegations, demonstrates that the Court can deny the Moving Plaintiffs' request for injunctive relief based upon the Moving Plaintiffs' manufactured delay. The Moving Plaintiffs make no attempt to explain the delay during which they could have brought an identical action and request for relief. By sleeping on their rights for months, they betrayed "the lack of need for speedy action" at present. *GTE Corp.,* 731 F.2d at 679.

The record further reveals that the Moving Plaintiffs were aware, or should have been aware, of the TPP even further back than September 2024. The MWC Board adopted the TPP on August 23, 2022 and the TPP was ratified by the Athletic Directors from each MWC member school on August 25, 2022—more than two years ago. (Gilliland Decl. ¶¶ 12, 13.) The TPP appeared in the Game Management Handbook for each MWC sport, including volleyball, in 2022, 2023 and 2024, putting each school's athletic department on notice of the MWC's forfeiture policy and its

effect on standings and postseason play.  (*Id.* Exs. 10, 11, 12.)  Thus, all institutions and coaches, including Plaintiff Batie-Smoose, had access to the TPP policy at least two years before Plaintiffs filed their Complaint or the Moving Plaintiffs filed for emergency injunctive relief.  (Gilliland Decl. ¶ 18.)

Tellingly, no MWC institution, coach, or player requested that MWC rescind or modify the TPP at any time in the years following its implementation – until the commencement of the current litigation.  (*Id.* ¶¶ 22, 23.)  Even after MWC volleyball teams began forfeiting matches, resulting in losses, in September 2024, not one MWC forfeiting school or coach asked the MWC to change the TPP or appealed the forfeit designation–again, until this lawsuit was filed.  (*Id.*; App. Exs. 14, 15.)

Moreover, contrary to the Moving Plaintiffs' assertion, the TPP did not impose a "new" conference forfeiture policy.  The facts demonstrate that the Moving Plaintiffs were aware, or should have been aware, of a functionally equivalent forfeiture policy long before September 27, 2024.  In fact, an equivalent forfeiture policy appeared in the 2022 version of the MWC Handbook, stating "[a] coach unilaterally taking his/her team from the playing area or refusing to play may be subject to Conference sanctions and possible forfeiture of the contest." (Gilliland Decl. Ex. 13, Rule 1.12.) As such, all Moving Plaintiffs knew, or at the very least should have known, that refusing to play any conference game, for any reason, carried with it the potential consequence of a forfeit that would affect teams' overall win-loss record.  This "cuts against [Moving Plaintiffs'] assertions [that they will suffer] imminent and irreparable harm" if the

Court does not enjoin the MWC ahead the tournament, because the MWC's forfeiture policy has remained in place since at least 2022. *Moyer,* 2020 WL 2197920, at *3 n.1.

As noted above, even assuming that the Moving Plaintiffs first became aware of the TPP on September 27, 2024, the Moving Plaintiffs still waited nearly two months to file their complaint in this matter and file their motion for preliminary injunction. (ECF No. 14.) In *Herrera,* a two-week delay between the date the complaint was filed and the date preliminary relief was sought, was sufficient for the court to deny plaintiff's request for injunctive relief. 580 F. Supp. 2d at 1246. The rule expressed in *Herrera* that any delay "considerably undercuts [an] allegation of irreparable harm" is particularly relevant here. *Id.* In waiting almost two months (and likely longer) to initiate this action and seek "emergency" injunctive relief, Plaintiffs have failed to demonstrate "that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Heideman v. S. Salt Lake City,* 348 F.3d 1182, 1189 (10th Cir. 2003) (citation omitted).

It is notable that at least one of the Moving Plaintiffs, Brooke Slusser, has had knowledge of her grievances underlying this litigation since at least September 24, 2024, when Slusser joined a Title IX lawsuit, *Gaines et al. v. National Collegiate Athletic Association et al.,* Docket No. 1:24-cv-01109 (N.D. Ga. Mar 14, 2024), pending in United States District Court for the Northern District of Georgia. (App. Ex. 12.) In the *Gaines* matter, Slusser is represented by the same counsel that represents her

in this litigation and brings virtually identical claims against the NCAA. *See* Corrected Second Amended Complaint, *Gaines et al. v. National Collegiate Athletic Association et al.*, Docket No. 1:24-cv-01109 (N.D. Ga. Mar 14, 2024), ECF No. 94 (asserting claims for violations of Title IX and Equal Protection; asserting the same argument that the NCAA transgender eligibility policy deprives women of equal opportunities in violation of Title IX (¶¶ 30-37); providing nearly word-for-word identical allegations relating to the "Male-Female Sport Performance Gap" and the NCAA "testosterone suppression policy" (¶¶ 272-286, 293-301, 305, 307, 308-10, 312-13)).

