# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.: 24-cv-3155-SKC-MDB

|  |  |
|---|---|
| BROOKE SLUSSER, *et al.*, | |
| *Plaintiffs*, | |
| v. | |
| THE MOUNTAIN WEST CONFERENCE, *et al.* | |
| *Defendants*. | |

---

## DEFENDANT TODD KRESS'S RESPONSE IN OPPOSITION TO EMERGENCY MOTION FOR PRELIMINARY INJUNCTION

---

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................. 1

II.   STATEMENT OF FACTS.................................................. 4

III.  LEGAL STANDARD.................................................... 10

IV.  PLAINTIFFS' EMERGENCY MOTION MUST BE DENIED FOR
MULTIPLE, INDEPENDENT REASONS ..................................... 11

     A.    Plaintiffs Are Exceedingly Unlikely to Succeed on The Merits............ 11

          1.    This Court Lacks Personal Jurisdiction over Coach Kress
and Venue Is Improper in this District ....................................... 11

          2.    Plaintiffs Are Unlikely to Succeed on Their Claims
Because They Are Barred by Laches .......................... 15

          3.    Plaintiffs Are Unlikely to Succeed on the Merits of Their
Title IX Claim ............................................. 21

               (a)    Plaintiffs Have No Title IX Claim Against Coach
Kress ................................................... 21

               (b)    Any Title IX Claim Would Fail as a Matter of Law ....... 22

     B.    The Equitable Factors Weigh Heavily Against an Injunction ............. 28

          1.    Plaintiffs Have Not Demonstrated Any Irreparable Harm ....... 28

               (a)    Plaintiffs' Inexcusable Delay Forecloses Injunctive
Relief.................................................. 29

               (b)    Plaintiffs' Asserted Harms Are Purely Speculative ........ 31

          2.    The Balance of the Equities Weighs Overwhelmingly
Against an Injunction.................................... 32

          3.    An Injunction Is Not in the Public Interest................ 33

V.    CONCLUSION.................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*,
75 F.4th 760 (7th Cir. 2023) ................................................................................. 25

*Abdulina v. Eberl's Temp. Servs., Inc.*,
79 F. Supp. 3d 1201 (D. Colo. 2015) ................................................................... 21

*Al-Rifai v. Willows Unified Sch. Dist.*,
469 F. App'x 647 (9th Cir. 2012) ........................................................................ 22

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ............................................................................................ 27

*AMBI Distrib. Corp. v. Doe*,
No. 21-CV-1961-WJM-NYW, 2021 WL 3269234 (D. Colo. July 28,
2021) ..................................................................................................................... 11

*Archer v. Griswold*,
638 F. Supp. 3d 1246 (D. Colo. 2022) ...................................................... 15, passim

*B.P.J. by Jackson v. W. Va. State Bd. of Educ.*,
98 F.4th 542 (4th Cir. 2024) ............................................................................... 27

*Benisek v. Lamone*,
585 U.S. 155 (2018) ............................................................................................ 29

*Biodiversity Conservation All. v. Jiron*,
762 F.3d 1036 (10th Cir. 2014) ..................................................................... 15, 16

*Bos. Parent Coal. for Acad. Excellence Corp. v. School Comm.*,
996 F.3d 37 (1st Cir. 2021) ...................................................................... 19, 29, 31

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020) ........................................................................ 23, 24, 25, 26

*Butler v. NCAA*,
No. 06-2319-KHV, 2006 WL 2398683 (D. Kan. Aug. 15, 2006) .......................... 33

*C5 Med. Werks, LLC v. CeramTec GMBH*,
937 F.3d 1319 (10th Cir. 2019) .......................................................................... 13

*Calder v. Jones,*
    465 U.S. 783 (1984) ............................................................................... 14

*Chiles v. Salazar,*
    116 F.4th 1178 (10th Cir. 2024) ........................................................... 11

*Colo. Motor Carriers Ass'n v. Town of Vail,*
    No. 23-CV-02752-CNS-STV, 2023 WL 8702074 (D. Colo. Dec. 15,
    2023) ..................................................................................................... 30

*Costello v. United States,*
    365 U.S. 265 (1961) ............................................................................... 15

*Colo. Motor Carriers Ass'n v. Town of Vail,*
    No. 23-CV-02752-CNS-STV, 2023 WL 8702074 (D. Colo. Dec. 15, 2023) ........... 31

*Dental Dynamics, LLC v. Jolly Dental Grp., LLC,*
    946 F.3d 1223 (10th Cir. 2020) ........................................................... 14

*DTC Energy Grp., Inc. v. Hirschfeld,*
    912 F.3d 1263 (10th Cir. 2018) ..................................................... 10, 29

*Dudnikov v. Chalk & Vermilion Fine Arts, Inc.,*
    514 F.3d 1063 (10th Cir. 2008) ........................................................... 12

*Emps. Mut. Cas. Co. v. Bartile Roofs, Inc.,*
    618 F.3d 1153 (10th Cir. 2010) ........................................................... 15

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) ......................................................................... 23, 26

*First W. Cap. Mgmt. Co. v. Malamed,*
    874 F.3d 1136 (10th Cir. 2017) ............................................. 2, 10, 23, 29

*Fish v. Kobach,*
    840 F.3d 710 (10th Cir. 2016) ......................................................... 26, 30

*Fitzgerald v. Barnstable Sch. Comm.,*
    555 U.S. 246 (2009) ............................................................................. 22

*Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A.,*
    320 F.3d 1205 (11th Cir. 2003) ....................................................... 18, 19

*Fowler v. Stitt,*
    104 F.4th 770 (10th Cir. 2024) ................................................................... 24, 26

*Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.,*
    245 F.3d 1172 (10th Cir. 2001) ...................................................................... 24

*Greater Yellowstone Coal. v. Flowers,*
    321 F.3d 1250 (10th Cir. 2003) ...................................................................... 29

*Greystoke Condo. Ass'n, Inc. v. Westfield Ins. Co.,*
    No. 21-CV-03419-RM-SKC, 2022 WL 17547946 (D. Colo. Aug. 10,
    2022) (Crews, J.) ........................................................................................... 21

*Haidak v. Univ. of Massachusetts-Amherst,*
    933 F.3d 56 (1st Cir. 2019) ............................................................................ 27

*Hartley v. Parnell,*
    193 F.3d 1263 (11th Cir. 1999) ...................................................................... 22

*Hecox v. Little,*
    104 F.4th 1061 (9th Cir. 2024), as amended (June 14, 2024)................. 27, 28, 33

*Hendricks v. Bank of America, N.A.,*
    408 F.3d 1127 (9th Cir. 2005) ....................................................................... 15

*Home-Stake Prod. Co. v. Talon Petrol., C.A.,*
    907 F.2d 1012 (10th Cir. 1990) ..................................................................... 11

*Jacobsen v. Deseret Book Co.,*
    287 F.3d 936 (10th Cir. 2002) ....................................................................... 16

*Jennings v. Rodriguez,*
    583 U.S. 281 (2018) ...................................................................................... 27

*Kansas v. U.S. Dep't of Educ.,*
    No. 24-4041-JWB, 2024 WL 3273285 (D. Kan. Jul. 2, 2024)................. 24, 25, 26

