IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge S. Kato Crews

Civil Action No. 1:24-cv-03155-SKC-MDB

BROOKE SLUSSER, *et al.*,

      Plaintiffs,

 v.

THE MOUNTAIN WEST CONFERENCE, *et al.*,

      Defendants.

---

## ORDER

Before the Court are two Motions to Dismiss Plaintiffs' Amended Complaint (Dkt. 78) and Strike Class Allegations: (1) the MWC Defendants'[1] Motion to Dismiss and Strike Class Allegations (Dkt. 96)[2], and (2) the CSU Defendants'[3] Motion to

---

[1] The "MWC Defendants" include the Mountain West Conference (MWC) and Gloria Nevarez.

[2] The MWC Defendants filed their original Motion to Dismiss at Dkt. 95, and then filed a Corrected Motion to Dismiss at Dkt. 96. The Court accepted the corrected version, *see* Dkt. 99; therefore, the Court will reference Dkt. 96 as the Motion to Dismiss throughout this Order.

[3] The "CSU Defendants" include the Board of Trustees of the California State University (CSU Board), Dr. Stephen Perez, the former President of San Jose State University (SJSU), Dr. Cynthia Teniente-Matson, the current SJSU President, Jeffrey Konya, the Director of Athletics at SJSU, and Todd Kress, the head coach of the SJSU women's volleyball team.

Dismiss and Strike Class Allegations (Dkt. 94). Plaintiffs filed a Consolidated
Response (Dkt. 102), and the MWC and CSU Defendants Replied (Dkts. 103 and 104).
No hearing is necessary. For the reasons shared below, the MWC Defendants' Motion
to Dismiss is GRANTED. The CSU Defendants' Motion to Dismiss is GRANTED in
part. The Motion to Strike Class Allegations is DENIED.

### FACTUAL BACKGROUND

The Court's ruling in this case largely turns on legal doctrines such as
mootness, qualified immunity, and standing, among others. Accordingly, the facts on
which the merits of this case rest are not outcome determinative of the Motions to
Dismiss. The Court therefore provides a brief summation of the facts as background
without detailing the alleged facts with respect to each Count in the Amended
Complaint. To the extent other facts are necessary to the Court's analysis, they are
discussed in the relevant analysis section.

Plaintiffs are eight women's collegiate volleyball players who played in the
MWC's 2024 season and three former SJSU women's volleyball players. Dkt. 78,
¶¶29–39. They seek relief against the MWC and CSU Defendants for various alleged
violations of Title IX and the Constitution based on SJSU's decision to roster an
allegedly transgender woman. Plaintiffs also seek to represent two proposed classes:
(1) MWC women's volleyball student-athletes who competed in the MWC during one
or more of the 2022, 2023, and/or 2024 seasons, and (2) MWC women's volleyball

student-athletes who competed on teams that were assigned forfeits during the 2024

season. *Id.* ¶746.

There are ten Counts in the case, asserted by various Plaintiffs and against

various Defendants. For ease of reference, the below chart lays out the Counts:

| Count | Brought by Whom | Against Whom |
|---|---|---|
| Count I: Title IX Deprivation of Equal Opportunities and Bodily Privacy | Slusser, Sugai, Patterson, Ray, Clarke, Liilii, Boggs, Grizzle, Sandy, and the Van Kirks | MWC and CSU Board |
| Count II: Title IX Deprivation of Equal Opportunities and Bodily Privacy under 42 U.S.C. § 1983 | Slusser, Sugai, Patterson, Ray, Clarke, Liilii, Boggs, Grizzle, Sandy, and the Van Kirks | MWC, Commissioner Nevarez in her official capacity, Former President Stephen Perez, President Cynthia Teniente-Matson, Director Konya, and Coach Kress in their individual capacities, and President Cynthia Teniente-Matson and Director Konya in their official capacities |
| Count III: Deprivation of Equal Opportunities under the Fourteenth Amendment Equal Protection Clause under 42 U.S.C. § 1983 | Slusser, Sugai, Patterson, Ray, Clarke, Liilii, Boggs, Grizzle, Sandy, and the Van Kirks | MWC, Commissioner Nevarez in her official capacity, Former President Stephen Perez, President Cynthia Teniente-Matson, Director Konya, and Coach Kress in their individual capacities, and President Cynthia Teniente-Matson and Director Konya in their official capacities |
| Count IV: Title IX Retaliation | Slusser | CSU Board |

3

| Count V: Equal Protection Clause Violation 42 U.S.C. § 1983 (Facial, As-Applied, Purposeful Discrimination Challenge to the MWC TPP) | Slusser, Ray, Clarke, Liilii, Boggs, Grizzle, Sandy, and the Van Kirks | MWC and Commissioner Nevarez |
|---|---|---|
| Count VI: Fourteenth Amendment Bodily Privacy Violations under 42 U.S.C. § 1983 | Slusser, Patterson, and Sugai | MWC, Commissioner Nevarez in her official capacity, Former President Perez, President Teniente-Matson, Director Konya, and Coach Kress in their individual capacities, and President Cynthia Teniente-Matson and Director Konya in their official capacities |
| Count VII: Facial First Amendment Violation for Punishing Boycotts under 42 U.S.C. § 1983 | Slusser, Ray, Clarke, Liilii, Boggs, Grizzle, Sandy, and the Van Kirks | MWC and Commissioner Nevarez in her official capacity |
| Count VIII: As-Applied First Amendment Violation for Punishing Boycotts under 42 U.S.C. § 1983 | Slusser, Ray, Clarke, Liilii, Boggs, Grizzle, Sandy, and the Van Kirks | MWC and Commissioner Nevarez in her official capacity |
| Count IX: First and Fourteenth Amendment Violation for Viewpoint Discrimination under 42 U.S.C. § 1983 | Slusser, Ray, Clarke, Liilii, Boggs, Grizzle, Sandy, and the Van Kirks | MWC and Commissioner Nevarez in her official capacity |
| Count X: First and Fourteenth Amendment Violation for Viewpoint Discrimination under 42 U.S.C. § 1983 | Slusser | Coach Kress in his individual capacity |

### A.    The MWC TPP

The MWC is a collegiate athletic conference comprised of 14 colleges and universities, 11 of which have NCAA Division I women's volleyball programs. *Id.* ¶¶58–59. The MWC requires members institutions to comply with NCAA rules and conducts MWC competitions under NCAA regulations. *Id.* ¶¶157–60. During the relevant time period, the NCAA had a Transgender Eligibility Policy (TEP) that allowed a transgender woman who wished to participate in women's sports to do so if she could undergo a full year of testosterone suppression and show that her testosterone levels were below a certain sport-specific threshold. *Id.* ¶194.