The Moving Plaintiffs also have failed to explain their delay, a factor the court considered and weighed in favor of its decision to deny plaintiff's preliminary injunction in *Found. Learning*, 2018 WL 3382933, at *3. As in *Found. Learning*, the Moving Plaintiffs make no effort to explain their delay in challenging the TPP.

The complete record demonstrates that the only purported "emergency" is one that the Moving Plaintiffs manufactured themselves by impermissibly delaying until only eleven days before the MWC women's volleyball tournament begins to assert their claims. For the foregoing reasons, the Moving Plaintiffs' motion for preliminary injunction should be denied.

## II.    Plaintiffs' Claims Against the MWC and Commissioner Nevarez Are Unlikely to Succeed on the Merits.

Even if this Court determines that the Moving Plaintiffs' did not impermissibly delay in seeking injunctive relief, the Plaintiffs are unlikely to succeed on the merits of their claims against the MWC or Commissioner Nevarez.

### A. The MWC is Not a State Actor Subject to Section 1983 Liability.

The Complaint purports to assert claims against the MWC under Section 1983, but these allegations do not meet the requirement of 42 U.S.C. § 1983. "Section 1983 permits suits against persons who, acting under the color of state law, deprive a United States citizen of his constitutional rights." *Kirchner v. Marshall*, No. 20-CV-00114-MEH, 2021 WL 243448, at *6 (D. Colo. Jan. 25, 2021).

A "prerequisite" to any relief under Section 1983 is a defendant who is a state actor. *Id*. "[A] proper defendant in a § 1983 action is one who represents the state in some capacity." *Schwab v. Kansas Dep't of Child. & Fams.*, 851 F. App'x 110, 117 (10th Cir. 2021) (unpublished) (citations omitted). It is clear that the MWC does not meet the Section 1983 definition of a "state actor." The United States Supreme Court previously determined that a multi-state college athletic association is not an actor who represents the state. *See National Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 179 (1988).

In *Tarkanian*, plaintiff University of Nevada Las Vegas' men's basketball coach was found in violation of National Collegiate Athletic Association ("NCAA") recruiting practices, and was subsequently disciplined by the University. *Id* at 186-188. Tarkanian alleged the NCAA violated his Fourteenth Amendment due process

rights in violation of 42 U.S.C. § 1983. *Id.* The NCAA is an association of approximately 960 public and private universities and colleges who adopts and enforces rules for its member institutions who span all over the United States. *Id.* at 193.

The Supreme Court held that that the NCAA was *not* a state actor, and the University's decision to suspend its coach "while in compliance with the NCAA's rules and recommendations, did not turn the NCAA's conduct into action under color of Nevada law." *Id.* The Court held that the source of rules the NCAA adopted is not from the state but rather "the collective membership, the vast majority of which was located in other States" *Id.* at 193.

Similar to the NCAA, the MWC is an association of 14 member institutions spread across 9 states. Like the NCAA, MWC enforces rules governing intraconference athletic contests among its members. As in *Tarkanian,* the fact that MWC members abided by intraconference rules assigning a forfeit to a school that refused to play against SJSU's women's volleyball team "did not turn the [MWC's] conduct into action under color of" any State's law. And, as in *Tarkanian,* the source of MWC's rules is not any particular State's law but rather MWC's "collective membership, the vast majority of which was located in other States." *Id.* at 193; (Gilliland Decl. ¶ 3.)