*Lipsett v. Univ. of P.R.,*
    864 F.2d 881 (1st Cir. 1988)........................................................................... 22

*N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior,*
    854 F.3d 1236 (10th Cir. 2017) ..................................................................... 29

*Nat'l R.R. Passenger Corp. v. Morgan*,
    536 U.S. 101 (2002) ................................................ 16

*Old Republic Ins. Co. v. Cont'l Motors, Inc.*,
    877 F.3d 895 (10th Cir. 2017) .............................. 12

*OMI Holdings, Inc., v. Royal Ins. Co. of Can.*,
    149 F.3d 1086 (10th Cir. 1998) ............................ 14

*Pillow Menu, LLC v. Super Effective, LLC*,
    No. 20-CV-03638-STV, 2021 WL 3726205 (D. Colo. Aug. 19, 2021).................... 15

*RoDa Drilling Co. v. Siegal*,
    552 F.3d 1203 (10th Cir. 2009) ................................................ 29-30, 31

*Smith v. Metro. Sch. Dist. Perry Twp.*,
    128 F.3d 1014 (7th Cir. 1997) .............................. 22

*Soule v. Connecticut Association of Schools, Inc.*,
    2024 WL 4680533 (D. Conn. Nov. 5, 2024)........................................ 28

*Stanley v. Trs. of the Cal. State. Univ.*,
    433 F.3d 1129 (9th Cir. 2006) ................................ 4

*Throupe v. Univ. of Denver*,
    988 F.3d 1243 (10th Cir. 2021) ............................ 24

*Tirrell v. Edelblut*,
    No. 24-CV-251-LM-TSM, 2024 WL 4132435 (D.N.H. Sept. 10, 2024) ................ 27

*Trujillo v. Williams*,
    465 F.3d 1210 (10th Cir. 2006) ...................................... 13, 14

*United States v. Brune*,
    767 F.3d 1009 (10th Cir. 2014) ...................................... 23, 27

**STATE CASES**

*City & Cnty. of San Francisco v. Regents of Univ. of Cal.*,
    7 Cal. 5th 536 (2019) ................................................ 4

**FEDERAL STATUTES**

20 U.S.C. § 1681(a) ................................................ 23

**STATE STATUTES**

Cal. Educ. Code. § 66250 ........................................................................... 28

Cal. Educ. Code. § 66292.4 ........................................................................ 28

Cal. Educ. Code § 66600 .............................................................................. 4

Cal. Educ. Code § 66606.2 ........................................................................... 4

## I.    __INTRODUCTION__

Plaintiffs have now conceded that threshold legal defects doom their

emergency motion for a preliminary injunction against Defendant Todd Kress, the

Head Coach of the San Jose State University ("SJSU") volleyball team.  Hours

before this response was due, Plaintiffs' counsel told Defendants' counsel in a phone

call and then notified the Court that they "withdraw the aspect of their Emergency

Motion for Preliminary Injunction seeking emergency injunctive relief as to

Defendant Todd Kress."  Dkt. 23 at 1.  Coach Kress nonetheless files this response

to the motion out of an abundance of caution.  The caution is due to Plaintiffs'

counsel's statements during the phone call that Plaintiffs would be seeking relief

from Defendant the Mountain West Conference ("MWC") that would, in Plaintiffs'

view, require Coach Kress to modify SJSU's roster for the upcoming MWC

tournament.  Counsel was also equivocal about the legal basis for seeking such an

injunction against the MWC and did not rule out the possibility of asking for relief

based on alleged violations of Title IX by SJSU.  Coach Kress therefore files this

brief to protect his interests and explain why there is no possible basis for such

relief.

Plaintiffs have come to this Court with an emergency of their own making

and are now asking for unprecedented relief on less than one week's notice.  They

ask this Court to exclude an SJSU volleyball player who they do not dispute is

eligible to compete under NCAA and MWC rules from next week's MWC

championship tournament solely because Plaintiffs believe her to be transgender and they do not like the rules.

Plaintiffs make this extraordinary request—and present it as emergent—after sitting on their hands for many months. Plaintiffs attest that, dating back as far as April, they believed, as they do now, that there was a transgender woman on the SJSU roster. Since September, moving Plaintiffs and their teams have refused to compete against SJSU for the same reason. In September, Plaintiff Slusser joined a separate lawsuit in federal court in Georgia and began giving press interviews based on the same facts alleged here. And since September, there has been intense public focus on this issue. More games have been played and forfeited since then, but nothing else has changed. Plaintiffs could have filed suit in September (or even April) and moved for the same relief they now seek. Plaintiffs' inexcusable delay is reason enough to deny the emergency motion.

But it is far from the only reason to deny the motion. There are several other fundamental problems that require denying emergency relief—without even reaching the merits or resolving any factual disputes.

*First*, Plaintiffs' motion seeks relief based on claims that are not asserted in the complaint. The motion seeks relief against Coach Kress based on only one legal claim—Title IX of the Education Amendments of 1972—but there is no Title IX claim against Coach Kress in the complaint. Nor could there be because individuals cannot be sued for violating Title IX, only schools can be. *See infra*, at 22. And, as

the Court has ruled, Plaintiffs cannot substitute a different Defendant for Coach Kress midstream to avoid this problem.  Dkt. No. 22.

*Second*, Coach Kress is not subject to personal jurisdiction in Colorado and venue in Colorado is improper on the claims asserted here.  Coach Kress works and lives in California, and his only contacts with Colorado this year have been one meeting and two non-forfeited games in which none of the Plaintiffs were on the opposing teams.  Such ancillary contacts with persons or entities residing in a state are not sufficient for personal jurisdiction or venue.  *See infra*, at 11–15.

*Third*, even if the Court reaches the substance of Plaintiffs' Title IX claim, Plaintiffs' interpretation of Title IX is wrong as a matter of Tenth Circuit law, without any need to get into any of the facts.  That is because, under Tenth Circuit law, discriminating on the basis of transgender status is unlawful under both Title IX and the Equal Protection Clause of the U.S. Constitution.  But Plaintiffs' interpretation of Title IX would *require* just that; it would require a transgender woman to be treated differently from other players, on the basis of her sex, and not permitted to play.  A statute cannot be interpreted in a manner that either contradicts itself or raises serious constitutional questions.  Plaintiffs' interpretation would do both and it therefore must be rejected.  *See infra*, at 22–28.

*Finally*, the balance of the equities weighs heavily against an injunction.  Not only did Plaintiffs wait far too long to run to court, their evidence of the harms they would suffer if denied relief is hypothetical.  Remarkably, it is entirely speculative

whether granting the relief requested and recalculating the MWC standings would change any of the six teams who are invited to participate in the tournament next week. *See infra*, at 32. It would be fundamentally inequitable, after such a long delay, to grant emergency relief based on pure speculation about what might happen in the standings. And it would be against the public interest to grant relief that would require declaring that nationwide NCAA and USA Volleyball eligibility rules violate federal law—especially when neither of those entities is a party. That is a nationwide issue that should not (and need not) be litigated on a week's notice.

The motion should be denied.