In August 2022, the MWC Board of Directors adopted a Transgender Participation Policy (TPP), which was unanimously ratified by the Athletic Directors of the applicable MWC member institutions. *Id.* ¶¶481–85. The TPP implemented the NCAA's TEP which permitted transgender athletes to participate in MWC athletics. *Id.* ¶¶310, 473. The TPP established that "[t]he decision as to whether a transgender athlete(s) will be permitted to participate in intercollegiate athletics for a particular MW member shall be a matter of that individual institution's discretion in the context of its interaction with the individual, the application of state law, etc." *Id.* The TPP also penalized teams who refused to play an MWC team who rostered an eligible transgender athlete. *Id.* It states:

> If a MW member institution's team refuses to compete in an intraconference contest against a fellow MW member institution's team which includes an eligible transgender student-athlete(s), the team refusing to participate shall be deemed to have forfeited the contest. The

forfeiting team will be charged with a loss and the opposing team credited with a win – for the purposes of Conference records, standings, tie-breaking formulas and MW championships participation.

*Id.*

### B.    The 2024 MWC Women's Volleyball Season

Plaintiffs allege that, beginning with the 2022 season, SJSU rostered an allegedly transgender woman on its women's volleyball team.[4] *Id.* ¶304. Yet it was not until 2024 that reports surfaced online regarding the allegedly transgender player's status. *Id.* ¶395. After the allegedly transgender player's gender identity became public, teams in the MWC began forfeiting their matches against SJSU. *Id.* ¶423.

On September 14, 2024, Southern Utah University, a non-MWC school, withdrew from its match against SJSU. *Id.* ¶431. On September 27, Boise State announced it would not play SJSU in the match scheduled for September 28. *Id.* ¶455. It issued a press release stating: "Boise State volleyball will not play its scheduled match at San Jose State on Saturday, Sept. 28. Per Mountain West Conference Policy, the Conference will record the match as a forfeit and a loss for Boise State. The Broncos will next compete on Oct. 3 against Air Force." *Id.* ¶457. Next, the University of Wyoming confirmed to the MWC that the women's volleyball team would not play its match against SJSU scheduled for October 5, in protest of SJSU's alleged

---

[4] The allegedly transgender player's first year of eligibility was 2021, thus, she has no remaining eligibility. Dkt. 78, ¶304.

transgender teammate. *Id.* ¶719. The University of Wyoming acknowledged the forfeit would be recorded as a loss per MWC policy. *Id.* ¶720., Utah State University followed suit and declined to play its match against SJSU on October 23, resulting in the MWC applying the TPP and assigning USU a loss and SJSU a win. *Id.* ¶¶722–23. University of Nevada, Reno, forfeited its game on October 25 and Boise State forfeited its November 21 game. *Id.* ¶¶724–27. Each time, the TPP applied and assigned losses to the forfeiting teams and wins to SJSU. *Id.*

## C.    The NCAA Adopts a New Policy

On February 6, 2025, the NCAA adopted a new participation policy for transgender student-athletes.[5] Dkt. 78-4. The new policy forbids a "student-athlete assigned male at birth" from competing on a women's team. *Id.* According to the policy, "sex assigned at birth" is defined as the "male or female designation doctors assign to infants at birth, which is marked on their birth records." *Id.* There is no specific indication from any Defendant that the TPP has been rescinded in light of the new NCAA policy, nor has any Defendant argued as much; but Plaintiffs do allege that the "MWC currently adheres to the revised NCAA TEP." *Id.* ¶312; Dkt. 102, ECF p.63.

---

[5] Plaintiffs contend that the new policy still violates Title IX and the Fourteenth Amendment. Dkt. 78, ¶243.

## LEGAL PRINCIPLES

### A.    Motion to Dismiss

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." *See* Fed. R. Civ. P. 12(b)(6). In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124–25 (10th Cir. 2010) (internal citations omitted). But the Court is not "bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (cleaned up).

The Twombly/Iqbal pleading standard first requires the court to identify which allegations "are not entitled to the assumption of truth" because, for example, they state legal conclusions or merely recite the elements of a claim. *Id.* at 679. It next requires the court to assume the truth of the well-pleaded factual allegations "and determine whether they plausibly give rise to an entitlement to relief." *Id.* In this analysis, courts "disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Khalik v.*

*United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012). The standard is a liberal one, however, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely." *Dias v. City and Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quoting *Twombly*, 550 U.S. at 556).

## B.   Motion to Strike

Rule 12(f) "provides that a court 'may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.'" *Sierra Club v. Tri-State Generation and Transmission Ass'n, Inc.*, 173 F.R.D. 275, 285 (D. Colo. 1997) (quoting Fed. R. Civ. P. 12(f)). "Rule 12(f) motions, however, are a generally-disfavored, drastic remedy." *Id.* (citations omitted). This is even more so with respect to motions to strike class allegations, as here. *Friedman v. Dollar Thrifty Auto. Grp., Inc.*, No. 12-cv-02432-WYD-KMT, 2013 WL 5448078, at *2 (D. Colo. Sept. 27, 2013). Accordingly, Defendants must demonstrate from the face of the complaint "that it will be *impossible* to certify the classes alleged by plaintiffs regardless of the facts the plaintiffs may be able to prove." *Ramsay v. Frontier, Inc.*, No. 19-cv-03544-CMA-NRN, 2021 WL 651021, at *7 (D. Colo. Feb. 19, 2021) (citing *Francis v. Mead & Johnson Co.*, No. 10-cv-00701-JLK, 2010 WL 3733023, at *1 (D. Colo. Sept. 16, 2010)) (emphasis in original).

## ANALYSIS & FINDINGS

### A.    The MWC Defendants' Motion to Dismiss

The MWC Defendants seek to dismiss all Counts against them under Rule 12(b)(6). For the reasons shared below, this Court finds that the MWC and Nevarez are not state actors, and therefore, and are not subject to Title IX. Thus, the MWC Defendants Motion to Dismiss is granted in full. Because of the Court's holding with respect to these issues, the Court need not address the MWC's arguments on the merits.

### 1.  The MWC Defendants are not State Actors

The MWC Defendants argue that all Counts against them should be dismissed because they are not state actors, which is required for Section 1983 claims. Dkt. 96, ECF p.12. They rely on the Supreme Court's decision in *NCAA v. Tarkanian*, 488 U.S. 179 (1988) and argue that there, the "Supreme Court [ ] addressed the state action doctrine in the context of multistate educational athletic conferences." *Id.* at ECF pp.13–15. Plaintiffs disagree and argue that the Supreme Court's analysis in *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001) should apply. Dkt. 102, ECF pp.58–60.