The Moving Plaintiffs spill much ink trying to establish that the MWC as a state actor, but fail. Relying heavily on *Brentwood Acad. v. Tennessee Secondary Sch.*

*Athletic Ass'n*, 531 U.S. 288, 298 (2001) (*Brentwood I*), the Moving Plaintiffs broadly assert that the MWC is a state actor because state schools have joined it, but the facts here hardly "perfectly replicate" those of *Brentwood I.  (*Mot. at 27.)  Indeed, the Supreme Court distinguished *Tarkanian* by stating that *Brentwood I* involved "an organization whose member public schools are all within a single State . . . created by the same sovereign." *Brentwood I*, 531 U.S. at 298 (quotation omitted).  That is not the case here.  Rather, the MWC spans nine states and as such *Brentwood I* is distinguishable by its very terms. *See Id*. at 294 n.1 ("A number of other courts have held *statewide* athletic associations to be state actors.")(emphasis added).

The Moving Plaintiffs' reliance on *Christian Heritage Acad. v. Oklahoma Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1026 (10th Cir. 2007) (Mot. at 26), is similarly misplaced, as the Moving Plaintiffs neglect to mention that, as in *Brentwood I*, all schools existed under a single sovereign, and Oklahoma explicitly delegated statutory authority to OSSAA.  Okla. Stat. Ann. tit. 70, § 8-103.2.  (*See* Mot. at 26.) Indeed, Oklahoma treated OSSAA as a state entity under state law before *Brentwood I*.  Josephine Potuto, *NCAA As State Actor: Much Ado About Nothing*, Marquette Sports L. Rev. 23:1 1, 4 n.16 (2012).

As demonstrated above, the cases the Moving Plaintiffs purport to be "on all fours" (Mot. at 27) are anything but.  The MWC and Commissioner Nevarez have not identified, and the Moving Plaintiffs have failed to cite, any authority stating that a college conference or other multi-state conference is a state actor. *See Behagen v.*

*Amateur Basketball Ass'n of U.S.*, 884 F.2d 524, 531 (10th Cir. 1989) ("USOC is not a governmental actor, it follows a fortiori that the ABA/USA is also not a governmental actor.").

The MWC is a private organization that does not receive any federal funding or take orders from any state on how to carry out its business. (Gilliland Decl. ¶ 6.); *see Florence v. Peterson*, No. CIVA 06CV00178 REBPA, 2007 WL 1793899, at *3 (D. Colo. June 19, 2007), *aff'd*, 268 F. App'x 737 (10th Cir. 2008) (noting a state actor is "one who acts with or *obtains significant aid* from state officials, or one whose conduct otherwise is chargeable to the state") (emphasis added). The MWC is a private nonprofit corporation, whose salaries and revenue comes principally from its member schools' dues. (Mot. Ex. 2; Gilliland Decl. ¶ 6.) The MWC functions under, and requires its members to follow, the guidance of the MWC Handbook, not any state regulations. (Gilliland Decl. ¶¶ 6, 11; *Id.* Ex. 2).

While the member universities are themselves funded at least in part by the state, there is no indication that the funding the schools receive is specifically used to pay MWC dues. And, even Conference received, receipt of government "funding is insufficient, standing alone, to transform [a party] into a state actor." *Doe v. Univ. of Denver*, No. 16-CV-00152-PAB-KMT, 2018 WL 1304530, at *5 (D. Colo. Mar. 13, 2018), *aff'd on other grounds*, 952 F.3d 1182 (10th Cir. 2020). Because the Moving Plaintiffs cannot demonstrate that the MWC is a state actor subject to Section 1983

liability, the Moving Plaintiffs are unlikely to succeed on the merits of their constitutional claims against the MWC.

## B. Commissioner Nevarez Is Not a State Actor Subject to Section 1983 Liability

The Complaint also purports to assert claims against Commissioner Nevarez under Section 1983, but these allegations similarly do not meet the requirement of 42 U.S.C. § 1983. The law makes clear that Commissioner Nevarez is not a state actor acting under color of state law.

As noted above, the MWC is not a state actor. By proxy, no employees of the MWC are state actors. *Muhammad v. Vectrus Sys. Corp.*, No. 123CV02186SKCMDB, 2024 WL 1073216, at *6 (D. Colo. Mar. 12, 2024) (stating "there is no dispute [that] Vectrus is a private company and Mr. Rather, as its employee, is a private actor"). Even if the MWC is found to be a state actor (which it is not), "whether a defendant's conduct constitutes state action depends not on whether she was employed by a state actor, but whether her conduct is 'fairly attributable to the State.'" *Spikes v. Car Toys, Inc.*, No. 21-CV-00681-PAB-KAS, 2024 WL 4135234, at *6 (D. Colo. Sept. 10, 2024).