## II.    <u>STATEMENT OF FACTS</u>

SJSU, located in Santa Clara County, California, is part of the California State University ("CSU") system, which is one legal entity governed by the Board of Trustees of California State University. *See* Cal. Educ. Code §§ 66600, 66606.2. The Board, a California government entity, is the State of California acting in its higher-education capacity. *See City & Cnty. of San Francisco v. Regents of Univ. of Cal.*, 7 Cal. 5th 536, 545 (2019); *Stanley v. Trs. of the Cal. State. Univ.*, 433 F.3d 1129, 1133 (9th Cir. 2006) ("Trustees are an arm of the state . . . ."). Coach Kress is a California resident who works in California as head coach of the SJSU women's

volleyball team.  Kress Decl. ¶ 3.[1]  He has made only three brief trips to Colorado within the last year—to attend two games against teams no Plaintiffs play for and to participate in the MWC's pre-season meeting.  Kress Decl. ¶¶ 9–10.

The National Collegiate Athletic Association's ("NCAA") transgender student-athlete participation policy binds SJSU as an NCAA and Mountain West Conference ("MWC") member school.  Compl. ¶¶ 34–35, 63.  In January 2022, the NCAA updated its policy to align with the U.S. Olympic and Paralympic Committee's policy in determining eligibility on a sport-by-sport basis using each sport's national governing body policy as a benchmark for NCAA eligibility, i.e., USA Volleyball provides the benchmark for women's volleyball.  Dkt. 14-1 ("App.") at 145, 160.  The NCAA's criteria was developed by its Committee on Competitive Safeguards and Medical Aspects of Sports to "preserve[] opportunity for transgender student-athletes while balancing fairness, inclusion and safety for all who compete."  App. 145.

In August 2022, the MWC Board of Directors, composed of representatives from MWC member schools, adopted the Transgender Participation Policy ("TPP").  Gilliland Decl. ¶ 11–12.  On August 25, 2022, the TPP was "unanimously" ratified

---

[1] The CSU Board of Trustees, Coach Kress, and Defendants Laura Alexander and Michelle Smith McDonald (erroneously named as "Michelle McDonald Smith" in the complaint) are referred to here as the "CSU Defendants."

5

by the MWC athletic directors from various schools and emailed to representatives
at all MWC member schools that same day.  *Id.* ¶ 14–16.  Plaintiffs' assertion that
this policy was stealthily adopted in recent months is just not true.  Indeed,
Proposed Intervenor Utah State University—which supports Plaintiffs in this
litigation—has confirmed as much.  Dkt. 16-1 at ¶ 8.  The 2022–23 Mountain West
Handbook was updated to reflect the TPP and distributed to MWC schools.  *See*
Gilliland Decl. ¶¶ 17–18.

Under the TPP, "a transgender athlete who has been deemed eligible by the
NCAA and has been included on a MW member institution's team shall be
permitted to participate in all Conference competitions."  App. 114.  A team that
"refuses to compete in an intraconference contest against a fellow . . . team which
includes an eligible transgender student-athlete(s)" is deemed to have "forfeited the
contest."  *Id.*  The forfeiting team is charged with a loss and the opposing team is
credited with a win for purposes of standings and championship participation.  *Id.*

In Spring 2024, an online article alleged that a player on SJSU women's
volleyball team is transgender.  App. 437–38 (Ray Decl. ¶ 24).  The CSU Defendants
have not publicly commented on this student-athlete's gender identity, nor has the
MWC or Commissioner Nevarez.[2]  The alleged student-athlete in question has been

---

[2] CSU Defendants are prohibited from addressing the gender identity of any
student under federal and state privacy laws, including the Family Educational

on SJSU's team, eligible under NCAA, MWC, and SJSU rules, and competed in MWC play since the 2022 season, including against Plaintiffs.  App. 423 (Batie-Smoose Decl. ¶ 20).  According to Plaintiffs' own statements and evidence, they and their schools became aware of the alleged transgender player on the SJSU women's volleyball team as early as the 2023 season and, at the latest, by the time of their teams' first game against SJSU this season a few months ago.

Plaintiff Brooke Slusser is co-captain of the SJSU team, App. 455 (Slusser Decl. ¶ 8), and its most decorated player this season (ranking second in the MWC for service aces, seventh for assists, and tenth for hitting percentage), App. 320.

---

Rights and Privacy Act.  The complaint inaccurately alleges that Commissioner Nevarez confirmed the student-athlete's gender identity.  Compl.  ¶ 86.  She did no such thing, saying only:  "The student-athlete (in question) meets the eligibility standard, so if a team does not play them, it's a forfeit, meaning they take a loss."  *See* Mark Anderson, *Mountain West Commissioner Says She's Heartbroken Over Turmoil Surrounding San Jose State Volleyball*, APNEWS (Oct. 18, 2024), https://apnews.com/article/san-jose-state-volleyball-b8f2b101b9825ee839ce17bd5cb1a1a2.  Plaintiffs' emergency motion exclusively relies on inadmissible hearsay to make claims about the transgender status of the athlete in question.  *See* Mot. at 5–6 (citing Batie-Smoose Decl. ¶¶ 33–44 [relaying hearsay]; Slusser Decl. ¶¶ 9–10 [same]).

Slusser has publicly stated that she learned about her teammate's alleged transgender status in Fall 2023, two-and-a-half months after joining the team. *See* Heckenlively Decl. ¶ 2. By Summer 2024, Slusser states that she became aware that other MWC teams were planning not to play SJSU to protest her teammate. App. 457 (Slusser Decl. ¶¶ 21, 24). In September, Slusser joined a lawsuit in federal court in Georgia (represented by the same counsel representing Plaintiffs here) to "assert [her] concerns arising from [this teammate's] participation on the SJSU Team." App. 458–59 (Slusser Decl. ¶ 33). After waiting months (and possibly over a year) since discovering her teammate's alleged transgender status, Slusser now seeks emergency relief from the Court. *See* Mot. at 2.

Other moving Plaintiffs, who play for other MWC schools, likewise demand emergency relief from the Court months after the allegedly transgender SJSU player became "public knowledge." *See* Mot. at 7. For Plaintiff Kaylie Ray of Utah State, her coach had informed her of the SJSU player's alleged transgender status *last* season (i.e., in 2023) and it then "became a talking point in the conference early in the season" in 2024. App. 435, 437–38 (Ray Decl. ¶¶ 7, 24–25). Ray and her teammates also were aware that Southern Utah University refused to play SJSU on September 14, 2024 due to the player in question. App. 438 (Ray Decl. ¶ 26). On September 24, 2024, the first day of MWC play this season, an advocacy organization sent letters to each MWC university president urging their schools to follow Southern Utah in withdrawing from games against SJSU. Compl. ¶ 327,

App. D.  Plaintiff Katelyn Van Kirk and her Boise State teammates refused to play SJSU on September 28, and Macey Boggs and her Wyoming teammates refused to play SJSU on October 5, also "in protest" against the allegedly transgender player they had faced without incident in prior competitions.  App. 462 (Katelyn Van Kirk Decl. ¶ 5); App. 429 (Boggs Decl. ¶ 5).