"Section 1983 permits suits against persons who, acting under the color of state law, deprive a United States citizen of his constitutional rights." *Kirchner v. Marshall*, No. 20-cv-00114-MEH, 2021 WL 243448, at *6 (D. Colo. Jan. 25, 2021) (citing *Boutwell v. Keating*, 399 F.3d 1203, 1208 (10th Cir. 2005)). Accordingly, a

prerequisite to any relief is that the defendant is a state actor. *Id.* (citing *Nagy v. Spence*, 172 F. App'x 847, 848 (10th Cir. 2006)). "Whether a defendant acts under color of state law is a legal determination to be made by the court." *O'Connor v. Williams*, 640 F. App'x 747, 750–51 (10th Cir. 2016) (citing *Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1270–71 (10th Cir. 1989)).

The determination in this case involves the Court's interpretation of the two Supreme Court cases the Parties cited, *Tarkanian* and *Brentwood*. In *Tarkanian*, the head basketball coach of UNLV, Jerry Tarkanian, sued the NCAA under 42 U.S.C. § 1983 and alleged he had been deprived of due process under the 14th Amendment. *Tarkanian*, 488 U.S. at 181. The Supreme Court considered whether the NCAA's conduct constituted state action. *Id.* at 181–82. The Court framed the question as "not whether UNLV participated to a critical extent in the NCAA's activities, but whether UNLV's actions in compliance with the NCAA rules and recommendations turned the NCAA's conduct into state action." *Id.* at 193. Of course, the Supreme Court found that the state of Nevada "had some impact on the NCAA's policy determinations," but critically

> [T]he NCAA's several hundred other public and private member institutions each similarly affected those policies. Those institutions, the vast majority of which were located in States other than Nevada, did not act under color of Nevada law. It necessarily follows that the source of the legislation adopted by the NCAA is not Nevada but the collective membership, speaking through an organization that is independent of any particular state.

*Id.*

11

The Supreme Court considered that there might be state action despite this "if UNLV, by embracing the NCAA's rules, transformed them into state rules and the NCAA into a state actor." *Id.* at 194. But the Court found that UNLV retained authority to withdraw from the NCAA or stay in the NCAA and amend the rules and standards it considered harsh or unfair. *Id.* at 194–95. Ultimately, "UNLV's decision to adopt the NCAA's standards nor its minor role in their formulation is a sufficient reason for concluding that the NCAA was acting under color of Nevada law when it promulgated standards governing athlete recruitment, eligibility, and academic performance." *Id.*

Next, the Court addressed Tarkanian's argument that UNLV delegated its power to the NCAA. *Id.* at 195. While a delegation of power to a private party might make that party a state actor, in *Tarkanian* it did not because "UNLV delegated no power to the NCAA to take specific action against any university employee. The commitment by UNLV to adhere to NCAA enforcement procedures was enforceable only by sanctions that the NCAA might impose on UNLV itself." *Id.* at 195–96.

In concluding that the NCAA was not a state actor, the Court was careful to note that "[t]he situation would, of course, be different if the membership consisted entirely of institutions located within the same State, many of them public institutions created by the same sovereign." *Id.* at 193 n.13. This situation played out in *Brentwood*, which Plaintiffs cite in support of their position.

In *Brentwood*, the Supreme Court considered whether the Tennessee Secondary School Athletic Association, a non-profit membership corporation organized to regulate interscholastic sports in Tennessee, was a state actor. *Brentwood*, 531 U.S. at 291. It stated that state action "may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Id.* at 295 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)). The Court considered *Tarkanian*, and summarized its actions therein as follows:

> We could see, on the one hand, that the university had some part in setting the NCAA's rules, and the Supreme Court of Nevada had gone so far as to hold that the NCAA had been delegated the university's traditionally exclusive public authority over personnel. But on the other side, the NCAA's policies were shaped not by the University of Nevada alone, but by several hundred member institutions, most of them having no connection with Nevada, and exhibiting no color of Nevada law. Since it was difficult to see the NCAA, not as a collective membership, but as surrogate for the one State, we held the organization's connection with Nevada too insubstantial to ground a state-action claim.

*Id.* at 297–98 (internal citations omitted).

The Court then noted the distinction *Tarkanian* made "with an organization whose member public schools are all within a single State," and held the private character of the Tennessee Association was "overborne by the pervasive entwinement of public institutions and public officials in its composition and workings." *Id.* at 298. Critically, 84% of the Tennessee Association were public schools who were represented by officials acting in their official capacity and who "perform all by the

purely ministerial acts by which the Association exists and functions in practical terms." *Id.* at 299–300.

Here, this Court finds the analysis in *Tarkanian* to be on point. Like the NCAA, the MWC is a Colorado non-profit corporation comprised of 14 public and private universities spread across nine states. Dkt. 78, ¶40; Dkt. 96, ECF p.14. The MWC Board members, which consists of Presidents of the MWC universities, voted unanimously to adopt the TPP.[6] Dkt. 78, ¶¶478–81. The Athletic Directors from each university ratified the TPP and it became an official MWC policy. *Id.* ¶¶483–85. It was the member institutions, however, who were required to "enforce eligibility rules and regulations of the NCAA and the Conference." Dkt. 78-1, p.28.[7] And "[i]f a *member institution* fails to apply the provisions of the Conference Handbook, the *institution* is deemed to be in violation of the Conference rules and shall be subject to the Conference enforcement procedures." *Id.* (emphasis added).

At no point do Plaintiffs identify any specific state which might be the state actor for purposes of their claim. Yet they argue that there is pervasive entwinement because presidents and actors from state universities generally adopted and ratified

---

[6] The President of the United States Air Force Academy was unable to participate in the vote. Dkt. 78, ¶480.

[7] Plaintiffs attached the MWC 2024-25 Handbook and Bylaws to their Amended Complaint, which the Court considers in ruling on the Motions to Dismiss. *See Free Speech v. Fed. Election Comm'n*, 720 F.3d 788, 792 (10th Cir. 2013) ("In evaluating a Rule 12(b)(6) motion to dismiss, courts may consider not only the complaint itself, but also attached exhibits, and documents incorporated into the complaint by reference.").

the TPP. Dkt. 102, ECF pp.59–60. Plaintiffs argue that "entwinement with multiple state actors does not weaken the argument for finding the MWC a state actor; rather, it strengthens it." *Id.* at ECF p.60. But how can there be "known and definite" state action across nine states? *See id.* Supreme Court precedent makes clear there cannot be. And this Court will not extend the meaning of state action to include actions that come from a collective membership, rather than from one state.

In addition, like the NCAA, the member institutions here did not delegate their power to the MWC. Member institutions retained authority to withdraw from it; or they could stay in it and revoke the TPP through the legislative process. Lastly, if a member institution fails to abide by MWC rules, they are the ones subject to enforcement procedures, not the individual Plaintiffs party to this lawsuit. For these reasons, the Court finds the MWC is not a state actor.