Commissioner Nevarez's duties involve the "authority to execute Conference policy", policy which is not guided by any state regulations. Gilliland Decl. Ex. MWC Handbook, 1.4 Commissioner; *See also Sgaggio v. Weiser*, No. 21-CV-00830-PAB-KMT, 2022 WL 252325, at *4 (D. Colo. Jan. 27, 2022), *report and recommendation*

*adopted,* No. 21-CV-00830-PAB-NYW, 2022 WL 425240, at *4 (D. Colo. Feb. 8, 2022)

("Although state employment generally suffices to 'render the defendant a state

actor,' 'private conduct that is not fairly attributable to the State is simply not

actionable under § 1983.'").

Plaintiffs fail to clearly show entitlement to relief as against Commissioner

Nevarez, as they cannot show substantial likelihood of success on the merits of their

Section 1983 claims against her.

### III.    Plaintiffs Are Not Likely to Succeed on Title IX Claims Against the Defendants.

### A. Plaintiffs Fail to Allege That the MWC Received Federal Financial Assistance.

Neither the MWC nor Commissioner Nevarez is subject to Title IX claims.

Title IX states that no person shall be "subjected to discrimination under any

education program or activity receiving Federal financial assistance."  20 U.S.C.A. §

1681.  The threshold requirement that the program or activity be federally-funded is

"a necessary prerequisite to Title IX coverage." *Houston v. Mile High Adventist Acad.*,

846 F. Supp. 1449, 1457 (D. Colo. 1994).

The MWC does not receive any federal funding.  (*See* Gilliland Decl. Ex. 1.)

The U.S. Department of Education specifically enumerates the institutions that

receive federal financial assistance as "approximately 17,600 local school districts,

over 5,000 postsecondary institutions, and charter schools, for-profit schools,

libraries, and museums…vocational rehabilitation agencies and education agencies

of 50 states, the District of Columbia, and territories of the United States." U.S. Department of Education, Office for Civil Rights (2021), *Title IX and Sex Discrimination*. Absent is any reference to private, multi-state non-profit athletic conferences whose operations are funded by member dues.

The Moving Plaintiffs cite zero authority holding that a collegiate athletic conference is subject to Title IX. In fact, controlling caselaw reaches the opposite conclusion. In *NCAA v. Smith*, the U.S. Supreme Court determined that simply because the NCAA receives dues payments from colleges that receive federal funding does not render NCAA subject to Title IX. 525 U.S. 459, 468 (1999) (*Smith* I). In *Smith*, the plaintiff allegied the NCAA denied her eligibility to continue to play volleyball in postgraduate programs in violation of Title IX. *Id*. at 463. The Court ultimately held that Title IX is inapplicable to the NCAA, because there was no way to determine that the dues the NCAA received from the membership colleges was comprised of funds the colleges received from the federal government. *Id*. at 468. Like in *Smith*, it is impossible to determine—and the Moving Plaintiffs have failed to demonstrate—that any funds the MWC receives from its member institutions are derived from federal funds.

Similarly, in *Sharp v. Kean University,* the court dismissed plaintiff's Title IX claims against the NCAA, finding that there was no showing the NCAA received federal financial assistance. 153 F. Supp. 3d 669, 674 (D.N.J. 2015). In any event, if federal funds aided MWC members' payment of dues, this limited economic benefit is

not enough to render the MWC a subject to Title IX. *See Edmonds-Radford v. Sw.
Airlines Co.,* No. 16-CV-02860-LTB-STV, 2020 WL 13897201, at *4 (D. Colo. Mar. 6,
2020), *aff'd*, 13 F.4th 1107 (10th Cir. 2021), *opinion withdrawn and superseded on
reh'g,* 17 F.4th 975 (10th Cir. 2021), and *aff'd,* 17 F.4th 975 (10th Cir. 2021) (citing
*Smith* , "entities that only benefit economically from federal assistance are not"
recipients within the meaning of Title IX).