After months of discussion within the MWC regarding the SJSU player and protest by four MWC teams against SJSU, Plaintiffs inexplicably waited to seek relief until days before the MWC championship tournament starts on November 27 in Nevada.  *See* Compl. at 2; Mot. at 2, 9.  The Court, Coach Kress, and other Defendants now have just four days to address Plaintiffs' 35-page emergency motion, 552-page appendix, and 128-page complaint.[3]  Plaintiffs provide no explanation why they waited so long.

Without making any showing whether their requested relief would even alter their teams' participation in the MWC tournament, Plaintiffs ask the Court for four forms of relief:  1) to strike the portion of the MWC TPP, which has been in place since August 2022 after it was passed by the member schools, that treats games

---

[3] Because Plaintiffs have "withdrawn" their motion against Coach Kress, he does not raise any specific evidentiary objections in this response.  Coach Kress reserves all rights to object to Plaintiffs' appendix and other evidence submitted to the Court should it be deemed that the motion is proceeding against Coach Kress.

forfeited against a team with an eligible transgender student-athlete as a loss; 2) to
undo the TPP's application to MWC games this season; 3) to recalculate winning
percentages without accounting for the six forfeited games; and 4) to declare the
allegedly transgender player, who is eligible under the NCAA's and MWC's rules
and policies, ineligible to play.  Mot. at 2–3.

Plaintiffs have made no showing whether the requested relief would even
affect the tournament—most, and potentially all six, of the tournament spots have
been locked in this far into the season.  The requested relief will not change who is
in the tournament at all unless the University of Wyoming wins both of its two
remaining games.  *See* Heckenlively Decl. ¶¶ 3-7.

That is one of many reasons why, as explained below, the motion should be
denied.

## III.   **LEGAL STANDARD**

A preliminary injunction is an "extraordinary remedy" available "only when
monetary or other traditional legal remedies are inadequate, and the right to relief
is clear and unequivocal." *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136,
1145 (10th Cir. 2017) (alteration adopted) (citation and internal quotation marks
omitted).  To obtain a preliminary injunction, a plaintiff must prove: (1) the plaintiff
"is substantially likely to succeed on the merits"; (2) the plaintiff "will suffer
irreparable injury if the injunction is denied"; (3) the "threatened injury" to the
plaintiff "outweighs the injury the opposing party will suffer under the injunction";

and (4) the injunction "would not be adverse to the public interest." *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (citation omitted). When a preliminary injunction would alter the status quo, it is especially disfavored and the moving party "faces a heavier burden." *Chiles v. Salazar*, 116 F.4th 1178, 1199 (10th Cir. 2024).

## IV.   PLAINTIFFS' EMERGENCY MOTION MUST BE DENIED FOR MULTIPLE, INDEPENDENT REASONS

### A.   Plaintiffs Are Exceedingly Unlikely to Succeed on The Merits

#### 1.   This Court Lacks Personal Jurisdiction over Coach Kress and Venue Is Improper in this District

Plaintiffs cannot succeed on any claim against Coach Kress for an independently sufficient reason that does not require reaching the substance of any legal theory.  Specifically, Plaintiffs have not shown they are likely to succeed on the merits against Coach Kress because they have not established a "reasonable probability" that the Court has personal jurisdiction over him.  *Home-Stake Prod. Co. v. Talon Petrol., C.A.*, 907 F.2d 1012, 1018 (10th Cir. 1990); *AMBI Distrib. Corp. v. Doe*, No. 21-CV-1961-WJM-NYW, 2021 WL 3269234, at *5 (D. Colo. July 28, 2021) ("Because the Court finds that Plaintiffs have not met their burden of establishing personal jurisdiction at this stage of the litigation, the Court finds they have also failed to show a likelihood of success on the merits.").

Plaintiffs' personal-jurisdiction theory would require them to show that Coach Kress "purposefully directed" his activities to Colorado and that the suit

arises out of or relates to those activities.[4]  *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 904 (10th Cir. 2017) (citation and internal quotation marks omitted); *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008).  This is referred to as specific personal jurisdiction.

Plaintiffs have fallen far short of the required showing.  The only allegations that connect Coach Kress with Colorado is that Coach Kress—who was otherwise based in California and coached a California team—once traveled with the SJSU volleyball team to Colorado for a game (that SJSU lost) against a team for which none of the Plaintiffs play.  Compl. ¶¶ 509, 533.  Coach Kress has visited Colorado only two other times in the last 12 months, once for a game against a different school (for which none of the Plaintiffs play) and once to attend an annual preseason MWC meeting.  Kress Decl. ¶¶ 9–10.

These contacts bear an at-best ancillary relationship to Plaintiffs' claims, which are all based on harm that occurred outside of Colorado, and they bear *no* relationship to the relief sought on the preliminary injunction motion, which focuses on a tournament that will be played in Nevada.  The isolated, sporadic nature of these contacts—two games in a twenty-six-game season, App. 315—make them insufficient to establish that Coach Kress purposefully availed himself of the state.

---

[4] Plaintiffs do not contend that this court has general jurisdiction over Coach Kress, *see* Compl. ¶ 11, who is domiciled in California, Kress Decl. ¶ 5.

It was merely "by chance" that these games were in Colorado, and such "fortuitous" contacts cannot serve as the basis for specific jurisdiction. *C5 Med. Werks, LLC v. CeramTec GMBH*, 937 F.3d 1319, 1323–24 (10th Cir. 2019) (holding that a defendant's attendance at three trade shows in Colorado was insufficient to establish purposeful availment when the defendant's attendance at the "tradeshows in Colorado, as opposed to some other state, was by chance," and the "location of the promotion [was] determined by others"). Were this sufficient for personal jurisdiction, Plaintiffs could have sued in any state in which the SJSU team played even a single game since 2023—an absurd result.

Coach Kress's implementation of MWC policy likewise cannot supply the required connection to Colorado. The Tenth Circuit has specifically held that it is not sufficient for specific personal jurisdiction that a policy is developed in the forum state but implemented vis-à-vis an individual located outside of it. *Trujillo v. Williams*, 465 F.3d 1210, 1220–21 (10th Cir. 2006). Plaintiffs' only remaining argument is that SJSU's affiliation with the MWC demonstrates that the CSU Board of Trustees "purposefully directed" its activities at Colorado. *See* Compl. ¶ 11. But there is no personal jurisdiction over the CSU Board of Trustees—an arm of the sovereign State of California itself—in Colorado either[5] and, regardless, the

---

[5] The MWC bylaws specifically provide that members do not "consent to the jurisdiction of the State of Colorado." App. 0119.

Board's conduct cannot be attributed to Coach Kress for purposes of personal jurisdiction even when sued in his official capacity. *Calder v. Jones*, 465 U.S. 783, 790 (1984); *Trujillo*, 465 F.3d at 1218–19, nn.9 & 10.

Finally, even if the minimum-contacts test were somehow satisfied, this Court could not exercise personal jurisdiction because it would not comport with "traditional notions of fair play and substantial justice." *Dental Dynamics, LLC v. Jolly Dental Grp., LLC*, 946 F.3d 1223, 1232 (10th Cir. 2020). When, as here, Plaintiffs' showing on minimum contacts is weak, "the less a defendant need show in terms of unreasonableness to defeat jurisdiction." *OMI Holdings, Inc., v. Royal Ins. Co. of Can.,* 149 F.3d 1086, 1092 (10th Cir. 1998) (citation and internal quotation marks omitted). "[T]he burden on the defendant of litigating the case in a foreign forum is of primary concern in determining the reasonableness of personal jurisdiction." *Id.* at 1096.