Defendant Nevarez argues she is not a state actor because the MWC is not a state actor. Dkt. 96, ECF p.15. Plaintiffs argue that Nevarez's job is to execute MWC policy, which is "made by the collective decision of multiple state actors." Dkt. 102, ECF p.60 n.19. The Court has articulated that a state actor cannot be contrived from a collective membership that involves multiple states. Thus, the Court finds that because the MWC is not a state actor, Defendant Nevarez, as Commissioner of the MWC, cannot be a state actor either.

The MWC Defendants' Motion to Dismiss as to Counts II, III, V, VI, VII, VIII, and IX is GRANTED. The MWC Defendants also seek dismissal of Count I on this

basis, but Count I is a Title IX claim and is not made under 42 U.S.C. § 1983. Accordingly, this Count can be dismissed only if the MWC Defendants are not subject to Title IX. The Court precedes to that analysis below.

### 2. The MWC is not Subject to Title IX

First, the Court notes that the MWC Defendants argue that Defendant Nevarez is not subject to Title IX with respect to Count II, but because the Court dismissed Count II above, it need not address the arguments related to her. Accordingly, the Court only considers whether the MWC is subject to Title IX with respect to Count I. The MWC argues that it is not subject to Title IX because it does not receive federal funding.[8] Dkt. 96, ECF p.16. Plaintiffs argue that the MWC receives (1) indirect federal financial assistance and/or (2) has controlling authority over its member institutions who are federally funded. Dkt. 102, ECF p.52.

Title IX provides that no person shall, "on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). A "program or activity" includes "all of the operations of . . . a college,

---

[8] The MWC also asserts it does not meet the definition of "educational institution" or "program or activity" as required by Title IX. Dkt. 96, ECF p.16. As defined by the Civil Rights Restoration Act of 1987, a "program or activity" includes "all of the operations of . . . a college, university, or other postsecondary institution, or a public system of higher education . . . any part of which is extended Federal financial assistance." 20 U.S.C. § 1687(2)(A). "Intercollegiate athletics is an educational program or activity within the statute." *Smith v. NCAA*, 266 F.3d 152, 155 n.3 (3d Cir. 2001). And colleges and universities are clearly educational institutions. Thus, the MWC is subject to Title IX provided it receives federal financial assistance.

university, or other postsecondary institution, or a public system of higher education
. . . any part of which is extended Federal financial assistance." 20 U.S.C. § 1687(2)(A).
"In most Title IX cases, the plaintiff attempts to demonstrate that the defendant is
either a direct or indirect recipient of federal funds." *Cmtys. for Equity v. Mich. High
Sch. Athletic Ass'n*, 80 F. Supp. 2d 729, 732 (W.D. Mich. 2000) (citing *NCAA v. Smith*,
525 U.S. 459 (1999) (hereinafter *Smith I*). Yet the Supreme Court has left open the
possibility that a party can also be subject to Title IX if it cedes control over a program
or activity that receives federal financial assistance. *Id.*

In *Smith I*, the Supreme Court considered whether the NCAA was subject to
Title IX because it received dues from members who received federal financial
assistance. As the Court stated, "there is no allegation that NCAA members paid
their dues with federal funds earmarked for that purpose. At most, the Association's
receipt of dues demonstrates that it indirectly benefits from the federal assistance
afforded its members." *Smith I*, 525 U.S. at 468. The Court left open the possibility
that the NCAA might be subject to Title IX on two alternative theories: (1) whether
the NCAA receives indirect federal financial assistance, or (2) whether a federal
funding recipient ceded controlling authority to the NCAA. *Id.* at 469–70. Plaintiffs
argue that the MWC is subject to Title IX based on these theories. Dkt. 102, ECF
p.52.

As for the first theory, the Supreme Court has held that "[e]ntities that *receive*
federal assistance, whether directly or through an intermediary, are recipients within

17

the meaning of Title IX; entities that only *benefit economically* from federal assistance are not." *Smith I*, 525 U.S. at 468 (emphasis added). To distinguish between entities that are recipients from those that only benefit economically, courts look to the underlying grant statute to determine (1) whether Congress intended the institution to receive federal funds, and (2) whether the institution has the power to opt out of receiving the funds." *Doe v. League Sch. of Greater Bos., Inc.*, No. 16-cv-11940-IT, 2017 WL 3594257, at *3 (D. Mass. Aug. 21, 2017) (citing *Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 604, 606–07 (1986)). Under Title IX, "Congress enters into an arrangement in the nature of a contract with the recipient of funds." *Paralyzed Veterans*, 477 U.S. at 605. Thus, "[b]y limiting coverage to recipients, Congress imposes the obligations of [Title IX] upon those who are in a position to accept or reject those obligations as a part of the decision whether or not to 'receive' federal funds." *Id.* at 106. In sum, whether the MWC is an indirect recipient of federal financial assistance depends on "the intent of those government agencies that grant money" as well as the MWC's ability to "control decisions made with respect to that money, the most important decision of which is whether the grant money should be accepted at all." *Bowers v. NCAA*, 118 F. Supp. 2d 494, 528 (D.N.J. 2000).

Plaintiffs assert that the MWC receives indirect federal financial assistance through its right to control the Air Force Academy's media rights. Dkt. 102, ECF p.53; Dkt. 78, ¶122. In support, they rely on *Smith v. NCAA* (*Smith II*) and *Bowers*, both of which analyzed whether the NCAA received indirect financial assistance through its

control of the National Youth Sports Program Fund (NYSPF). In *Bowers*, the court noted that the NCAA was responsible for the administration of the program (for which the NYSPF paid one dollar per year); it also observed the NYSPF had no employees and had never had any, the NYSPF's address was the same as the NCAA's, and the NCAA had the ability to significantly influence how the NYSPF's federal funding was spent because it had NCAA personnel in management positions. *Bowers*, 118 F. Supp. 2d at 528–29. Given its involvement, the court found that there was a genuine issue of material fact as to whether the NCAA was an indirect recipient of federal funds. *Id.* at 530; *see also Smith II*, 266 F.3d at 162–63 (same).

The amount of control the NCAA has over the NYSPF and its ability to control the decisions made with respect to that money differs greatly from the MWC's role in the Air Force Academy's media rights. As Defendant notes, the MWC sells the media rights to networks, which generate net revenues that are distributed back to MWC members. DKt. 78-1, p.118. What the Air Force Academy chooses to do with the revenues after it is distributed to them is not determined by the MWC. Unlike the NCAA, Plaintiffs do not allege that the MWC have personnel in place at the Air Force Academy to influence those decisions. And the Air Force has chosen to accept the obligations of Title IX and thus receive federal funding. The Court thus concludes that the MWC is not an indirect recipient of federal financial assistance.