**B. The Moving Plaintiffs' Title IX "Control Theory" Has Been Rejected.**

The Moving Plaintiffs next argue that MWC exercises controlling authority
over its federally funded member institutions. Courts in other circuits have rejected
preliminary injunctions alleging Title IX claims against multi-state athletic
conferences similar to the MWC by rejecting the Moving Plaintiffs' "controlling
authority" argument.[11]    *Barrs v. S. Conf.,* No. 2:10-CV-01227-AKK, 2010 WL

---

[11] The other cases the Moving Plaintiffs' cite in support of their assertion that the
MWC is subject to Title IX because it exercises "controlling authority" over federally-
funded member institutions are inapposite. Mot. at 14. All but one of the cases
involve state-specific programs and not multi-state entities like the MWC. Mot. at
14.-15; *See Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282 (11th
Cir. 2007) (lawsuit brought against the University of Georgia, its athletic association,
and university officials); *B.P.J. by Jackson v. W. Virginia State Bd. Of Educ.*, 98
F.4th 542 (4th Cir. 2024) (lawsuit brought against West Virginia state secondary
schools activities commission, West Virginia and Harrison County boards of
education, and their superintendents); *Horner v. Kentucky High Sch. Athletic Ass'n*,
43 F.3d 265 (6th Cir. 1994) (lawsuit brought against Kentucky State Board of
Education for Elementary and Secondary Education and Kentucky High School
Athletic Association); *A.B. by C.B. v. Hawaii State Dep't of Educ.*, 386 F. Supp. 3d
1352 (D. Haw. 2019) (lawsuit brought against Hawaii State Department of Education
and Oahu Interscholastic Association); *Communities for Equity v. Michigan High
Sch. Athletic Ass'n*, 80 F. Supp. 2d 729 (W.D. Mich. 2000) (lawsuit brought against
Michigan High School athletic association and their representative council). The only

11613799, at *3 (N.D. Ala. May 13, 2010). In *Barrs*, the plaintiffs sought a motion for preliminary injunction resulting from the decision of the Southern Conference, a collegiate athletic conference spanning multiple states, to reduce the number of teams advancing to post-season tournaments, which the plaintiffs claimed disproportionally affected women's teams. *Id.* at *1. Plaintiffs contended that, because the Southern Conference had "control" over certain functions of the member schools which received federal funding, the conference was subject to Title IX. *Id.* at *2. The court rejected this theory, noting that "plaintiffs failed to point to any case in which a court has found a collegiate athletic conference liable under this control theory." *Id.* at *2. The court denied the plaintiff's request for preliminary injunction, finding that the "the contrary holding in *Smith* and the subsequent lack of acceptance of the control theory by the lower courts cast heavy doubt, at this juncture, on the likelihood that plaintiffs will succeed on the merits." *Id.* at *2.

In *Smith v. NCAA*, 266 F.3d 152 (3d Cir. 2001) (*Smith* II), the Third Circuit addressed the control theory "that the NCAA exercised controlling authority over its federally-funded member institutions because it had the power to establish rules governing intercollegiate athletics at member schools." 266 F.3d at 157. The court

---

case the Moving Plaintiffs cite that does not involve a state specific program is *Barrs v. S. Conf.*, 734 F. Supp. 2d 1229, 1235 (N.D. Ala. 2010), in which the court had previously denied a preliminary injunction against the multi-state athletic conference. *See Barrs v. S. Conf.*, No. 2:10-CV-01227-AKK, 2010 WL 11613799, at *2 (N.D. Ala. May 13, 2010) (denying a preliminary injunction due to the "lack of acceptance of the control theory by the lower courts").

rejected this theory and granted the NCAA's motion to dismiss because "[t]he fact that the institutions make…decisions cognizant of NCAA sanctions does not mean the NCAA controls them." *Id.* at 156.

The law above demonstrate that the Moving Plaintiffs are unable to make a showing that the MWC "controls" federally-funded member institutions and thus is subject to Title IX claims.