Here, it would be unduly burdensome to force Coach Kress—a California coach of a California team—to defend this case in Colorado. Colorado also has little interest in adjudicating the dispute between Coach Kress and Plaintiffs, all of whom attend schools outside of the state. *Id.* at 1096 (explaining that a forum state had little interest in adjudicating a dispute where neither party was a resident of the forum state and the actions giving rise to the lawsuit occurred out of state). The vast majority of the witnesses related to the claims against Coach Kress are located in California or otherwise outside of Colorado. *See OMI Holdings* 149 F.3d at 1097.

14

Based on these factors, it would be unreasonable to exercise personal jurisdiction over Coach Kress.

For this same reason, the District of Colorado is not the proper forum for the claims against Coach Kress. *Emps. Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1166 (10th Cir. 2010). The events that are material to those claims, such as Coach Kress's implementation of the TPP and his rostering decisions, did not occur in Colorado. As a result, the claims against Coach Kress are subject to dismissal and injunctive relief cannot issue. *See Pillow Menu, LLC v. Super Effective, LLC*, No. 20-CV-03638-STV, 2021 WL 3726205, at *4 (D. Colo. Aug. 19, 2021); *Hendricks v. Bank of America, N.A.*, 408 F.3d 1127, 1135 (9th Cir. 2005) ("[T]he court would lack authority to grant relief if . . . venue was improper.").

## 2. Plaintiffs Are Unlikely to Succeed on Their Claims Because They Are Barred by Laches

Plaintiffs also are unlikely to succeed on the merits because any claim for equitable relief related to the MWC tournament next week is barred by laches. Put simply, they waited too long to bring this case. Laches is an equitable doctrine that "requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Archer v. Griswold*, 638 F. Supp. 3d 1246, 1256 (D. Colo. 2022) (quoting *Costello v. United States*, 365 U.S. 265, 282 (1961)). Laches "bars a party's dilatory claim" and "stems from the principle that equity aids the vigilant and not those who slumber on their rights." *Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1090–91 (10th Cir. 2014)

15

(citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121–22 (2002)) (citation and internal quotation marks omitted).  By their own complaint, Plaintiffs have established a record of delay that belies their claims for emergency relief without any requirement to consider whether they are able to satisfy their burden as to the likelihood of success on the merits.  *See Archer*, 638 F. Supp. 3d at 1259.

Plaintiffs have not been diligent in asserting their claims.  For purposes of this motion, "the relevant delay is the period from when the plaintiff knew (*or should have known*) of the allegedly infringing conduct, until the initiation of the lawsuit."  *Jiron*, 762 F.3d at 1094 (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 949 (10th Cir. 2002)) (emphasis added).  As Plaintiffs' own admissions make clear, they (a) concluded as early as the 2023 season—a full year prior to the filing of this lawsuit—that an allegedly transgender woman played for SJSU's women's volleyball team, (b) discussed as early as the summer of 2024—months before the filing of this lawsuit, which included the preseason and the majority of the NCAA Division I women's volleyball championship season—refusing to play SJSU during the season that commenced as of August 30, 2024, (c) joined a lawsuit against the NCAA transgender-eligibility policies in September, (d) were urged to follow another school in protesting SJSU, and (e) knew by September 27, 2024, at the latest, that their forfeits against SJSU would be considered losses according to a policy reviewed by and voted upon by their schools consistent with MWC procedures.  *See supra*, at 6–9.  Yet Plaintiffs waited until two weeks before the

16

MWC championship to file their sprawling, multiparty complaint. And still they waited another two full days to seek preliminary relief—leaving the Defendants with limited time to respond and the Court just days to resolve this complex motion. Plaintiffs offer no explanation for their dilatory practices.

Nor is there any explanation that would reasonably satisfy the legal standard. Plaintiffs could easily have sought preliminary relief challenging SJSU's roster decisions in Spring 2024, when they assert that public reports hypothesizing about the gender identity of a player on an opposing team first surfaced. *See* App. 437–38 (Ray Decl. ¶¶ 24–25). And they could have challenged the MWC's forfeiture rules as early as September 27, 2024, when they say they became aware of them, despite the rules having been approved in August 2022 (at a time when some Plaintiffs were already playing in the MWC but did not object). *See id.* 462–63 (Van Kirk Decl.¶¶ 5–6). Rather than seek emergency relief before refusing to play games that had been on their competitive schedule long before the start of the season—or in the immediate aftermath of doing so—Plaintiffs did nothing for the entire season. Instead, they chose to forfeit contests against a player and a team that they had competed against in prior seasons without incident. They now contend they are legally entitled to have those forfeits wiped away because they have become unhappy with the foreseeable and fully transparent consequences of their decisions.

Plaintiffs' unexcused (and inexcusable) delay has severely prejudiced the Coach Kress. He must now respond to a sprawling multiparty complaint with over

a dozen claims and an associated preliminary injunction motion with more than 500 pages of supporting materials, including expert declarations, in just four days.[6]  *See Archer*, 638 F. Supp. at 1261–62 (holding that increased litigation burdens caused by delay are prejudicial).  Coach Kress must do so while coaching his team of fully eligible players during a critical stretch of the season.  With more time, Coach Kress and the CSU Defendants could have retained their own experts, interviewed additional witnesses, sought discovery from Plaintiffs (including depositions), and otherwise compiled a more complete record to rebut Plaintiffs' evidence of SJSU's purported advantage based on speculative and specious arguments.[7]

---

[6] Courts have held similarly short notice periods to violate due process, including in cases without such a voluminous record.  *E.g., Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1212 (11th Cir. 2003) (holding that a defendant did not have adequate notice of a preliminary injunction because "[t]he two day notice period provided insufficient time to read the pertinent documents, obtain and consult with counsel, and locate witnesses or obtain affidavits supporting Appellants' position").

[7] Because Coach Kress has had a very limited opportunity to gather responsive evidence that could rebut or otherwise test Plaintiffs' evidence—including Plaintiffs' expert declarations—Coach Kress would ask that the Court give Plaintiffs' supporting evidence little to no weight.  In particular, the Court should strike

More importantly, Plaintiffs' delay prejudices Coach Kress and his team in their MWC competition.  Had Plaintiffs brought and prevailed on a challenge earlier in the season, Coach Kress would have had the opportunity to fully brief and rebut the substantive allegations.  In the unlikely event that after full consideration, Plaintiffs prevailed in their substantive claims and different rules applied as a consequence, SJSU would have then had the opportunity to compete to win games and qualify for the tournament under a different set of eligibility rules than those that are currently in place for all NCAA Division I women's volleyball programs across the country.  *See Bos. Parent Coal. for Acad. Excellence Corp. v. School Comm.*, 996 F.3d 37, 50 (1st Cir. 2021) (denying injunction where it "would unsettle important expectations" that solidified while plaintiffs delayed); *Archer*, 638 F. Supp. 3d at 1262 (defendant prejudiced where he has already taken action in reliance on the status quo).  By delaying, Plaintiffs have ratcheted up the stakes of the litigation, such that if Plaintiffs prevail, Coach Kress and *all of the players on SJSU's team* will have functionally been denied the ability to compete in their

---

Plaintiffs' expert materials and exclude any expert testimony or evidence from the hearing.  If Plaintiffs seek relief against Coach Kress, he is prepared to file a formal motion to request that relief.  *See Four Seasons* Hotels, 320 F.3d at 1211.

conference this year.[8]  To be clear, the decision to participate—or not—has been at all times within the purview of the Plaintiffs.  Now that they are unhappy with the consequences of their actions under the established NCAA and MWC rules of play and their failure timely to address those rules as the law allows, they now seek retroactively to change the rules of the game to their advantage.