For the second theory, Plaintiffs claim that the MWC member institutions ceded controlling authority to the MWC by:

1. Ceding authority over the rulemaking and enforcement components of collegiate athletics.
2. Ceding authority over the end-of season conference tournaments.
3. Paying fees to the MWC.
4. Accepting the MWC's limit on the number of non-conference games that women's volleyball teams may schedule.
5. Accepting the MWC's exclusive right to negotiate media rights contracts with broadcast networks and to distribute revenues from these contracts to the member institutions.
6. Paying millions to the MWC if they ever leave the MWC to join a rival conference.

Dkt. 102, ECF pp.55–56 (internal citations omitted).

It should first be noted that there is no consensus from the Supreme Court or the Tenth Circuit on the viability of the controlling authority theory or its application to a defendant like the MWC. In fact, this Court is unaware of any court in the Tenth Circuit who has considered this issue. In *Cureton v. NCAA*[9], the Third Circuit considered whether the NCAA had controlling authority over its members. 198 F.3d 107, 116 (3d Cir. 1999). It relied on *Tarkanian*, which made "clear that the NCAA does not 'control' its members," and found that the NCAA did not have controlling authority. *Id.* at 117. In reaching this conclusion, it held that

[T]he ultimate decision as to which freshman an institution will permit to participate in varsity intercollegiate athletics and which applicants will be awarded athletic scholarships belongs to the member schools. The fact that the institutions make these decisions cognizant of NCAA sanctions does not mean that the NCAA controls them, because they have the option, albeit unpalatable, of risking sanctions or voluntarily withdrawing from the NCAA. In this regard, we point out that this case differs from *Horner* as there the Athletic Association was exercising public authority with respect to its functions. We emphasize that the NCAA members have not ceded controlling authority to the NCAA by

---

[9] *Cureton* is a Title VI case. But it is instructive in the Title IX context because the statutes are "defined in nearly identical terms." *Smith I*, 525 U.S. at 466 n.3.

giving it the power to enforce its eligibility rules directly against students.

*Id.* at 117–18. Other courts have come to the same conclusion. *See Smith II*, 266 F.3d at 157; *see also Bowers*, 118 F. Supp. 2d at 527 n.25; *Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n of Ill., Inc.*, 134 F. Supp. 2d 965, 971 (N.D. Ill. 2001).

But the Eleventh Circuit came to the opposite conclusion and held that the University of Georgia ceded control of its athletic department to the University of Georgia Athletic Association. *See Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1294 (11th Cir. 2007). It relied on a case out of the Western District of Michigan which noted that "if we allowed funding recipients to cede control over their programs to indirect funding recipients but did not hold indirect funding recipients liable for Title IX violations, we would allow funding recipients to receive federal funds but avoid Title IX liability." *See id.* (citing *Cmtys. for Equity*, 80 F. Supp. 2d at 733–34). Other courts have also followed this approach. *See B.P.J. ex rel. Jackson v. W. Va. State Bd. of Educ.*, 98 F.4th 542, 554 (4th Cir. 2024); *A.B. ex rel. C.B. v. Haw. State Dep't of Educ.*, 386 F. Supp. 3d 1352, 1357–58 (D. Haw. 2019).

This Court finds the MWC is not subject to Title IX under a controlling authority rationale. First, this Court does not agree that there is a loophole within Title IX if the MWC is not required to abide by it. "Title IX liability is predicated on the actions of the funding recipient, not on agency principles. And that being so, a funding recipient may be liable if it fails to respond appropriately to the discriminatory acts of nonagent third parties." *Johnny's Icehouse, Inc.*, 134 F. Supp.

2d at 971 (citing *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629, 643–44 (1999)). Even if the MWC is not bound by Title IX, the member institutions are. So if Plaintiffs believe the TPP violated their Title IX rights, they could pursue an action against their member institution(s) accordingly.

Next, the Court disagrees with Plaintiffs that *Tarkanian* is inapposite regarding whether the MWC has controlling authority over its member institutions. Dkt. 102, ECF p.57. *Tarkanian's* analysis of whether UNLV delegated its authority to the NCAA is materially similar to the issue of controlling authority. And as discussed above, the member institutions have not delegated their authority to the MWC. *See supra* p.15. The member institutions still have authority to decide whether to follow the MWC's rules and can choose to leave if they disagree. *See Cureton*, 198 F.3d at 118 ("[W]e cannot understand how that fact that the NCAA promulgates rules and regulations with respect to intercollegiate athletics somehow means that the NCAA has controlling authority over its members' programs or activities receiving Federal financial assistance.").

Third, Plaintiffs distinguish *Cureton* by arguing that "the school had final authority over each decision," whereas here, it was "the MWC's decision to allow Fleming to play women's volleyball and punish teams who opposed [her] participation by awarding them losses in MWC competition." Dkt. 102, ECF p.58. This is simply inaccurate. The TPP states: "The decision as to whether a transgender athlete(s) will be permitted to participate in intercollegiate athletics for a particular MW member

shall be a matter of that individual institution's discretion . . ." Dkt. 78-1, p.113. This is directly on point with *Cureton*. The MWC had no role in SJSU's decision to roster an allegedly transgender player. Nor did they "take affirmative steps" to allow an allegedly transgender player to play in MWC competition. The decision of which athletes play in a game is not made by the MWC—that the MWC had a policy permitting transgender students to participate if they met eligibility requirements set by the NCAA does not mean the MWC forced SJSU to roster an allegedly transgender player.

Lastly, the cases Plaintiffs cite in support of their argument do not apply to the factual scenario before this Court. In those cases, the controlling authority rationale was applied to parties who had been given their authority by statute. *See Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 272 (6th Cir. 1994) (Association was Kentucky Department of Education's agent authorized by statute to manage interscholastic athletics); *Cmtys. for Equity*, 80 F. Supp. 2d at 736 (Michigan legislature granted authority to MHSAA to govern interscholastic athletics); *B.P.J. ex rel. Jackson*, 98 F.4th at 554 (Commission comprehensively supervised and controlled interscholastic athletics under West Virginia statute). And *B.P.J. ex rel. Jackson* pointed out the "key differences between the NCAA and state athletic associations, including that the NCAA spans every state and that states had delegated no power to the NCAA to take specific action against any employee." *B.P.J. ex rel. Jackson*, 98 F.4th at 554 (cleaned up). Like the NCAA, the MWC is not

restricted to a single state and failure to abide by the Conference Handbook is a violation on the part of the member institution. The Court is also not persuaded by *Barrs v. Southern Conf.*, 734 F. Supp. 2d 1229 (N.D. Ala. 2010), where the court concluded that the Southern Conference had controlling authority over its members. Of course, this Court need not consider this case in coming to its conclusion, and in any event, *Barrs* relied on the Eleventh Circuit's reasoning in *Williams*, which this Court has distinguished.