### C. Title IX Claims Cannot Be Brought Against Individual Defendants.

The Title IX claims against Commissioner Nevarez fail because individuals are not subject to Title IX claims, in either their personal or official capacity. *Day v. The Career Bldg. Acad.*, No. 18-CV-00837-RM-KMT, 2021 WL 4260797, at *7 (D. Colo. Sept. 20, 2021) (Title IX has "consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals.") (internal citations omitted); *see also Byrd v. Ind. Sch. Dist. No. 8 of Tulsa Cnty.*, No. 23-CV-00404-CDL, 2024 WL 4350800, at *7 n.10 (N.D. Okla. Sept. 30, 2024) ("[A] Title IX claim can only be maintained against an entity receiving federal funding, not an individual."); *Dimas v. Pecos Indep. Sch. Dist. Bd. of Educ.*, No. 23-2064, 2024 WL 1881076, at *3 (10th Cir. Apr. 30, 2024); *Sharp,*153 F. Supp. 3d at 674.

Additionally,"[t]his court and others have found official capacity claims are duplicative of the claim against the agency and should be dismissed on that basis." *Neal v. Colorado State Univ.-Pueblo*, No. 16-CV-873-RM-CBS, 2017 WL 633045, at

*8 (D. Colo. Feb. 16, 2017), *report and recommendation adopted*, No. 16-CV-00873-RM-CBS, 2017 WL 11696393 (D. Colo. Sept. 11, 2017).

**D. USU's Title IX Claims Are Unlikely to Succeed for the Same Reasons.**

On November 18, 2024, Utah State University ("USU") filed a Motion for Limited Intervention as Plaintiff requesting leave to file an attached complaint and a partial joinder to the Moving Plaintiffs' Motion ("Joinder"). (ECF No. 16.) On November 19, 2024, the Court granted that motion to intervene. (ECF No. 20.) USU's Joinder to the Motion is limited to "the portion of [Moving Plaintiffs'] Motion that seeks injunctive relief against Defendant Mountain West Conference (MWC) related to the claim that MWC's Transgender Participation Policy (TPP) violates Title IX." (ECF No. 16-2.) Defendants MWC and Nevarez did not oppose USU's intervention nor do they oppose USU's partial Joinder to Plaintiffs' Motion. However, USU does not add any new arguments to those already stated by the Moving Plaintiffs' and USU's request for emergency relief fails for the same reasons – namely that Defendant MWC is not subject to Title IX and that undue delay in bringing a claim does not create a valid basis for injunctive relief.

As discussed in detail above, preliminary injunctions are the exception, not the rule, and are only granted when there is an "urgent need for speedy action." *Archer*, 638 F. Supp. 3d at 1255. However, here, USU has been aware of the TPP since 2022, when USU's board representative approved the TPP including its forfeiture provision. (Gilliland Decl. Ex. 13, § 1.12.) At no time since 2022 has USU tendered

an objection to the TPP until USU's November 18, 2024 filing. (Gilliland Decl. ¶29.) Further, when USU declined to play against SJSU on October 2, 2024 USU did not require a waiver of the forfeiture or otherwise object to the application of the TPP or its potential impact on USU's standings in the MWC finals. (*Id.*) Instead, USU waited until yesterday, nine days before the MWC Championship tournament to complain. Like Moving Plaintiffs, USU should not be rewarded for sitting on its grievances until the eve of the tournament.

For these reasons, the Plaintiffs' Title IX claims against Commissioner Nevarez are not likely to succeed on the merits.

## IV.    The Remaining Preliminary Injunction Factors Weigh Against the Moving Plaintiffs' Requested Relief.

In addition to failing to show a likelihood of success on the merits of their claims against the MWC and Commissioner Nevarez, the Moving Plaintiffs have failed to carry their burden on the remaining three elements necessary to obtain a preliminary injunction.

In addition to showing a likelihood of success on the merits, a party moving for a preliminary injunction must show that they are likely to suffer irreparable harm in the absence of preliminary relief; that the balance of equities tips in their favor; and that an injunction is in the public interest. *Denver Homeless Out Loud*, 32 F.4th 1259, 1277-78. Here, each of these factors favors maintaining the status quo, requiring the denial of the Moving Plaintiffs' requested relief.