Another court in this district has held a nearly identical delay doomed a preliminary injunction on laches grounds.  In *Archer v. Griswold*, the court held that a candidate for office had not been diligent in pursuing his claims related to a November general election when he *could have been* aware of his basis for filing suit in February, actually became aware of the basis for filing suit in late June, filed suit in early September and did not move for preliminary relief until October 19—just 20 days before the election in question.  638 F. Supp. 3d at 1257.  Plaintiffs offer no explanation whatsoever for their longer delay that leaves even less time for Defendants to respond to this far more burdensome complaint and motion.

---

[8] Despite declaring an emergency, Plaintiffs did not seek relief that would affect the four regular-season games—including games against several of the Plaintiffs—that SJSU was scheduled to play after the complaint was filed, three of which were scheduled after Plaintiffs filed their motion.  This suggests they may be more interested in spoiling SJSU's season than competing in the manner they contend is required.

### 3. Plaintiffs Are Unlikely to Succeed on the Merits of Their Title IX Claim

#### (a) Plaintiffs Have No Title IX Claim Against Coach Kress

Plaintiffs' request for relief against Coach Kress is based on a claim that they do not and cannot assert against him. The only legal theory advanced against Coach Kress in the emergency motion is based on Title IX, but Plaintiffs' complaint does not actually assert a Title IX claim against him.[9] They name only the CSU Board of Trustees, the MWC, and the Commissioner as defendants for the Title IX claims. Compl. ¶¶ 633–58. Plaintiffs cannot avoid this pleading problem by asking for relief against Coach Kress in motion papers. *See, e.g.*, *Greystoke Condo. Ass'n, Inc. v. Westfield Ins. Co.*, No. 21-CV-03419-RM-SKC, 2022 WL 17547946, at *5 (D. Colo. Aug. 10, 2022) (Crews, J.) ("Plaintiff cannot amend its pleading through a response to the motion to amend."); *Abdulina v. Eberl's Temp. Servs., Inc.*, 79 F.

---

[9] The other legal claims in the emergency motion are the Equal Protection Clause and the First Amendment. There is no argument whatsoever in the motion that Plaintiffs are seeking emergency relief against Coach Kress (or any CSU Defendant) based on either of those claims. Nor could they: no Equal Protection Clause claim is alleged against Coach Kress, Compl. ¶¶ 634, 665, and the First Amendment allegations against Coach Kress have nothing to do with eligibility, *see* Compl. ¶¶ 720–39.

Supp. 3d 1201, 1206 (D. Colo. 2015) (Moore, J.) ("Plaintiff … cannot amend her complaint by adding factual allegations in response to [a] motion to dismiss.").

There is another, more fundamental reason why Plaintiffs could not assert a Title IX claim against Coach Kress: Title IX does not permit claims against individual school officials, period. "Title IX reaches institutions and programs that receive federal funds, . . . but it has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009); *see also Al-Rifai v. Willows Unified Sch. Dist.*, 469 F. App'x 647, 649 (9th Cir. 2012) ("Title IX does not create a private right of action against school officials, teachers, and other individuals who are not direct recipients of federal funding."); *Hartley v. Parnell*, 193 F.3d 1263, 1270 (11th Cir. 1999) ("Individual school officials . . . may not be held liable under Title IX."); *Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1018–19, 1021 (7th Cir. 1997) (Title IX claim could not proceed against "a supervisory official, either individually or officially"); *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 884 (1st Cir. 1988) (same). Plaintiffs' motion is entirely silent on this fatal problem.

> **(b)    Any Title IX Claim Would Fail as a Matter of Law**

Even if Plaintiffs could somehow clear all of the procedural hurdles to seeking relief against Coach Kress, they still could not show a likelihood of success under Title IX. This is because—under clear Tenth Circuit precedent—accepting Plaintiffs' Title IX theory would require ordering Defendants to violate both (a) Title

IX and (b) the Equal Protection Clause of the U.S. Constitution.  That means that Plaintiffs' interpretation of Title IX is wrong.  *See United States v. Brune*, 767 F.3d 1009, 1023 (10th Cir. 2014) ("[A]s between multiple reasonable interpretations of a statute, we will always prefer one that sustains constitutionality to one that does not under the presumption of constitutional validity."); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must . . . interpret the statute as a symmetrical and coherent regulatory scheme." (citation and internal quotation marks omitted)).

*First*, every player on the SJSU women's volleyball team is a woman eligible to compete under Title IX, the 14th Amendment of the Constitution, and all applicable NCAA rules, including those that reference outside competitive and eligibility standards such as the standards applied by USA Volleyball.

*Second*, even if a member of the SJSU women's volleyball team were determined to be a transgender woman, under Tenth Circuit law, Title IX prohibits discrimination against a person because they are transgender.  Title IX provides that "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  The Supreme Court has interpreted similar language in Title VII that prohibits discrimination "because of sex" to prohibit discrimination on the basis of transgender status.  *Bostock v. Clayton Cnty.*, 590 U.S. 644, 660 (2020).  In other

words, "it is impossible to discriminate against a person for being . . . transgender

without discriminating against that individual based on sex." *Id.* As Justice

Gorsuch reasoned, when an employer who fires a transgender woman, but "retains

an otherwise identical employee who was identified as female at birth, the employer

intentionally penalizes a person identified as male at birth for traits or actions that

it tolerates in an employee identified as female at birth." *Id.*

*Bostock*'s reasoning applies with equal force to Title IX. Under Tenth Circuit

law, courts "generally assess[] Title IX discrimination claims under the same legal

analysis as Title VII claims." *Gossett v. Okla. ex rel. Bd. of Regents for Langston

Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001)*; Throupe v. Univ. of Denver*, 988 F.3d

1243, 1250–51 (10th Cir. 2021). Plaintiffs erroneously contend, based on a lone

district court decision, that *Bostock* is limited to Title VII cases and that, as a

result, its reasoning uniquely does not apply in the Title IX context. *See* Mot. at 17

(citing *Kansas v. U.S. Dep't of Educ.*, No. 24-4041-JWB, 2024 WL 3273285, at *8 (D.