Accordingly, this Court finds the MWC is not subject to Title IX and Count II of the Amended Complaint should be dismissed. No claims remain against either the MWC or Gloria Nevarez, so the Court will not consider any additional arguments the parties made. To the extent the class allegations seek relief against the MWC Defendants, those are dismissed as well. The Court now turns to the CSU Defendants' Motion to Dismiss.

**B.    The CSU Defendants' Motion to Dismiss**

The CSU Defendants seek to dismiss all the claims against them. For the reasons shared below, the Court grants the Motion to Dismiss as to all claims except the Title IX claims for damages (Counts I and IV). The Court defers ruling on these Counts until the Supreme Court issues its opinion in *West Virginia v. B.P.J. ex rel. Jackson*, 146 S. Ct. 57 (2025), which will address issues directly on point in this case.

1. **The Individual CSU Defendants are Entitled to Sovereign Immunity**

Defendants argue that "Plaintiffs' claims for damages against individual CSU Defendants acting in their official capacities are barred by the Eleventh Amendment." Dkt. 94, ECF p.18. This applies to Plaintiffs' constitutional claims against Defendants Teniente-Matson and Konya in their official capacities (Counts III and VI). *Id.* Plaintiffs do not address this argument in their Response.

"The Eleventh Amendment generally bars suits against a state in federal court commenced by citizens of that state *or* citizens of another state. *Good v. Dep't of Educ.*, 121 F.4th 772, 788 (10th Cir. 2024) (quoting *Elephant Butte Irrigation Dist. of N.M. v. Dep't of Interior*, 160 F.3d 602, 607 (10th Cir. 1998)) (emphasis in original). The immunity extends beyond the states themselves and encompasses "governmental entities that are 'arms of the state.'" *Id.* at 789 (quoting *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 574 (10th Cir. 1996)). That is to say that sovereign immunity is extended to "entities created by state governments that operate as alter egos or instrumentalities of the states." *Id.*

Importantly, "[d]efendants in an official-capacity action may assert sovereign immunity" because "[i]n an official-capacity claim, the relief sought is only nominally against the official and in fact is against the official's office and thus the sovereign itself." *Lewis v. Clarke*, 581 U.S. 155, 162–63 (2017). Defendant Teniente-Matson was sued in her official capacity as President of SJSU, and Defendant Konya was sued in his official capacity as Director of Athletic for SJSU. Dkt. 78, ¶¶46–47. And as

Plaintiffs note, the CSU Board of Trustees "is the only proper entity to be named in a civil suit brought against an institution within the California State University system." *Id.* ¶43. Thus, as Defendants point out, the official-capacity claims are, in reality, claims against the CSU Board of Trustees.

Accordingly, this Court must consider whether the CSU Board of Trustees is an arm of the state entitled to sovereign immunity. The caselaw shows that Boards and public universities are consistently considered arms of the state. *See McLaughlin v. Bd. of Regents of Univ. of Okla.*, 566 F. Supp. 3d 1204, 1211–12 (W.D. Okla. 2021) (granting motion to dismiss on the basis of lack of subject matter jurisdiction based on the University of Oklahoma's arm of the state status); *Englehart v. Bd. of Regents for the Okla. Agric. & Mech. Colls.*, No. 15-CV-138-JED-PJC, 2016 WL 3645193, at *3 (N.D. Okla. June 30, 2016) ("The Tenth Circuit has consistently held that state colleges and universities—as well as their governing boards of regents—are arms of the state and therefore enjoy Eleventh Amendment immunity."); *see also Bd. of Regents for Okla. Agric. & Mech. Colls. ex rel. Okla. Panhandle State Univ. v. Johnson Controls, Inc.*, No. CIV-23-1025-D, 2024 WL 400188, at *2 n.3 (W.D. Okla. Feb. 2, 2024) (collecting cases); *Smith v. Plati*, 258 F.3d 1167, 1171 n.1 (10th Cir. 2001) ("The Eleventh Amendment bars Smith's attempt at recovery of all forms of relief against Plati in his official capacity except for prospective equitable relief."). Thus, Defendants' motion to dismiss the official-capacity claims against Teniente-Matson and Konya is granted.

26

### 2. The CSU Defendants are Entitled to Qualified Immunity

The CSU Defendants argue that the constitutional claims against Defendants Perez, Teniente-Matson, Konya, and Kress in their individual capacities (Counts III, VI, and X) are barred by qualified immunity. Dkt 94, ECF p.19. Plaintiffs respond that: (1) "since its inception [ ] Title IX prohibits men from stealing opportunities of women in collegiate athletics and invading women's spaces and that contact sports should be separated by sex," (2) "[s]ince 1993 the Supreme Court has recognized the EPC prohibits discrimination against women," and (3) "it has been clearly established since 1982 that punishing boycotts violates the First Amendment." Dkt. 102, ECF pp.63–64.

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Callahan v. Unified Gov't of Wyandotte Cnty.*, 806 F.3d 1022, 1026 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). In the Tenth Circuit, "to show that a right is clearly established, the plaintiff must point to 'a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as plaintiff maintains.'" *Id.* at 1027 (quoting *Est. of Booker v. Gomez*, 745 F.3d 405, 427 (10th Cir. 2014)). The law can also be clearly established "if the conduct is so obviously improper that any reasonable [state actor] would know it was illegal." *Id.* (citing *Hope v. Pelzer*, 536 U.S. 730, 739–42 (2002)). A case directly

27

on point is not required, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Stanton v. Sims*, 571 U.S. 3, 5 (2013) (quoting *Achcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

First, Defendants are seeking to dismiss the constitutional claims based on qualified immunity, not Title IX claims. Therefore, the clearly established rights Plaintiffs discuss related to Title IX are irrelevant. With respect to the Equal Protection Clause and First Amendment, Plaintiffs merely make generalized assertions. Plaintiffs cite no caselaw for these propositions at all, let alone precedent that is directly on point. The Supreme Court has explicitly warned not to define clearly established law at a high level of generality. *See Ashcroft*, 563 U.S. at 742; see also *Kisela v. Hughes*, 584 U.S. 100, 104 (2018); *White v. Pauly*, 580 U.S. 73, 79 (2017) ("As this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case."). The Court is hard pressed to come up with more generalized statements than simply that the Equal Protection Clause prohibits discrimination against women and the First Amendment protects boycotts. Plaintiffs do not even attempt to tether these statements to the specific facts of this case or any on point Supreme Court or Tenth Circuit precedent. Accordingly, Counts III, VI, and X are dismissed because the SJSU officials are entitled to qualified immunity.