As an initial matter, "denial of [P]laintiffs' opportunity . . . play in post-season [] games does not constitute a violation of" their rights or become worthy of injunctive relief as to any movant. *See Justice v. Nat'l Collegiate Athletic Ass'n*, 577 F. Supp. 356, 375 (D. Ariz. 1983) (denying preliminary injunction). Even if the Moving Plaintiffs did have a right to reorder the rankings at the end of the season, doing so would simply shift the alleged harm to other teams and players. All of the MWC's member institutions have been aware of the TPP since 2022 and played under the rules of the policy for three seasons, including the current volleyball season. Gilliland Decl. No MWC member schools, players, or coaches refused to compete until this season, and the Moving Plaintiffs waited until the very end of the season to bring these claims. It is not fair to players, coaches, and staff who abided by the Conference's rules of play, including the TPP, to make last minute changes at the end of the season, nor does it serve any public interest to do so. *See Archer*, 638 F. Supp. 3d at 1255 (an injunction is disfavored where it "changes the status quo").

## CONCLUSION

For the reasons stated above, Plaintiffs motion for a preliminary injunction should be denied.

Dated: November 19, 2024

By: */s/ Chad D. Williams*

    Chad D. Williams
    Kyler K. Burgi
    DAVIS GRAHAM & STUBBS L.L.P.
    1550 17th Street, Suite 500

Denver, Colorado 80202
Telephone:  303.892.9400
Email:
kyler.burgi@davisgraham.com
chad.williams@davisgraham.com

Wesley R. Powell
WILLKIE FARR & GALLAGHER
L.L.P.
787 Seventh Avenue
New York, New York 10019
Telephone:  212.728.8264
Email: wpowell@willkie.com
*Pro hac vice Pending*

Matt D. Basil
WILLKIE FARR & GALLAGHER
L.L.P.
300 North LaSalle Dr.
Chicago, Illinois 60654
Telephone:  312.728.9020
Email: mbasil@willkie.com
*Pro hac vice Pending*


*Counsel for Defendants The
Mountain West Conference and
Gloria Nevarez*

## ARTIFICIAL INTELLIGENCE CERTIFICATION

I certify that no portion of this filing was drafted by artificial intelligence.


Dated: November 19, 2024

By: */s/  Chad D. Williams*

Chad D. Williams
Kyler K. Burgi
DAVIS GRAHAM & STUBBS L.L.P.
1550 17th Street, Suite 500
Denver, Colorado 80202
Telephone:  303.892.9400
Email:
kyler.burgi@davisgraham.com
chad.williams@davisgraham.com


Wesley R. Powell
WILLKIE FARR & GALLAGHER
L.L.P.
787 Seventh Avenue
New York, New York 10019
Telephone:  212.728.8264
Email: wpowell@willkie.com
*Pro hac vice Pending*

Matt D. Basil
WILLKIE FARR & GALLAGHER
L.L.P.
300 North LaSalle Dr.
Chicago, Illinois 60654
Telephone:  312.728.9020
Email: mbasil@willkie.com
*Pro hac vice Pending*


*Counsel for Defendants The
Mountain West Conference and
Gloria Nevarez*

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of November, 2024 the foregoing

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' EMERGENCY**

**MOTION FOR PRELIMINARY INJUNCTION** was filed and served via CM/ECF

to all counsel of record:

> William Bock III
> Justin R. Olson
> KROGER GARDIS & REGAS LLP
> 111 Monument Circle, Suite 900
> Indianapolis, Indiana 46204
> Telephone: 317.692.9000
> Email: wbock@kgrlaw.com
>         jolson@kgrlaw.com
> *Attorneys for Plaintiffs*
>
> Andrew Nussbaum
> First & Fourteenth PLLC
> 2 N. Cascade Ave., Suite 1430
> Colorado Springs, CO 80903
> Telephone 719-428-2386
> Email: andrew@first-fourteenth.com
>
> and
>
> Sean D. Reyes
> Utah Attorney General
> Stanford Purser (admission pending)
> Office of the Utah Attorney General
> 160 E. 300 S., 5th Floor
> Salt Lake City, Utah 84111
> Telephone 801-366-0533
> Email: spurser@agutah.gov
>
> *Counsel for Intervenor-Plaintiff Utah
> State University*

Bryan Heckenlively
Helen E. White
Munger Tolles & Olson LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Email: bryan.heckenlively@mto.com
      helen.white@mto.com

*Counsel for Board of Trustees of the
California University System, Laura
Alexander, and Todd Kress*

 *s/Wesley R. Powell*