Kan. Jul. 2, 2024). But the Tenth Circuit had rejected that exact argument weeks

earlier and affirmed that *Bostock* stands for the broader proposition that

discrimination on the basis of transgender status is a form of sex-based

discrimination.[10] *Fowler v. Stitt*, 104 F.4th 770, 790 (10th Cir. 2024) (applying

---

[10] Plaintiffs rely on the same district court opinion for the proposition that "the term

'sex' means the traditional concept of biological sex in which there are only two

*Bostock*'s reasoning that discrimination on the basis of transgender status is a form of sex-based discrimination outside the Title VII context). Thus, just as Title IX prohibits institutions from denying a student-athlete the ability to participate in athletics because she is a woman, Title IX also prohibits institutions from denying a student-athlete the ability to participate in athletics because she is transgender.

But Plaintiffs' requested relief would do just that—bar an otherwise eligible, allegedly transgender student-athlete from participating in the MWC volleyball tournament "on the basis of sex." Plaintiffs cannot reasonably dispute that if any athlete in question were assigned female at birth, Plaintiffs would have no objection to her playing. Plaintiffs therefore engage in precisely the same kind of sex-based discrimination that Justice Gorsuch described in *Bostock*. 590 U.S. at 660. And

---

sexes, male and female." Mot. 17 (citing *Kansas*, 2024 WL 3273285 at *8). But as *Bostock* explains, defining "sex" as "biological sex" does not mean that discrimination on the basis of transgender status is not sex-based discrimination. In any event, Plaintiffs' "traditional concept" of biological sex ignores the existence of intersex people, i.e., individuals with one of "several conditions that create discrepancies between external and internal sex markers, which can produce XX males or XY females, or other chromosomal combinations such as XXY or XXX that affect overall sexual development," who are also protected by Title IX. *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 770 (7th Cir. 2023).

Plaintiffs cannot square Title IX's prohibition against discrimination on the basis of gender identity and transgender status with the conclusion that Title IX *requires* the exclusion of an allegedly transgender student-athlete. *See Brown & Williamson*, 529 U.S. at 133 (2000) (statute must be read harmoniously); *Fish v. Kobach*, 840 F.3d 710, 736 (10th Cir. 2016) (same).

*Third*, the Tenth Circuit squarely held earlier this year that the Equal Protection Clause prohibits discrimination against transgender individuals. *Fowler*, 104 F.4th at 790. In *Fowler*, the Tenth Circuit decided that *Bostock*'s "commonsense reasoning" is not limited to the employment context or to Title VII claims, and that discrimination on the basis of transgender status is therefore a form of sex-based discrimination under the Equal Protection Clause. *Id.* Plaintiffs ignore that holding of *Fowler* and instead invite the Court to rely on a single district court decision that limits *Bostock* to Title VII cases. Mot. at 17–18 (citing *Kansas*, 2024 WL 3273285, at *9). But, in this Court, the Tenth Circuit's view is what controls. Under Tenth Circuit law, accepting Plaintiffs' interpretation of Title IX would therefore require Coach Kress to prohibit otherwise eligible and qualified transgender athletes from membership on any of his teams and thereby violate the rights of these players under the Equal Protection Clause.[11] Again, that means that

---

[11] Other courts have held that blanket prohibitions on transgender athletes' participation in interscholastic athletics are unlawful discrimination under the

Plaintiffs' interpretation must be wrong. *See Brune*, 767 F.3d at 1023. Even "a serious doubt" that Plaintiffs' interpretation would be constitutionally permissible requires the Court not to adopt it. *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) (citation omitted).

Finally, even apart from the statutory interpretation problem, Plaintiffs' Title IX claims will fail because they cannot show that Coach Kress intentionally discriminated against any student-athlete on the basis of sex. Because Title IX does not permit private plaintiffs to bring claims for disparate-impact discrimination, Plaintiffs must establish discriminatory intent. *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001); *Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56, 75 (1st Cir. 2019). Plaintiffs offer no evidence that Coach Kress applied any criteria when selecting players for his roster other than selecting the best players who were eligible under NCAA rules—including, but not limited to, those that govern the eligibility of transgender athletes—to compete. Nor do Plaintiffs offer any record evidence indicating that Coach Kress acted with any intent to discriminate on the

---

Equal Protection Clause and Title IX. *See B.P.J. by Jackson v. W. Va. State Bd. of Educ.*, 98 F.4th 542, 561–63 (4th Cir. 2024); *Hecox v. Little*, 104 F.4th 1061, 1079–80 (9th Cir. 2024), *as amended* (June 14, 2024); *see also Tirrell v. Edelblut*, No. 24-CV-251-LM-TSM, 2024 WL 4132435, at *6–17 (D.N.H. Sept. 10, 2024).

basis of sex.[12]  California and Ninth Circuit law also specifically prohibit discrimination based on gender identity.  *See* Cal. Educ. Code. §§ 66250-66292.4; *Hecox v. Little*, 104 F.4th 1061, 1089 (9th Cir. 2024).

In sum, there is no basis to conclude that Plaintiffs are likely to succeed on their Title IX claim—and several independently sufficient reasons to conclude they are not.  The motion should be denied on that basis alone.

**B.**    **The Equitable Factors Weigh Heavily Against an Injunction**

**1.**    **Plaintiffs Have Not Demonstrated Any Irreparable Harm**

Plaintiffs' motion for extraordinary relief must fail for yet another independent reason: Plaintiffs cannot demonstrate that they will suffer any irreparable harm absent an injunction.  "Because a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary

---

[12] This is one of many ways this case is distinguishable from *Soule v. Connecticut Association of Schools, Inc.*, 2024 WL 4680533 (D. Conn. Nov. 5, 2024).  There the court held that  application of federal policies permitting transgender girls to compete in high school girls sports was a facially neutral, nondiscriminatory explanation for transgender girls' inclusion.  The court then went on to hold that the plaintiffs had nevertheless *pleaded* discriminatory intent because they had alleged that the defendants "regarded girls' sports as relatively unimportant compared to boys' sports."  *Id.* at *18.  There is no similar record evidence here.

injunction, the moving party must first demonstrate that such injury is likely before the other requirements will be considered." *Hirschfeld*, 912 F.3d at 1270 (alteration adopted) (citation and internal quotation marks omitted). "The party seeking a preliminary injunction faces a high bar—to constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1251 (10th Cir. 2017) (alteration adopted) (citation and internal quotation marks omitted); *see also Malamed*, 874 F.3d at 1141 ("Demonstrating irreparable harm is 'not an easy burden to fulfill.'" (quoting *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003))). Plaintiffs' threadbare assertions of injury here fail for two independent reasons. *First*, Plaintiffs' inexcusable delay in bringing this motion proves that emergency relief is unwarranted. *Second*, Plaintiffs' alleged safety and fairness harms are entirely speculative and without factual support.

> (a)    *Plaintiffs' Inexcusable Delay Forecloses Injunctive Relief*

Plaintiffs cannot show irreparable harm because of their lack of diligence. *See Benisek v. Lamone*, 585 U.S. 155, 159–60 (2018). Plaintiffs' "unnecessary . . . delay" in seeking relief has created a manufactured crisis. *See id.* at 160. Courts "do not lightly grant emergency relief, especially where the emergency is largely one of plaintiff's own making and the relief sought would interfere with processes on which many others have reasonably relied." *Bos. Parent Coal.*, 996 F.3d at 50 (alteration adopted) (citation and internal quotation marks omitted); *see also RoDa*

*Drilling Co. v. Siegal*, 552 F.3d 1203, 1211 (10th Cir. 2009) ("delay in seeking preliminary relief cuts against finding irreparable injury" (citation omitted)). Plaintiffs' lengthy delay in seeking preliminary injunctive relief here is fatal to their request. *See Colo. Motor Carriers Ass'n v. Town of Vail*, No. 23-CV-02752-CNS-STV, 2023 WL 8702074, at *12 (D. Colo. Dec. 15, 2023) ("Courts in both this jurisdiction and others have uniformly determined that a movant's delay in seeking injunctive relief warranted the relief's denial.").