### 3. Plaintiffs' Claims for Declaratory Relief are Moot

Plaintiffs "seek a declaration that Defendants violated Title IX and the EPC." Dkt. 102, ECF p.62. The CSU Defendants argue that the claims for declaratory relief

are moot because the allegedly transgender player has no remaining eligibility and Plaintiffs have identified no other transgender players at SJSU or in the MWC. Dkt. 96, ECF pp.16–17. Plaintiffs argue that the TPP has not been rescinded and "CSU remains willing to violate Title IX's equal opportunity mandate based on state law, notwithstanding the Supremacy Clause." Dkt. 102, ECF p.63.

Article III of the Constitution permits the judicial branch to hear "Cases" and "Controversies." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III— 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'" *Id.* at 91 (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)). The crucial question in determining whether a case is moot "is whether 'granting a present determination of the issues offered . . . will have some effect in the real world.'" *Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson*, 236 F.3d 1174, 1182 (10th Cir. 2000) (quoting *Kennecott Utah Copper Corp. v. Becker*, 186 F.3d 1261, 1266 (10th Cir. 1999)).

Courts "take a claim-by-claim approach to mootness and 'must decide whether a case is moot as to each form of relief sought.'" *Smith v. Becerra*, 44 F.4th 1238, 1247 (10th Cir. 2022) (quoting *Prison Legal News v. Fed. Bureau of Prisons*, 944 F.3d 868, 880 (10th Cir. 2019)). "A plaintiff cannot maintain a declaratory action 'unless he or she can demonstrate a good chance of being likewise injured in the future.'" *Gays Against Groomers v. Garcia*, 758 F. Supp. 3d 1298, 1311 (D. Colo. 2024) (quoting *Facio*

29

*v. Jones*, 929 F.2d 541, 544 (10th Cir. 1991)). A claim for declaratory relief is moot "if the relief would not affect the behavior of the defendant toward the plaintiff." *Robert v. Austin*, 72 F.4th 1160, 1164 (10th Cir. 2023); *see also Jordan v. Sosa*, 654 F.3d 1012, 1025 (10th Cir. 2011) ("[I]n the context of an action for declaratory relief, a plaintiff must be seeking more than a retrospective opinion that he was wrongly harmed by the defendant.").

Here, Plaintiffs' claims for declaratory relief are moot. First, though Plaintiffs note that there are "students with remaining eligibility," it is unclear to the Court from the Amended Complaint and briefing on the Motions to Dismiss which students these are. But even assuming there are still eligible Plaintiffs, the declaratory relief they seek remains moot.

First, Plaintiffs do not allege that there is currently a transgender athlete playing volleyball in the MWC, nor do they allege that it is likely that a school in the MWC will roster a transgender athlete while Plaintiffs still have eligibility. In addition, the MWC Bylaws specify that "all Member Institutions and all future members of the Conference *agree to abide by and fully comply with the rules and regulations of the [NCAA]*." Dkt. 78, ¶157 (emphasis in original). On February 6, 2025, the NCAA changed its TEP. *See* Dkt. 78-4. The policy now precludes student-athlete's assigned male at birth from competing on women's teams. *Id.* Further, while Plaintiffs note the TPP has not been rescinded, it specifies that member institutions "shall be responsible for certifying the student-athlete's eligibility for competition *per*

*the applicable NCAA transgender participation standards and procedures and competing with only those individuals who are eligible.*" Dkt. 78-1, p.113 (emphasis added).

As of February 6, 2025, the NCAA's TEP, which MWC members are required to abide by, no longer permits transgender athletes from participating in women's sports. Thus, the declaratory relief Plaintiffs request would not affect the behavior of the CSU Defendants toward them because the policy permitting transgender athletes to compete has been replaced. Plaintiffs argue that the CSU Defendants remain willing to violate Title IX, but this allegation is purely speculative. Accordingly, Plaintiffs' claims for declaratory relief are moot. *See Gays Against Groomers*, 758 F. Supp. 3d at 1311 ("Because of the level of speculation involved, the Court cannot presently craft a declaratory judgment that would have any known effect on the real world."); *see also Robert*, 72 F.4th at 1164 ("Appellants' claim is also moot because Congress passed legislation requiring DoD to rescind the COVID-19 vaccine mandate, and the Secretary of Defense has since done so.").

### 4. Plaintiffs do not have Standing for their Injunctive Relief Claim

Defendants argue that Slusser, Sugai, and Patterson lack Article III standing for their claim for injunctive relief requesting that this Court order the CSU Defendants to petition the NCAA for more years of eligibility. Dkt. 94, ECF p.17. Specifically, Defendants argue that Plaintiffs' injury is not redressable. *Id.*

31

Article III standing is a "bedrock constitutional requirement." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024) (quoting *United States v. Texas*, 599 U.S. 670, 675 (2023)). To possess Article III standing, a plaintiff must have suffered an injury in fact that is fairly traceable to the defendant's challenged conduct and likely to be redressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). These requirements are "an essential and unchanging part of the case-or-controversy requirement of Article III." *Id.* at 560. And they help ensure that a plaintiff is not "a mere bystander, but instead [has] a 'personal stake' in the dispute." *All. for Hippocratic Med.*, 602 U.S. at 379 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). "The requirement that the Plaintiff possess a personal stake helps ensure that courts decide litigants' legal rights in specific cases, as Article III requires, and that courts do not opine on legal issues in response to citizens who might 'roam the country in search of governmental wrongdoing.'" *Id.* (citation omitted).

As mentioned above, the issue here is with redressability. "Redressability is established if 'it is likely that the injury will be redressed by a favorable decision.'" *Frank v. Lee*, 84 F.4th 1119, 1135 (10th Cir. 2023) (citing *Kitchen v. Herbert*, 755 F.3d 1193, 1201 (10th Cir. 2014)). Further, "it is a bedrock principle that a federal court cannot redress 'injury that results from the independent action of some third party not before the court.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)). Similarly, in a case "in which

relief for the petitioner depends on actions by a third party not before the court, the petitioner must demonstrate that a favorable decision would create a 'significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered.'" *US Magnesium, LLC v. EPA*, 690 F.3d 1157, 1166 (10th Cir. 2012) (quoting *Klamath Water Users Ass'n v. F.E.R.C.*, 534 F.3d 735, 739 (D.C. Cir. 2008)). But complete redress is not necessary as long as a favorable decision would relieve some extent of an injury. *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 902 (10th Cir. 2012).