To decide whether a delay undercuts claimed harm, the Tenth Circuit looks to whether the "delay [1] was reasonable, [2] was not a decision by the party to 'sit on its rights,' and [3] did not prejudice the opposing party." *Kobach*, 840 F.3d at 753. Delay can undercut even claims of irreparable harm caused by constitutional violations. *See Archer v. Griswold*, 638 F. Supp. 3d 1246, 1261 (D. Colo. 2022).

Here, all three considerations weigh against Plaintiffs. As already explained, Plaintiffs' delay in seeking injunctive relief is lengthy and unexcused. *See supra*, at 15–17 (discussing laches defense); *see also Archer*, 638 F. Supp. 3d at 1261 (finding same facts to trigger laches defense and to undercut a finding of irreparable harm).

On the second factor, Plaintiffs' delay cuts against irreparable harm because the delay was not caused by some other party. *See Archer*, 638 F. Supp. 3d at 1261. It is apparent that Plaintiffs decided to sit on their rights. No Defendant interfered with Plaintiffs' ability to pursue these claims, and Plaintiffs were not otherwise precluded from initiating this lawsuit or filing this motion earlier. *Id*. at 1261

(delay is presumed intentional when no other party plays a role in plaintiff's decision-making). And there is no evidence in the record that suggests Plaintiffs were otherwise engaged in a good faith effort to resolve their claims without legal action until a few days before they filed when they sent emails asking Defendants to agree to all the relief Plaintiffs sought. *Cf. RoDa Drilling*, 552 F.3d at 1212 (excusing delay because of parties' efforts to informally resolve their dispute).

Third, as previously explained, *supra*, at 17–20, Plaintiffs' delay strategy prejudices Coach Kress in two ways: First, he has between one and four days to respond to almost 700 pages of materials, including a 128-page complaint and approximately 600 pages of preliminary injunction materials that include multiple expert reports. Plaintiffs' delay has created an unnecessary emergency that deprives Coach Kress a meaningful opportunity to litigate these issues. *See supra*, at 17–20 (discussing prejudice in the context of laches); *see also Archer*, 638 F. Supp. 3d at 1261–62 (holding that shortened timelines causing increased litigation burdens are prejudicial). Second, as already discussed in the context of laches, SJSU's women's volleyball team and Coach Kress have relied on the eligibility of the entire team to play all season in accordance with the NCAA and MWC rules. *See Bos. Parent Coal.*, 996 F.3d at 50; *Archer*, 638 F. Supp. 3d at 1262. Granting Plaintiffs' late-breaking relief would functionally erase SJSU's season, which could have been avoided had Plaintiffs timely pursued their case and this relief.

> (b)    *Plaintiffs' Asserted Harms Are Purely Speculative*

Plaintiffs' concerns about a supposed lack of "competitive fairness," *see, e.g.*, App. 446 (Ray Decl. ¶ 80), are purely hypothetical and based on speculative claims that are not factually tied to any player on the SJSU team. Depending on the outcomes of the games remaining in this season, Plaintiffs' request to rewrite their teams' wins and losses *might have no effect whatsoever* on the composition of the MWC tournament. *See* Heckenlively Decl. ¶¶ 3-7. The purported harm of being excluded from the MWC tournament is therefore inherently uncertain. Moreover, the existing MWC player-eligibility rules in no way guarantee that SJSU will win any games in the tournament. Indeed, Plaintiff Kaylie Ray boasts that she and her team beat SJSU in the 2022 MWC tournament while the allegedly transgender student athlete was on the roster. *See* App. 436–37 (Ray Decl. ¶¶ 17–20). For all these reasons, any purported harm based on the outcomes of the remaining games in the season or the outcome of the MWC tournament is far too speculative to justify relief.

### 2. The Balance of the Equities Weighs Overwhelmingly Against an Injunction

In light of Plaintiffs' nonexistent showing of harm, the balance of the equities weighs heavily against granting the injunction. As already explained, Plaintiffs delayed bringing suit and, in doing so, greatly increased the harm an injunction would cause Coach Kress and SJSU student-athletes. Awarding Plaintiffs' injunction and reversing the outcomes of forfeited games would unfairly penalize a team full of SJSU student athletes who competed all season pursuant to the MWC's

rules and qualified for the MWC tournament. A disqualification remedy would be especially harmful to the allegedly transgender student athlete, who is eligible under NCAA and MWC rules and has competed for nearly four years in intercollegiate volleyball without challenge, including in games against Plaintiffs.

An injunction would be especially inequitable given the jurisdictional problems with this lawsuit. The only Defendants with Colorado contacts are the MWC and Commissioner Nevarez, but neither of them is bound by Title IX, the First Amendment, or the Equal Protection Clause, as they likely explain in their brief. It is not equitable for a court of equity in Colorado to issue a remedy with no available cause of action against the only Defendants with ties to the state.[13]

### 3. An Injunction Is Not in the Public Interest

Finally, Plaintiff's injunction is adverse to the public interest. The public benefits from consistent and effective policies governing collegiate athletics. *See Hecox*, 104 F.4th at 1089; *Butler v. NCAA*, No. 06-2319-KHV, 2006 WL 2398683, at *4 (D. Kan. Aug. 15, 2006) ("It is in the public interest to allow voluntary athletic associations to determine and enforce their rules without judicial interference."). Here, the NCAA has issued guidance on transgender student-athlete eligibility, consistent with the eligibility rules followed by national sports governing bodies and

---

[13] Of course, there is no viable cause of action against Coach Kress either, so there is no need for the Court even to reach this balance of the equities.

33

the U.S. Olympics and Paralympics.  Conferences, schools, and student-athletes around the country have relied on that guidance for more than two years.  Plaintiffs now ask this Court effectively to declare that the NCAA eligibility rules and USA Volleyball eligibility rules are illegal under federal law—in a case where neither of those entities is even a party.

## V.   **CONCLUSION**

Plaintiffs' request for emergency relief should be denied.

Respectfully submitted this 19th day of November 2024,

MUNGER, TOLLES & OLSON LLP

*/s/ Bryan H. Heckenlively*

Bryan H. Heckenlively
Jennifer L. Bryant
Helen E. White
560 Mission Street
San Francisco, CA 94105
(415) 512-4000
bryan.heckenlively@mto.com

Attorneys for Defendants Board of Trustees of The California State University, Laura Alexander, Todd Kress, and Michelle Smith McDonald

## Certification Regarding the Use of Artificial Intelligence

I certify that no portion of this filing was drafted by artificial intelligence.

/s/ Bryan H. Heckenlively
Bryan H. Heckenlively