The CSU Defendants argue that they cannot restore Plaintiffs' eligibility; only the NCAA can, and whether the NCAA would restore their eligibility is unknown. Dkt. 94, ECF p.17. Plaintiffs argue that they "demand only that Defendants petition the NCAA, not guarantee the results." Dkt. 102, ECF p.61. But simply ordering Defendants to petition the NCAA would afford no relief to Plaintiffs because what they seek is another year of eligibility, which the CSU Defendants cannot give them. A favorable decision would likewise not relieve some extent of the injury because the NCAA is the ultimate decision-maker and it is a non-party to this lawsuit. Nor have Plaintiffs indicated that a favorable decision by this Court would heighten the likelihood that the NCAA would grant them another year of eligibility. For these reasons, Slusser, Sugai, and Patterson's claim for injunctive relief against the CSU Defendants is dismissed.

**5. Plaintiffs Cannot Bring Title IX Claims Against Individual Defendants**

Plaintiffs bring a Title IX claim under 42 U.S.C. § 1983 against Defendants Perez, Teniente-Matson, Konya, and Kress in their individual capacities, and Defendants Teniente-Matson and Konya in their official capacities. Defendants argue that Plaintiffs cannot pursue Title IX claims against individual defendants. Dkt. 94, ECF pp.23–24. Plaintiffs do not respond to this argument.

"Title IX reaches institutions and programs that receive federal funds . . . but it has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009); *see also Williams*, 477 F.3d at 1300 ("[A] plaintiff cannot assert a § 1983 action based on a violation of Title IX."); *Seamons v. Snow*, 84 F.3d 1226, 1234 n.8 (10th Cir. 1996); *Kinman v. Omaha Pub. Sch. Dist.*, 171 F.3d 607, 610–11 (8th Cir. 1999). Accordingly, the Title IX individual capacity claims are dismissed.

Defendants also argue that the official capacity claims should be dismissed as duplicative. Dkt. 94, ECF p.24 n.5. As noted above, an official-capacity claim is a suit against the entity. *See Lewis*, 581 U.S. at 162–63. In Count I, Plaintiffs sue the CSU Board, and in Count II, Plaintiffs sue Teniente-Matson and Konya in their official capacities. These are suits against the same entity, and so the official capacity claims should be dismissed as well.

### 6. Plaintiffs' Title IX Damages Claims

What remains of the Amended Complaint is Plaintiffs' Title IX claims for damages against the CSU Board. *See* Dkt. 78, p.179. The CSU Defendants argue that these claims should be dismissed on the merits. Dkt. 94, ECF pp. 20–23. Yet the Supreme Court recently granted certiorari in *West Virginia v. B.P.J. ex rel. Jackson*, 146 S. Ct. 57 (2025), a case on appeal from the Fourth Circuit. In that case, B.P.J. challenged a West Virginia law that prevents transgender girls from playing on girls' sports teams. *B.P.J. ex rel. Jackson*, 98 F.4th at 550. The Fourth Circuit held that the law discriminated against B.P.J. in violation of Title IX. *Id.* at 563. In Petitioner's opening brief to the Supreme Court, they argue that *Bostock's* reasoning does not apply to Title IX because if it did "Title IX would provide more protection to men and boys who *identify* as female than to women and girls who are biologically female." Brief for Petitioners at 30, *B.P.J. ex rel. Jackson*, 146 S. Ct. 57 (2025) (emphasis in original). In the Order Denying Plaintiffs' Preliminary Injunction, this Court, in part, relied on *Bostock's* reasoning (and other courts' interpretations of *Bostock's* holding) to conclude that "sex under Title IX's prohibitions includes discrimination based on an individual's trans status or sexual orientation." Dkt. 37, p.23. This interpretation of *Bostock* is now called into question and might be upended by the Supreme Court. So the Court defers ruling on the Title IX damages claims until after the Supreme Court has issued its ruling in *B.P.J. ex rel. Jackson*.

### C.    Motion to Strike

The only claim that remains pertinent to the class is the Title IX damages claim for Deprivation of Equal Opportunities and Bodily Privacy against the CSU Board. Dkt. 78, ¶783. The MWC Defendants and the CSU Defendants make several arguments as to why this Court should strike the class allegations. *See* Dk. 94, ECF pp.28–31; Dkt. 96, ECF pp.27–29.

In determining whether to strike class allegations "courts apply the same standards applied at the certification stage." *Nagel v. DFL Pizza, LLC*, No. 1:21-cv-00946-DDD-SBP, 2024 WL 5095298, at *3 (D. Colo. Dec. 4, 2024). Accordingly, to certify a class action, a plaintiff must satisfy all of Rule 23(a)'s requirements and one of Rule 23(b)'s requirements. *Faulhaber v. Petzl Am., Inc.*, 656 F. Supp. 3d 1257, 1271 (D. Colo. 2023) (citing *Colorado Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1213 (10th Cir. 2014)). Additionally, "although not specifically mentioned in the rule, an essential prerequisite to an action under Rule 23 is that there must be a class." *Id.* at 1272 (citing *Edwards v. Zenimax Media Inc.*, No. 12-CV-00411-WYD-KLM, 2012 WL 4378219, at *4 (D. Colo. Sept. 25, 2012)). To satisfy the ascertainability requirement, "a class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Id.* (citing *Tarrify Props., LLC v. Cuyahoga Cnty., Ohio*, 37 F.4th 1101, 1106 (6th Cir. 2022)).

36

Plaintiffs propose two classes: (1) MWC women's volleyball student-athletes who competed in the MWC during one or more of the 2022, 2023, and/or 2024 seasons, and (2) MWC women's volleyball student-athletes who competed on teams that were assigned forfeits during the 2024 season. Dkt. 78, ¶746. Plaintiffs allege that the CSU Board "deprived women on the SJSU of equal competitive opportunities, playing time, recognition, and scholarships" by giving these opportunities to the allegedly transgender player and "deprived women on other MWC teams of competitive opportunities and recognition because Fleming has insuperable performance advantages." *Id.* ¶768–69. Plaintiffs also allege that the allegedly transgender player's participation on SJSU's team put women on SJSU and women on competing teams at an increased risk of injury. *Id.* ¶770.

While this Court questions the propriety of the proposed classes, this question is better suited for the class certification stage. Accordingly, the Motion to Strike is denied.

*    *    *

For the reasons shared above, it is ORDERED:

The MWC Defendants Motion to Dismiss (Dkt. 96) is GRANTED;

the CSU Defendants' Motion to Dismiss (Dkt. 94) is GRANTED IN PART; and

the Motion to Strike Class Allegations is DENIED.

DATED: March 3, 2026

37

BY THE COURT:

_____

S. Kato Crews
United States District Judge